# In the U.S. District Court of the District of Columbia

### 333 Constitution Avenue, Washington, DC 20001

FILED

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| Don Hamrick, pro se | ) | No. _____ |
| **IN THE CAPACITY OF A** | ) | **Civil RICO Act, 18 U.S.C. § 1964(a)** |
| **PRIVATE ATTORNEY GENERAL** | ) | ●Threefold Damages: $14 million |
| 5860 Wilburn Road | ) | Under 18 U.S.C. § 1964(c) Civil Remedies. |
| Wilburn, AR 72179 | ) | ●Service by U.S. Marshals Service |
| *PLAINTIFF/APPELLANT* | ) | In Accordance with Rule 4(c)(2). |
| v. | ) | ●Filing Fee Exempt under |
| United ~~States~~ Nations (Lead Defendant) | ) | 28 U.S.C. § 1916 |
| United ~~Nations~~ States | ) | Plaintiff is a Seaman |
| *DEFENDANTS/APPELLEE* | ) | JURY TRIAL DEMANDED |

Case: 1:07-cv-01616
Assigned To : Collyer, Rosemary M.
Assign. Date : 9/10/2007
Description: Pro Se General Civil

**JURY ACTION**

<u>DO NOT ASSIGN TO JUDGES ELLEN SEGAL HUVELLE, REGGIE WALTON, OR RICHARD LEON</u>

## CIVIL RICO ACT COMPLAINT FOR RACKETEERING ACTIVITIES, THREEFOLD DAMAGES AND CRIMINAL INVESTIGATION FOR:

*RULE 5.1(b). CONSTITUTIONAL CHALLENGE TO ALL FEDERAL AND STATE STATUTES ON FIREARMS UNDER THE SECOND AMENDMENT*

*RULE 5.1(c). INTERVENTION BY THE ATTORNEY GENERAL*

*RULE 64. SEIZURE OF PERSON AND PROPERTY BY WRIT OF REPLEVIN AND CITIZEN'S ARREST WARRANT ON AFFIDAVIT OF REPLEVIN AND UPON 28 U.S.C. § 1963 REGISTRATION OF JUDGMENTS FOR ENFORCEMENT IN OTHER DISTRICTS*

*EXTORTION AS A PREDICATE ACT OF RACKETEERING; OBSTRUCTIONS OF JUSTICE; UNLAWFUL DENIAL OF RIGHT TO A JURY TRIAL; RACKETEERING AN UNLAWFUL AND AN UNCONSTITUTIONAL PROTECTION SCHEME OVER THE SECOND AMENDMENT BY THE FEDERAL COURTS;*

*OBSTRUCTIONS OF JUSTICE, HARASSMENT AND INTIMIDATION OF AN UNREPRESENTED CIVIL PLAINTIFF WITH A CIVIL RICO ACT CASE ACTING IN THE CAPACITY OF A PRIVATE ATTORNEY GENERAL BY THE U.S. MARSHALS SERVICE, THE U.S. COAST GUARD AND THE U.S. DEPARTMENT OF TRANSPORTATION*

*HUMAN RIGHTS VIOLATIONS COMMITTED BY THE UNITED STATES AND THE UNITED NATIONS IN VIOLATION OF THE INTERNATIONAL BILL OF HUMAN RIGHTS AND OTHER INTERNATIONAL COVENANTS, CONVENTIONS, AND DECLARATIONS ON HUMAN RIGHTS*

## <u>"Res Judicata"</u> Does Not Apply Because Rule 5.1 was added to the Federal Rules of Civil Procedure on April 12, 2006 and Became Effective December 1, 2006 Thereby Affecting Plaintiff's Right to Due Process and His Right to a Jury Trial.

*"Justice delayed is justice denied."*
Magna Charta, Article 40, June 15, 1215.

## Rule 4(c)(2) Service by U.S. Marshals Service

*Because of the injustice of wrongful dismissals by the federal courts and the Plaintiff's 5-year pursuit of justice the Plaintiff cannot now afford the cost of service to the defendants, United States and the United Nations. Plaintiff must rely on the Court to provide copies of the Service of Summons and the Complaint to the Defendants.*

# The Definition of Injustice:

## The Wrongful Acts of the Judicial and Executive Branches of the U.S. Government and the United Nations Prohibiting the Unrepresented Civil Plaintiff from Enforcing His Statutory Rights, Civil Rights, Constitutional Rights, and His Human Rights.

*"If everywhere I turn for remedies as a matter of statutory, civil, constitutional and human rights and I am denied those remedies at each and every step then it stands to reason that unenforceable rights are not rights at all but only revocable or deniable privileges, the illusion of rights. The ultimate remedy therefore becomes civil disobedience, rebellion, rioting, or open civil war for freedom. But for want of an educated public we must suffer this injustice."* The Plaintiff, Don Hamrick.

Judge Edith Jones of the U.S. Court of Appeals for the Fifth Circuit February 28, 2003 lecture[1] to the Federalist Society at the Harvard Law School, inspired me to write the political poem om the next page:

---

[1] http://www.nevadascams.com/PDF/jones_legal_system_corrput.pdf

# A Nihilistic Government, This United States

By Don Hamrick
© 2004 Don Hamrick

Give us this day our daily servilism,
So that actual freedom may never taunt,
The spirit in us, into a future pugilism.
Lest the government forever haunt.
How long?

Henry Hyde confessed that fateful day,
The Constitution, no longer relevant.
Tis our fault we are slaves today,
We refused to be freedom's adjuvant.
How long?

Our Republican government, overthrown,
By the Department of Homeland Insecurity.
Terrorism, its propaganda, overblown,
Freedom guaranteed by enslavement to security.
How long?

A new mythos proclaimed from this nihilism,
Only deadens our sense of discernment.
From this ethos of paranoia comes this falabilism,
You can't be trusted. But trust the government.
How long?

Deceiving us in a blanket of security,
That we are safe from a world of dangers.
Forever oppressed our sense of responsibility,
To protect ourselves from such harbingers.
How long?

In vain we plead our Second Amendment right
To contest government edicts from on high.
The courts rule our arguments as so much tripe.
They say it does not apply on the thigh.
How long?

Three doors of government slammed shut
Leaving us to agitate for want of freedom.
The rule of law now is anything but,
As we live in this wretched thraldom.
How long?

How long will we sit and cower,
Resenting those who act above the law,
Before we stand up for balance of power,
To stop the advancing rape of law.
How long?

Lost to us now our Bill of Rights.
This Nihilistic government frights.
Will it be much longer?

3

# 28 U.S.C. § 1963
# REGISTRATION OF JUDGMENTS
# FOR ENFORCEMENT IN OTHER DISTRICTS

*Hamrick* v. *George*, US District Court for the Western District of NC, Charlotte Division, Case No. 03-cv-0344-W, ORDER, November 9, 2006. Judge Frank D. Whitney:

> "*If Plaintiff elects to exercise his appeal rights*, **the Court finds that 28 U.S.C. § 1916 waives the requirement of prepayment of docket fees or furnishing security therefor** , *and the Clerk of Court is so instructed.*"

# RULE 42
# CONSOLIDATING THE FOLLOWING CASES:

The Cases below marked with • must be consolidated with the present case not only for the interest of justice but also because I was unjustly denied my right to due process as a direct consequence of the politicalization of the federal courts and the U.S. Department of Justice culminating in the resignation of top Justice officials up to and including theAttorney General Alberto Gonzales, and it would be extremely cost prohibitive for me to reproduce all the court records from these cases as direct relevant evidence in this Case, especially for Case No. 06-0044 at the U.S. District Court in Little Rock consisting of about 1,700 pages, double-sided printing, in 4 volumes each at a thickness of about 1 inch.

## RELATED ACTIVE CASES:

- •8th Circuit, Case No. 07-2400
- •U.S. District Court, Little Rock, Northern Division, No. _____
- •U.S. District Court, St. Louis for the Eastern District of Missouri, No. _____
- International Commission on Human Rights, Washington, DC, No. 1142-06.

# RELATED CASES UNLAWFULLY DISMISSED/CLOSED:

*"Judge's dismissal for no cause is reversible."*
*Foman* v. *Davis*, 371 US 178 (1962)

- •U.S. District Court/DC, No. 02-1434 (OBEYED 28 U.S.C. § 1916)
- •U.S. District Court/DC, No. 02-1435 (OBEYED 28 U.S.C. § 1916)
- •U.S. District Court/DC, No. 03-2160 (OBEYED 28 U.S.C. § 1916)
- •U.S. District Court/DC, No. 04-0422 (OBEYED 28 U.S.C. § 1916)
- U.S. District Court/DC, No. 04-2040 (OBEYED 28 U.S.C. § 1916)
- U.S. District Court/DC, No. 05-1993 (OBEYED 28 U.S.C. § 1916)
- U.S. District Court/Charlotte, NC), No. 04-0065 (OBEYED 28 U.S.C. § 1916)
- U.S. District Court/Charlotte, NC), No. 04-0344 (OBEYED 28 U.S.C. § 1916)
- •DC Circuit, No. 02-5334 (VIOLATED THE LAW)
- •DC Circuit, No. 04-5316 (VIOLATED THE LAW)
- DC Circuit, No. 05-5414 (VIOLATED THE LAW)
- DC Circuit, No. 05-5429 (VIOLATED THE LAW)
- •U.S. District Court/Little Rock, No. 06-0044. (VIOLATED THE LAW)
- •U.S. Supreme Court, Nos. 03-145 (VIOLATED THE LAW)
- •U.S. Supreme Court, Nos. 04-1150 (VIOLATED THE LAW)
- •U.S. Supreme Court, Nos. 04M56 (VIOLATED THE LAW)

## Exceptions to Tort Liability Cannot Be Claimed under 28 U.S.C. § 2680(a):

The U.S. Coast Guard did not have the discretionary duty to deny Plaintiff's Application for National Open Carry Handgun endorsement on his Merchant Mariner's Document on the personal judgment of the Coast Guard Officer that such an endorsement provided

no benefit to marine safety or security by admission of fact that their were (and still are) no federal laws or regulations for or against such an endorsement. The Coast Guard Officer's duty was first to consult the U.S. Constition and the Bill of Rights for guidance when there are no federal laws or regulations for or against such an endorsement.

**Exceptions to Tort Liability Cannot Be Claimed under 28 U.S.C. § 2680(a):**

The Courts do not have the discretionary authority to compel payment of filing fees from a U.S. seaman filing a Second Amendment case qualifying under the "safety clause" of 28 U.S.C. § 1916 nor to dismiss such cases on the pretext of "failure to prosecute" for refusal to pay the courts filing fee. The federal courts collection of filing fees is not a judicial function but is an administrative function and as such does not have the protection of absolute immunity or immunities of any can because if becomes a criminal act of felony extortion or attempted felony extortion under 18 U.S.C. § 872.

# JURISDICTION

**28 U.S.C. § 1330(b). Actions Against Foreign States:** Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under 28 U.S.C. § 1608.

**28 U.S.C. § 1604. Immunity of a Foreign State From Jurisdiction (*Foreign Sovereign Immunities Act of 1976*):** *Subject to existing international agreements to which the United States is a party* at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter. (***PLAINTIFF'S COMMENTARY:*** *It is through the exception clause, "Subject to existing international agreements to which the United States is a party" that the United Nations waives it's "privileges and immunities" under the International Bill of Human Rights consisting of Articles 7, 8, 9, 10, 12, 13, 19, 20, 27, of the Universal Declaration of Human Rights; Articles 3 and 5 of the International Covenant on Economic, Social and Cultural Rights; Articles 1, 2, 3, 5, 6, 9, 14, 17, and 19 of the International Covenant on Civil and Political Rights*; Article 4 of the United Nations General Assembly Resolution 3314 (XXIX), December 14, 1974 *Definition of Aggression* is construed to include the United Nations global gun control campaign on Small Arms and Light Weapons as a War of Aggression against the People of Member States derogating and depriving their individual right to life and their right to self-determination in violation of Article 2(c) and Article 3(c) of the Genocide Convention; all or part of the above allegations also apply against the United States.)

**28 U.S. Code § 1605 General Exceptions to the Jurisdictional Immunity of a Foreign State (*Foreign Sovereign Immunities Act of 1976*):**

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver ; (***PLAINTIFF'S COMMENTARY:*** *Waiver is implied by Article 6, Clause 1 of the International Covenant on Civil and Political Rights: Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life ; and by Article 2, Clause 3(b) of the International Covenant on Civil and Political Rights: To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy*)

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act

outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States; (*PLAINTIFF'S COMMENTARY: Federal and State gun control laws are modeled after the United Nations global gun control agenda abolishing "Small Arms and Light Weapons" from private ownership and possession.*)

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue; (*HAMRICK COMMENTARY: The Fifth Amendment Takings Clause includes non-physical takings. Non-physical takings include "immovable property situated in the United States." "Immovable property situated in the United States" includes the Second Amendment right to keep and bear arms.*)

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of **property**, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, ( *HAMRICK COMMENTARY: United Nations' observance of our Second Amendment right to keep and bear arms is NOT discretionary.*) or

**28 U.S.C. § 1346(b)(1). United States as defendant:** Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

# CASE LAW

*Cohens* v. *Virginia*, 19 U.S. 264, at 404 (6 Wheaton 264) (1821)

> "It is most true that this Court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment and conscientiously to perform our duty. In doing this on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the Constitution and laws of the United States. We find no exception to this grant, and we cannot insert one."

*Mireles* v. *Waco*, 502 U.S. 9, at 11 (1991):

> . . . a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Forrester v. White, 484 U.S., at 227 -229; Stump v. Sparkman, 435 U.S., at 360.

*Chandler* v. *Judicial Council*, 398 U.S. 74, at 140 (1970), Chief Justice Berger:

> "If [judges] break a law, they can be prosecuted."

*Chandler* v. *Judicial Council*, 398 U.S. 74, at 141-142 (1970), Justice Black and Douglas in their dissenting opinion agreed with Chief Justice Berger on the point made above:

> "While judges, like other people, can be tried, convicted, and punished for crimes . . ."

HAINES V. KERNER, 92 S.Ct. 594; JENKINS V. MCKEITHEN, 395 US 411, 421 (1969); PICKING V. PENNA. RWY. CO. 151 F.2d 240; PUCKETT V. COX, 456 F.2d 233

> Pro Se (Without a Lawyer, representing self) pleadings are to be considered without technicality; pro se litigants pleadings are not to be held to the same high standards of perfection as lawyers.

US v. GUEST, 86 S.Ct. 1170; US v.COMPAGNA, 146 F.2d 524

> A conspirator is responsible for the acts of other conspirators who have left the conspiracy before he joined it, or joined after he left it; statutes of limitations tolled for previous acts when each new act is done.

YICK WO V. HOPKINS, 118 S.Ct. 356 (1886)

> Laws and Court procedures that are "fair on their faces" but administered "with an evil eye and a heavy hand" (discriminatorily) are unconstitutional.

*United States* v. *Lee*, 106 U.S. 196, at 220 (1882):

> "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

*Duncan* v. *Missouri*, 152 U.S. 377, 382 (1894):

> "[T]he privileges and immunities of citizens of the United States protected by the fourteenth amendment are privileges and immunities arising out of the nature and essential character of the federal government, and granted or secured by the constitution; and due process of law and the equal protection of the laws are secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government; . . ."

*Wilson* v. *State*, 33 **Arkansas**, 557, 560 (1878) (*striking a ban on unconcealed carry*).

> "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be pre vented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) **[PLAINTIFF'S NOTE: "I CAN PROVE MY CASE if the Federal Courts were not so corrupt!]**

"[A] complaint should not be dismissed unless `it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980) (quoting **Conley v. Gibson, 355 U.S. 41, 45 -46 (1957)**).

*Conley* v. *Gibson*, 355 U.S. 41 at 48 (1957)

"Following the simple guide of Rule 8 (f) that "all pleadings shall be so construed as to do substantial justice," we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. Cf. *Maty v. Grasselli Chemical Co.*, 303 U.S. 197. (1938) (*Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end.*)

*United States* v. *Chadwick*, 433 U.S. 1, at 16 (1976)

" . . . it is deeply distressing that the Department of Justice, whose mission is to protect the constitutional liberties of the people of the United States, should even appear to be seeking to subvert them by extreme and dubious legal arguments. It is gratifying that the Court today unanimously rejects the Government's position."

*Forrester* v. *White*, 484 U.S. 219 (1988):

This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. Thus, for example, the informal and ex parte nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character. See Stump v. Sparkman, 435 U.S. 349, 363 , n. 12 (1978). Similarly, acting to disbar an attorney as a sanction for contempt of court, by invoking a power "possessed by all courts which have authority to admit attorneys to practice," does not become less judicial by virtue of an allegation of malice or corruption of motive. Bradley v. Fisher, 13 Wall., at 354. [484 U.S. 219, 228]   As the Bradley Court noted: "Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." Ibid.

Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts. In Ex parte Virginia, 100 U.S. 339 (1880), for example, this Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts. The Court reasoned:

"Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. . . . That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or

their appointment a judicial act?" Id., at 348.

Although this case involved a criminal charge against a judge, the reach of the Court's analysis was not in any obvious way confined by that circumstance.

Likewise, judicial immunity has not been extended to judges acting to promulgate a code of conduct for attorneys. Supreme Court of Virginia v. Consumers Union of United States, Inc., 446 U.S. 719 (1980). In explaining why legislative, rather than judicial, immunity furnished the appropriate standard, we said: "Although it is clear that under Virginia law the issuance of the Bar Code was a proper function of the Virginia Court, propounding the Code was not an act of adjudication but one of rulemaking." Id., at 731. Similarly, in the same case, we held that judges acting to enforce the Bar Code would be treated like prosecutors, and thus would [484 U.S. 219, 229] be amenable to suit for injunctive and declaratory relief. Id., at 734-737. Cf. Pulliam v. Allen, 466 U.S. 522 (1984). Once again, it was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis.

### F.R.Cv.P. Rule 11(b) Representations to Court.

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

# Law Review Articles

Adam Winkler, SCRUTINIZING THE SECOND AMENDMENT, 105 Mich. L. Rev. 683 (February, 2007)

Cheryl Boudreau and Mathew D. McCubbins, THE BATTLE FOR TRUTH: THEORY AND EXPERIMENTS REGARDING COMPETITION AND THE ADVERSARIAL SYSTEM, University of San Diego School of Law Legal Studies Research Paper Series, Research Paper No. 07-63, September 2006

Monroe H. Freedman, IN PRAISE OF OVERZEALOUS REPRESENTATION - LYING TO JUDGES, DECEIVING THIRD PARTIES, AND OTHER ETHICAL CONDUCT, Hofstra University Law School, Legal Studies Research Paper Series, Research Paper No. 06-9

Stuart P. Green, LYING, MISLEADING, AND FALSELY DENYING: HOW MORAL CONCEPTS INFORM THE LAW OF PERJURY, FRAUD, AND FALSE STATEMENTS, Hastings Law Review, Vol. 53, Nov. 2001, pp.157-212

Citing David B. Kopel, Paul Gallant, & Joanne D. Eisen, Firearms Possession by "Non-state Actors": The Question of Sovereignty, 373 Texas Review of Law & Politics, Vol. 8, No. 2, the Introduction at 374-376, and the Conclusion at 435-436

BOOK REVIEW

William R. Tonso, 'UNSPEAK' AND THE GUN PROHIBITIONISTS, February 10, 2007

# FEDERAL QUESTIONS:

**28 U.S.C. § 1331 Federal Question:** The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

DISTRICT OF COLUMBIA OFFICIAL CODE 2001 EDITION

DIVISION IV. CRIMINAL LAW AND PROCEDURE AND PRISONERS.
TITLE 23. CRIMINAL PROCEDURE.
CHAPTER 5. WARRANTS AND ARRESTS.

SUBCHAPTER V. ARREST WITHOUT WARRANT.

DC CODE § 23-582. ARRESTS WITHOUT WARRANT BY OTHER PERSONS.

**(b) A private person may arrest another** --

**(1) who he has probable cause to believe is committing in his presence:**

> **(A) a felony;** or

> (B) an offense enumerated in section 23-581(a)(2); or

(2) in aid of a law enforcement officer or special policeman, or other person authorized by law to make an arrest.

**(c) Any person making an arrest pursuant to this section shall deliver the person arrested to a law enforcement officer without unreasonable delay.**

(July 29, 1970, 84 Stat. 630, Pub. L. 91-358, title II, § 210(a); Apr. 30, 1988, D.C. Law 7-104, § 7(e), 35 DCR 147.)

**(1) WHETHER** an unrepresented U.S. seaman in a civil RICO Act case has any rights to a jury trial in defense of the Second Amendment against the United States and against the United Nations?

**(2) WHETHER** Federal Law Enforcement Agencies have compelling obligations to investigate the Judicial and Executive Branches upon the presentment of evidence of extortion, obstructions of justice, and conspiracies to obstruct justice, etc. and to assist with a "Citizen's Arrest Warrant" presented by a unrepresented civil plaintiff acting in the capacity of a Private Attorney General in a civil RICO Act case against the U.S. Government in like manner as the public Attorney General?

**(3) WHETHER** the United Nations has the authority to wage a War of Aggression against the human right to armed self defense and personal security in defense of the human right to life as implied by **international** conventions and declarations on the human right to life?

**(4) WHETHER** the United Nations is violating Article 2, Clause 7 of its own U.N. Charter by waging a War of Aggression against the Second Amendment of the Bill of Rights to the U.S. Constitution

**(5) WHETHER** the United Nations has **violated** Article 2, Clause 7 of the U.N. Charter by meddling in the internal affairs of Member States in regard to the rights of the people of the Member States to defend their right to life by "Small Arms and Light Weapons" (invoking the protections of the Genocide Convention) the United Nations can be disbanded under Article 60 *Termination or Suspension of the Operation of a Treaty as a Consequence of its Breach* of the *Vienna Convention on the Law of Treaties 1969* and the *Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations 1986*

**(6) WHETHER** my cases these past 5 years have been unlawfully dismissed with prejudice and by such unwarranted dismissals WHETHER the United States Government unlawfully denied my rights to a judicial remedy under Article 2, Clause 3 of the *International Covenant on Civil and Political Rights* (part of the *International Bill of Human Rights*):

Article 2

3. Each State Party to the present Covenant undertakes:

(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b) To ensure that any person claiming such a remedy shall have **his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy** ;

(c) To ensure that the competent authorities shall enforce such remedies when granted.

**(7) WHETHER** privileges and immunities allow the United Nations to wage a war of aggression upon the United States Constitution and on the Bill of Rights and on the Thirteenth and Fourteenth Amendments in violation of the Chapter 1, Article 2, Clause 7 of the United Nations Charter?

**(7) WHETHER** the Second Amendment right to keep and bear arms is implied in in the "right to life" clause of Article 6, Clause 1 of the *International Covenant on Civil and Political Rights* :

Article 6

1. **Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.**

**(8) WHETHER** the general exceptions of the US Foreign Sovereign Immunities Act of 1976 (*28 U.S. Code § 1605, General Exceptions to the Jurisdictional Immunity of a Foreign State* ) provides the Plaintiff the right to bring a lawsuit against the United Nations for breaches of the United Nations Charter, international covenants, conventions, and declarations on human rights, and the genocide convention and their war of aggression against the Second Amendment.

# ARGUMENT

"The 'right to (openly) keep and bear arms' clause of the Second Amendment in the Bill of Rights to the United States Constitution is an 'Absolute Right' under the Tenth Amendment as the final arbiter on the balance of power between the People, the State Governments, and the United States Government! Therein rests the right to armed rebellion against any a government, be it local, county, State, or Federal Government that becomes oppressive and despotically tyrannical in a militaristic or fascist regime or any other type of government operating outside the limits of the United States Constitution. The "shall not be infringed" clause of the Second Amendment implies an 'Absolute Right' because something that is Absolute means that it cannot be infringed. This is simple deduction.

"The oft asserted judicial and executive branch claim of governmental interest for the United States in prohibitively or restrictively legislating and regulating firearms possession, carriage, and usage under the Second Amendment to its near extinction is allegedly ~~the~~ *done* through the Commerce Clause for the purpose of crime prevention and regulating commerce is, in actuality, the ways and means to commit either genocide or politicide at some future time. Crime prevention through disarmament is a fraudulent farce against humanity. Gun control as a crime prevention measure is a proven dismal failure many times over. There is no other effective goal against the Second Amendment rights of the American people but genocide or politicide. The 'right to life' provisions under the International Bill of Human Rights and other international conventions and declarations imply that our Second Amendment 'right to [openly] keep and bear arms' is an absolute right to protect ourselves from our own local, county, State, and Federal Governments, especially under the Genocide Convention as well as from invading forces (illegal immigration), under the Law of Nations. And by extension the ultimate goal of the United Nations global gun control agenda is to empower the Member States to an increased capability and efficiency to commit genocide or politicide without fear of armed reprisals from their own people that they may someday want to kill, massacre, or slaughter. Simple logic demands this conclusion."

# COMPLAINT

## Stating the Claims Clearly and Concisely under Rule 8(a)(2) and with Particularity under Rule 9(b).

### DEMAND (1): VERIFICATION AND VALIDATION OF CITIZEN'S ARREST WARRANT UNDER F.R.Cv.P. RULE 64 SEIZURE OF PERSON AND PROPERTY:

Under penalty of perjury, under the laws of the United States of America, I am the unrepresented civil plaintiff, Don Hamrick, sui juris, citizen of Arkansas and of the United States under the Ninth, Tenth, Thirteenth and Fourteenth Amendments, acting in the capacity of a *Private Attorney General* with a civil RICO Act case against the United States Government for violations of statutory, civil, and constitutional rights and of humans rights under the International Bill of Human Rights and other international covenants, conventions, and declarations and against the United Nations for breach of Article 2, Clause 7 of the United Nations Charter and of international humans rights under the International Bill of Human Rights and other international covenants, conventions, and declarations on human rights in defense of not only my own rights under the Second Amendment but also for the Second Amendment rights of the citizens of the United States at large.

I therefor and hereby file this Complaint for verification and validation of my Citizen's Arrest Warrant; that probable cause exists to justify the immediate arrest and arraignment of federal judges, their court clerks, and other court personnel implicated above on formal charges

of felony extortion (18 U.S.C. § 872) as a predicate act to racketeering activities 18 U.S.C. 1961(1)(A), of exempted filing fees from the unrepresented civil Plaintiff Don Hamrick, a fully documented U.S. merchant seamen in violation of the Seamen's Suit law (28 U.S.C. § 1916) and for conspiring to engage in a pattern of racketeering activities in connection with this Civil RICO Action and for participating as principals (18 U.S.C. § 2) in racketeering activities (18 U.S.C. § 1962) as accessories after the facts (18 U.S.C. § 3) and for misprision of felony (18 U.S.C. § 4), of an unlawful and an unconstitutional protection scheme over the Second Amendment and for triple damages for violations of my statutory, civil, constitutional and human rights under 18 U.S.C. § 1964(c).

**CLAIM (1): The U.S. Department of Justice criminally withheld vital direct relevant evidence vindicating my Second Amendment case (U.S. District Court for DC, No. 03-2160):**

**CHRONOLOGY CONCERNING THE JUSTICE DEPARTMENT'S
WITHOLDING EVIDENCE FROM THE DISTRICT COURT
IN THE MATTER OF THEIR MEMORANDUM OPINION TITLED,
"WHETHER THE SECOND AMENDMENT SECURES AN INDIVIDUAL RIGHT"**

**OCTOBER 21, 2003.** I filed my RICO Act case for the Second Amendment at the U.S. District Court for DC (No. 03-2160). Alan Burch, Assistant U.S. Attorney from the U.S. Attorney's Office in Washington, DC (555 4TH ST., NW).

**JUNE 2, 2004.** Almost 7.5 months since I filed my case Alan Burch is "Terminated" (word used in the Docket Report) and was replaced by Dennis Barghaan, "Special Attorney" from the U.S. Attorney's Office for the Western District of Virginia in Alexandria under 28 U.S.C. § 515 (out of jurisdiction U.S. Attorney). The Plaintiff alleges that the switch of defense attorneys has a direct bearing on the impending internal release of the Justice Department's Memorandum Opinion titled, Whether the Second Amendment Secures an Individual Right on August 24, 2004, just 83 days away. Something had to be done to prevent the Plaintiff from using that Memorandum Opinion as evidence in the District Court. So, the Justice Department brought in a hatchet man to expedite the dismissal of Plaintiff's case before the expected release date of the Memorandum Opinion. This implies a conspiracy against the due process rights of the Plaintiff in violation of 18 U.S.C. § 241. Plaintiff alleges that the sole purpose for the switch in defense attorneys is to effectively deny the Plaintiff his right to use the Justice Department's upcoming Memorandum Opinion on the Second Amendment as evidence supporting his case.

**JUNE 21, 2004.** Dennis Barghaan filed the Motion to Dismiss just 19 days after replacing Alan Burch. Plaintiff observes that the Department of Justice was going to internally release their Memorandum Opinion on August 24, 2004 which is just 64 days from June 21. Plaintiff has 60 days to respond to the Motion to Dismiss. If Dennis Barghaan had prior knowledge of the Department of Justice's Memorandum Opinion it is the Appellant's belief that he had a duty to inform the court of the impended release of this Memorandum Opinion because it had a direct impact upon the case at hand. If Dennis Barghaan did not have prior knowledge then the duty fell upon the Department of Justice to inform Dennis Barghaan of the impending release of the Memorandum Opinion because it was and is admissible evidence affecting the integrity of the governments argument

against the Plaintiff/Appellant. The fact that the existence of the Memorandum Opinion was never made known to the District Court or to the DC Circuit or even to the Plaintiff, that the Plaintiff learned of the Memorandum Opinion through his Internet news links implies a deliberate attempt to subvert justice. The Appellant alleges that the timing of Dennis Barghaan's Motion to Dismiss occurring jut 64 days before the internal release o the Memorandum implies prior knowledge calculated to unjustly defeat Appellant's case at the District Court. The Appellant further alleges that Dennis Barghaan's obstructive tactics are meant to harass or to cause unnecessary delay or needless increase in the cost of litigation and Dennis Barghaan's denials of factual contentions are not warranted on the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief because the Appellant has now identified the Memorandum Opinion as admissible evidence and there can be no lack of information on the Second Amendment as an individual right because it was the duty of the Justice Department to inform Dennis Barghaan of the Memorandum Opinion. That fact that this was not done implies an intentional violation of Rule 11(b)(1) and Rule 11(b)(4) of the Federal Rules of Civil Procedure

**JULY 12, 2004.** The Justice Department issues a press release stating that Paul D. Clement was will serve as acting Solicitor General.

**JULY 15, 2004.** The judge, Reggie B. Walton, denies my Motion for Change of Venue.

**AUGUST 10, 2004.** My Objection to Motion to Dismiss filed out of time (because Kinkos lost my emailed Objection due to a virus attack. But Dennis Barghaan in a footnote in his rebuttal did not oppose my filing out of time).

**AUGUST 16, 2004.** Dennis Barghaan files his rebuttal to my objection.

**AUGUST 16, 2004.** Wasting no time Judge Reggie B. Walton grants Motion to Dismiss just 8 days before the internal release of the Justice Department's Memorandum Opinion. A job well done by Dennis Barghaan. Does Judge Walton actually read these motions?

**AUGUST 24, 2004. Direct Relevant Evidence Concealed from the Court & Plaintiff.** U.S. Department of Justice internally published their Memorandum Opinion for the Attorney General John Ashcroft titled, Whether the Second Amendment Secures an Individual Right. The Department of Justice did not release the Memorandum Opinion to the public until mid-December 2004, for obvious political gain until well after the presidential election in November. That Memorandum Opinion is documentary evidence, a government record under 28 U.S.C. § 1733 and is admissible as evidence because under Rule 704 of the Federal Rules of Evidence the Memorandum Opinion becomes an Opinion on an Ultimate Issue because it embraces an ultimate issue to be decided by the trier of fact. [Rule 406 Habit/Routine Practice]

**AUGUST 27, 2004.** Plaintiff filed Notice of Appeal.

**AUGUST 27, 2004.** On this date President Bush issues Executive Order 13353 Establishing the President's Board on Safeguarding Americans' Civil Liberties. The Deputy Attorney General James Comey is appointed as Chairman. However, there may exist a conflict of interest with this appointment. In the May 21, 2001 edition of U.S. News & World Report then U.S. Attorney James Comey is reported to have said "To us gun possession itself is a crime of violence" in discussing Virginia's Project Exile program. James Comey's position against the Second Amendment as an individual right back then does not exactly square with his appointment to the President's Board on Safeguarding American Civil Liberties. At best it compares more accurately to a Trojan Horse tactic for an undisclosed agenda.

**SEPTEMBER 9, 2004.** Appellant filed his Appellant's Brief at the DC Circuit.

**SEPTEMBER 14, 2004.** Appellant filed Motion for Permissive Intervention By The President's Board on Safeguarding Americans' Civil Liberties And Other Third Parties & Motion for Appeal Conference. The DC Circuit has not yet ruled on this motion or any motion for judicial notice of adjudicative facts or presumptions in general that the Plaintiff has filed. Copy of this motion was FedEx'd to the Deputy Attorney General James Comey as Chairman of that civil liberties board. No response has yet been received. This is not a very good track record for the Government on protecting the civil liberties of the American people when the federal courts and the Executive Branch treats a pro se Plaintiff in such a manner.

**OBSERVATION FROM TIMELINE:** Alan Burch was almost 7.5 months (225 days) as defense counsel and hadn't filed the Motion to Dismiss. He was under Ted Olson as Solicitor General. Dennis Barghaan took a fast 2 months, 3 weeks, 4 days (75 days total) to get Judge Reggie B. Walton to dismissed the Plaintiff's case with prejudice. It is the Appellant's understanding that if evidence does not get admitted into the record at the District Court then that evidence cannot be submitted at the Appellant level. However, the ethical conduct of Dennis Barghaan and the Justice Department can be submitted as evidence of a conspiracy to subvert justice and for other allegations which can lead the DC Circuit in overturning the District Courts dismissal with prejudice.

**CLAIM (2) Circumstantial Evidence Implicates the U.S. Marshals Service with Allegations of Obstruction of Justice:** Circumstantial evidence exists to implicate agents of the U.S. Marshals Service in a conspiracy to obstruct justice, *42 U.S.C. § 1985(2),* and in a conspiracy against my statutory, civil, and constitutional rights *18 U.S.C. § 241 Conspiracy Against Rights*; and by such *Conspiracies to Interfere with Civil Rights, 42 U.S.C. § 1985(2) and (3),* did deprive me of my rights, under *18 U.S.C. § 242. Deprivation of Rights Under Color of Law*; to a jury trial, *18 U.S.C. § 245(b)(4), Federally Protected Activities* in regard to *18 U.S.C. § 245(b)(1)(B) and (E)* and thereby violated my Equal Rights Under the Law, 42 U.S.C. § 1981; for obstructing my right to a jury trial in order to defend my Property Rights under the Second Amendment, under 42 U.S.C. § 1982.

**CLAIM (3) Federal judges have denied my right of access to the federal courts and my right to substantial due process under the Fifth and Fourteenth Amendments and my right to a jury trial.** I am an unrepresented U.S. seaman in a civil RICO Act case

acting in the capacity of a Private Attorney General. has any rights to a jury trial in defense of the Second Amendment against the United States and against the United Nations?

**CLAIM (4) Federal Law Enforcement Agencies have obstructed justice** by refusing to recognize any criminal acts by the Judicial and Executive Branches even when I presented evidence of extortion, obstructions of justice, and conspiracies to obstruct justice. Federal Law Enforcement agencies have refused to acknowledge my standing as an unrepresented civil plaintiff acting in the capacity of a Private Attorney General in like manner as the public Attorney General and refused to assist with my "Citizen's Arrest Warrant" for extortion by federal judges and court clerks in my civil RICO Act case against the U.S. Government.

**CLAIM (5) The United States and the United Nations are waging a War of Aggression against the Second Amendment.** For an example of the United States War of Aggression against the Second Amendment see Exhibit 1. The United Nations *PROGRAMME OF ACTION TO PREVENT, COMBAT AND ERADICATE THE ILLICIT TRADE IN SMALL ARMS AND LIGHT WEAPONS IN ALL ITS ASPECTS* (UN Document A/CONF.192/15)[2] is a *WAR OF AGGRESSION* (see Exhibit 2 for U.N. Definition of Aggression) against the human right to armed self defense and personal security in defense of the human right to life as implied by **international** conventions and declarations on the human right to life.

**CLAIM (6) The United Nations's War of Aggression** is violating Article 2, Clause 7 of its own U.N. Charter by waging a War of Aggression against the Second Amendment of the Bill of Rights to the U.S. Constitution by meddling in the internal affairs of Member States in regard to the rights of the people of the Member States to defend their right to life by "Small Arms and Light Weapons" (invoking the protections of the Genocide Convention) the United Nations can be disbanded under Article 60 *Termination or Suspension of the Operation of a Treaty as a Consequence of its Breach* of the *Vienna Convention on the Law of Treaties 1969* and the *Vienna Convention on the Law of Treaties betweenStates and International Organizations or between International Organizations 1986*

**CLAIM (7) The U.S. Department of Justice unlawfully withheld as vital direct relevant evidence** their Memorandum Opinion on the Second Amendment, dated August 24, 2004, from the U.S. District Court for DC in Case No. 03-2160 and from the me, the unrepresented civil plaintiff. Moreover, the U.S. Department of Justice fast-tracked my case to dismissal on August 16, 2004 just 8 days before the internal release of that Memorandum Opinion. Even more egregious is that their Memorandum Opinion was not released to the public until mid-December 2004 so as not to have any effect on the presidential election of November 2004. The implication that the Memorandum Opinion was not released to the public until well after the November elections is made by Monica Gooding's congressional testimony on the criminal activities of preventing African-American and military absentee voters from casting their votes, known as "caging" which corresponds to my allegation that the GOP did not want anything to jeopardize their chances at winning the presidential election. This is an example of racketeering activities.

**CLAIM (8) On January 13, 2004**, Judge Roberts, of the U.S. District Court for the District of Columbia, No. 03-2160, issued his Order granting recusal recommending that a judge from another district be assigned to my case:

> "The Clerk of the Court is directed to reassign this matter to the Calendar Committee. Because United States District Judge Ellen Segal Huvelle of this

---

[2] http://disarmament.un.org/cab/poa.html

*Court is also a named defendant in this suit, I recommend to the Calendar Committee that it seek to have a judge from another district assigned to this matter."*

**On January 14, 2004** Judge Reggie B. Walton issued his Memorandum Opinion in *Seegars* v. *Ashcroft*, No. 03-834; 297 F. Supp. 2d 201, 204 (D.D.C. January 14, 2004), a Second Amendment case, in which he claimed that *"the Second Amendment does not apply to the District of Columbia."*

**On January 15, 2004** my Second Amendment case was *NOT* reassigned to a judge from another district but to Judge Reggie B. Walton of the same district as Judge Roberts – the U.S. District Court for the District of Columbia. My every attempt to get Judge Walton recused for bias failed. Judge Reggie B. Walton of the U.S. District Court for DC in Case No. 03-2160 was assigned to my case under suspicious circumstances on Motion for Recusal of Judge Roberts. How and why did the Calendar Committee reassign my case to Judge Reggie B. Walton when he just ruled on the Second Amendment in the *Seegars* case the day before? This has all the implications of judicial bias, misconduct, and corruption written all over it! My complaints to the U.S. Department of Justice for an investigation were ignored.

**CLAIM (9) The United States Government has committed human rights violations** in my cases these past 5 years have been unlawfully dismissed with prejudice and by such unwarranted dismissals. The United States Government has unlawfully denied my rights to a judicial remedy under Article 2, Clause 3 of the *International Covenant on Civil and Political Rights* (part of the *International Bill of Human Rights)*:

Article 2

3. Each State Party to the present Covenant undertakes:

(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b) To ensure that any person claiming such a remedy shall have **his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy** ;

(c) To ensure that the competent authorities shall enforce such remedies when granted.

**CLAIM (10) The United States and the United Nations refuse to acknowledge are accept the fact that** the Second Amendment right to keep and bear arms is implied in the "right to life" clause of Article 6, Clause 1 of the *International Covenant on Civil and Political Rights* :

Article 6

1. **Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.**

**CLAIM (11) The U.S. District Court, Little Rock violated the general exceptions of the US Foreign Sovereign Immunities Act of 1976 (*28 U.S. Code § 1605. General Exceptions to the Jurisdictional Immunity of a Foreign State* )** that I have the statutory right and the human right to bring a lawsuit against the United Nations for breaches of the United Nations Charter, and international covenants, conventions, and declarations on human rights, and the genocide convention as a consequence of their war of aggression against the Second Amendment.

**CLAIM (12)** Judge Moody of the U.S. District Court for the Eastern District of Arkansas in Case No. 06-0044 wrongfully dismissed my Amended Complaint adding the United Nations as Lead

Defendant on the basis that "privileges and immunities" protects the United Nations from lawsuits. This is not always true! Therefore Judge Moody committed an injustice against an unrepresented civil plaintiff. Consider:

# THE UNITED NATIONS WRONGFULLY HIDES BEHIND "PRIVILEGES & IMMUNITIES" AS AN AFFIRMATIVE DEFENSE FROM LAWSUITS AS THEY WAGE A WAR OF AGGRESSION AGAINST OUR SECOND AMENDMENT

Nicolas Michel, Under-Secretary-General for Legal Affairs, Legal Counsel for the United Nations, in their letter to the U.S. District Court for the Eastern District of Arkansas, Little Rock, Case No. 06-0044, dated April 5, 2007, claimed privileges and immunities as an affirmative defense on behalf of the United Nations under:

(1) Article 105, paragraph 1 of the United Nations Charter;

> "The Organization shall enjoy in the territory of each of its Members such privileges and immunities that are necessary for the fulfillment of its purposes."

(2) Article 105, paragraph 3 of the United Nations Charter;

> "The General Assembly may make recommendations with a view to determining the details o the application of paragraph 1 . . . of this Article or may propose conventions to the Members of the United Nations for this purpose." UN Charter, Art. 105, 1945 U.S. Code Cong. & Admin. News, at 985.

(3) Article II, Section 2 of the Convention on Privileges and Immunities of the United Nations, February 13, 1946, (CPIUN), 1 U.N.T.S. 15 (1946), General Convention, Art. II, 21 U.S.T. at 1422. noting that the United States of America acceded to the General Convention on April 29, 1970. 21 U.S.T. at 1418; [1970] TIAS No. 6900.

> "The United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every from of legal process except insofar as in any particular case it has expressly waived its immunity. It is, however, understood that no waiver of immunity shall extend to any measure of execution."

(4) United States International Organizations Immunities Act (IOIA). Pub. L. No. 291, 79th Cong., 1st Sess., December 29, 1945 (codified at 22 U.S.C. 288 et seq.).

PLAINTIFF'S CLAIM: The United Nations does not have the protection of *privileges and immunities* to wage a **_war of aggression_** on the human right to life as implied by the Second Amendment to the United States Constitution, as part of the Bill of Rights and on the Thirteenth and Fourteenth Amendments as further implied by Article 2, Clause 7 of the United Nations Charter:

UNITED NATIONS CHARTER
CHAPTER 1 - PURPOSES AND PRINCIPLES

ARTICLE 2

7. Nothing contained in the present Charter shall authorize the United Nations to intervene in matters which are essentially within the domestic jurisdiction of any state or shall require the Members to submit such matters to settlement under the present

Charter; but this principle shall not prejudice the application of enforcement measures under Chapter VII.

I further claim that the United States is conspiring with and assisting the United Nations in their War of Aggression on the American People's Second Amendment right as defined in ARTICLES 4 and 5 of the United Nations' *DEFINITION OF AGGRESSION* which states:

### Article 4

The acts enumerated above [in Article 3] are not exhaustive and the Security Council may determine that other acts constitute aggression under the provisions of the Charter.

### Article 5

1. No consideration of whatever nature, whether political, economic, military or otherwise, may serve as a justification for aggression.

2. A war of aggression is a crime against international peace. Aggression gives rise to international responsibility.

Exhibit 2 presents the United Nations *DEFINITION OF AGGRESSION.*

It is my claim that the United Nations campaign for global gun control under their *PROGRAMME OF ACTION TO PREVENT, COMBAT AND ERADIATE THE ILLICIT TRADE IN SMALL ARMS AND LIGHT WEAPONS IN ALL ITS ASPECTS*, is, in fact and in constitutional and international law, a *War of Aggression* on the individual freedoms of the people of the 192 Member States of the United Nations and even of the countries not Member States of the United Nations in violation of the Article 2, Clause 7, of the United Nations Charter.

To secure my allegation that the United Nations campaign for global gun control is a War of Aggression on individual freedoms in violation of the United Nations Charter I cite ARTICLE 1(b) of the *DEFINITION OF AGGRESSION* defines "State" to include the concept of a "group of States" where appropriate. From that definition in construe the fact that the United Nations is included in the definition of a "State."

ARTICLE 1 of the *DEFINITION OF AGGRESSION* defines Aggression as *"the use of armed force by a State against the sovereignty, territorial integrity or political independence of another State, or in any other manner inconsistent with the Charter of the United Nations, as set out in this Definition."*

To further secure my allegation I cite ARTICLE 4 of the *DEFINITION OF AGGRESSION* to show that the list of definitions under the United Nations *DEFINITION OF AGGRESSION, "are not exhaustive and the Security Council may determine that other acts constitute aggression under the provisions of the Charter."*

And to further secure my allegation I cite ARTICLE 5, CLAUSE 1, *"No consideration of whatever nature, whether political, economic, military or otherwise, may serve as a justification for aggression."* From this clarification I allege that that the United Nations campaign for global gun control is without justification.

It is also my allegation under ARTICLE 5, CLAUSE 3., *"No territorial acquisition or special advantage resulting from aggression is or shall be recognized as lawful"* that the Member States cascadingly passing gun control laws in accordance with the United Nations Programme of Action is an *unlawful acquisition* or an *unlawful special advantage resulting from that aggression* for global gun control.

And it is also my allegation under ARTICLE 7, that the United Nations campaign for global gun control under their Programme of Action unlawfully *"prejudices the right to self-*

determination, freedom and independence, as derived from the [United Nations] Charter, of peoples forcibly deprived of that right and referred to in the DECLARATION ON PRINCIPLES OF INTERNATIONAL LAW CONCERNING FRIENDLY RELATIONS AND COOPERATION AMONG STATES in accordance with the Charter of the United Nations, particularly peoples under colonial and racist regimes or other forms of alien domination: nor the right of these peoples to struggle to that end and to seek and receive support, in accordance with the principles of the [United Nations] Charter and in conformity with the above-mentioned Declaration.

# EXTORTION BY THE FEDERAL COURTS

The U.S. Court of Appeals for the District of Columbia Circuit in Case Nos. 02-5334, 04-5316, extorted their filing fee in violation of federal law, 28 U.S.C. § 1916. The DC Circuit attempted to extort their filing fee in Case No. 05-5414 but denied my appeal for lack of prosecution when I refused to pay their filing fee in defense of my statutory right of exemption because I am a U.S. seaman under 28 U.S.C. § 1916. Motions for the return of the filing fee were unlawfully deny and are construed as corruption and misconduct under the civil RICO Act because extortion, 18 U.S.C. § 872, is a predicate act for racketeering activities because my case is about the Second Amendment rights of U.S. seamen. Such racketeering activities and obstructions of justice are necessary in order to assist the U.S. Supreme Court to avoid hearing a Second Amendment case and the U.S. Supreme Court has not heard a Second Amendment case since United States v. Miller 307 U.S. 174 (1939).

The U.S. Supreme Court in Case Nos. 03-145 and 04-1150 extorted their filing fees in violation of the same federal law, 28 U.S.C. § 1916 adding to my allegations of extortion as a predicate act for racketeering activities under the civil RICO Act.

The U.S. District Court for the Eastern District of Arkansas in Case No. 06-0044 extorted their filing fee in violation of the same federal law, 28 U.S.C. § 1916 under as a predicate act for racketeering activities. The Plaintiff's best effort at getting the filing fee of this court returned was his Motion for Replevin to which the Court denied.

The U.S. District Court for the District of Columbia should note that it *DID NOT* extort their filing fee from the Plaintiff in Case Nos. 02-1434; 04-1435; 03-2160; 04-2040; 04-mc-0422; and 05-1993. These cases sets up the Cause of Action now before the Court because the Plaintiff has exhausted all available remedies for the return of the extorted filing.

*Hamrick, pro se* v. *President Bush*, 8th Circuit, Nos. 07-1644 and 07-2400; appeals from U.S. District Court, Eastern District of Arkansas, Little Rock, No. 06-0044. Second Amendment case employing the RICO Act against the U.S. Government. The 8th Circuit, in St. Louis denied my appeals of the U.S. District Court's dismissal for lack of prosecution because I refused to pay their filing fee in defense of my statutory right of filing fee exemption provided to me as a seaman in accordance with federal law, 28 U.S.C. § 1916. My latest appeal, No. 07-2400, is pending on Petition for Rehearing En Banc. The dismissals are construed as attempted extortion of their filing fee which is further construed as a predicate act for racketeering activities.

Nearly every motion, every judicial notice of adjudicative facts, nearly every presumption I have filed in all my cases has been denied. My cases repeatedly get dismissed with prejudice for no apparrent logical reason especially when the DC Circuit wrongfully affirmed the dismissal of Case No. 04-5316 but remands my case "for further proceedings" on Second Amendment grounds. The phrase "for further proceedings," I believe, was intentionally vague to give Judge Reggie B. Walton wiggle room to apply a judicial "dirty trick," abusing the Federal Rules of Civil Procedure by issuing a "Scheduling Order" that was essentially a redo of Rule 7 pleadings giving the U.S. Department of Justice another chance to file their Motion to Dismiss. Rund-and-round we go on the merry-go-round instead of proceeding to the Discovery Phase under Rule 16 and Rule 26. In retaliation I filed my own Motion to Dismiss and refiled my case in the U.S. District Court for the Eastern District of Arkansas as provided by federal law. However, I met the same judicial obstructions of justice as I experienced in Washington, DC.

The U.S. Department of Justice, the FBI, U.S. Marshals Service, and the Judicial

Committees of the House and Senate have ignored my complaints of judicial misconduct and corruption of the federal judicial system.

# Is the U.S. Marshals Service Criminally Obstructing Justice?

On May 25, 2007 the 8th Circuit in St. Louis dismissed my appeal for lack of prosecution for not paying their filing fee. On May 26, 2007, the very day after that dismissal, I coincidentally visited Senior Inspector Robert Robeson, U.S. Marshals Service in Washington, DC. During the meeting Mr. Robeson volunteering his admission that he knew about the 8th Circuit's dismissal without me having to tell him about it. The manner in which he made his admission was intended to service as intimidation conveying the implied meaning that he is keeping close watch on my case developments.

I find this surveilance to be particularly troublesome. It leads to the allegation that he contacted the court clerks of all the courts I had cases in and because of these contacts it is my reasonable suspicion that the court clerks conveyed this interest by the U.S. Marshals Service to the presiding judges and these judges were thereby negatively influenced by the interest of the U.S. Marshals Service and thereby proceed to obstruct my case with denials of my pleadings and dismissing my cases with prejudice. Therefore I presume the prejudice extends from the U.S. Marshals Service contacts with the courts.

The reason for the U.S. Marshals Service apparent interference with the judicial process of my cases is because of my activities and interest in the right of "Citizen's Arrest" as provided by Rule 64 of the Federal Rules of Civil Procedure and by DC Code § 23-582(c). *Arrests Without Warrant by Other Persons.* This U.S. Marshals Service has conducted a "manhunt" for me by intercepting me at the Greyhound Terminal in 2003(?) on my trip from Arkansas to visit the U.S. Marshals Service for help and information. The U.S. Marshals Service questioned me for about 2 hours on the false belief that I was going to "kidnap" federal judges to effect "citizen's arrest" based upon an email I sent to the U.S. Marshals Service asking for help and information. I construe the conduct of the U.S. Marshals Service as criminal acts of obstruction of justice and aiding and abetting corruption of and extortion by federal judges and court clerks over filing fees under 28 U.S.C. § 1916.

Additionally, the U.S. Department of Justice itself has acted to obstruct justice for political reasons. My Case No. 03-2160 was fast-tracked to dismissal on August 16, 2004 just 8 days before the U.S. Department of Justice internally released their Memorandum Opinion on the Second Amendment on August 24, 2004 finding it to be an individual right: "*The Second Amendment secures a right of individuals generally, not a right of States or a right restricted to persons serving in militias.*" Available online at: http://www.usdoj.gov/olc/secondamendment2.pdf

*"The Conclusion"*

"*. . . we conclude that the Second Amendment secures an individual right to keep and to bear arms. Current case law leaves open and unsettled the question of whose right is secured by the Amendment. Although we do not address the scope of the right, our examination of the original meaning of the Amendment provides extensive reasons to conclude that the Second Amendment secures an individual right, and no persuasive basis for either the collective-right or quasi-collective-right views. The text of the Amendment's operative clause, setting out a "right of the people to keep and bear Arms," is clear and is reinforced by the Constitution's structure. The Amendment's prefatory clause, properly understood, is fully consistent with this interpretation. The broader history of the Anglo-American right of individuals to have and use arms, from England's Revolution of 1688-1689 to the ratification of the Second Amendment a hundred years later, leads to the same conclusion. Finally, the first hundred years of*

*interpretations of the Amendment, and especially the commentaries and case law in the pre-Civil War period closest to the Amendment's ratification, confirm what the text and history of the Second Amendment require."*

It has been my allegation that the Special Attorney Dennis Barghaan, brought in from the U.S. Attorney's Office in Alexandria, Virginia, for the purpose of fast-tracking my case to dismissal did so with full knowledge of and by direction of U.S. Department of Justice superiors in order to prevent me from using the Justice Department's Memorandum Opinion as evidence because it would have vendicated the constitutional merits of my case. It is my further allegation that the Justice Department had a judicial duty to inform the Court of the pending release of their Memorandum Opinion for its direct evidence value under their the rules of disclosure. Therefore, the U.S. Department committed the criminal act of obstructing justice for political reasons as later revealed by congressional testimony of Monica Gooding over the scandal of the fired U.S. Attorney's to which the Attorney General Alberto Gonzales has know announced his resignation. These developes demand greater scrutiny of my allegations in light of developments at the U.S. Department of Justice suggested that the prejudicial treatment of all my cases were politically motivated essential denying me my Seventh Amendment right to a jury trial and even denying me my right to access to the federal courts and my rights to substantial due process under the Fifth and Fourteenth Amendments.

Respectfully,

Don Hamrick

# CERTIFICATION

I cannot afford the cost of service. However, I did email a copy

TO:   **US Dept of Justice, Washington, DC,** I.G. Glenn Find,<inspector.general@usdoj.gov>
**US Dept of Justice, Washington, DC,** AskDOJ@usdoj.gov,
**US Dept of Justice, Washington, DC,** Daisy.D.Correa@usdoj.gov,
**US Dept of Justice, Washington, DC,** Scott.A.Myers@usdoj.gov,
**US Dept of Justice, Washington, DC,** dc.outreach@usdoj.gov,
**US Marshals Service, Washington, DC,** Director John Clark, <us.marshals@usdoj.gov>
**US Marshals Service, Washington, DC,** robert.robeson@usdoj.gov,
**US Marshals Service, Little Rock,** Dave Loyer, Little Rock <dave.loyer@usdoj.gov>
**US Attorney's Office, Little Rock,** Duke, Jane  <jane.duke@usdoj.gov>
**US Attorney's Office, Little Rock,** Kim Squires <Kim.Squires@usdoj.gov>
**US Attorney's Office, Little Rock,** Richard Pence <richard.pence@usdoj.gov>
**FBI Field Office, Washington, DC,** washington.field@ic.fbi.gov
**FBI Field Office, Little Rock,** little.rock@ic.fbi.gov,
**FBI Field Office, St. Louis,** stlouis@ic.fbi.gov,.

Respectfully

Don Hamrick

# Exhibit 1.  Example of United States' War of Aggression Against the Second Amendment

## Number of U.S. Gun Dealers Plunges

BY MICHAEL DOYLE
St. Paul Pioneer Press
Updated: August 18th, 2007 10:26 AM PDT
http://www.officer.com/web/online/Top-News-Stories/Number-of-US-Gun-Dealers-Plunges/1$37447

*"The number of federally licensed firearms dealers fell 79 percent nationwide since 1994."*

WASHINGTON - Tougher laws and stricter enforcement cost nearly 200,000 U.S. gun dealers their licenses since the mid-1990s, a new study shows.

Led by sharp declines in states including California, Florida and Washington, the number of federally licensed firearms dealers fell 79 percent nationwide since 1994. In that year, Congress adopted new gun-control measures that still spark fiery debate.

"The sharp drop in gun dealers is one of the most important, and little noticed, victories in the effort to reduce firearms violence in America," declared Marty Langley, a policy analyst with the Violence Policy Center.

The decline is undeniable. What it means is more controversial.

"They're trying to pump their stats up," complained Bill Mayfield, a longtime gun dealer in Fresno, Calif. "It looks good, but what they're doing is pursuing an anti-gun, anti-American point of view."

In 1994, 245,628 U.S. residents held federal licenses allowing them to sell firearms. In California, the nation's most populous state, there were 20,148 license holders.

Now, there are 50,630 of the so-called Type 1 federal firearms licenses nationwide. In California, the number of licenses fell to 2,120 this year.

The number of firearms licenses likewise fell more than 80 percent since 1994 in Florida, Washington, Louisiana and Georgia, among other states. Even the state with the smallest reduction in licensed dealers - Montana - saw a 68 percent decline.

"As the number of licensed dealers has dropped, it's become more manageable for the (Bureau of Alcohol, Tobacco, Firearms and Explosives) to enforce," Langley said.

The Violence Policy Center is a gun-control advocacy group funded by the Chicago-based Joyce Foundation. The foundation also finances other efforts, including the Illinois Council Against Handgun Violence and a Great Lakes States Summit on Handgun Violence, which was held in April.

The decline in licenses began after Congress approved in 1993 the Brady Bill, named for former White House press secretary James Brady, who was wounded in a 1981 assassination attempt on President Ronald Reagan. The 1993 law, and a subsequent 1994 anti-crime law, imposed new restrictions.

The firearms licenses that once cost $10 a year now cost $200 a year for the first three years. License applicants now must submit photographs and fingerprints and inform local police of their plans. In many cases, those losing licenses weredealers who operated from their homes rather than from formal storefronts.

"Smaller shops simply can't afford some of that," said Ashley Varner, a spokesperson for the National Rifle Association, and "people in rural areas have a harder time getting firearms if they aren't near a large store."

Nonetheless, Varner said Justice Department records indicate total firearm sales have remained roughly even in recent years.

Starting with the Clinton administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives has been more aggressive in monitoring license-holders. Officials have insisted license holders be "actively engaged in the business" of selling guns if they hold licenses.

FILED

SEP 1 0 2007

07 1616

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Gun-related crimes have fallen in the past year, as have the percentage of Americans who say they own firearms.

In 1993, for instance, the Justice Department recorded more than 1 million nonfatal crimes involving firearms. By 2005, the number of nonfatal gun-related crimes had declined to 419,000.

"The fact there are fewer gun dealers out there means there are fewer sources of guns for street criminals," Langley said.

Gun-control advocates hope to tighten regulations even more, for instance, by permitting federal authorities to conduct more than the annual compliance inspection that's currently allowed. Congress, though, hasn't shown significant interest so far in renewing gun debate this year.

In many cases, those losing licenses were so-called "kitchen table" dealers, who operated from their homes rather than from formal storefronts.

## Exhibit 2.



## United Nations
General Assembly Resolution 3314 (XXIX).

# Definition of Aggression

http://daccessdds.un.org/doc/RESOLUTION/GEN/NR0/739/16/IMG/NR073916.pdf?OpenElement

The General Assembly,

*Having considered* the report of the Special Committee on the Question of Defining Aggression, established pursuant to its resolution 2330(XXII) of 18 December 1967, covering the work of its seventh session held from 11 March to 12 April 1974, including the draft Definition of Aggression adopted by the Special Committee by consensus and recommended for adoption by the General Assembly,[3]

*Deeply convinced* that the adoption of the Definition of Aggression would contribute to the strengthening of international peace and security,

1. *Approves* the Definition of Aggression, the text of which is annexed to the present resolution;

2. *Expresses* its appreciation to the Special Committee on the Question of Defining Aggression for its work which resulted in the elaboration of the Definition of Aggression;

3. *Calls upon* all States to refrain from all acts of aggression and other uses of force contrary to the Charter of the United Nations and the Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations;[4]

4. *Calls the attention* of the Security Council to the Definition of Aggression, as set out below, and recommends that it should, as appropriate, take account of that Definition as guidance in determination, in accordance with the Charter, the existence of an act of aggression.

2319th plenary meeting
14 December 1974

*07 1616*

FILED

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

[3] Official Records of the General Assembly, Twenty-ninth Session, Supplement No. 19 (A/9619 and Corr. 1).

[4] Resolution 2625 (XXV), annex.



# Annex
# Definition of Aggression

*The General Assembly,*

*Basing itself* on the fact that one of the fundamental purposes of the United Nations is to maintain international peace and security and to take effective collective measures for the prevention and removal of threats to the peace, and for the suppression of acts of aggression or other breaches of the peace,

*Recalling* that the Security Council, in accordance with Article 39 of the Charter of the United Nations, shall determine the existence of any threat to the peace, breach of the peace or act of aggression and shall make recommendations, or decide what measures shall be taken in accordance with Articles 41 and 42, to maintain or restore international peace and security,

*Recalling* also the duty of States under the Charter to settle their international disputes by peaceful means in order not to endanger international peace, security and justice,

*Bearing in mind* that nothing in this Definition shall be interpreted as in any way affecting the scope of the provisions of the Charter with respect to the functions and powers of the organs of the United Nations,

*Considering also* that, since aggression is the most serious and dangerous form of the illegal use of force, being fraught, in the conditions created by the existence of all types of weapons of mass destruction, with the possible threat of a world conflict and all its catastrophic consequences, aggression should be defined at the present stage,

*Reaffirming* the duty of States not to use armed force to deprive peoples of their right to self-determination, freedom and independence, or to disrupt territorial Integrity,

*Reaffirming also* that the territory of a State shall not be violated by being the object, even temporarily, of military occupation or of other measures of force taken by another State in contravention of the Charter, and that it shall not be the object of acquisition by another State resulting from such measures or the threat thereof,

*Reaffirming also* the provisions of the Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations,

*Convinced* that the adoption of a definition of aggression ought to have the effect of deterring a potential aggressor, would simplify the determination of acts of aggression and the implementation of measures to suppress them and would also facilitate the protection of the rights and lawful interests of, and the rendering of assistance to, the victim,

*Believing* that, although the question whether an act of aggression has been committed must be considered in the light of all the circumstances of each particular case, it is nevertheless desirable to formulate basic principles as guidance for such determination,

*Adopts* the following Definition of Agression:[5]

---

[5] Explanatory notes on articles 3 and 5 are to be found in paragraph 20 of the Report of the Special Committee on the Question of Defining Aggression (Official Records of the General Assembly, Twenty-ninth Session, Supplement No. 19

## Article 1

Aggression is the use of armed force by a State against the sovereignty, territorial integrity or political independence of another State, or in any other manner inconsistent with the Charter of the United Nations, as set out in this Definition.

*Explanatory note*: In this Definition the term "State":

(a) Is used without prejudice to questions of recognition or to whether a State is a member of the United Nations;

(b) Includes the concept of a "group of States" where appropriate.

## Article 2

The First use of armed force by a State in contravention of the Charter shall constitute prima facie evidence of an act of aggression although the Security Council may, in conformity with the Charter, conclude that a determination that an act of aggression has been committed would not be justified in the light of other relevant circumstances, including the fact that the acts concerned or their consequences are not of sufficient gravity.

## Article 3

Any of the following acts, regardless of a declaration of war, shall, subject to and in accordance with the provisions of article 2, qualify as an act of aggression:

(a) The invasion or attack by the armed forces of a State of the territory of another State, or any military occupation, however temporary, resulting from such invasion or attack, or any annexation by the use of force of the territory of another State or part thereof,

(b) Bombardment by the armed forces of a State against the territory of another State or the use of any weapons by a State against the territory of another State;

(c) The blockade of the ports or coasts of a State by the armed forces of another State;

(d) An attack by the armed forces of a State on the land, sea or air forces, or marine and air fleets of another State;

(e) The use of armed forces of one State which are within the territory of another State with the agreement of the receiving State, in contravention of the conditions provided for in the agreement or any extension of their presence in such territory beyond the termination of the agreement;

(f) The action of a State in allowing its temtory, which it has placed at the disposal of another State, to be used by that other State for perpetrating an act of aggression against a third State;

(g) The sending by or on behalf of a State of armed bands, groups, irregulars or mercenaries, which carry out acts of armed force against another State of such gravity as to amount to the acts listed above, or its substantial involvement therein.

## Article 4

The acts enumerated above are not exhaustive and the Security Council may determine that other acts constitute aggression under the provisions of the Charter.

## Article 5

1. No consideration of whatever nature, whether political, economic, military or otherwise, may serve as a justification for aggression.

---

(A/9619 and Corr. 1). Statements on the Definition are contained in paragraphs 9 and 10 of the report of the Sixth Committee (A/9890).

2. A war of aggression is a crime against international peace. Aggression gives rise to international responsibility.

3. No territorial acquisition or special advantage resulting from aggression is or shall be recognized as lawful.

### Article 6

Nothing in this Definition shall be construed as in any way enlarging or diminishing the scope of the Charter, including its provisions concerning cases in which the use of force is lawful.

### Article 7

Nothing in this Definition, and in particular article 3, could in any way prejudice the right to self-determination, freedom and independence, as derived from the Charter, of peoples forcibly deprived of that right and referred to in the Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations, particularly peoples under colonial and racist regimes or other forms of alien domination: nor the right of these peoples to struggle to that end and to seek and receive support, in accordance with the principles of the Charter and in conformity with the above-mentioned Declaration.

### Article 8

In their interpretation and application the above provisions are interrelated and each provision should be construed in the context of the other provisions.

**Exhibit 3.**

# Unratified and Unsigned Treaties
# Still Constrain U.S. Action

## Jon Kyl, Chairman
### Republican Policy Committee
### U.S. Senate
#### May 16, 2006

## Introduction

International law is based on consent. There has been a veritable explosion in recent decades in the number and scope of international agreements, some of which promulgate principles of law that the United States does not accept. Signing a treaty has consequences under international law, and thus it is an act not to be taken lightly. Moreover, this paper will provide examples of how even treaties that the United States has not signed still constrain U.S. action. This finding illustrates why the United States must vigorously defend its position in international fora and negotiations directed at new treaties. It is insufficient for the United States simply to refuse to sign a treaty in the hopes of avoiding its adverse effects.

## Treaty Background

International law is primarily concerned with the rights and obligations of states and their relations with each other. Historically, it has been much less directed at sub-state actors, such as individual persons.[6] International treaties and conventions are a primary source of international law; [7] and they are the most obvious manifestation of international law to the general public.

A traditional principle of international law is that it is based on the consent of states.[8] In order for the rules of international law to be properly applied to states, those states must have accepted those rules. As such, states are not bound by treaties they do not sign.[9]

---

[6] RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 101 (1987) (defining international law as the "rules and principles of general application dealing with the conduct of states and of international organizations and with their relations inter se, as well as with some of their relations with persons, whether natural or juridical").

[7] STATUTE OF THE INTERNATIONAL COURT OF JUSTICE, Art. 38 ("ICJ Statute"). THE STATUTE OF THE INTERNATIONAL COURT OF JUSTICE is annexed to the CHARTER OF THE UNITED NATIONS, and is reprinted at 59 Stat. 1031 (1945). Customary practices are another primary source of international law. ICJ Statute Art. 38(1)(b). In fact, "[u]ntil recently, international law was essentially customary law." Restatement at Part I, Chapter I, Introductory Note.

[8] RESTATEMENT at § 102, Reporters' Notes ¶ 1 (noting the "traditional principle that international law essentially depends on the consent of states").

[9] VIENNA CONVENTION ON THE LAW OF TREATIES, art. 34, 1155 U.N.T.S. 331, 8 I.L.M. 679 (opened for signature May 23, 1969, entered into force Jan. 27, 1980) ("A treaty does not create either obligations or rights for a third State without its consent."). **The United States is not a party to this treaty but essentially accepts the treaty as a declaratory restatement of customary international law default rules governing the topic of treaties in general.** See RESTATEMENT at Part III, Introductory Note.

*07 1616*

FILED

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

In recent decades, there has been an increase in the number of international agreements coming into existence, and an expansion in the topics they address.[10] "[T]reaties have become the principal vehicle for making law for the international system."[11] The subject of treaties is also of note, as, traditionally, they were focused on relations between states, but they are now expanding to cover behavior of sub-state actors, including corporations and individuals. An individual person was historically not the "'subject' of international law,"[12] and "it was thought to be especially against their own governments."[13] Now, as the Restatement (Third) of the Foreign Relations Law of the United States[14] notes, how a state treats individual human beings, including its own citizens, is considered to be a matter of international concern, and a proper subject for regulation by international law.[15]

International agreements seem increasingly directed at creating legal measures to constrain the ability of states to act unilaterally, especially in the use of force[16] — and particularly directed at the United States. It is part of a trend that Henry Kissinger describes as a movement "to submit international politics to judicial procedures."[17] The United States itself has potentially exacerbated this trend. Several years ago, John Bolton, now the United States Ambassador to the United Nations, lamented the "legalism that has permeated American foreign policy during the twentieth century."[18] The Rome Statute creating the International Criminal Court and the Landmine Convention are examples of this trend. The United States, under the Clinton Administration, was intimately involved in the negotiations of both of these texts; but in the end, it did not sign the Landmine Convention, and only signed the Rome Statute on the last day it was open for signature as a last act before leaving office.[19] The United States has since removed its signature from the Rome Statute. But, as discussed herein, both treaties continue to affect U.S. affairs.

## Legal Effect of Signing a Treaty

Signing a treaty, even if that treaty is never ratified, has consequences for the signatory state under international law. When negotiations for a treaty or international convention are

---

[10] Richard B. Graves, III, *GLOBALIZATION, TREATY POWERS, AND THE LIMITS OF THE INTELLECTUAL PROPERTY CLAUSE*, 50 J. Copyright Soc'y USA 199, 249 (2003) ("Both the number of treaties to which the United States is a party, and particularly the scope of those treaties, have sharply increased in recent decades."); Curtis A. Bradley, *THE TREATY POWER AND AMERICAN FEDERALISM*, 97 Mich. L. Rev. 390, 396 (1998) (noting the "proliferation of treaties").

[11] *RESTATEMENT* at Part I, Chapter I, Introductory Note.

[12] *RESTATEMENT* at Part VII, Introductory Note.

[13] Mark W. Janis, *AN INTRODUCTION TO INTERNATIONAL LAW* 245 (2d ed. 1993) (emphasis added).

[14] The *RESTATEMENT* is published by the American Law Institute, and is generally regarded as a persuasive declaration of the foreign affairs law of the United States. Though not binding authority, U.S. courts, including the Supreme Court, do cite it in their official opinions. E.g., *Medellin* v. *Dretke*, 544 U.S. 660, 670 (2005).

[15] *RESTATEMENT* at Part VII, Introductory Note.

[16] John R. Bolton, *THE RISKS AND WEAKNESSES OF THE INTERNATIONAL CRIMINAL COURT FROM AMERICA'S PERSPECTIVE*, Law & Contemp. Probs. (Vol. 64, No. 1, Winter 2001), at 167, 167-68.

[17] Henry Kissinger, *THE PITFALLS OF UNIVERSAL JURISDICTION*, Foreign Aff (July-Aug 2001), at 86, 86.

[18] Bolton, *LAW & CONTEMP. PROBS.* (Vol. 64, No. 1, Winter 2001), at 168.

[19] The United States was an initial supporter of both the creation of a permanent international criminal court and some type of ban on antipersonnel landmines. Once the negotiations of agreements directed towards these ends were hijacked by countries more interested in constraining great power action, particularly U.S. action, it was almost inevitable that the final texts would be irredeemably hostile to U.S. interests.

completed, that instrument generally is opened for signature, which differs from ratification. Ratification, under international law, "refer[s] to a conclusive act by which a state party communicates its consent to an international agreement to its treaty partners."[20] "Ratification is also used to refer to internal procedures (like those under Article II of the U.S. Constitution) that national law requires as a condition precedent for ratification in the international law sense."[21] Signature, on the other hand, is generally the first step in the process by which a state makes an initial tangible commitment to the treaty.

It is crucial to note that a state literally "signs up" to some legal consequences under international law when it signs a treaty. Article 18 of the Vienna Convention on the Law of Treaties outlines the most important consequence under international law of *signing* a treaty. It provides that a state that has signed, but not ratified, a treaty is "to refrain from acts which would defeat the object and purpose of a treaty . . . *until it shall have made its intention clear not to become a party to the treaty.*"[22]  The Vienna Convention does not define "object and purpose," and, as the Restatement notes, "[i]t is often unclear what [state] actions would have such effect"[23] of defeating the object and purpose of a treaty. Moreover, the "Vienna Convention does not suggest any easily administered test for determining a treaty's 'object and purpose' or, for that matter, assessing when a state's actions would 'defeat' it."[24]

The scope of this obligation is, therefore, unclear. Some commentators suggest that state behavior violates the interim obligation when the behavior violates the treaty's provisions, particularly "major or indispensable provisions."[25] This likely proves too much, however, because Article 18 of the Vienna Convention "clearly resists any attempt to break up the object and purpose of a treaty into the objects and purposes of smaller parts of the treaty."[26] Moreover, such a test would essentially equate signature with ratification,[27] and completely conflate concepts that are treated separately under international law, and the Vienna Convention itself. A

---

[20] Edward T. Swaine, *Unsigning*, 55 Stan. L. Rev. 2061, 2066 n. 21 (2003).

[21] Swaine, 55 Stan. L. Rev. at 2066 n. 21 (parenthesis in original). Under U.S. law, it is the Executive Branch that exchanges the instrument of ratification with foreign treaty partners, and officially commits the United States to a treaty under international law. This, of course, may only take place after at least two-thirds of the Senate has approved a resolution of ratification. *Treaties and Other International Agreements: The Role of the United States Senate*, pp. 147-49, S. Prt. 106-71, 106th Cong, 2d Sess (2001). The President cannot ratify a treaty without the consent of the Senate, although one can imagine an odd scenario in which the President chooses not to ratify a treaty after the Senate consents to it. *See Treaties and Other International Agreements*, pp. 152-53, S. Prt. 106-71. For example, the Senate could attach Reservations, Understandings, or Declarations that the President would find unacceptable.

[22] *Vienna Convention on the Law of Treaties*, art. 18, 1155 U.N.T.S. 331, 8 I.L.M. 679 (opened for signature May 23, 1969, entered into force Jan. 27, 1980) (emphasis added). "Prior to the entry into force of an international agreement, a state that has signed the agreement or expressed its consent to be bound is obliged to refrain from acts that would defeat the object and purpose of the agreement." Restatement at § 312(3). Other practical effects of signature are that "signature tends to fix the treaty's substantive terms," Swaine, 55 Stan. L. Rev. at 2067; and, in some instances, "may also invest the signatory with particular rights under the treaty." Swaine, 55 Stan. L. Rev. at 2067 n.25.

[23] *Restatement* at § 312, cmnt i.

[24] Swaine, 55 Stan. L. Rev. at 2078.

[25] *See* arguments discussed in Swaine, 55 Stan. L. Rev. at 2078.

[26] Jan Klabbers, *How to Defeat a Treaty's Object and Purpose Pending Entry into Force: Toward Manifest Intent*, 34 Vand. J. Transnat'l L. 283, 293 (2001).

[27] Klabbers, 34 Vand. J. Transnat'l L. at 293-94.

better approach to this interim obligation is a requirement that a signatory not engage in acts that would disable it from complying with the treaty if ratified.[28] Formulated slightly differently, a state must "not do anything which would affect its ability fully to comply with the treaty once it has entered into force."[29]

This obligation has important real-world impacts. The Restatement offered the following example with respect to the Second Strategic Arms Limitation Treaty, which was signed in 1979 but has never been ratified: "Testing a weapon in contravention of a clause prohibiting such a test might violate the purpose of the agreement, since the consequences of the test might be irreversible. Failing to dismantle a weapon scheduled to be dismantled under the treaty might not defeat its object, since the dismantling could be effected later."[30] Similarly, as a signatory to the Comprehensive Test Ban Treaty,[31] for example, it would seem that the United States could maintain a posture where it could be in a position to conduct a nuclear test in a timely manner at some point in the future,[32] but not conduct an actual test. Because of these interim obligations, signing a treaty is not an act to be completed blithely. It is also possible to "unsign" a treaty, as the United States did with the Rome Statute creating the International Criminal Court.

The practical effect of "unsigning" a treaty is that a state removes itself from this burden to not frustrate the treaty's object and purpose. Article 18, by its terms, contemplates that states can exit from under this interim obligation.[33] It is entirely appropriate that unsigning a treaty be "acknowledged as a legitimate and understandable course of action under the Vienna Convention."[34]

Moreover, even when the United States does not sign a treaty—or even if it "unsigns" a treaty previously signed but not ratified—those treaties can still affect the United States. The next section will illustrate, by reference to the International Criminal Court and the Landmine Treaty, how international law principles to which the United States *has not consented* still constrain U.S. action.

---

[28] Swaine, 55 Stan. L. Rev. at 2078.

[29] Anthony Aust, *MODERN TREATY LAW AND PRACTICE*, p. 94 (Cambridge 2000).

[30] *RESTATEMENT* at § 312, cmnt i.

[31] *COMPREHENSIVE TEST BAN TREATY*, 35 I.L.M. 1439 (1996) (opened for signature Sept. 24, 1996). The United States remains a signatory to the CTBT, but has no intention of becoming a party to it. Condolezza Rice, Response of the Secretary of State to a Question for the Record of Senator Biden (No. 12), Committee on Foreign Relations, Feb. 16, 2005, reprinted at 151 Cong. Rec. S8532 (daily ed. July 20, 2005) (noting that "the U.S. does not support the CTBT and will not become a party to it"). The ratification of the United States is required for the treaty to enter into force, which CTBT, art. 14 and Annex II (listing the states whose ratification is required for the treaty to enter into force, which includes the United States).

[32] *Cf. CONFERENCE REPORT* attending *FY06 ENERGY AND WATER APPROPRIATIONS ACT*, Pub. L. No. 109-103, Conf. Rpt. 109-275, p. 159 (directing the Department of Energy to "maintain the current 24-month test readiness posture"). Being able to resume nuclear weapons testing requires the nuclear weapons and scientific communities to conduct various non-nuclear experiments.

[33] Swaine, 55 Stan. L. Rev. at 2082 (noting that Article 18 "does not require that the interim obligation be observed for all eternity, but instead only 'until [the signatory] shall have made its intention clear not to become a party to the treaty'") (brackets in original).

[34] Swaine, 55 Stan. L. Rev. at 2089.

## Exhibit 4.

# UNCONTROVERTABLE EVIDENCE OF THE UNITED NATIONS WAGING A WAR OF AGGRESSION ON FREEDOM

I cite Barbara Frey, Special Rapporteur for the United Nations General Assembly *FINAL REPORT ON SPECIFIC HUMAN RIGHTS ISSUES: PREVENTION OF HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS AND LIGHT WEAPONS*, dated July 26, 2006, Report No. A/HRC/Sub.1/58/27. *See* Exhibit 2 for excerpts.[35]

> ¶21. No international human right of self-defence is expressly set forth in the primary sources of international law: treaties, customary law, or general principles. While the right to life is recognized in virtually every major international human rights treaty, the principle of self-defence is expressly recognized in only one, the *CONVENTION FOR THE PROTECTION OF HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS* (EUROPEAN CONVENTION ON HUMAN RIGHTS), article 2.[36] Self-defence, however, is not recognized as a right in the European Convention on Human Rights. According to one commentator, "The function of this provision is simply to remove from the scope of application of article 2 (1) killings necessary to defend against unlawful violence. **It does not provide a right that must be secured by the State**".[37]

Citing paragraph 40 in the *CONCLUSIONS AND RECOMMENDATIONS* (pp. 13-14) of that report, *"States have positive obligations to protect individuals from violations by State and*

---

[35] Complete report available Online at http://www.iansa.org/un/documents/salw_hr_report_2006.pdf

[36] *CONVENTION FOR THE PROTECTION OF HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS*, 213 *UNITED NATIONS TREATY SERIES* 222, entered into force on 3 September 1953, as amended by Protocols Nos. 3, 5, 8 and 11, which entered into force on 21 September 1970, 20 December 1971, 1 January 1990 and 1 November 1998, respectively. **Article 2 states:**

> **(1) Everyone's right to life shall be protected by law.** No one shall be deprived of his life intentionally save in the execution of a sentence of a court following his conviction of a crime for which this penalty is provided by law.

> **(2) Deprivation of life shall not be regarded as inflicted in contravention of this article when it results from the use of force which is no more than absolutely necessary:**

> > **(a) In defence of any person from unlawful violence;**

> > **(b) In order to effect a lawful arrest or to prevent the escape of a person lawfully detained;**

> > **(c) In action lawfully taken for the purpose of quelling a riot or insurrection.**

[37] John Cerone, "A HUMAN RIGHT OF SELF-DEFENCE?", George Mason Journal of Law, Economics, & Policy (accepted for 2006 publication).

**07 1616**

**FILED**

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

33

*non-State actors."* This United Nations conclusion and recommendation stands directly counter to American jurisprudence.

> "[C]itizens have no right to demand or even expect police protection. Courts have consistently ruled "that there is no constitutional right to be protected by the state against being murdered by criminals or madmen." *Bowers* v. *DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). Furthermore, courts have ruled that the police have no duty to protect the individual citizen. *DeShaney* v. *Winnebago County Dep't of Social Serv.*, 109 S.Ct. 998, 1004 (1989); *South* v. *Maryland*, 59 U.S. 396 (1855); *Morgan* v. *District of Columbia*, 468 A.2d 1306 (D.C. App. 1983) (en banc); *Warren* v. *District of Columbia*, 444 A.2d 1 (D.C. App. 1981) (en banc); *Ashburn* v. *Anne Arundel County*, 360 Md. 617, 510 A.2d 1078 (1986).

From Amicus Curia Brief of *CONGRESS OF RACIAL EQUALITY* in Support of Appellants Seeking Reversal, *Parker, et al.* v. *District of Columbia, et al.*, DC Circuit No. 04-7041. (These cases were not cited in the DC Circuit's Opinion finding in favor of Parker. However the DC Circuit did rule that the Second Amendment is an individual right.

## Exhibit 5.

**UNITED NATIONS GENERAL ASSEMBLY**
**A/HRC/Sub.1/58/27**
**27 July 2006**

HUMAN RIGHTS COUNCIL
Sub-Commission on the Promotion and Protection of Human Rights
Fifty-eighth session
Item 6 of the provisional agenda

**SPECIFIC HUMAN RIGHTS ISSUES**

# Prevention of human rights violations committed with small arms and light weapons.

Final report submitted by Barbara Frey, Special Rapporteur,
in accordance with Sub-Commission resolution 2002/25**

## II. THE PRINCIPLE OF SELF-DEFENCE WITH REGARD TO HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS AND LIGHT WEAPONS

Excerpts (p. 8)
(http://www.iansa.org/un/documents/salw_hr_report_2006.pdf)

19. This report discusses and recognizes the principle of self-defence in human rights law and assesses its proper place in the establishment of human rights principles governing small arms and light weapons.[38] **Those opposing the State regulation of civilian possession of firearms claim that the principle of self-defence provides legal support for a "right" to possess small arms thus negating or substantially minimizing the duty of States to regulate possession.[39] _The present report concludes that the principle of self-defence has an important place in international human rights law, but that it does not provide an independent, legal supervening right to small arms_**

---

[38] Because of the severe limits on space and the breadth of issues that need to be covered in this study, the author does not attempt here to undertake a full legal discussion of the principle of self-defence in international law. For an authoritative discussion of this complex topic, see Antonio Cassese, International Criminal Law (2003). In addition, the legal concepts discussed herein assume a non-conflict setting. Situations of mass human rights abuse and armed conflict involve international humanitarian law and security law principles that require an extended if not completely separate set of legal and policy considerations. For the Special Rapporteur's findings and recommendations regarding role of small arms and light weapons in violations of human rights and international humanitarian law in armed conflict, see her progress report (E/CN.4/Sub.2/2004/37).

[39] David Kopel, Paul Gallant, and Joanne Eisen, "IS RESISTING GENOCIDE A HUMAN RIGHT?" Notre Dame Law Review, vol. 81, No. 4 (2006), p. 1 ("... The Universal Declaration of Human Rights affirms the existence of a universal, individual right of self-defense, and also a right to revolution against tyranny ... Taken in conjunction with A American human rights law, the human rights instruments can be read to reflect a customary or general international law recognizing a right of armed resistance by genocide victims".).

07 1616

FILED

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

***possession***, nor does it ameliorate the duty of States to use due diligence in regulating civilian possession.[40]

## A. SELF-DEFENCE AS AN EXEMPTION TO CRIMINAL RESPONSIBILITY, NOT A HUMAN RIGHT (pp. 9-10)

20. Self-defence is a widely recognized, yet legally proscribed, exception to the universal duty to respect the right to life of others. Self-defence is a basis for exemption from criminal responsibility that can be raised by any State agent or non-State actor. Self-defence is sometimes designated as a "right". There is inadequate legal support for such an interpretation. Self-defence is more properly characterized as a means of protecting the right to life and, as such, a basis for avoiding responsibility for violating the rights of another.

21. No international human right of self-defence is expressly set forth in the primary sources of international law: treaties, customary law, or general principles. While the right to life is recognized in virtually every major international human rights treaty, the principle of self-defence is expressly recognized in only one, the CONVENTION FOR THE PROTECTION OF HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS (EUROPEAN CONVENTION ON HUMAN RIGHTS), article 2.[41] Self-defence, however, is not recognized as a right in the European Convention on Human Rights. According to one commentator, "The function of this provision is simply to remove from the scope of application of article 2 (1) killings necessary to defend against unlawful violence. **It does not provide a right that must be secured by the State**".[42]

22. Self-defence is broadly recognized in customary international law as a defence to criminal responsibility as shown by State practice. There is not evidence however that States have enacted self-defence as a freestanding right under their domestic laws, nor is there evidence of *opinio juris* that would compel States to recognize an independent, supervening right to self-defence that they must enforce in the context of their domestic jurisdictions as a supervening right.

23. Similarly, international criminal law sets forth self-defence as a basis for avoiding criminal responsibility, not as an independent right. The International Criminal Tribunal for the Former

---

[40] Emphasis is the Plaintiff's.

[41] ***Convention for the Protection of Human Rights and Fundamental Freedoms***, 213 UNITED NATIONS TREATY SERIES 222, entered into force on 3 September 1953, as amended by Protocols Nos. 3, 5, 8 and 11, which entered into force on 21 September 1970, 20 December 1971, 1 January 1990 and 1 November 1998, respectively. **Article 2 states:**

**(1) Everyone's right to life shall be protected by law.** No one shall be deprived of his life intentionally save in the execution of a sentence of a court following his conviction of a crime for which this penalty is provided by law.

(2) Deprivation of life shall not be regarded as inflicted in contravention of this article when it results from the use of force which is no more than absolutely necessary:

  **(a) In defence of any person from unlawful violence;**

  **(b) In order to effect a lawful arrest or to prevent the escape of a person lawfully detained;**

  (c) In action lawfully taken for the purpose of quelling a riot or insurrection.

[42] John Cerone, "A HUMAN RIGHT OF SELF-DEFENCE?", George Mason Journal of Law, Economics, & Policy (accepted for 2006 publication).

Yugoslavia noted the universal elements of the principle of self-defence.[43] The International Criminal Tribunal for the Former Yugoslavia noted "that the 'principle of self-defence' enshrined in article 31, paragraph 1, of the Rome Statute of the International Criminal Court 'reflects provisions found in most national criminal codes and may be regarded as constituting a rule of customary international law'".[44]  As the chapeau of article 31 makes clear, self-defence is identified as one of the "grounds for excluding criminal responsibility". The legal defence defined in article 31, paragraph (d) is for:

> conduct which is alleged to constitute a crime within the jurisdiction of the Court has been caused by duress resulting from a threat of imminent death or of continuing or imminent serious bodily harm against that person or another person, and the person acts necessarily and reasonably to avoid this threat, provided that the person does not intend to cause a greater harm than the one sought to be avoided.[45]

Thus, international criminal law designates self-defence as a rule to be followed to determine criminal liability, and not as an independent right which States are required to enforce.

24. There is support in the jurisprudence of international human rights bodies for requiring States to recognize and evaluate a plea of self-defence as part of the due process rights of criminal defendants. Some members of the Human Rights Committee have even argued that article 6, paragraph 2, of the International Covenant on Civil and Political Rights requires national courts to consider the personal circumstances of a defendant when sentencing a person to death, including possible claims of self-defence, based on the States Parties' duty to protect the right to life.[46]  Under common law jurisdictions, courts must take into account factual and personal circumstances in sentencing to the death penalty in homicide cases. Similarly, in civil law jurisdictions: "Various aggravating or extenuating circumstances such as self-defence, necessity, distress and mental capacity of the accused need to be considered in reaching criminal conviction/sentence in each case of homicide."[47]

25. Again, the Committee's interpretation supports the requirement that States recognize self-defence in a criminal law context. Under this interpretation of international human rights law,

---

[43] Antonio Cassese, International Criminal Law (New York, Oxford University Press, 2003), p. 223, No. 2 (2003) (citing Prosecutor v. Kordić and Čerkez, International Criminal Tribunal for the Former Yugoslavia (Trial Chamber) (26 February 2001) at section 451). "In Kordić and Čerkez a Trial Chamber of the International Criminal Tribunal for the Former Yugoslavia held that self-defence as a ground for excluding criminal responsibility is one of the defences that 'form part of the general principles of criminal law which the International Tribunal must take into account in deciding the cases before it'." Idem at p. 223 (citing Prosecutor v. Kordić and Čerkez, International Criminal Tribunal for the Former Yugoslavia (Trial Chamber) (26 February 2001) at section 449).

[44] Ibid., p. 223, No. 2 (2003) (quoting Prosecutor v. Kordić and Čerkez, International Criminal Tribunal for the Former Yugoslavia (Trial Chamber) (26 February 2001) at section 451).

[45] ROME STATUTE OF THE INTERNATIONAL CRIMINAL COURT (A/CONF.183/9), adopted 17 July 1998, as corrected by the procés-verbaux of 10 November 1998, 12 July 1999, and 8 May 2000.

[46] See communication No. 806/1998 of the Human Rights Committee, Thompson v. Saint Vincent and the Grenadines (CCPR/C/70/D/806/1998) of 5 December 2000. In his dissent, Lord Colville said self-defence was an avenue for the defence to counter accusations of homicide which must result in acquittal of any crime, "unless the prosecution can satisfy the tribunal of facts that the defendant's actions, which led to the death, exceed a proportional response, in his own perception of the circumstances, to the threat with which he was faced" (para. 5).

[47] Human Rights Committee, communication No. 1077/2002, Jaime Carpo et al. v. Philippines (CCPR/C/77/D/1077/2002) of 15 May 2003 dissenting opinion of Mr. Nisuke Ando.

the State could be required to exonerate a defendant for using firearms under extreme circumstances where it may be necessary and proportional to an imminent threat to life. Even so, none of these authorities enumerate an affirmative international legal obligation upon the State that would require the State to allow a defendant access to a gun.

## B. NECESSITY AND PROPORTIONALITY REQUIREMENTS FOR CLAIM OF SELF-DEFENCE

### (PP. 10-11)

26. International bodies and States universally define self-defence in terms of necessity and proportionality.[48] Whether a particular claim to self-defence is successful is a fact-sensitive determination. When small arms and light weapons are used for self-defence, for instance, unless the action was necessary to save a life or lives and the use of force with small arms is proportionate to the threat of force, self-defence will not alleviate responsibility for violating another's right to life.

27. The use of small arms and light weapons by either State or non-State actors automatically raises the threshold for severity of the threat which must be shown in order to justify the use of small arms or light weapons in defence, as required by the principle of proportionality. Because of the lethal nature of these weapons and the jus cogens human rights obligations imposed upon all States and individuals to respect the right to life,[49] small arms and light weapons may be used defensively only in the most extreme circumstances, expressly, where the right to life is already threatened or unjustifiably impinged.

28. The requirements for a justifiable use of force in self-defence by State officials are set forth in the United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials. In exceptional circumstances that necessitate the use of force to protect life, State officials may use firearms and claim self-defence or defence of others as a justification for their decision to use force.[50] However, if possible to avoid the threat without resorting to force, the obligation to protect life includes the duty of law enforcement to utilize alternative non-violent and non-lethal methods of restraint and conflict resolution.[51]

---

[48] The presence of the principle of self-defence in emerging international criminal law reflects the global uniformity of the principle of self-defence and its elements. Antonio Cassese summarized the required elements of self-defence as a justification for criminal action in customary international criminal law as:

"(i) the action in self-defence is taken in response to an imminent or actual unlawful attack on the life of the person or or of another person;

(ii) there is no other way of preventing or stopping the offence [necessity];

(iii) the unlawful conduct of the other has not been caused by the person acting in self-defence;

(iv) the conduct in self-defence is proportionate to the offence to which the person reacts." Cassese, op. cit., p 222.

[49] Ibid. ("[T]he life, body, and dignity of human beings are protected by international norms having the rank of jus cogens, and are therefore not derogable by either States or Individuals.")

[50] Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, adopted by the Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Havana, Cuba, 27 August to 7 September 1990 (hereinafter "Basic Principles"), principle 9.

[51] Basic Principles, principle 4 ("Law enforcement officials, in carrying out their duty, shall, as far as possible, apply non-violent means before resorting to the use of force and firearms. They may use force and firearms only if other means remain ineffective or without any promise of achieving the intended result."). See also Office of the United Nations High Commissioner for Human Rights, Professional

29. The severe consequences of firearm use therefore necessitate more detailed and stricter guidelines than other means of force.[52] Even when firearm use does not result in death, the injuries caused by firearm shots can be paralyzing, painful, and may immobilize a person for a much longer period of time than would other methods of temporary immobilization.[53] The training handbook for police on human rights practices and standards produced by the Office of the High Commissioner for Human Rights says that "firearms are to be used only in extreme circumstance".[54] Any use of a firearm by a law enforcement official outside of the above-mentioned situational context will likely be incompatible with human rights norms.

. . .

## C. THE CLAIM OF SELF-DEFENCE DOES NOT NEGATE THE DUE DILIGENCE OBLIGATION TO PREVENT PRIVATE SECTOR VIOLENCE (pp. 12-13)

33. The individual's desire to carry a gun as self-defence must be considered in the broader context of the State's obligation to maximize protection of human rights. The State has an obligation under international law to promote law enforcement and to suppress private violence by creating a legal and social system in which the general duty is to avoid the use of force where non-violent means of self-protection are reasonably available. [55]

34. Even if there were a "human right to self-defence", it would not negate the State's due diligence responsibility to maximize protection of the right to life for the society through reasonable regulations on civilian possession of weapons. While there is no international mandate to prohibit all civilian ownership, neither is there a mandate to allow every individual

Training Series No. 5/Add.3, Human rights standards and practice for the police (United Nations publication Sales No. E.03.XIV.7) (2004), p. 23.

[52] Basic Principles, article 9, states that "Intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life". See also Human Rights Committee, Consideration of Reports Submitted by States parties under article 40 of the Covenant, Second periodic report of States parties due in 1996, Addendum: Ireland (28 April 1999) (CCPR/C/IRL/98/2, para. 113). "The Human Rights Committee, in its comments on the first periodic report of Ireland (A/48/40, para. 612) emphasized the importance of the issuing of rules and guidelines on, inter alia, the use of firearms, and ensuring the strict enforcement thereof by law enforcement officials." "The regulations governing the use of firearms by the Gardaí forces in Ireland thereafter developed are detailed in the Irish Garda Code 25.42." Idem., para. 117.

[53] Small Arms Survey 2001: Profiling the Problem (Geneva, the Graduate Institute of International Studies, 2001), pp. 216-17. ("Victims of small arms injuries often require resource-intensive surgery, followed by prolonged hospitalization and rehabilitation ... For the individual, the repercussions from firearm injury are profound ... [including] long-term, often permanent, psychological trauma and social arginalization.")

[54] Office of the United Nations High Commissioner for Human Rights, Professional Training Series No. 5/Add.3, Human rights standards and practice for the police (United Nations publication Sales No. E.03.XIV.7) (2004), p. 24. The handbook further states that:

Firearms are to be used only in self-defence or defence of others against imminent threat of death or serious injury, or to prevent a particularly serious crime that involves a grave threat to life, or to arrest or prevent the escape of a person posing such a threat and who is resisting efforts to stop the threat and in every case, only when less extreme measures are insufficient. Intentional lethal use of force and firearms shall be permitted only when strictly unavoidable in order to protect human life.

[55] *Nachova and Others v. Bulgaria* (Application Nos. 43577/98 and 43579/98) [2004], European Convention on Human Rights 89 (26 February 2004), para. 105.

to carry a weapon. The State must consider the community as a whole, and not just the single individual, in carrying out its obligation to minimize physical violence.

35. For example, even if there were a "right" to self-defence, that would not negate the State's due diligence responsibility to keep weapons out of the hands of those most likely to misuse them. As the responses to the Special Rapporteur's questionnaire show, screening for likely misuse is one of the measures commonly used by States to implement legitimate State policy interests in preventing small arms violence by non-State actors. This common State practice is an example of the responsible implementation of the legal principle of due diligence that has been elaborated in many international bodies with no apparent negative impact on self-defence law. Thus it appears that States, at the very least, should put in place regulations to keep weapons away from certain people who - based on factors such as age, past record of criminality or personal violence, or lack of mental fitness - can be reasonably expected not to understand or comply with the requirements of necessity and proportionality that are the prerequisites to invoking self-defence.

36. Having established that the affirmative duty of States to impose some regulation on unfettered civilian possession is not inconsistent with principles of self-defence, other instances of appropriate regulation may also be identified. For example, the State has particularly acute obligations when it comes to protecting the rights of vulnerable groups, including victims of domestic violence, who are most at risk from misuse of a gun in the home. The presence of a gun in the home can easily turn domestic violence into domestic homicide. Recent studies show that, in the United States, firearms are used in 59 per cent of all intimate partner homicides of women,[56] and having one or more guns in the home makes a woman 7.2 times more likely to be murdered by an intimate partner.[57] Despite self-defence justifications for possessing a firearm, research indicates that firearms are rarely used to stop crimes or kill criminals.[58] Instead, they are often turned on the very person who may have the best arguments for self-defence – the woman herself.[59] In the face of such evidence and under the international due diligence legal mandate that has been elaborated by human rights bodies to prevent violence against women - including:

> "the duty of Governments to ... exercise due diligence to prevent, investigate and, in accordance with national legislation, to punish acts of violence against women and to take appropriate and effective action concerning acts of violence against women, whether those acts are perpetrated by the State or by private persons ..."[60]

- the State has an irrefutable international legal duty to keep small arms out of the hands of persons who have a history of interfamilial violence.

---

[56] United States Bureau of Justice Statistics, 2002, cited in Small Arms Survey 2004: rights at risk, A project of the Graduate Institute of International Studies, Geneva, p. 183.

[57] James E. Bailey, MD, MPH, et. al., "Risk factors for violence death of women in the home," Archives of Internal Medicine, vol. 157, No. 7 (1997), pp. 777-782.

[58] In 2003 only 203 justifiable homicides by private citizens using firearms were reported by the United States Federal Bureau of Investigation Uniform Crime Reports, including 163 with handguns. This number compares to the 17,108 suicides, 11,829 homicides and 762 accidental deaths caused by firearms in 2003, data compiled by the Centers for Disease Control and Prevention.

[59] K.M. Grassel and others, *"Association Between Handgun Purchase and Mortality from Firearm Injury"*, INJURY PREVENTION, vol. 9 (2003) (reporting that women who were murdered were more likely, not less likely, to have purchased a handgun in the three years prior to their deaths).

[60] THE ELIMINATION OF VIOLENCE AGAINST WOMEN, Commission on Human Rights resolution 1996/49, para. 4.

37. Screening for likely misuse and removing of weapons where there is a history of interfamilial violence are two examples where States' duty of due diligence to regulate firearms is: (a) consistent with commonly reported State practices; and (b) not inconsistent with the principle of self-defence. Such regulations can be carried out in a manner that does not implicate issues of generalized confiscation that are raised disingenuously by opponents of any regulation of civilian possession. Other instances of such regulation may be evaluated based on the experience in States that have implemented them and on the criteria that have been discussed in this paper and the draft principles.

. . .

## III. CONCLUSIONS AND RECOMMENDATIONS (pp. 13-14)

40. To meet their obligations under international human rights law, States must enact and enforce laws and policies to maximize protection of human rights for the most people. States must consider the community as a whole and not just the single individual in carrying out their obligation to minimize violence by promoting law enforcement and suppressing private violence. International human rights law mandates States "to respect and to ensure" human rights to all individuals subject to their jurisdiction. Under this mandate, States have positive obligations to protect individuals from violations by State and non-State actors.

41. States must take effective measures to reduce the need for people to arm themselves by ensuring an atmosphere of public safety supported by law enforcement that is committed and trained to protect the rule of law and to prevent illegal acts.

42. States must also take effective measures to minimize violence carried out by armed private actors. States are required to enforce criminal sanctions against persons who use arms to violate the law. States are further required, under the principle of due diligence, to prevent small arms from getting into the hands of those who are likely to misuse them. Under the due diligence standard, international human rights bodies should require States to enforce a minimum licensing standard designed to prevent small arms from being used by private actors to violate human rights.

43. Other effective measures consistent with due diligence include the prohibition of civilian possession of weapons designed for military use; the sponsoring of effective amnesty programmes to decrease the number of weapons in active use; requirement of marking and tracing information by manufacturers; and incorporation of a gender perspective in policies regarding small arms. States have an affirmative duty under international human rights law to protect groups that are most vulnerable to small arms misuse, including victims of domestic violence.

44. The principle of self-defence, as an internationally recognized exemption from criminal responsibility, is not inconsistent with the due diligence responsibilities of States to regulate civilian possession of small arms. There is no independent or supervening right in international human rights law of self-defence that would require States to provide civilians with access to small arms; nor does the principle of self-defence diminish the State's responsibility to use due diligence to keep weapons out of the hands of those most likely to misuse them. Rather, States should exercise their due diligence responsibilities in the context of self-defence law, including the likelihood that those possessing firearms will act only out of necessity and with proportionality.

45. Article 51 of the Charter of the United Nations applies to States acting in self-defence in response to armed attacks against their State sovereignty. It does not apply to situations of self-defence for individual persons.

46. The Sub-Commission on the Promotion and Protection of Human Rights should act to clarify the positive responsibilities of States to prevent human rights violations committed with small arms. To this end, the Special Rapporteur with the task of preparing a comprehensive study on the prevention of human rights violations committed with small arms and light

weapons would welcome the endorsement by the Sub-Commission of the draft principles on the prevention of human rights violations committed with small arms (E/CN.4/Sub.2/2005/35) as an important contribution to the ongoing delineation of measures regarding small arms and light weapons to be carried out by States in order to give effect to international human rights in communities around the world.

## Exhibit 6.

# United Nations:
# You Have No Right To Self-Defense

Will Franklin's blog
www.willisms.com

http://www.willisms.com/archives/2006/08/united_nations.html

Glenn Reynolds[61] points to a UN report[62] that attempts to minimize the most basic and premier human right of all: self-defense -

> 20. Self-defence is a widely recognized, yet legally proscribed, exception to the universal duty to respect the right to life of others. Self-defence is a basis for exemption from criminal responsibility that can be raised by any State agent or non-State actor. Self-defence is sometimes designated as a "right". There is inadequate legal support for such an interpretation. Self-defence is more properly characterized as a means of protecting the right to life and, as such, a basis for avoiding responsibility for violating the rights of another.

If a guy breaks into your house with a gun, and you shoot him, you are 'violating his rights' according to the UN, not engaging in your right to self-defense. The UN's notion that there is "inadequate legal support" for the idea that self-defense is a human right is an agenda-driven wilful misreading of texts on the issue. The right to self-defense is the first among all human rights. Even Thomas Hobbes recognized that "summe of the Right of Nature" is "by all means we can, to defend our selves." Enlightenment literature and legal thought is replete with the concept of self-defense as the cornerstone of all natural rights. As an example, the Pennsylvania Declaration of 1776 stated that "the people have a right to bear arms for the defence of themselves and the state." In criticizing the UN report, the Claremont Institute [63]points out that the very founders of international law itself, who would count for something at the UN one would think, Grotius[64] and Emmerich de Vattel[65] both recognized the concept.

The UN is most eager to deny that self-defense is a right, because this would obligate the UN to defend the concept of individual self-defense. Since unarmed self-defense in a world full of weapons is too often meaningless, this puts the UN in the position of having to defend the individual right to bear arms. Quelle horror! Is there anything more vulgar to a silk-suited euroweenie diplomat than individual gun ownership? This should not baffle you - the UN and its supporters are proponents of a single world government, under the ludicrous belief that a unitary government would hold a monopoly on all arms throughout the world, thus abolishing violence. Then, once violence is abolished the UN may disarm itself and the glorious new age of peace, love and rainbows can ensue.

---

[61] http://instapundit.com/archives/032282.php

[62] http://www.iansa.org/un/documents/salw_hr_report_2006.pdf

[63] http://www.claremont.org/weblog/005192.html

[64] http://www.constitution.org/gro/djbp_201.htm

[65] http://www.constitution.org/vattel/vattel_02.htm

07 1616

**FILED**

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

43

The report goes out of its way to clear up any silly confusion about self-defense for States, including totalitarian regimes, as somehow also applying to lowly individual human beings:

"Article 51 of the Charter of the United Nations applies to the States acting in self-defence against armed attacks against their State sovereignty. It does not apply to situations of self-defence for individual persons."

How ironic, that the preeminent human rights organization in the world, the UN, gives the full panoply of protections and immunities under international law to someone like Kim Jong-Il, whereas if you engage in self-defense you are 'violating the rights of another.' This goes to the heart of an entire belief system rampant in the world today that thinks that all violence is bad regardless of circumstances and context, and that the problems of violence are caused by weapons and not those that wield them. We saw this in the 80's with the unilateral disarmament movement. They believed that reducing nuclear arsenals somehow reduced the chance of war breaking out. If we have an arsenal of 10,000 warheads and we reduce that arsenal to 5,000 warheads - voila! - we have reduced the chance of war by 50%! As if each warhead was just itching to detonate itself, so the fewer the better. And so it is with guns. Every gun is just waiting to go off, and so reducing the number of guns will somehow reduce violence. And as we all know, the mere possession of a gun causes the urge to violence in otherwise perfectly sane and law-abiding owners. So, if everyone just put their guns down, and put their full faith in sovereign government instead to protect them, we can begin to initiate the Reign of Peace.

Anyone see any holes in this logic?

## Exhibit 9.

# CITIZEN'S ARREST WARRANT
# FOR EXTORTION AND RACKETEERING ACTIVITIES

**FROM:**   **Don Hamrick, pro se**
            **In the Capacity of a** *PRIVATE ATTORNEY GENERAL*
            5860 Wilburn Road
            Wilburn, Arkansas

**TO:**   **Chief Justice, John G. Roberts**   **TO:**   **The Chief Judge**
          U.S. Supreme Court                            Of the Below Named Courts
          One First Street, NE
          Washington, DC 20543                 **TO:**   **FBI & U.S. Marshals Service**

PRESENT CASE:

    8th CIRCUIT, CASE NO. 07-2400

PREVIOUS CASES:

    U.S. District Court/DC, No. 02-1434 (OBEYED 28 U.S.C. § 1916)
    U.S. District Court/DC, No. 02-1435 (OBEYED 28 U.S.C. § 1916)
    U.S. District Court/DC, No. 03-2160 (OBEYED 28 U.S.C. § 1916)
    U.S. District Court/DC, No. 04-0422 (OBEYED 28 U.S.C. § 1916)
    U.S. District Court/DC, No. 04-2040 (OBEYED 28 U.S.C. § 1916)
    U.S. District Court/DC, No. 05-1993 (OBEYED 28 U.S.C. § 1916)
    U.S. District Court/Charlotte, NC), No. 04-0065 (OBEYED 28 U.S.C. § 1916)
    U.S. District Court/Charlotte, NC), No. 04-0344 (OBEYED 28 U.S.C. § 1916)
- DC Circuit, No. 02-5334  (VIOLATED THE LAW)
- DC Circuit, No. 04-5316  (VIOLATED THE LAW)
- DC Circuit, No. 05-5414  (VIOLATED THE LAW)
- DC Circuit, No. 05-5429  (VIOLATED THE LAW)
- U.S. District Court/Little Rock, No. 06-0044. (VIOLATED THE LAW)
- U.S. Supreme Court, Nos. 03-145 (VIOLATED THE LAW)
- U.S. Supreme Court, Nos. 04-1150 (VIOLATED THE LAW)
- U.S. Supreme Court, Nos. 04M56 (VIOLATED THE LAW)

# CASE LAW

*Mireles v. Waco*, 502 U.S. 9, at 11 (1991):
". . . a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in
the judge's judicial capacity. *Forrester v. White*, 484 U.S., at 227 -229; *Stump v. Sparkman*,
435 U.S., at 360 .

*Chandler v. Judicial Council*, 398 U.S. 74, at 140 (1970), Chief Justice Berger:
*"If [judges] break a law, they can be prosecuted."*

07 1616

**FILED**

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

I, Don Hamrick, *sui juris*, citizen of Arkansas and of the United States under the Ninth, Tenth, Thirteenth and Fourteenth Amendments, am the unrepresented civil Plaintiff acting in the capacity of a *PRIVATE ATTORNEY GENERAL* with a civil RICO Act case against the United States Government (President George W. Bush, et al) and against the United Nations for breach of the United Nations Charter, Article 2, Clause 7, in defense of not only my own rights under the Second Amendment but also for the Second Amendment rights of the citizens of the United States at large, and under penalty of perjury, under the laws of the United States of America, hereby warrant that probable cause exists to justify the immediate arrest and arraignment of federal judges and their court clerks so named or implicated above on formal charges of participating as principals (18 U.S.C. § 2) in racketeering activities (18 U.S.C. § 1962) as accessory after the facts (18 U.S.C. § 3) and misprision of felony (18 U.S.C. § 4), of an unlawful and an unconstitutional protection scheme over the Second Amendment and for felony extortion (18 U.S.C. § 872) and conspiring to engage in a pattern of racketeering activities and related RICO "predicate acts" in connection with the above Civil RICO action, in violation of the criminal statutes at 18 U.S.C. 1961(1)(A), "Extortion" of exempted filing fees from the unrepresented civil Plaintiff Don Hamrick, a fully documented U.S. merchant seamen in violation of the Seamen's Suit law (28 U.S.C. § 1916).

## Miranda Warning

Pursuant to the holding of the U.S. Supreme Court in the case of *Miranda* v. *Arizona*, the above named or implicated persons have previously been informed, in writing transmitted via first class U.S. Mail and/or by email, that they have the Right to remain silent; that the above named or implicated judges and court clerks have the Right to effective assistance of Counsel; and that anything which they may say, or do, from that point forward, can and will be held against them in a court of Law.

I hereby verify also, under penalty of perjury, under the laws of the United States of America that I am the victim of felony extortion (18 U.S.C. § 872) under color of law (18 U.S.C. § 241 and 18 U.S.C. § 242) in retaliation for participating in Federal Protected Activities (18 U.S.C. § 245) of the federal judicial system as a U.S. merchant seaman and as an unrepresented civil Plaintiff acting in the capacity of a *PRIVATE ATTORNEY GENERAL* in defense of not only my own statutory, civil, and constitutional rights as a U.S. merchant seaman and as a U.S. citizen but also the same statutory, civil, and constitutional rights of all U.S. merchant seamen as a class of citizens and all U.S. citizens at large, and also as an eyewitness to, the criminal violations enumerated above.

Please make all necessary arrangements to execute the arrest of the above named or implicated judges and court clerks, and/or to schedule on-site assistance from the **Capitol Police, the FBI** and/or **the U.S. Marshals Service** to the victim, Don Hamrick, for purposes of executing a proper Citizen's Arrest, at a time and place convenient to the victim and to your office.

Thank you, in advance, for your immediate cooperation in this matter.

Respectfully,

Don Hamrick

# CASE LAW

*United States* v. *Lee*, 106 U.S. 196, at 220 (1882):

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

*Cohens* v. *Virginia*, 19 U.S. 264, at 404 (6 Wheaton 264) (1821)

"It is most true that this Court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment and conscientiously to perform our duty. In doing this on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the Constitution and laws of the United States. We find no exception to this grant, and we cannot insert one."

*Duncan* v. *Missouri*, 152 U.S. 377, 382 (1894):

"[T]he privileges and immunities of citizens of the United States protected by the fourteenth amendment are privileges and immunities arising out of the nature and essential character of the federal government, and granted or secured by the constitution; and due process of law and the equal protection of the laws are secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government; . . ."

*Wilson* v. *State*, 33 **Arkansas**, 557, 560 (1878) (*striking a ban on unconcealed carry*).

"If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be pre vented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."

*Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764 (1993) **[PLAINTIFF'S NOTE: "I CAN PROVE MY CASE!]**

"[A] complaint should not be dismissed unless `it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain* v. *Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980) (quoting **Conley** v. **Gibson, 355 U.S. 41, 45 -46 (1957)**).

*Conley* v. *Gibson*, 355 U.S. 41 at 48 (1957)

"Following the simple guide of Rule 8 (f) that "all pleadings shall be so construed as to do substantial justice," we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a

proper decision on the merits. Cf. *Maty v. Grasselli Chemical Co.*, 303 U.S. 197. (1938) (*Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end.*)

*United States v. Chadwick*, 433 U.S. 1, at 16 (1976)

"... it is deeply distressing that the Department of Justice, whose mission is to protect the constitutional liberties of the people of the United States, should even appear to be seeking to subvert them by extreme and dubious legal arguments. It is gratifying that the Court today unanimously rejects the Government's position."

*Chandler v. Judicial Council*, 398 U.S. 74, at 140 (1970), Chief Justice Berger:

"If [judges] break a law, they can be prosecuted."

*Chandler v. Judicial Council*, 398 U.S. 74, at 140 (1970), Justice Black and Douglas in their dissenting opinion, 398 U.S. 74, at 141-142, agreed with Chief Justice Berger on the point above:

"While judges, like other people, can be tried, convicted, and punished for crimes ..."

*Forrester v. White*, 484 U.S. 219 (1988):

This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. Thus, for example, the informal and ex parte nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character. See *Stump v. Sparkman*, 435 U.S. 349, 363 , n. 12 (1978). Similarly, acting to disbar an attorney as a sanction for contempt of court, by invoking a power "possessed by all courts which have authority to admit attorneys to practice," does not become less judicial by virtue of an allegation of malice or corruption of motive. *Bradley v. Fisher*, 13 Wall., at 354. [484 U.S. 219, 228]   As the Bradley Court noted: "Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." Ibid.

Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts. In *Ex parte Virginia*, 100 U.S. 339 (1880), for example, this Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts. The Court reasoned:

"Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. ... That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?" Id., at 348.

Although this case involved a criminal charge against a judge, the reach of the Court's analysis was not in any obvious way confined by that circumstance.

Likewise, judicial immunity has not been extended to judges acting to promulgate a code of conduct for attorneys. *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719 (1980). In explaining why legislative, rather than judicial, immunity furnished the appropriate standard, we said: "Although it is clear that under

Virginia law the issuance of the Bar Code was a proper function of the Virginia Court, propounding the Code was not an act of adjudication but one of rulemaking." Id., at 731. Similarly, in the same case, we held that judges acting to enforce the Bar Code would be treated like prosecutors, and thus would [484 U.S. 219, 229]   be amenable to suit for injunctive and declaratory relief. Id., at 734-737. Cf. Pulliam v. Allen, 466 U.S. 522 (1984). Once again, it was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis.

## "The Substantial Benefit Doctrine"
### A.K.A. "The Private Attorney General Doctrine" & the RICO Act

To improve my education on the RICO Act as an unrepresented civil plaintiff, this past week I purchased by mail order directly from Thomson/West, the *Annotated Manual for Complex Litigation*, 4th Edition (2006) by David F. Herr. Citing Chapter 35, Civil RICO, p. 792-793. From that book:

Congress enacted the 1920 Racketeer (Influence and Corrupt Organizations Act (RICO) to respond to the "infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." Congress targeted organized crime through a broad statutory scheme that included severe criminal penalties, fines, imprisonment, asset forfeiture, and civil remedies in an effort to undermine the economic power of racketeering organizations. The statute further enabled private litigants to act, in effect, as private attorneys general to sue for injury to their businesses or property caused by a RICO violation.

Civil RICO claims have alleged wrongs actionable under state and common law, as well as other federal statutes. Although the statute was targeted at organized crime, courts have broadly construed RICO's provisions, and its scope has extended well beyond its original aim. Early efforts by lower courts restrict claims that appeared to exceed RICO's original goals were overruled by Supreme Court decisions that broadened the statute's reach. RICO claims can now be found in a variety of contexts, including insurance and business disputes, anti[-]abortion and other protests consumer financial services litigation, family law, and whistle-blower actions. Although the nontraditional uses of RICO have continued to expand despite significant criticism by commentators and the courts, Congress has shown little inclination to narrow the state's focus or reach.

***"Private attorney general? What the hell is that?!"*** **(I wondered).** A quick search on the Internet and I found one case law from the Supreme Court of Indiana giving a brief overview on the ***Private Attorney General Doctrine***. Bolding, underlined text, and the indexing dots are my emphasis as directly applying to my case:

### I. The Private Attorney General Doctrine: An Overview

As a prelude to analyzing Indiana law, we note that there are two basic attorney fee schemes: the English rule ("loser pays") and the American rule ("every man for himself"). W. Kent Davis, The International View of Attorney Fees in Civil Suits: Why Is the United States the "Odd Man Out" in How It Pays Its Lawyers?, 16 Ariz. J. Int'l & Comp. L. 361, 399, 403 (1999). Both schemes are grounded in statute. Id. at 400, 404.

Some view the English rule as more fair, arguing that a legal victory is not complete if one is out of pocket for attorney fees. Id. at 405. Proponents of the American rule respond:

[S]ince litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and [] the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel. Also, the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration.

*Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U.S. 714, 718 (1967) (citations omitted).

Courts in various American jurisdictions have sought a middle ground by using their inherent equitable powers to carve out exceptions to the American rule. *See Saint Joseph's Coll.* v. *Morrison, Inc.*, 158 Ind. App. 272, 279, 302 N.E.2d 865, 870 (1973). The most common exceptions are:

• The "obdurate behavior" exception, in which courts impose costs upon defendants as a punishment for bringing frivolous actions or otherwise acting in bad faith. Andrew W.

Hull, Attorney's Fees for Frivolous, Unreasonable or Groundless Litigation, 20 Ind. L. Rev. 151, 152-53 (1987).

- The "common fund" exception, in which an award benefits members of an ascertainable class, and the court reimburses the prevailing litigant's attorney fees out of that pool of money to prevent the unjust enrichment of free riders. Id. at n.11.

- The "private attorney general" exception, where courts award fees to litigants who bring actions to protect important social policies or rights. Id.

Judge Jerome Frank coined the phrase "private attorney general" in 1943, to describe a private person acting to "vindicate the public interest." Associated Indus. v. Ickes, 134 F.2d 694, 704 (2d Cir. 1943). In 1975, the U.S. Supreme Court resolved a federal circuit split by declining to reallocate by judicial decree the burdens of federal litigation under the private attorney general doctrine. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 270 n.46 (1975). The Court expressed concern that without statutory authorization, authority to make fee awards would leave courts free to "pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases." Id. at 269. The Court recently reaffirmed its commitment to the American rule, citing Alyeska, in Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 121 S.Ct. 1835, 1839 (Rehnquist, C.J., for majority), 1856 (Ginsburg, J., dissenting) (2001).

. . .

## III. Other Jurisdictions Have Mixed Views

### States Adopting the Exception.

A number of state high courts have adopted the private attorney general exception. One widely-cited case is Serrano v. Priest, 569 P.2d 1303 (Cal. 1977), in which the California Supreme Court recognized the exception because:

> In the complex society in which we live it frequently occurs that citizens in great numbers and across a broad spectrum have interests in common. These, while of enormous significance to the society as a whole, do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts. Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative. Because the issues involved in such litigation are often extremely complex and their presentation time-consuming and costly, the availability of representation of such public interests by private attorneys acting pro bono publico is limited.

Id. at 1313.

New Hampshire was among the most recent to adopt the private attorney general doctrine, in Claremont School District v. Governor, 761 A.2d 389 (N.H. 1999)(fees sought following declaratory judgment that the state public education funding system was unconstitutional). The New Hampshire Supreme Court observed that proportional and reasonable taxation is one of the core constitutional foundations of this State" and held that "[t]he public interest in preserving constitutional rights against governmental infringement is paramount. Only private citizens can be expected to 'guard the guardians.' Because the benefits of this litigation flow to all members of the public, the plaintiffs should not have to bear the entire cost of this litigation." Id. at 393-94.

ADDITIONAL READING:

Pamela S. Karlan, ***Disarming the Private Attorney General***, Univ. Illinois Law Review, Vol. 2003, No. 1. pp. 183-209.
http://home.law.uiuc.edu/lrev/publications/2000s/2003/2003_1/Karlan.pdf

> *In Disarming the Private Attorney General, Professor Karlan describes how the Supreme Court has created a significant regulation remedy gap by critically undercutting one of the primary mechanisms Congress has used for enforcing civil rights: the private attorney general. Professor Karlan identifies a series of techniques the Court has used to strip private individuals of their ability to enforce civil rights laws. On the one hand, the Court has expanded the scope of sovereign immunity under a new "Eleventeenth" Amendment jurisprudence and the scope of compelled arbitration under the Federal Arbitration Act. On the other hand, the Court has contracted the availability of implied rights of action and attorney's fees. The overall effect of the Court's decisions is to severely restrict enforcement of basic antidiscrimination requirements.*

William B. Rubenstein, ***On What a Private Attorney General is - And Why it Matters***, Vanderbilt Law Review, Vol. 57, No. 6, p. 2129, November 2004
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=743544

> First, private attorneys general are persons who mix public and private functions in the adjudicative arena, but they do so in a variety of ways that can best be understood when mapped onto a spectrum. Private attorneys general occupy the middle portion of a lawyering spectrum that runs from private lawyering on one side to public lawyering on the other.

> Second, within this middle, three distinct types of public/private mixes are presently identifiable -- those I label substitute attorneys general, supplemental attorneys general, and simulated attorneys general.

> Third, two sets of legal doctrines -- standing and attorneys' fees -- police the margins between private attorneys general and regular attorneys. Standing doctrine polices the boundary between public attorneys and private attorneys general: the former represent the public interest by job description; the latter are permitted in the federal court, to represent the public interest only when they have some private stake of their own in the matter. Attorneys' fees doctrine polices the boundary between private attorneys and private attorneys general. The former represent only private clients and are paid only by them; the latter perform a function that exceeds pure private representation and are therefore entitled to some different type of fee arrangement.

> Fourth, supplemental private attorneys general are synchronically so -- performing public and private functions at the same time, not episodically. However, the quantities of public and private presented in the synchronic mix can vary. Some supplemental attorneys general perform significant public functions with only scant private interests at stake (such as environmental citizen-suit plaintiffs) while others perform incidental public functions with significant private interests at stake (such as mass tort class action plaintiffs).

**ADVISORY:** It is my understanding that if the FBI, the U.S. Marshals Service, the U.S. Attorneys and the U.S. Department of Justice refuse to acknowledge that felony extortion has been committed by the federal courts and/or refuse to assist me with the "Citizen's Arrest" procedure ( i.e., being present at the time of Citizen's Arrest in order to take the arrested judge or court clerk into "physical custody" or take any action to hinder or prevent me from making a Citizen's Arrest by threatening me with arrest that such acts will be construed as Obstruction of Justice, notwithstanding any lawful reason or authority why I cannot make Citizen's Arrests of judges or court clerks (including the U.S. Supreme Court) for felony extortion under the above circumstances.

# AFFIDAVIT OF REPLEVIN

CASE LAW ON CIVIL RICO:

The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity.[66]1 Id., at 187 (citing Malley-Duff , 483 U. S., at 151 ) (civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to investigate"). The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better. Rottella v. Wood 528 U.S. 549 (2000), 147 F.3d 438.

PRIVATE ATTORNEY GENERAL:

Citing Pamela S. Karlan, DISARMING THE PRIVATE ATTORNEY GENERAL, University of Illinois Law Review, [Vol. 2003, No. 1, pp. 183-209] introduction and conclusion:

In Disarming the Private Attorney General, Professor Karlan describes how the Supreme Court has created a significant regulationremedy gap by critically undercutting one of the primary mechanisms Congress has used for enforcing civil rights: the private attorney general. Professor Karlan identifies a series of techniques the Court has used to strip private individuals of their ability to enforce civil rights laws. On the one hand, the Court has expanded the scope of sovereign immunity under a new "Eleventeenth" Amendment jurisprudence and the scope of compelled arbitration under the Federal Arbitration Act. On the other hand, the Court has contracted the availability of implied rights of action and attorney's fees. The overall effect of the Court's decisions is to severely restrict enforcement of basic antidiscrimination requirements.

Conclusion

The overriding theme that links together the Supreme Court's decisions on a range of issues— from the scope of Eleventh Amendment immunity to the scope of congressional power under section 5 of the Fourteenth Amendment, and from when to find implied rights of action to when to award attorney's fees—can be stated quite simply: The current Court is creating an ever-greater regulation-remedy gap. It has left Congress free to regulate a wide range of subjects, but it is engaged in a form of court stripping that reduces the possibilities for judicial enforcement of statutory commands. Thus, I would argue that a "virulent variety of freewheeling interventionism lies at the core of [the Court's] devices of restraint."[67]

The Congress and Supreme Court of an earlier era constructed the institution of the private attorney general because they recognized that, without private attorneys general, it would be impossible to realize some of our most fundamental constitutional and political values. The current Court seems bent on dismantling this centerpiece of the Second Reconstruction. For all its invocations of Marbury's declaration that it "is emphatically the province and the duty of the judicial department to say what the law is,"[68] the current Court seems to have forgotten

---

[66] This objective of encouraging prompt litigation to combat racketeering is the most obvious answer to Rotella's argument that the injury and pattern discovery rule should be adopted because "RICO is to be read broadly" and " `liberally construed to effectuate its remedial purposes,' " *Sedima , S. P. R. L. v. Imrex Co.* , 473 U. S. 479, 497-498 (1985) (quoting Pub. L. 91-452, §904(a), 84 Stat. 947).

[67] Gunther, supra note 6, at 25. The quoted text summarizes Gunther's assessment of Alexander M. Bickel's article, *The Passive Virtues.*

[68] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

Marbury's equally important acknowledgment—that "the government of the United States has been emphatically termed a government of laws, and not of men," but "will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."[69]  When the law furnishes no remedy because the Supreme Court has cast out the remedies that the political branches have tried to provide, then the courts threaten to become the most dangerous branch "to the political rights of the Constitution,"[70]5 and not the least.

## SEAMEN'S SUIT LAW 28 U.S.C. § 1916:

"In all courts of the United States, seamen may institute and prosecute suits and appeals in their own names and for their own benefit for wages or salvage or the enforcement of laws enacted for their health or safety without prepaying fees or costs or furnishing security therefor."

## EXTORTION BY OFFICERS OR EMPLOYEES OF THE UNITED STATES, 18 U.S. CODE § 872.

Whoever, being an officer, or employee of the United States or any department or agency thereof, or representing himself to be or assuming to act as such, under color or pretense of office or employment commits or attempts an act of extortion, shall be fined under this title or imprisoned not more than three years, or both; but if the amount so extorted or demanded does not exceed $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

## EXTORTION IS DEFINED AS:

"The obtaining of property from another induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." BLACK'S LAW DICTIONARY - 6th Edition

## AFFIRMATION OF REPLEVIN (See Exhibit 3):

(1) Description of the property claimed: $350 filing fee of the Court.

(2) Its actual value is $350. The amount in damages for extorting the filing fee is indeterminable by the Plaintiff.

(3) The Plaintiff is the rightful owner of that money and he is entitled to immediate reimbursement of that money.

(4) Judge George Howard and the Court wrongfully extorted the Court's filing fee from the Plaintiff under color of official right, in violation of the black-letter reading of the Seamen's Suit Law, according to the best knowledge, information, and belief of the affiant plaintiff.

(5) The $350 was not for a tax or fine against the plaintiff, or under any order or judgment of a court against him or her, or seized under an execution or attachment against his or her property.

(6) That the plaintiff's cause of action has accrued on September 11, 2006, well within the three year limit.

---

[69] Marbury, 5 U.S. at 163.

[70] THE FEDERALIST NO. 78, supra note 3, at 465.

PRESUMPTIONS IN GENERAL IN CIVIL ACTIONS AND PROCEEDINGS,
Rule 301. Federal Rules of Evidence

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

## PLAINTIFF'S PRESUMPTIONS:

(1) Exhibit 1 and Exhibit 6 are construed to be or includes the "federal right" to make a citizen's arrest of Judge George Howard and the Court Clerk for felony extortion, 18 U.S. Code § 872 of the Court's filing fee in violation of the Seamen' Suit Law, 28 U.S.C. § 1916, aided by Exhibit 2, Arkansas Code 16-81-106(d). AUTHORITY TO ARREST and DC CODE § 23-582 ARRESTS WITHOUT WARRANT BY OTHER PERSONS.

(2) The procedure for Citizen's Arrest to be employed by the Plaintiff will be the standard procedure commonly done at the local law enforcement level but assisted by a U.S. Marshal or Deputy U.S. Marshal, see EXHIBIT 2, ARKANSAS CODE 16-81-106(g)(4) AUTHORITY TO ARREST, and ARKANSAS CODE 16-81-107 PROCEDURES OF ARREST.

(3) Replevin is perhaps my last available remedy to rectify the Court's extortion of the $350 before it becomes necessary to make the Citizen's Arrests in the event that the Eighth Circuit denies my appeal for Rule Nisi on the Seaman's Suit Law. This is the classic push coming to shove situation in the constitutional fight to restore the balance of power under the Tenth Amendment, albeit at the minimal level of litigation in defense of a Seaman's statutory right to the exemption of filing fees and court costs that Judge George Howard and the Court Clerk has unlawfully denied. See EXHIBIT 3 ARKANSAS CODE 18-60-809. REPLEVIN and ARKANSAS CODE18-60-810. AFFIDAVIT FOR REPLEVIN.

(4) In accordance with ARKANSAS CODE 5-2-603 EXECUTION OF PUBLIC DUTY (see EXHIBIT 5) I am justified to pursue Replevin and Citizen's Arrest because I reasonably believe Replevin and/or Citizen's Arrest are required and authorized by comparative implication of the November 9, 2006 Court Order of Judge Frank D. Whitney of the U.S. District Court in Charlotte, North Carolina, in an unrelated civil case (No. 3:04-cv-0344-W), acknowledging and recognizing the Seamen's Suit Law stating, in part: "If the Plaintiff elects to exercise his appeal rights, the Court finds that 28 U.S.C. § 1916 waives the requirement of prepayment of docket fees or furnishing security therefor, and the Clerk of the Court is so instructed."

(5) The U.S. District Court for the District of Columbia is another court that acknowledged and recognized the Seamen's Suit Law in the Second Amendment cases that I filed in that court from 2002 to 2005. However, the DC Circuit and the U.S. Supreme Court coerced payment of their respective filing fees in clear and convincing violation of the Seamen's Suit Law. Success in Replevin or Citizen's Arrest for extortion in the present case before the U.S. District Court in Little Rock will provide vindication of my rights under 42 U.S.C. § 1988. PROCEEDINGS IN VINDICATION OF CIVIL RIGHTS.

(6) If my Second Amendment case proceeds to trial I will have the opportunity to cause the State of Arkansas to investigation federal gun control laws and legislation as well as state gun control laws and legislation with the purposes of revision or repeal, streamlining firearms laws to be more in line with National Open Carry Handgun, (see EXHIBIT 5, ARKANSAS CODE 25-21-103. INVESTIGATION OF FEDERAL LEGISLATION ON REQUEST OF SENATORS OR REPRESENTATIVES, stating, "The [Arkansas] Attorney General shall also make any reasonable

or appropriate investigation or study of any existing or proposed federal legislation to determine its effect upon the state and its citizens whenever he is requested so to do by any of this state's Senators or Representatives in Congress and report the result of such investigation or study."

## PLAINTIFF'S DEMAND FOR ONE OF TWO REMEDIES

Therefore, with the aforesaid Affidavit for Replevin and the aforesaid Motion for Writ of Replevin and Writ of Arrest on Affidavit of Replevin, I hereby demand the return of my $350 filing fee. Denial of my Motion for Replevin and/or Writ of Arrest on Affidavit of Replevin as a justified remedies I will be left with one other alternative, Citizen's Arrest as a means of last resort in the event the Eight Circuit denies my appeal for the return of the $350 filing fee.

Don Hamrick, Plaintiff, pro se a
5860 Wilburn Road a
Wilburn, Arkansas 72179

CITIZEN'S ARREST WARRANT EXHIBIT 1.

## FEDERAL RULES OF CIVIL PROCEDURE

### RULE 64. SEIZURE OF PERSON OR PROPERTY

"At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought, subject to the following qualifications:

(1) any existing statute of the United States governs to the extent to which it is applicable;

(2) the action in which any of the foregoing remedies is used shall be commenced and prosecuted or, if removed from a state court, shall be prosecuted after removal, pursuant to these rules.

The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action."

CITIZEN'S ARREST WARRANT EXHIBIT 2.

CITIZEN'S ARREST
ARKANSAS CODE

TITLE 16. PRACTICE, PROCEDURE, AND COURTS.
SUBTITLE 6. CRIMINAL PROCEDURE GENERALLY.

Arkansas Code 16-81-106. Authority to arrest.

ARKANSAS CODE 16-81-106(d) A private person may make an arrest where he or she has reasonable grounds for believing that the person arrested has committed a felony.

ARKANSAS CODE 16-81-106(g) The following persons employed as full-time law enforcement officers by the federal, state, county, or municipal government, who are empowered to effect an arrest with or without warrant for violations of the United States Code and who are authorized to carry firearms in the performance of their duties, shall be empowered to act as officers for the arrest of offenders against the laws of this state and shall enjoy the same immunity, if any, to the same extent and under the same circumstances as certified state law enforcement officers:

(1) Federal Bureau of Investigation special agents;

(2) United States Secret Service special agents;

(3) United States Citizenship and Immigration Services special agents, investigators, and patrol officers;

(4) United States Marshals Service deputies;

(5) Drug Enforcement Administration special agents;

(6) United States postal inspectors;

(7) United States Customs and Border Protection special agents, inspectors, and patrol officers;

(8) United States General Services Administration special agents;

(9) United States Department of Agriculture special agents;

(10) Bureau of Alcohol, Tobacco, Firearms and Explosives special agents;

(11) Internal Revenue Service special agents and inspectors;

(12) Certified law enforcement officers of the United States Department of the Interior, National Park Service, and the United States Fish and Wildlife Service;

(13) Members of federal, state, county, municipal, and prosecuting attorneys' drug task forces; and

(14) Certified law enforcement officers of the United States Department of Agriculture, Forest Service.

ARKANSAS CODE 16-81-107. PROCEDURES OF ARREST.

(a) An arrest is made by placing the person of the defendant in restraint or by his or her submitting to the custody of the person making the arrest.

(b) No unnecessary force or violence shall be used in making the arrest.

(c) To make an arrest, a law enforcement officer may break open the door of a house in which the defendant may be after having demanded admittance and explained the purpose for which admittance is desired.

(d) A law enforcement officer making an arrest may summon orally as many persons as he or she deems necessary to aid him or her in making the arrest, and all persons failing without reasonable excuse to obey the summons shall be guilty of Class C misdemeanors.

(e) The person making the arrest shall:

(1) Inform the person about to be arrested of the intention to arrest him or her and the offense for which he or she is to be arrested; and

(2) If acting under a warrant of arrest, give information of the warrant and show the warrant if required.

(f) The law enforcement officer making an arrest in obedience to a warrant shall proceed with the defendant as directed by the warrant.

History. Crim. Code, §§ 36-40, 42; C. & M. Dig., §§ 2907-2912; Pope's Dig., §§ 3723-3728; A.S.A. 1947, §§ 43-412 - 43-414, 43-415 - 43-417; Acts 2005, No. 1994, § 412.

CITIZEN'S ARREST WARRANT EXHIBIT 3.

ARKANSAS CODE

TITLE 18. PROPERTY
SUBTITLE 5. CIVIL ACTIONS
CHAPTER 60. MISCELLANEOUS PROCEEDINGS RELATING TO PROPERTY
SUBCHAPTER 8.
RECOVERY OF PERSONAL PROPERTY AND REPLEVIN

ARKANSAS CODE 18-60-809. REPLEVIN

The plaintiff in an action to recover the possession of specific personal property, at the commencement of the action or at any time before judgment, may claim the immediate delivery of the property, as provided in §§ 18-60-810 - 18-60-822.

History. Civil Code, § 202; C. & M. Dig., § 8639; Pope's Dig., § 11372; A.S.A. 1947, § 34-2101.

ARKANSAS CODE18-60-810. AFFIDAVIT FOR REPLEVIN.

(a) An order for the delivery of property to the plaintiff shall be made by the clerk when there is filed in his or her office an affidavit of the plaintiff, or of someone in his or her behalf, showing:

(1) A particular description of the property claimed;

(2) Its actual value and the damages which the affiant believes the plaintiff ought to recover for the detention thereof;

(3) That the plaintiff is the owner of the property or has a special ownership or interest therein, stating the facts in relation thereto, and that he or she is entitled to the immediate possession of the property;

(4) That the property is wrongfully detained by the defendant, with the alleged cause of the detention thereof, according to the best knowledge, information, and belief of the affiant;

(5) That it has not been taken for a tax or fine against the plaintiff, or under any order or judgment of a court against him or her, or seized under an execution or attachment against his or her property, or, if so seized, that it is by statute exempt from seizure;

(6) That the plaintiff's cause of action has accrued within three (3) years; and

(7) When the action is brought to recover property taken under an execution, the fact of the taking and the nature of the process under which it was done.

(b) When the delivery of several articles of property is claimed, the affidavit must state the value of each.
History. Civil Code, §§ 203, 204; Acts 1871, No. 48, § 1 [203], p. 219; 1887, No. 29, § 1, p. 31; C. & M. Dig., §§ 8640, 8641; Pope's Dig., §§ 11373, 11374; A.S.A. 1947, §§ 34-2102, 34-2103.

CITIZEN'S ARREST WARRANT EXHIBIT 4.

ARKANSAS CODE

SUBCHAPTER 6. JUSTIFICATION

ARKANSAS CODE 5-2-603. EXECUTION OF PUBLIC DUTY.

(b) The justification afforded by this section applies if the actor reasonably believes his or her conduct is required or authorized:

(1) By the judgment or direction of a competent court or tribunal or in the lawful execution of legal process, notwithstanding lack of jurisdiction of the court or tribunal or defect in the legal process; or

CITIZEN'S ARREST WARRANT EXHIBIT 5.

ARKANSAS CODE

TITLE 25. STATE GOVERNMENT

CHAPTER 21. UNIFORM LAW TO OPPOSE
FEDERAL ENCROACHMENT ON STATE RIGHTS

ARKANSAS CODE 25-21-101. STUDY OF EXISTING FEDERAL LEGISLATION.

In order to secure concerted action among the states to oppose federal encroachments upon the state powers, and to expedite the proper execution of the responsibility of the government in the war effort, it shall be the duty of the Attorney General to cooperate with the attorneys general of other cooperating states in making a study of existing federal legislation to determine whether, by the establishment of federal bureaus, boards, or commissions, or otherwise, such legislation has resulted in objectionable or harmful encroachments upon the normal field of state functions and powers, and, except during the war and insofar as the legislation is reasonably related to the conduct of the war to call to the attention of this state's Senators and Representatives in Congress all legislation which, in his opinion, is objectionable or harmful in this respect. He shall also furnish each such Senator and Representative a written statement of the reasons for his belief that such legislation is objectionable or harmful to the state, together with his suggestions for appropriate congressional legislation to remedy same.

History. Acts 1943, No. 166, § 1; A.S.A. 1947, § 5-401.

ARKANSAS CODE 25-21-102. STUDY OF PROPOSED FEDERAL
LEGISLATION.

It shall also be the duty of the Attorney General to likewise cooperate with such other attorneys general in making studies and examinations of all now pending or hereafter proposed congressional legislation to determine whether the same may result in federal encroachments into the normal field of state legislation or state functions, or whether same is harmful or beneficial to the interests of the state or its citizens, and to advise the Senators and Representatives in writing of his opinion and views with respect thereto, together with his reasons therefor; and to suggest any amendments to any such pending or proposed legislation which the Attorney General deems appropriate or necessary to protect the interests of the state and its citizens.

History. Acts 1943, No. 166, § 2; A.S.A. 1947, § 5-402.

ARKANSAS CODE 25-21-103. INVESTIGATION OF FEDERAL LEGISLATION ON REQUEST OF SENATORS OR REPRESENTATIVES.

The Attorney General shall also make any reasonable or appropriate investigation or study of any existing or proposed federal legislation to determine its effect upon the state and its citizens whenever he is requested so to do by any of this state's Senators or Representatives in Congress and report the result of such investigation or study.

History. Acts 1943, No. 166, § 3; A.S.A. 1947, § 5-403.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Don Hamrick, pro se, 5860 Wilburn Rd, Wilburn, AR In the Capacity of a Private Attorney General | UNITED NATIONS and UNITED STATES |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Cleburne County
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Unrepresented     Pro Se App

Case: 1:07-cv-01616
Assigned To : Collyer, Rosemary M.
Assign. Date : 9/10/2007
Description: Pro Se General Civil

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ● 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation  United Nations | | ● 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
- ☐ 410 Antitrust

### ○ B. Personal Injury/ Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)   OR   ● F. Pro Se General Civil

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☒ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

③

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

18 USC 1964 - RICO

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** 14 Million   Check YES only if demanded in complaint   **JURY DEMAND:**   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY** _N.F.O._   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE _Sept. 8, 2007_   SIGNATURE OF ATTORNEY OF RECORD _Dan Hammric_  UNREPRESENTED

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.