# In the U.S. District Court of the District of Columbia

333 Constitution Avenue, Washington, DC 20001

## No. 1:07-cv-1616, RMC

| | | |
|---|---|---|
| Don Hamrick, pro se | ) | |
| IN THE CAPACITY OF A | ) | |
| PRIVATE ATTORNEY GENERAL | ) | |
| 5860 Wilburn Road | ) | |
| Wilburn, AR 72179 | ) | **Civil RICO Act** |
| PLAINTIFF/APPELLANT | ) | **18 U.S.C. § 1964(a)** |
| v. | ) | |
| | ) | |
| United Nations | ) | |
| | ) | |
| United States | ) | |
| DEFENDANT/APPELLEE | ) | |

*Let this be filed*
*R. M. Collyer*
*11/21/07*

## PLAINTIFF'S MEMORANDUM OPINION ON ABUSIVE USE OF SUA SPONTE DISMISSALS AND SUMMARY JUDGMENT DISMISSALS WHEN GENUINE (TRIABLE) ISSUES OF MATERIAL FACTS PRECLUDE DISMISSALS AND THE FEDERAL COURTS SHORT-SHEETING THE ROLE OF THE PRIVATE ATTORNEY GENERAL

The federal courts have a distinct hatred for unrepresented civil plaintiffs. The federal courts these last 5 years, including the present Court today with my case herein has denied my right to judicial review of genuine and triable issues of material facts arising from the U.S. Coast Guard denying my Second Amendment rights resulting from mandatory small arms training under the Common Defence clause of the Preamble to the U.S. Constitution. What began in 2002 as an open and shut Second Amendment case with a Petition for Writ of Mandamus to the U.S. District Court for DC, No. 02-1434 and for damages, No. 02-1434 has evolved into civil RICO Act case against the United States and the United Nations and escalating even further into an international human rights case with the Inter-American Commission on Human Rights, Petition No. P-1142-06 simple because the federal judges standing in bias and prejudicial opposition due, in part, to political ideologies against the Second Amendment and/or against unrepresented civil plaintiffs. The intent of this Memorandum Opinion is to show that Judge Rosemary M. Collyer committed an egregious error of judgment in dismissing my case *sua sponte* when there are seriously genuine and triable issues of material facts suitable for a jury trial such that summary judgment dismissal and *sua sponte* dismissal is unwarranted. The remainder of this Memorandum Opinion speaks more expertly than I can as a layman.

1

# CIVIL RICO, FOREIGN DEFENDANTS, AND "ET"

Michael Goldsmith and Vicki Rinne
73 Minn. L. Rev. 1023, (April, 1989)

## II. JURISDICTIONAL BARRIERS TO EXTRATERRITORIAL RICO SUITS

Although courts have held that RICO applies to foreign as well as to United States defendants, *no extraterritorial RICO case has resulted in a judgment*.[1] Jurisdictional requirements have raised serious obstacles.[2] To accept an extraterritorial RICO case, a court

---

[1] Plaintiffs have filed approximately one dozen extraterritorial RICO cases in United States courts, four of which were dismissed for failure to prove jurisdiction. See *Michelson* v. *Merrill Lynch, Pierce, Fenner & Smith*, 709 F. Supp. 1270, 1285 (S.D.N.Y. 1989) (finding no jurisdiction over foreign defendants); *Huang* v. *Sentinel Gov't Sec.*, 657 F. Supp. 485, 491-92 (S.D.N.Y. 1987) (same); *Ancilla Domini Health Servs.* v. *Communications Assocs.*, No. 84-C-2771a (N.D. Ill. Nov. 5, 1985) (LEXIS, Genfed library, Dist file) (same); *Nordic Bank PLC* v. *Trend Group, L.*, 619 F. Supp. 542, 564 (S.D.N.Y. 1985) (same); *Soltex Polymer Corp.* v. *Fortex Indus.*, 590 F. Supp. 1453, 1460 (E.D.N.Y. 1984) (same), aff'd, 832 F.2d 1325 (2d Cir. 1987). In another five cases, plaintiffs established jurisdiction, but their RICO claims were stayed or dismissed. See *Republic of Phil.* v. *Marcos*, 818 F.2d 1473, 1490 (9th Cir. 1987) (holding RICO claims barred by act of state and political question doctrines); S.A. *Mineracao da Trinidade-Samitri* v. *Utah Int'l, Inc.*, 745 F.2d 190, 191 (2d Cir. 1984) (staying "non-arbitrable" RICO claims pending arbitration of other claims); *FMC Corp.* v. *Varonos*, No. 87-C-9640 (N.D. Ill. Oct. 20, 1988) (LEXIS, Genfed library, Dist file) (finding RICO claims insufficient); *Selman* v. *American Sports Underwriters*, No. 84-0099-C (W.D. Va. Oct. 4, 1988) (LEXIS, Genfed library, Dist file) (same); *Chisholm & Col.* v. *Bank of Jamaica*, 643 F. Supp. 1393, 1404-05 (S.D. Fla. 1986) (same).

Courts have maintained RICO causes of action against foreign defendants in only four cases. *See In re All Terrain Vehicles Litig.*, No. 88-237 (E.D. Pa. Feb. 23, 1989) (LEXIS, Genfed library, Dist file) (denying foreign defendant's motion to dismiss); *Chamarac Properties, N.V.* v. *Pike*, Fed. Sec. L. Rep. (CCH) 93,761 (S.D.N.Y. 1988) (same*); North Carolina* v. *Alexander & Alexander Servs.*, 680 F. Supp. 746, 750 (E.D.N.C.), certification for immediate appeal denied, 685 F. Supp. 114, 117 (E.D.N.C. 1988) (same); *Shulton, Inc.* v. *Optel Corp.*, 1987-1 Trade Cas. (CCH) 67,436 (D.N.J. 1986) (same).

[2] See, e.g., *Michelson* v. *Merrill Lynch, Pierce, Fenner & Smith*, 709 F. Supp. 1270, 1285 (S.D.N.Y. 1989) (finding no jurisdiction over foreign defendants because foreign service of process lacking); *Huang* v. *Sentinel Gov't Sec.*, 657 F. Supp. 485, 491-92 (S.D.N.Y. 1987) (finding no jurisdiction over foreign defendants because minimum contacts lacking); *Ancilla Domini Health Servs.* v. *Communications Assocs.*, No. 84nC-2771 (N.D. Ill. Nov. 5, 1985) (LEXIS, Genfed library, Dist file) (finding no jurisdiction over foreign defendants because personal jurisdiction lacking); *Nordic Bank PLC* v. *Trend Group, L.*, 619 F. Supp. 542, 564 (S.D.N.Y. 1985) (denying jurisdiction over foreign defendants because foreign service of process lacking); *Soltex Polymer Corp.* v. *Fortex Indus.*, 590 F. Supp. 1453, 1460 (E.D.N.Y. 1984) (same), aff'd, 832 F.2d 1325 (2d Cir. 1987).

**must have prescriptive, adjudicative, and enforcement jurisdiction**.[3] Although lack of adjudicative jurisdiction [*1043] appears to be the most frequent basis for rejecting an extraterritorial case, each jurisdictional predicate merits careful consideration.

## A. JURISDICTION TO PRESCRIBE

**Jurisdiction to prescribe**, also known as **subject matter jurisdiction**,[4] provides judicial authority over the topic of a dispute.[5] Under international law, prescriptive authority may derive from **territorial, nationality, passive personality, universality, or protective principles**.[6] These principles often work [*1044] together in practice,[7] but are best understood when treated separately.

---

[3] Traditionally, discussions on international law divide jurisdiction into the right 73 to prescribe rules and the right to enforce them. J. Sweeney, C. Oliver & N. Leech, CASES AND MATERIALS ON THE INTERNATIONAL LEGAL SYSTEM 89 (2d ed. 1981). The RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES considers jurisdiction in three categories:

> (a) jurisdiction to prescribe, i.e., the authority of a state to make its law applicable to persons or activities;
>
> (b) jurisdiction to adjudicate, i.e., the authority of a state to subject particular persons or things to its judicial process; and
>
> (c) jurisdiction to enforce, i.e., the authority of a state to use the resources of government to induce or compel compliance with its law.

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES Part IV, introductory note (1988) [hereinafter RESTATEMENT]. The Restatement recognizes that adjudication deals primarily with judicial function while enforcement often encompasses executive or administrative action in addition to the judicial process. Id.

[4] The RESTATEMENT uses the term jurisdiction to prescribe to avoid confusion with the term subject matter jurisdiction as used in a national context. Jurisdiction to prescribe addresses transnational activity. RESTATEMENT, supra note 73, § 401 comment c; see also Moessle, THE BASIC STRUCTURE OF THE UNITED STATES SECURITIES LAW ENFORCEMENT IN INTERNATIONAL CASES, 16 Cal. W. Int'l l.J. 1, 7 (1986) (stating that jurisdiction to prescribe is preferable term); see generally Lowenfeld, ANTITRUST, INTEREST ANALYSIS, AND THE NEW CONFLICT OF LAWS (Book Review), 95 Harv. L. Rev. 1976, 1980-84 (1982) (reviewing J. Atwood & K. Brewster, ANTITRUST AND AMERICAN BUSINESS ABROAD (2d ed. 1981)).

[5] See supra note [86]. Prescriptive jurisdiction occurs when a nation, by legislative action, executive decree, administrative regulation, or judicial decision, declares a principle or legal norm. J. Sweeney, C. Oliver & N. Leech, supra note [86], at 89. In practice, a court considering an extraterritorial case first must ask if national law applies to the conduct in dispute.

[6] *United States* v. *King*, 552 F.2d 833, 851 (9th Cir. 1976), cert. denied, 430 U.S. 966 (1977); *Rocha* v. *United States*, 288 F.2d 545, 549 n.4 (9th Cir.), cert. denied, 366 U.S. 948 (1961); 1 NAT. COMM'N ON THE REFORM OF FEDERAL CRIMINAL LAWS, Working Papers 72-73 (1970); see also United States v. Pizzarusso, 388 F.2d 8, 10 (2d Cir.) (stating that "International law has recognized, in varying degrees, five bases of jurisdiction" (citing HARVARD RESEARCH IN INTERNATIONAL LAW, JURISDICTION WITH RESPECT TO CRIME, 29 Am. J. Int'l l. Spec. Supp. 435, 445 (1935))), cert. denied, 392 U.S. 936 (1968); RESTATEMENT, supra note 73, § 402 (same). Some scholars recognize as a sixth basis for extraterritorial jurisdiction crimes under international law, including war crimes and crimes against humanity. *See Attorney General of Isr.* v. *Eichmann*, 36 I.L.R. 277 (Isr. Sup. Ct. 1962). Most authorities, however, treat this category as encompassed by the universality principle. Cf. I.

| Jurisdiction to Prescribe = Subject Matter Jurisdiction | |
|---|---|
| *Plaintiff's Case has Subject Matter Jurisdiction in 4 out of the 5 Principles of Jurisdiction* | |
| **(1) Territorial Principles** | U.N. treaties cannot displace the U.S. Constitution or the Bill of Rights. The United Nations global gun control agenda is repugnant to the Second Amendment of the Bill of Rights to the U.S. Constitution |
| (2) Nationality Principles | Based on the citizenship of the offender. This principle does not grant prescriptive jurisdiction in an extraterritorial RICO suit against foreign defendants. The nationality of the Secretary-General of the United Nations is South Korean. However, the United Nations includes the United States. Therefore, it may be a technicality of international law but the United Nations may very well be subject to the jurisdiction of the federal courts of the United States. |
| **(3) Passive Personality Principles** | Obverse of Nationality Principle, Passive Personality Principles confers jurisdiction based on the nationality of the victim. |
| **(4) Universality Principles** | Provides jurisdiction over acts which are condemned unconditionally by international law, such as piracy on the high seas and genocide. |
| **(5) Protective Principles** | Confers jurisdiction over foreign acts that threaten national security, such as the United Nations global gun control agenda. Disarming the citizens of the United States of their Second Amendment rights is construed to be a threat to national security. |

## *The only way my case can be dismissed is by judicial bias, political ideology, and unlawful prejudice against an unrepresented civil plaintiff.*

Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 305 (3d ed. 1979) (noting distinction between universality and crimes under international law).

[7] The passive personality principle, for example, is similar to the protective principle, and the nationality, territorial, and protective principles also interrelate. I. Brownlie, supra note [89], at 306; *see, e.g., King,* 552 F.2d at 851-52 (finding jurisdiction established under both nationality and territorial principles); *United States* v. *Daniszewski,* 380 F. Supp. 113, 115-16 (E.D.N.Y. 1974) (finding jurisdiction established under nationality principle and indicating court was prepared to rely on protective principle as well).

## EVIDENCE OF ONE GUNUINE AND TRIABLE ISSUE OF MATERIAL FACT: *DO AMERICAN SEAMEN HAVE SECOND AMENDMENT RIGHTS ABOARD SHIP AT SEA?*

# HIJACKED SHIP CREW OVERPOWERS PIRATES

Oct 30 09:48 AM US/Eastern
By EDWARD HARRIS
Associated Press Writer

NAIROBI, Kenya (AP) - The crew of a ship hijacked from Somalia overpowered their attackers Tuesday and regained control of the vessel, officials said.

About two dozen crew members of the North Korea-flagged vessel **were able to fight off the eight gunmen** who had seized the vessel late Monday, and the crew was piloting the ship back to the war-battered city's port in Mogadishu, said Andrew Mwangura, program coordinator of the Seafarers Assistance Program, which independently monitors piracy in the region.

He said first reports that the vessel was from South Korea were incorrect, and that the crew numbered about 22, instead of nearly twice that number as earlier reported.

**An international watchdog reported this month that pirate attacks worldwide jumped 14 percent in the first nine months of 2007, with the biggest increases off the poorly policed waters of Somalia and Nigeria.**

Reported attacks in Somalia rose rapidly to 26, up from eight a year earlier, the London-based International Maritime Bureau said through its piracy reporting center in Kuala Lumpur, Malaysia. **And some of those hijackings have turned deadly.**

Somalia has had 16 years of violence and anarchy, and is now led by a government battling to establish authority even in the capital. Its coasts are virtually unpoliced.

Piracy off Somalia increased this year after Ethiopian forces backing Somali government troops ousted an Islamic militia in December, said Andrew Mwangura, program coordinator of the Seafarers Assistance Program which independently monitors piracy in the region.

During the six months that the Council of Islamic Courts ruled most of southern Somalia, where Somali pirates are based, piracy abated, Mwangura said.

At one point, the Islamic group said it was sending scores of fighters to crack down on pirates there. Islamic fighters even stormed a hijacked, UAE-registered ship and recaptured it after a gunbattle in which pirates—but no crew members—were reportedly wounded.

In May, **pirates complaining their demands had not been met killed a crew member a month after seizing a Taiwan-flagged fishing vessel off Somalia's northeastern coast**.

Pirates even targeted vessels on humanitarian missions, such as the MV Rozen which was hijacked in February soon after it had delivered food aid to northeastern Somalia. The ship and its crew were released in April. France has offered naval vessels to escort ships carrying World Food Program food to Mogadishu beginning in November.

Indonesia remained the world's worst piracy hotspot, with 37 attacks in the first nine months of 2007. But that was an improvement from 40 in the same period a year earlier, IMB said.

The IMB said Southeast Asia's Malacca Strait, one of the world's busiest waterways, has been relatively quiet with 198 attacks on ships reported between January and September, up from 174 in the same period in 2006.

It said 15 vessels were hijacked, 63 crew members kidnapped and three killed.

Oil-rich Nigeria suffered 26 pirate attacks so far this year, up from nine in the same period last year.

# DID JUDGE ROSEMARY M. COLLYER COMMITT TREASON AGAINST THE CONSTITUTION BY DISMISSING MY CASE *Sua Sponte* WHERE GUNIUNE AND TRIABLE ISSUES OF MATERIAL FACT REMAIN?

## *Cohens v. Commonwealth of Virginia,* 19 U.S. 264 (1821)

It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. **The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty**. In doing this, on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the constitution and laws of the United States. We find no exception to this grant, and we cannot insert one.

Because my case has genuine and triable issues of material fact under four of the five international jurisdiction principles under the civil RICO Act as applied against the United Nations Judge Rosemary M. Collyer exercised poor judgment in her *sua sponte* dismissal of my case and by doing so committed "treason" against the Constitution because she acted in a manner to prevent my case from proceeding to trial to defend the Constitution and the Second Amendment against the United Nations global gun control agenda, hence my claim that the United Nations and the United States are waging a War of Aggression against the freedoms and liberties of the citizen's of the United States.

Judge Rosemary M. Collyer's *sua sponte* dismissal of my case just because she finds the content includes political poems criticizing the U.S. Government and the federal judicial system crystallizes the mounting evidence of a judicial and executive branch war on the Tenth Amendment and on the rights of the American people embodied in the Bill of Rights.

*Marbury* v. *Madison* was the first volley in the war over the First Amendment's right to petition the government for redress of grievances and in the war over the Tenth Amendment powers reserved to the people to interpret the U.S. Constitution for themselves and to say what it means. Thus we have a war between Judicial Review and Popular Constitutionalism.

The federal courts and the executive branch is ignored and trampled my Ninth Amendment rights and Tenth Amendment powers reserved to the People to act in the capacity of a Private Attorney General as an unrepresented civil plaintiff with a civil RICO Act case let alone my statutory, civil, constitutional, and human rights.

# JUDGE LAY OF THE 8TH CIRCUIT ON ABUSIVE USE OF SUMMARY JUDGMENTS

*Melvin* v. *Car-Freshener Corporation*, 8th Circuit, No. 06-1279 (July 12, 2006),
**Circuit Judge Lay, dissenting opinion,**
http://www.ca8.uscourts.gov/opndir/06/07/061279P.pdf:

Too many courts in this circuit, both district and appellate, are utilizing summary judgment in cases where issues of fact remain. This is especially true in cases where witness credibility will be determinative. In these instances, a jury, not the courts, should ultimately decide whether the plaintiff has proven her case. Summary judgment should be the exception, not the rule. It is appropriate "*only . . . where it is quite clear what the truth is, . . . for the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.*" *Poller* v. *Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (emphasis added) (citation and internal quotations omitted).

It is undeniable that summary judgment is a valuable tool, the use of which allows overextended courts to remove cases that lack merit from their dockets. See *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986). However, in accomplishing this goal, we have an obligation not to "overlook[] considerations which make . . . summary judgment an inappropriate means to that very desirable end." *Sartor* v. *Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944). As Justice Black explained,

> The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment.

*Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring).

I express no opinion as to whether Melvin would ultimately be able to convince a jury in this case. However, she and all other similarly-situated plaintiffs should be afforded the opportunity to do so.

- - - - -

# IOWA STATE COURT OF APPEALS

*Leonard* v. *Leonard*, Court of Appeals of Iowa, No. 5-611 / 05-0634 filed October 12, 2005, In Re The Marriage of Stephen Craig Leonard and Norma Jean Leonard:

Our supreme court has admonished district courts to use restraint in exercising their power to dismiss actions *sua sponte*. *See Rush*, 240 N.W.2d at 439 (cautioning that "the more logical approach is to allow trial courts to exercise the power to sua sponte dismiss actions in a "restrained' manner.").

# WHY SUMMARY JUDGMENT IS UNCONSTITUTIONAL

Suja A. Thomas,
93 Virginia Law Review 139, 179-180 (2007)

## CONCLUSION

It is an appropriate time for the Court to change its jurisprudential course regarding the Seventh Amendment and hold summary judgment unconstitutional. Federal courts frequently employ summary judgment to dispose of cases, and the procedure has, thus, contributed to the decrease in the availability of civil jury trials.

Having recently taken renewed interest in the proper role of the jury under the Sixth Amendment, it would be fitting for the Court to examine this issue in the context of the Seventh Amendment. In the last seven years, in interpreting the Sixth Amendment, the Court has given power back to the criminal jury, emphasizing the historical role of the jury. In comparison, the text of the Seventh Amendment, which requires the court to follow the "common law," dictates an even more significant role for history in the preservation of the right to a civil jury trial under the Seventh Amendment.

As described in this Essay, three core principles emanate from the common law that demonstrate the unconstitutionality of summary judgment. First, under the common law, the jury or the parties determined the facts. The court itself never decided a case without such a determination. Second, a court would determine the sufficiency of the evidence only after a jury trial, and if the court believed that the evidence was insufficient, it would order only a new trial. The court would never order judgment for the moving party upon a review of the sufficiency of the evidence. Third, a jury would decide a case that had any evidence, however improbable that evidence was, unless the moving party admitted the facts and conclusions of the nonmoving party, including improbable facts and conclusions. Summary judgment, under which a court dismisses a case after its assessment of the sufficiency of the evidence, including the reasonableness of the factual inferences, wholly contrasts with these principles. Accordingly, the Court should, following the historical mandate of the Amendment, declare summary judgment unconstitutional.

# MARBURY V. MADISON
## 5 U.S. 137, 162-163 (Cranch) (1803):

If he has a right, and that right has been violated, do the laws of his country afford him a remedy? [5 U.S. 137, 163]

The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain, the King himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.

In the third volume of his Commentaries, page 23, Blackstone states two cases in which a remedy is afforded by mere operation of law.

"In all other cases," he says,

> it is a general and indisputable rule that where there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded.

And afterwards, page 109 of the same volume, he says,

> I am next to consider such injuries as are cognizable by the Courts of common law. And herein I shall for the present only remark that all possible injuries whatsoever that did not fall within the exclusive cognizance of either the ecclesiastical, military, or maritime tribunals are, for that very reason, within the cognizance of the common law courts of justice, for it is a settled and invariable principle in the laws of England that every right, when withheld, must have a remedy, and every injury its proper redress.

The Government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right.

# ON WHAT A "PRIVATE ATTORNEY GENERAL" IS AND WHY IT MATTERS

By Rubenstein, William B
57 Vand. L. Rev. 2129 (2004)

## III. Three Forms of the Private Attorney General

The private attorney general concept is deployed in the legal literature in at least three distinct ways, each of which presents a different mix of the public and private features of lawyering:

> (1) some private attorneys general **substitute** for the public attorney general;
>
> ## (2) some private attorneys general *supplement* the public attorney general; and
>
> (3) some private attorneys general **simulate** an attorney general, acting as the advocate for a group, but solely for a group of private persons.

## B. The Private Attorney General as Supplemental Law Enforcer

Lawyers who occasionally stand in for the public attorney general are not the only attorneys dubbed private attorneys general. The literature more commonly employs the label to describe private attorneys whose work for private clients contributes to the public interest by supplementing the government's enforcement of laws and public policies.[8] There are several versions of the supplemental private attorney general. The clearest and narrowest form is the private attorney general who earns her post through a specific delegation by Congress or a state legislature. In the environmental field, for example, Congress has included provisions in most of its statutes for citizen suits; these provisions authorize nongovernmental attorneys to enforce environmental standards if the government has not done so.[9] As just

---

[8] See Ann K. Wooster, Annotation, *PRIVATE ATTORNEY GENERAL DOCTRINE -- STATE CASES*, 106 A.L.R. 5th 523 ("The private attorney general doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies emobied in constitutional or statutory provisions and that, without some mechanism authorizing the awasrd of attorneys fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible.") (citing Cal. Civ. Proc. Code § 1021.5; *People ex rel. Dep't of Conservation v. El Dorado County*, 108 Cal. App. 4th 672 (3d Di9st. 2003)).

[9] Professor Thompson reports that "[e]very major environmental law passed since 1970 now includes a citizen suit provision (with the anomalous exception of the Federal Insecticide, Fungicide, and Robenticide Act)." Barton H. Thompson, Jr., *THE CONTINUING INNOVATION OF CITIZEN ENFORCEMENT*, 2000 U. Ill. L. Rev. 185, 192. *See also*, Beverly McQueary Smith, *Recent Developments in Citizens' Suits Under Selected Federal Environmental Statutes*, in *ENVIORNMENTAL LITIGATION*, 701, 708-09 (A.L.I.-A.B.A. Course of Study, Feb. 15, 1995), WL C981 ALI-ABA 701 (providing a list of laws that include citizen suit provisions). That citizen suits are precluded if the government has itself pursued enforcement, *see, e.g.*, 33 U.S.C. § 1365(b)(1)(B), make these citizen suit advocates seem more like substitute attorneys general, such as *qui tam* relators, who fill in for government lawyers. Thompson, *supra*, at 196-97 (stating that citizen suit provisions were heavily

discussed above, this places the citizen-suit plaintiff at the boundary closest to the substitute attorney general: if Congress authorizes her to do the government's work, she is being created to substitute for the government lawyer. Supreme Court doctrine, however, limits the plaintiff's appearance in court to those instances in which she can show she pursues her own injury in fact. This makes her a supplemental attorney general because she comes to enforce law by pursuing her own interests. To be clear though, her interest may be quite modest compared to the breadth of the statutory provision she derivatively enforces. She is but one small step away from the substitute attorney general, a step that is necessitated by standing doctrine, but the size of the step can be measured by the relatively minute scope of her individual interest.

At the other side of the spectrum are private lawyers whose clients have significant individual interests but who incidentally further some public policy through their litigation activities. At the extreme, commentators occasionally argue that any individual lawsuit-even one seeking nothing more than compensation for a single private citizen-benefits the public as the compensatory damages realized in such a case help deter wrongdoing by the defendant. The lawyer in such a case might be labeled a private attorney general under a very broad definition of the term, one that in essence turns every private attorney into a private attorney general.[10] Courts have been understandably wary of embracing this broad notion of the private attorney general as it would authorize fee shifting in every private lawsuit, the exception thereby swallowing the traditional American rule that parties bear their own costs. Hence, black letter law holds that "attorney's fees will not be

---

influenced by *qui tam* actions). And the two categories do bleed into one another. Nonetheless, there are several key distinctions. *Qui tam* cases seek compensatory damages and *qui tam* attorneys are bounty hunters funded by their catch; most citizen suits in the environmental field seek deterrent prospective relief and are brought by public interest groups subsisting on statutory fee shifting provisions. This occurs because citizen suits do not allow for compensatory damages. *See Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Found.*, 484 U.S. 49, 67 (1987) (holding that the CLEAN WATER ACT did not authorize citizen suits for past damages). Congress has enacted provisions altering the outcome in *Gwaltney* by permitting some citizen suits for civil penalties. *See, e.g.,* THE CLEARN AIR ACT AMENDMENTS OF 1990, Pub. L. No. 101-549, § 707(g), 104 Stat. 2683; Daniel Riesel, Citizen Suits and the Award of Attorneys' Fees in Environmental Litigation 1073, 1114, 1126 (A.L.I.-A.B.A. Course of Study, June 20, 1994), WL C921 ALI-ABA 1073. Nonetheless, *Gwaltney's* statement that "the citizen suit is meant to *supplement* rather than to supplant governmental action." *Gwaltney*, 484 U.S. at 60 (emphasis added), remains a sensible characterization of these provisions. *See* Thompson, *supra*, at 199-200 (discussing use of citizen shits to fill enforcement gaps).

[10] *See* Martin H. Redish, CLASS ACTIONS AND THE DEMOCRATIC DIFFICULTY: RETHINKING THE INTERSECTION OF PRIVATE LITIGATION AND PUBLIC GOALS, 2003 U. Chi. Legal. F. at 90-91 (stating that individual compensatory lawsuits may "be categorized as private attorney general actions, because they may well have the incidental impact — perhaps even intended by the legislative creation of the private rights — of exposing and punishing law violations"); Jeremy A. Rabkin, THE SECRET LIFE OF THE PRIVATE ATTORNEY GENERAL, 61 Law & Contemp. Probs. 179, at 195 (1998) ("If the term is defined simply as one who brings a lawsuit that may benefit third parties, then indeed almost any litigant might qualify").

awarded under the private attorney general doctrine where the interests of the general public are only incidental to the primary objectives of the parties of protecting their interests."[11] This is the far end of the spectrum because at this end, the private interest is large, not modest, and the supplemental governmental work is incidental, not central. Attorneys' fees doctrine polices this boundary between the private attorney general and the mere private attorney.

Between these two extremes lies the core case: the class action attorney who pursues representative litigation on behalf of a group of private citizens. Unlike the environmental citizen suit plaintiff, this private attorney general is not necessarily explicitly created by the statute that supplies her substantive claims. Instead, her role is often authorized by the class action rules enabling representative litigation and by common law or statutory rules authorizing fee shifting when a private attorney advances the public interest.[12] Black's Law Dictionary defines the phrase "private attorney

---

[11] 7 Am. Jur. 2d Attorneys at Law § 256 (2004) (citing Cal. Licensed Foresters Ass'n. v. State Bd. Of Forestry, 30 Cal. App. 4th 562 (3d Dist. 1995)). It is true, as I discuss below, that fees may be available in purely private situations, but such fees come from the class of private beneficiaries according to a common fund theory, not by fee shifting according to this private attorney general concept. *See infra* Part III.C.

[12] This is not to suggest, as Professor Redish argues, that such suits are illegitimate. *See* Redish, *supra note* [3], *passim*. Redish argues that Congress has not authorized the now-common type of attorney-initiated small claims cases that do not yield significant individual relief. Rather, he claims, Congress has been duped "by indirection and subterfuge." *Id.* at 73. Redish is quite feverish on this point: he accuses the courts of acting "furtively" (four times), *id.*, at 78, 116, 132, 138; "surreptitiously" (six times), *id.*, at 114, 114-15, 115 n. 47m 116, 136 n. 194, 138; and by "disguise" (four times, *id.*, at 81, 83-84, 84-85, 93. Yet court approvals of class action settlements are public documents, widely available in case reports and on web sites, relatively transparent, and far from unknown to Congress.

Forty years ago, when it approved the current version of Rule 23, Congress was exposed to the idea that the rule could generate small claims cases unlikely to be initiated by private plaintiffs nor to result in any significant compensation for class members. The federal class certification rule explicitly requires courts to examine, "the interest of members of the class in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). The clear implication of this inquiry is that there will be cases in which individuals have scant interest in initiating or controlling the action, namely those cases where their individual interest is minute, and that this is a factor that *cuts in favor of class certification*. Lest this implication be lost on Congress, the Advisory Committee Notes emphasize the point, stating:

> The interest of individuals in conducting separate lawsuits may be son strong as to call for denial of a class action. *On the other hand, these interests may be theoretical rather than practical*: the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, *or the amounts at stake for individuals may be so small that separate suits would proved impracticable.*

*See* Fed. R. Civ. P. 23 advisory committee's note (discussing 1966 amendment) (emphasis added).

Since 1966, Congress has rewritten the procedural rules for key areas of federal law in clear reaction to — and hence with full knowledge of — the relationships between small claimants and class action attorneys. In the securities field, Congress reacted to the absence of client control of class actions by requiring that the largest intervening investor be presumptively appointed as lead

general" in these terms:

> The "private attorney general" concept holds that a successful private party plaintiff is entitled to recovery of his legal expenses, including attorneys fees, if he has advanced the policy inherent in public interest legislation on behalf of a significant class of persons.[13]

The literature contains two competing visions of the supplemental private attorney general. The oldest and most common vision contends that private attorneys general are a necessary supplement to government enforcement because government attorneys lack certain attributes.[14] According to this account, private attorneys general might be better at either discerning or pursuing private wrongdoing,[15] or they may simply supplement public enforcement by increasing the intensity of the penalty wrongdoers must pay.[16] Private attorneys may be better at the first two functions for a variety

---

plaintiff. *See* Private Securities Litigation Reform Act of 1995 § 27(a)3(B)(iii), Pub. L. No. 194-67, 109 Stat. 737 (codified, *inter alia*, at 15 U.S.C. §§ 77z-1 to 78j-1 (2004)). In the antitrust field, Congress reacted to the absence of client control and compensation by creating power in state attorneys general to pursue compensatory *parens patriae* actions on behalf of consumers. *See* Hart-Scott-Rodino Act ("HRSA") tit. III, § 301, Pub. L. No. 94-435, 90 Stat. 1383, (codified at 15 U.S.C. § 15c (2004)). While Congress's appreciation that small claims class actions are not generally initiated by individual claimants and do not generally result in compensation for them. Yet in neither instance did Congress attempt to preclude the filing or settling of such cases. Moreover, on numerous occasions in the past decade, members of Congress have introduced legislation and Congress has held hearings reacting to precisely the state of affairs Redish characterizes as "furtive." *See, e.g.*, S. Rep. No. 108-123, at 16 (2003) ("The common theme is the same: the lawyers get the cash, while the plaintiffs get coupons or less."); S. Rep. No. 106-420 at 8 (2000) ("Judges too readily approve settlements that primarily benefit the class counsel, not the class members who they supposedly represent."). Nonetheless, Congress only recently enacted the *CLASS ACTION FAIRNESS ACT* advocated in these reports, a law that will severely curtail the use of coupon settlement.

In sum, Congress has authorized causes of action for small consumer, securities, and antitrust violations knowing full well these were small claims, it has authorized representative and other forms of litigation to vindicate these rights, and it has authorized fee shifting for attorneys who successfully bring these cases.

[13] Black's Law Dictionary 129 (6th ed. 1990) (subdefinition of "Attorney General") (quoting *Dasher* v. *Hous. Auth. of Atlanta*, 64 F.R.D. 722, 729, 729 (N.D. Ga. 1974)).

[14] *See Deposit Guar. Nat'l. Bank of Jackson* v. *Roper*, 445 U.S. 326, 339 (1980) ("The aggregation of individual claims in . . . a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of the government."); Fleming James Jr., et al, *CIVIL PROCEDURE* 643-44 (5th ed. 2001) ("The rise of the class action starting in the 1960s reflected the . . . view that government agencies cannot adequately enforce certain rights . . .")

[15] *See, e.g., Newman* v. *Piggie Park Enter., Inc.*, 390 U.S. 400, 401 (1968) ("When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law.").

[16] Professor Yeazell uses this language in his recitation of the conventional argument for the class suit:

> [Kalven and Rosenfield] envisioned representative litigation as a *supplement* to governmnental regulation of large, diffuse markets like those in securities. They

of reasons-because public attorneys may be fewer in number, underfunded, less skilled, or prone to political pressures.[17] This original version of the supplemental attorney general embodies a weak public/strong private vision.

Some accounts of current class action practice supply a competing vision of the supplemental attorney general. According to these commentators, many, if not most, securities and antitrust class actions are "piggyback" cases brought only on the heels of a government enforcement action.[18] As Professor Coffee has demonstrated, plaintiffs' attorneys are risk averse entrepreneurs, attempting to maintain diversified portfolios of case investments.[19] For such businesspeople,[20] cases that government attorneys have already deemed relatively meritorious are attractive investments. It is likely the government has undertaken significant investigation before pursuing its action. The

---

argued that recent regulation of such markets reflected a consensus that the old, ordinary forms of liability were not functioning to discipline their operations. . . . In their view the representative suit would serve to *supplement* regulatory agencies both by requiring wrong-doers to give up their ill-gotten gains and by ferreting out instances of wrong that might have escaped the regulators' observance.

Stephen C. Yeazel, *FROM MEDIEVAL GROUP LITIGATION TO THE MODERN CLASS ACTION* 232 (1987) (emphasis added).

[17] On the differing incentives of public and private lawyers, *see* John C. Coffee, Jr., *RESCUING THE PRIVATE ATTORNEY GENERAL: WHY THE MODEL OF THE LAWYER AS BOUNTY HUNTER IS NOT WORKING*, 42 Md. L. Rev. 215, 225-28 (1983); Warren F. Schwartz, *AN OVERVIEW OF THE ECONOMICS OF ANTITRUST ENFORCEMENT*, 68 Geo. L. J. 1075, 1093 (1980) (arguing that public enforcement may not be optimal because the legislature will shape the prosecutor's case selection and because the prosecutor's behavior will be "influenced by the available opportunities for advancement within the bureaucracy and the impact of his behavior on his career if he leaves the government"); Barton H. Thompson Jr., *THE CONTINUING INNOVATION OF CITIZEN ENFORCEMENT*, 2000 U. Ill. L. Rev. 185, 192.

[18] Professor Coffee first began sketching this account more than twenty years ago. John C. Coffee, Jr., *"NO SOUL TO DAMN; NO BODY TO KICK": AN UNSCANDALIZED INQUIRY INTO THE PROBLEM OF CORPORATE PUNISHMENT*, 79 Mich. L. Rev. 386, 435-36 (1981); John C. Coffee, Jr., *RESCUING THE PRIVATE ATTORNEY GENERAL: WHY THE MODEL OF THE LAWYER AS BOUNTY HUNTER IS NOT WORKING*, 42 Md. L. Rev. 215, at 220-23 (1983); *see also* Bryant Garth et al., *THE INSTITUTION OF THE PRIVATE ATTORNEY GENERAL: PERSPECTIVES FROM AN EMPIRICAL STUDY OF CLASS ACTION LITIGATION*, 61 S. Cal. L. Rev. 353, at 376 (1988) (stating empirical conclusion that "private attorneys tended to 'piggyback' their cases on governmental investigations, even to the extent of copying the government's complaint").

[19] *See, e.g.*, John C. Coffee, Jr., *RESCUING THE PRIVATE ATTORNEY GENERAL: WHY THE MODEL OF THE LAWYER AS BOUNTY HUNTER IS NOT WORKING*, 42 Md. L. Rev. 215, at 230-36, 280-84 (1983) ("[T]he lawyer as a bounty hunter has reason to be more risk adverse than the client he represents . . . ."); John C. Coffee, Jr., *UNDERSTANDING THE PLAINTIFF'S ATTORNEY: THE IMPLICATIONS OF ECONOMIC THEORY FOR PRIVATE ENFORCEMENT OF LAW THROUGH CLASS AND DERIVATIVE ACTIONS*, 86 Colum. L. Rev. 669, 704-712 (1986) ("[P]ortfolio diversification is a strategy that permits a plaintiff's attorney . . . to reduce the variance associated with an expected return.").

[20] John C. Coffee, Jr., *THE UNFAITHFUL CHAMPION: THE PLAINTIFF AS MONITOR IN SHAREHOLDER LITIGATION*, 48 Law & Contemp. Probs. 5, 12 (Summer 1985) ("[T]he plaintiff's attorney [is] a rational decisionmaker who acts according to the same utility-maximizing criteria as do other businessmen.").

private attorney can free-ride on these efforts, reaping the benefits of the government's factual investigation and reducing her own investment in expensive fact discovery.[21] Better still, nonmutual offensive issue preclusion provides a cheap and simple way to take advantage of any issues litigated and determined against the defendant.[22] Such coattail class actions present a vision of the supplemental attorney general that is a strong public/weak private vision. The only supplemental function performed by this private attorney general is that of multiplying wrongdoers' penalties: she provides no independent search skills, no special litigation savvy, and no nonpoliticized incentives. She simply piles on and runs up the tab.[23]

---

[21] *See* John C. Coffee, Jr., UNDERSTANDING THE PLAINTIFF'S ATTORNEY: THE IMPLICATIONS OF ECONOMIC THEORY FOR PRIVATE ENFORCEMENT OF LAW THROUGH CLASS AND DERIVATIVE ACTIONS, 86 Colum. L. Rev. 669, at 682 (1986) (stating that entrepre;neurial plaintiff's attorneys "gravitate to those areas where search costs [for cases] are lowest"); John C. Coffee, Jr., RETHINKING THE CLASS ACTION: A POLICY PRIMER ON REFORM, 62 Ind. L. J. 625, 641 (1986-1987) (same) [hereinafter Coffee, RETHINKING THE CLASS ACTION]

[22] *See Parklane Hosiery Co.* v. *Shore,* 439 U.S. 322, 326 (1979) (authorizing the use of nonmutual offensive issue preclusion in certain circumstances).

[23] John C. Coffee, Jr., RESCUING THE PRIVATE ATTORNEY GENERAL: WHY THE MODEL OF THE LAWYER AS BOUNTY HUNTER IS NOT WORKING, 42 Md. L. Rev. 215, at 223 (1983) (concluding that "the private attorney general does not seem to broaden the scope of law enforcement, but rather only intensifies the penalty"). As Professor Coffee points out, however, this piling on is far from insignificant — by contrast to the limited penalties that public enforcers can exact, private damage remedies are often quite high and hence an important adjunct to public proscription. *Id.* at 224 n. 19.

The strong public/weak private vision has received significant attention in the law review literature in recent years, but empirical evidence demonstrating that this is the prevalent model is decidedly mixed.[24] On the one hand, class action filings in the securities field, for example, barely exceed the number of sec enforcement actions, suggesting that private lawyers are not, in fact, supplementing public enforcement by independently ferreting out and pursuing cases.[25] On the other hand, the SEC itself has "repeatedly acknowledged . . . that private litigation enables a level of compliance that would be impossible to achieve if enforcement were limited to the government."[26] Moreover, public attorneys general and large savvy plaintiffs hire private class action attorneys to represent them in important cases. Public attorneys general do so, as noted, in high profile matters like the tobacco and Microsoft cases; large investors do so when such investors are made lead plaintiffs under federal securities rules and given the authority to choose class counsel for the investor class.[27] These public choices of private counsel imply that private attorneys general continue to provide litigation or

[24] *See, e.g.*, Stephen Calkins, *An Enforcement Official's Reflections on Antitrust Class Actions*, 39 Ariz. L. Rev. 413 (1997) (providing a careful assessment of enforcement in the antitrust field).

[25] The Stanford Law School Securities Class Actions Clearinghouse lists roughly 500 ([497]) federal securities fraud class actions filed in 2001. *See* Stanford Law School, Securities Class Action Clearinghouse, *at* http://securities.stanford.edu/ (last updated [October 22, 2007]). Two scholars report that the Securities and Exchange Commission pursued almost precisely the same number (484) of actions that calendar year. James D. Cox and Randall S. Thomas, *SEC ENFORCEMENT HEURISTICS: AN EMPIRICAL INQUIRY*, 53 Duke L. J. 737, 749 (2003).



FEDERAL SECURITIES FRAUD CLASS ACTION LITIGATION

[26] Jill E. Fisch, *CLASS ACTION REFORM, QUI TAM, AND THE ROLE OF THE PLAINTIFF*, 60 Law. & Contemp. Probs. 167. at 199 (1997) (citing *SECURITIES LITIGATION ABUSES: TESTIMONY OF ARTHUR LEVITT, JR., CHAIRMAN OF THE SEC. AND EXCHANGE COMM'N BEFORE THE SUBCOMM. ON SEC. OF THE COMM. ON BANKING, HOUSING, AND URBAN AFFAIRS*, 105th Cong. (1997), available at 1997 WL 416650).

[27] *See* William B. Rubenstein, *A TRANSACTIONAL MODEL OF ADJUDICATION*, 89 Geo. L. J. 371, 409 (2001) (noting that "even after enactment of the PSLRA, the same exact plaintiffs' law firms that so spurred Congress to act still appear to be representing securities classes") (citing Joseph A. Grundfest & Michael A. Perino, *SECURITIES LITIGATION REFORM: THE FIRST YEAR'S EXPERIENCE*, 1015 PLI/Corp. 955, 959, 976 (1997); Jill E. Fisch, *CLASS ACTION REFORM: LESSONS FROM SECURITIES LITIGATION*, Ariz. L. Rev. 533, 549 (1997)).

negotiation skills that supplement those of the public sector's attorneys general. It may also be the case that private enforcement, even if weakened, is important in that "the sheer diversity of enforcers should generate more innovations than a monopolistic government enforcer would produce."[28]

But the real limitation of the strong public/weak private critique of the supplemental attorney general is that it focuses almost exclusively in the areas of securities and antitrust (small claims) class actions. In other fields, supplemental attorneys general continue to play significant detection and pursuit functions. This is true of the qui tam relator, for instance, who is authorized, in the first place, precisely because it is believed that private parties (whistle blowers) will be in a better situation to uncover fraud.[29] But it is also true in the broad field of environmental enforcement, where citizen groups play an important monitoring function[30] and where citizen suits, filed often, are an important part of regulatory pursuit.[31] And commentators have

---

[28] Barton H. Thompson, Jr., THE CONTINUING INNOVATION OF CITIZEN ENFORCEMENT, 2000 U. Ill. L. Rev. 185, at 206; see also Harry Kalven, Jr. & Maurice Rosenfield, THE CONTEMPORARY FUNCTION OF THE CLASS SUIT, 8 U. Chi. L. Rev. 684, at 721 (1941) (concluding that the situation is to enable both administrative and class enforcement, "permitting both to develop side by side to check and complement each other").

[29] See Gretchen L. Forney, Note, QUI TAM SUITS: DEFINING THE RIGHTS AND ROLES OF THE GOVERNMENT AND THE RELATOR UNDER THE FALSE CLAIMS ACT, 82 Minn. L. Rev. 1357, at 1364 (1998) (stating that "[t]he idea behind [the False Claims Act] was that individuals within the entity defrauding the government would have superior knowledge of fraud over that of the Department of Justice") (citing U.S. ex rel. Kelly v. Boeing Co., 9 F.3d 743, 745 n.2 (9th Cir. 1993)); see also Jill E. Fisch, CLASS ACTION REFORM, QUI TAM, AND THE ROLE OF THE PLAINTIFF, 60 Law. & Contemp. Probs. 167, at 196 (1997) ("Indeed, the incentive structure of qui tam is tailored to place a premium on the contribution of orginal information, with the intent that the unique access and insight of qui tam plaintiffs into the operations of government contractors may enable them to identify instances of fraud that the government would be unable to address on its own.").

[30] Professor Thomson discusses the ways in which citizens play monitoring and informant functions outside of doing so in citizen suits. Nonetheless, his article highlights how much work citizen suits continue to do in the environmental context, as opposed to in the securities or antitrust fields. Barton H. Thompson, Jr., THE CONTINUING INNOVATION OF CITIZEN ENFORCEMENT, 2000 U. Ill. L. Rev. 185, at 192-216.

[31] In a dozen years (1981-1993), more than 2000 60-day notices, initiating citizen suits, were filed under the Clean Water Act alone. David R. Hodas, ENFORCEMENT OF ENVIRONMENTAL LAW IN A TRIANGULAR FEDERAL SYSTEM: CAN THREE NOT BE A CROWD WHEN ENFORCEMENT AUTHORITY IS SHARED BY THE UNITED STATES, THE STATES, AND THEIR CITIZENS?, 54 Md. L. Rev. 1552, 1573 (1995). The government takes over these private environmental actions only on rare occasions. See Barton H. Thompson, Jr., THE CONTINUING INNOVATION OF CITIZEN ENFORCEMENT, 2000 U. Ill. L. Rev. 185, at 200 n.74 (citing study showing that "out of 349 60-day notices, 11 were dropped because of government enforcement and 22 more resulted in government enforcement with private regulation"). That said, "citizen suits are still swamped in magnitude by state and federal enforcement actions," id. at 204, with the "vast majority" being Clean Water Act cases. Id. Professor Thompson concludes that "citizen suits, in short, provide only marginal and circumscribed corrective value. But the value is not insignificant and may be quite large in particular regions of the country where nonprofits have filed or threatened to file sizable numbers of citizen suits." Id. Other commentators are less positive, seeing even environmental suits as largely piggyback cases: "the

argued that private attorneys general continue to play a key role in unearthing and pursuing mass torts.[32][90]

The supplemental attorney general is situated in the middle of the litigation spectrum. She is more distant from the public side than the substitute attorney general, though not as close to the private side, as we shall see, as the simulated attorney general. She mixes public and private features in complex ways that, I will argue, both exceed those noted by other commentators and have important policy ramifications. Because she is clearly not paid for her services by a government salary, it is tempting to see her compensation as private in nature; yet she is generally not paid from her client's purse, either, but rather by her adversary, according to fee-shifting rules that provide her very title. Because she is clearly not representing the government, it is tempting to see her client as her private class members alone; yet her very position is justified on the grounds that she pursues more than just her clients' private interests, but the public interest as well. As she is clearly not a government enforcement official, it is tempting to see her goal as compensation for her clients; but again, in many of her cases each of her clients has so little at stake that her pursuit of their scant interests is justified by the deterrent impact of the class members' cumulative interest.[33][91]

There are important policy ramifications of the supplemental private attorney general's strikingly dual nature to which I will return, below. First, though, it helps to situate these by filling out the last part of the private attorney general spectrum.

## V. Conclusion

Scholars and judges have regularly utilized the private attorney general concept in a variety of contexts for nearly a quarter-century. So prevalent is the use of this term that its meaning has become somewhat vague and undifferentiated. My hope is that this Article will make the field somewhat

---

kinds of violations most easily 'caught' by private advocacy groups are statutory 'violations' which the EPA has already learned about — and the advocacy groups then learn of them from EPA's own records." Jeremy A. Rabkin, THE SECRET LIFE OF THE PRIVATE ATTORNEY GENERAL, 61 Law & Contemp. Probs. 179, at 191 (1998)

[32] See, e.g., Michael L. Rustad, Smoke Signals From Private Attorneys General in Mega Social Policy Cases, 51 DePaul L. Rev. 511, 518 (2001) (reporting that "[p]rivate attorneys general, not government regulators, discovered that Firestone Tires mounted on Ford Explorers caused hundres of rollover accidents due to tread separation. . . . The NHTSA [National Highway Traffic Safety Administration] based its recall of 6.5 million tires on information provided by plaintiff's counsel, rather than [by] in-house government investigators").

[33] See Harry Kalven, Jr. & Maurice Rosenfield, THE CONTEMPORARY FUNCTION OF THE CLASS SUIT, 8 U. Chi. L. Rev. 684, at 717 (1941) (concluding that "the class suit as a way of redressing group wrongs is a semi-public remedy administered by the lawyer in private practice"); Coffee, supra note 12, at 1355[?] (stating that in most small claims contexts, "commentators largely have agreed that deterrence, not compensation, should be the rationale of the class action, and they have doubted the compensation is likely to be achieved") (citing Reinier Kraakman et al., WHEN ARE SHAREHOLDER SUITS IN SHAREHOLDER INTERESTS?, 82 Geo. L. J. 1722, 1739-41 (1994)).

less vague and more differentiated. In particular, I have highlighted four key aspects of the private attorney general concept.

First, private attorneys general are persons who mix public and private functions in the adjudicative arena, but they do so in a variety of ways that can best be understood when mapped onto a spectrum. Private attorneys general occupy the middle portion of a lawyering spectrum that runs from private lawyering on one side to public lawyering on the other.

Second, within this middle, three distinct types of public/private mixes are presently identifiable-those I label substitute attorneys general, supplemental attorneys general, and simulated attorneys general.

Third, two sets of legal doctrines-standing and attorneys' fees-police the margins between private attorneys general and regular attorneys. Standing doctrine polices the boundary between public attorneys and private attorneys general: the former represent the public interest by job description; the latter are permitted, in federal court, to represent the public interest only when they have some private stake of their own in the matter. Attorneys' fees doctrine polices the boundary between private attorneys and private attorneys general. The former represent only private clients and are paid only by them; the latter perform a function that exceeds pure private representation and are therefore entitled to some different type of fee arrangement.

Fourth, supplemental private attorneys general are synchronically so-performing public and private functions at the same time, not episodically. However, the quantities of public and private presented in the synchronie mix can vary. Some supplemental attorneys general perform significant public functions with only scant private interests at stake (such as environmental citizen-suit plaintiffs) while others perform incidental public functions with significant private interests at stake (such as mass tort class action plaintiffs).

More than a half century ago, Alfred Kinsey relieved us of the sense that sexuality comes in two pure forms, demonstrating instead that our sexual lives can be arranged across a spectrum of mixes. He was, of course, correct, and yet only faint traces of this lesson are imprinted on our public consciousness. Occasionally, we pay intellectual lip service to Kinsey's spectrum, but our minds and our public discourse continue to sort individuals into but two boxes. I suspect some of the reason we do so is that where a person may fall on the Kinsey spectrum-the degree of mixes she embodies-is of so seemingly little import. Kinsey had insisted that "[i]t is imperative that one understand the relative amounts of the heterosexual and homosexual in an individual's history if one is to make any significant analysis of him."143 But we don't believe it-the relative amounts of the heterosexual and homosexual in an individual's history may tell us very little of his practices and even less about his character.

By contrast, my argument here is that it really is imperative that we know the relative measure of the public and private embodied in particular private attorneys general. The legal system can neither be sure what to expect nor

certain what to demand from a private attorney general in a given situation without knowing the contours of that person's public/private mix. How much a particular type of private attorney general is thought to be an agent for public ends, in addition to private ones, critically affects the rules by which we should enable (and constrain) her and the fees with which we should reward her. The precision with which we define the private attorney general concept matters.

# DISARMING THE PRIVATE ATTORNEY GENERAL

Pamela S. Karlan*
Stanford Law School
Research Paper No. 36 (2002)
http://ssrn.com/abstract_id=308220

The two great Alexanders of constitutional law – Hamilton and Bickel – saw courts as essentially reactive institutions. The judiciary, Hamilton wrote in the Federalist Paper that gave Bickel's book its title, is "the least dangerous branch" because it can "take no active resolution whatever ... and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments."[34] Bickel applied this general proposition even to the fundamental constitutional principle of equality expressed in Brown v. Board of Education,[35] suggesting that the Supreme Court might properly decline to grant an immediate remedy because realistic enforcement would require enlisting Congress and the President.[36] The Alexandrian view depends on a model of adjudication in which the courts announce a rule and then rely on the political branches to obey or enforce it.[37] But Marbury shows that the converse can also be true. There is an important class of cases in which the legislature and the executive must depend on the judiciary for the efficacy of their judgments. In these cases, it is judicial refusals to act that pose a danger "to the political rights of the Constitution."[38]

Marbury itself recognized this threat, when Chief Justice Marshall observed that the government of the United States could no longer be "termed a government of law, and not of men .... if the laws furnish no remedy for a vested legal right."[39] As the Court stated last Term, although there are "vital limits on judicial authority," when "contending parties invoke the process of the courts, ... it becomes our unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront."[40] What makes that declaration so ironic is the context. As in Marbury, an

---

[34] See The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed. 1961); this passage appears as the epigraph to Bickel's book.

[35] 347 U.S. 483 (1954).

[36] See Alexander M. Bickel, THE LEAST DANGEROUS BRANCH: THE SUPREME COURT AT THE BAR OF POLITICS 247-54, 267-72. (1962).

[37] Even when it comes to straightforward constitutional adjudication, however, as Gerald Gunther explained in a classic article, there can be substantial costs to a court's refusal to address properly presented claims. See Gerald Gunther, THE SUBTLE VICES OF THE "PASSIVE VIRTUES" – A COMMENT ON PRINCIPLE AND EXPEDIENCY IN JUDICIAL REVIEW, 64 Colum. L. Rev. 1 (1964).

[38] THE FEDERALIST, No. 78, supra note 3, at 465.

[39] 5 U.S. at 163.

[40] Bush v. Gore, 531 U.S. 98, 111 (per curiam).

aspirant for federal office sought the Court's assistance. But unlike William Marbury, George W. Bush managed to procure a sweeping remedial order from the Supreme Court without ever identifying any vested legal right that the remedy he requested would actually vindicate.[41] Moreover, the same Court that provided George W. Bush with an unprecedented remedy in the service of an expansive, if evanescent, equal protection claim has shown itself strikingly resistant to judicial remedies for civil-rights plaintiffs raising more traditional equality-based claims.

There are two ways a court might retrench on civil rights protections. First, a court might explicitly redefine an underlying right in narrower terms. For example, in City of Mobile v. Bolden,[42] the Supreme Court redefined the preexisting jurisprudence of racial vote dilution, embodied in such decisions as White v. Regester,[43] to forbid only those electoral structures that were adopted or maintained for racially discriminatory purposes, rather than prohibiting also those that had a disparate impact on minority voters.[44] Similarly, in Patterson v. McLean Credit Union,[45]14 the Supreme Court offered a cramped interpretation of 42 U.S.C. § 1981's protection against racial discrimination in the right "to make and enforce contracts."[46] It held that section 1981 "extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment,"[47] and thus that racial harassment of employees was not

[41] I explore this point at substantial length in Pamela S. Karlan, Nothing Personal:

The Evolution of the Newest Equal Protection from Shaw v. Reno to Bush v. Gore, 79 N.C.L. Rev. 1345 (2001), and Pamela S. Karlan, Equal Protection: Bush v. Gore and the Making of a Precedent, in The Unfinished Election of 2000, at 159, 185-95 (Jack N. Rakove ed. 2001).

[42] 446 U.S. 55 (1980).

[43] 412 U.S.755 (1973).

[44] For discussions of this retrenchment, see, e.g., Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS 708-10, 729-45 (2d ed. 2001); James U. Blacksher & Larry T. Menefee, FROM REYNOLDS V. SIMS TO CITY OF MOBILE V. BOLDEN: HAVE THE WHITE SUBURBS COMMANDEERED THE FIFTEENTH AMENDMENT?, 34 Hastings L.J. 1, 4, 28 (1982).

[45] 491 U.S. 164 (1989).

[46] 42 U.S.C. § 1981 provided, at the time, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ...." Congress subsequently amended § 1981 to overturn the Court's decision in Patterson, declaring that "[f]or purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (1994).

[47] 491 U.S. at 176.

actionable under section 1981.

The other approach, which is more insidious, is for the court to leave the formal right in place, but to constrict the remedial machinery. At best, this will dilute the value of the right, since some violations will go unremedied. At worst, it may signal potential wrongdoers that they can infringe the right with impunity.

Remedial abridgment is a pervasive tool of the contemporary Supreme Court. In criminal procedure, for example, Carol Steiker has shown that while the Burger and Rehnquist Courts have left in place most of the Warren Court's restrictions on police activity, they have developed new "inclusionary" rules that allow the introduction of unconstitutionally obtained evidence, thereby dampening the effect of "conduct" rules directed at law enforcement personnel.[48] Similarly, in structural reform litigation, Daryl Levinson has pointed to ways in which the Court's retrenchment on the scope of appropriate remedies has backwashed into the definition of the underlying rights.[49]

\* \* \*

In this article, I shall discuss how several of the Supreme Court's civil rights decisions from last Term reflect this strategy as well. For the most part, the Court has left the political branches' power to regulate relatively unconstrained. That is, the Court assumes that Congress and the Executive can prohibit various forms of primary conduct. At the same time, however, the Court has launched a wholesale assault on one of the primary mechanisms Congress has used for enforcing civil rights: the private attorney general.

The idea behind the "private attorney general" can be stated relatively simply: Congress can vindicate important public policy goals by empowering private individuals to bring suit. While one can imagine a regime in which Congress simply delegates the government's own right to enforce its laws to private bounty hunters – that is essentially what qui tam lawsuits envision[50] – the current reliance on private attorneys general is more modest. It consists essentially of providing a cause of action for individuals who have been injured by the conduct Congress wishes to proscribe, usually with the additional incentive of attorney's fees for a prevailing plaintiff.

---

[48] See Carol S. Steiker, *COUNTER-REVOLUTION IN CRIMINAL PROCEDURE?: TWO AUDIENCES, TWO ANSWERS*, 94 Mich. L. Rev. 2466 (1996).

[49] See Daryl J. Levinson, *RIGHTS ESSENTIALISM AND REMEDIAL EQUILIBRATION*, 99 Colum. L. Rev. 857 (1999).

[50] And what Judge Jerome Frank, who apparently coined the phrase "private attorney general" in his 1943 opinion in Associated Industries v. Ickes, 134 F.2d 694, 704 (1943), imagined. For discussions of qui tam lawsuits, see, e.g., Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000); Evan Caminker, Comment, The Constitutionality of Qui Tam Actions, 99 Yale L.J. 341 (1989).

Virtually all modern civil rights statutes rely heavily on private attorneys general. As the Court explained in Newman v. Piggie Park Enterprises,[51] one of the earliest cases construing the Civil Rights Act of 1964, which forbids various kinds of discrimination in public accommodations, federally funded programs, and employment, Congress recognized that it could not achieve compliance solely through lawsuits initiated by the Attorney General:

A [public accommodations] suit is thus private in form only. When a plaintiff brings an action ..., he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority.[52]

Thus, Piggie Park recognized the piggybacking function of the Act: Congress harnessed private plaintiffs to pursue a broader purpose of obtaining equal treatment for the public at large. Later, the Court explained that this public function exists even when a civil rights plaintiff asks for compensatory damages rather than injunctive relief. "Unlike most private tort litigants," the civil rights plaintiff "seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.... Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits."[53] Thus, when "his day in court is denied him," the congressional policy which a civil rights plaintiff "seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers."[54]

In this article, I explore four decisions from October Term 2000 in which the Supreme Court sharply abridged the ability of private attorneys general to get their day in court. In two cases, the Court denied private plaintiffs the ability to bring lawsuits altogether. In Board of Regents v. Garrett,[55] the Court underscored its narrow reading of congressional enforcement power under section 5 of the Fourteenth Amendment, holding that Congress cannot authorize private damages lawsuits against state governments that discriminate against the disabled. And in Alexander v. Sandoval,[56] the Court held that there is no private right of action to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964, which forbids racial discrimination in federally funded programs or activities. In each of these cases, the Court left open (perhaps only for the time being) the possibility of other forms of congressional or administrative enforcement, but

---

[51] 390 U.S. 400 (1968) (per curiam).

[52] Id. at 401-02.

[53] City of Riverside v. Rivera, 477 U.S. 561, 574 (1986).

[54] Id. (internal quotation marks omitted).

[55] 531 U.S. 356 (2001).

[56] 532 U.S. 275 (2001).

the elimination of private attorneys general altogether will surely decrease overall enforcement of the underlying rights.

In two other cases, the Court left open the formal availability of private lawsuits, but created substantial practical barriers to private vindication of public policy. In Circuit City v. Adams,[57] the Court construed the Federal Arbitration Act in a way that permits employers to compel workers to arbitrate claims under federal fair-employment laws. And in Buckhannon Board and Care Home v. West Virginia Department of Health and Human Resources,[58] the Court rejected the preexisting "catalyst theory" for attorney's fees. Under that theory, courts had awarded plaintiffs attorney's fees when their lawsuits led the defendant to change the challenged practice voluntarily. The Supreme Court, however, held that fees can be awarded only if there is a judicially sanctioned change in the parties' legal relationship. These decisions will cut down both on the amount of civil rights enforcement and on the development of the law through the creation of binding precedent.

Conclusion

The overriding theme that links together the Supreme Court's decisions on a range of issues – from the scope of Eleventh Amendment immunity to the scope of congressional power under section 5 of the Fourteenth Amendment, and from when to find implied rights of action to when to award attorney's fees – can be stated quite simply: The current Court is creating an ever-greater regulation-remedy gap. It has left Congress free to regulate a wide range of subjects, but it is engaged in a form of courtstripping that reduces the possibilities for judicial enforcement of statutory commands. To paraphrase my colleague Gerry Gunther, a "virulent variety of free-wheeling interventionism lies at the core of [the Court's] devices of restraint."[59]

The Congress and Supreme Court of an earlier era constructed the institution of the private attorney general because they recognized that, without private attorneys general, it would be impossible to realize some of our most fundamental constitutional and political values. The current Court seems bent on dismantling this centerpiece of the Second Reconstruction. For all its invocations of Marbury's declaration that it "is emphatically the province and the duty of the judicial department to say what the law is,"[60] the current Court seems to have forgotten Marbury's equally important acknowledgment – that "the government of the United States has been emphatically termed a government of laws, and not of men," but "will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested

---

[57] 532 U.S. 105 (2001).

[58] 532 U.S. 598 (2001).

[59] Gerald Gunther, *THE SUBTLE VICES OF THE "PASSIVE VIRTUES" – A COMMENT ON PRINCIPLE AND EXPEDIENCY IN JUDICIAL REVIEW*, 64 Colum. L. Rev. at 25 (1964).

[60] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

legal right."[61] When the law furnishes no remedy because the Supreme Court has cast out the remedies that the political branches have tried to provide, then the courts threaten to become the most dangerous branch "to the political rights of the Constitution,"[62] and not the least.

---

[61] 5 U.S. at 163.

[62] The Federalist, No. 78, supra note 3, at 465.

# The Procedural Attack on Civil Rights:
## The Empirical Reality of Buckhannon for the Private Attorney General

Catherine R. Albiston†
University of California, Berkeley -
School of Law (Boalt Hall)

Laura Beth Nielsen
American Bar Foundation
Northwestern University - Department of Sociology

UC Berkeley Public Law Research Paper No. 937114
University of California, Los Angeles Law Review, June 2007

In 2001, the Supreme Court issued an opinion that changed the American system of civil rights enforcement. At issue in *Buckhannon Board & Care Home, Inc.* v. *West Virginia Department of Health and Human Resources*,[63] was whether plaintiffs could qualify as "prevailing parties" entitled to attorneys' fees if they achieved their desired result because their lawsuit was a catalyst for voluntary change in the defendant's conduct. Although nearly every circuit court in the country had adopted the "catalyst theory" for fee recovery at the time that *Buckhannon* was decided,[64] the Court rejected it. Instead, the Court held that to qualify as a "prevailing party" under the fee shifting statutes at issue the plaintiffs must obtain a "material alteration of the legal relationship of the parties" such as a favorable judgment on the merits or a consent decree.[65] Simply acting as a catalyst for the defendant's change in position was not sufficient to support a fee award, even if the defendant's action gave the plaintiffs the relief they sought.[66]

*Buckhannon* is about much more than whether plaintiffs' attorneys will be paid when the defendant voluntarily changes its conduct in response to a lawsuit. Fee shifting statutes support an extensive system of rights enforcement through "private attorneys general": private litigants who bring enforcement actions that benefit not only the litigant but also the broader public interest. More than 150 important statutory policies, including civil rights and environmental protections, provide statutory fees to encourage private litigants to mobilize a private right of action.[67]

---

[63] 532 U.S. 598 (2001).

[64] Id. at 625-26 & n.4 (Ginsburg, J. dissenting) (collecting cases).

[65] Id. at 604.

[66] Id. at 605.

[67] *Ruckleshaus* v. *Sierra Club*, 463 U.S. 680, 684 (1983); see also Marek v. Chesny, 473 U.S. 1, 43-51 (Brennan, J. dissenting) (Appendix) (collecting federal statutory fee shifting provisions); Coulter v.

Although federal and state governments also engage in some enforcement activities, private parties bring more than ninety percent of actions under these statutes.[68] This private enforcement system decentralizes enforcement decisions, allows disenfranchised interests access to policy making, and helps insulate enforcement from capture by established interests. It is also, from the perspective of taxpayers, cheap: it does not place the cost of enforcement solely upon government actors. Little empirical evidence exists, however, about how *Buckhannon* has affected this system.

Answering this empirical question is important because fee shifting statutes are an integral part of civil rights enforcement. Fee shifting statutes are needed to encourage private enforcement because unlike other tort actions, many meritorious civil rights claims lack financial incentives sufficient to interest private attorneys. In some instances, the plaintiff seeks non-monetary relief, such as institutional reform or a change in policy, relief that would benefit many but will not pay a lawyer. In others, the plaintiff's monetary damages are relatively small; for example, low-wage discrimination victims may have economic damages that are far less then the cost of litigating their claim. Yet when successful, these actions confer broad benefits. Injunctive relief and policy changes have effects far beyond the individual litigant, and vigorous enforcement of civil rights serves important deterrence interests. Fee

---

Tennessee, 805 F.3d 146, 152-55 (1986) (Appendix A) (collecting federal statutes authorizing the award of attorneys fees).

[68] *See, e.g.,* Daniel J. Meltzer, STATE SOVEREIGN IMMUNITY: FIVE AUTHORS IN SEARCH OF A THEORY, 75 Notre Dame L. Rev. 1011, 1021-23 (2000) (indicating that the United States rarely brings enforcement actions under the Fair Labor Standard Act); Catherine R. Albiston, THE RULE OF LAW AND THE LITIGATION PROCESS: THE PARADOX OF LOSING BY WINNING, 33 Law & Soc'y Rev. 869, 896 (1999) (reporting that only a handful of federal Family and Medical Leave Act actions that produced reported opinions involved government representation of plaintiffs); Paul Burstein and Kathleen Monaghan, EQUAL EMPLOYMENT OPPORTUNITY AND THE MOBILIZATION OF LAW, 20 Law & Soc'y Rev. 355, 359-367 (1986) (reviewing statistics on EEOC and amicus participation in employment rights enforcement suits from 1965 to 1983 and concluding that most litigants involved in employment actions are proceeding on their own). Data from the Administrative Office of the United States Courts indicate that the federal government is seldom the plaintiff in civil rights and other statutory enforcement actions that implicate the public interest. The following table was complied from the Report of the Administrative Office of the United States Courts on the Judicial Business of the United States Courts for 2005, Table C-2 <http://www.uscourts.gov/judbus2005/appendices/c2.pdf> (last visited by Plaintiff Hamrick: Sunday, October 28, 2007).

| Select Civil Cases Commenced in U.S. District Courts | | | |
|---|---|---|---|
| **Type of Action** | **US as Plaintiff** | **Other Plaintiff** | **Total Cases** | **Percent Brought by US as Plaintiff** |
| Civil Rights | 534 | 35,562 | 36,096 | 1.5% |
| Prisoner Civil Rights | 0 | 16,005 | 16,005 | -- |
| FLSA& LMRA | 155 | 5558 | 5713 | 2.7% |

shifting statutes help civil rights claimants find lawyers willing to take on these often expensive and time consuming claims; without these statutes, access to the judicial process would be much more difficult to obtain.

Congress enacted fee shifting statutes to encourage private enforcement of civil rights legislation by making it easier for victims of civil rights violations to find lawyers willing to represent them. Congress intended these statutes to "ensure that there would be lawyers available to plaintiffs who could not otherwise afford counsel, so that these plaintiffs could fulfill their role in the federal enforcement scheme as 'private attorneys general,' vindicating the Congress saw the need for fee shifting statutes based in part on evidence that most civil rights plaintiffs could not afford legal counsel, and that the limited potential for compensation meant private attorneys were refusing to take civil rights cases.public interest." [69, 70] Congress explicitly noted that civil rights enforcement depends heavily on private enforcement, and that fee awards are essential "if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain."[71] And, significantly, Congress seems to have specifically considered the prospect that defendants would voluntarily change their conduct in response to litigation. For example, the legislative history to the Civil Rights Attorneys' Fee Awards Act (CFRAA) notes:

> [A]fter a complaint is filed, a defendant might voluntarily cease the unlawful practice. A court should still award fees even though it might conclude, as a matter of equity, that no formal relief, such as an injunction, is needed.[72]

Congress made clear that "[t]he phrase 'prevailing party' is not intended to be limited to the victor only after entry of a final judgment following a full trial on the merits."[73] Instead, "parties may be considered to have prevailed when they vindicate rights through a consent judgment *or without formally obtaining relief.*"[74]

Because *Buckhannon* undermines incentives for bringing enforcement actions, it threatens to weaken this system of private enforcement of civil rights. The catalyst theory was an important part of this enforcement

---

[69] Evans v. Jeff D., 475 U.S. 717, 745 (Brennan, J. dissenting) (discussing legislative history of fee shifting provisions); see also S.Rep. No. 94-1011 pp. 1-5 (1976)(discussing the role of private attorneys general in vindicating rights of the highest priority through private enforcement).

[70] H.R. Rep. No. 94-1558, at 3 (1976).

[71] S. Rep. No. 94-1011, at 2 (1976).

[72] H.R. Rep. No. 94-1558, at 7 (1976).

[73] H.R. Rep. No. 94-1558, at 7 (1976).

[74] S. Rep. No. 94-1011, at 5 (1976) (emphasis added).

system because it prevented a litigation maneuver that we term "strategic capitulation." By strategic capitulation, we mean situations where defendants faced with likely adverse judgments provide the requested relief in order to moot the case and defeat the plaintiff's fee petition. So, for example, when a challenge to a policy prompts a government entity to change the policy, or when the government grudgingly produces documents requested under the Freedom of Information Act only after protracted litigation, courts were reluctant to deny fee petitions simply because the defendant mooted the case by providing the relief sought in the lawsuit. To do so might deter attorneys from taking such actions in the future and encourage defendants to stall to drain their opponent's resources. Such an approach would be contrary to the intent behind fee shifting provisions: promoting vigorous enforcement of important public policies.

Although the Court rejected the catalyst theory in *Buckhannon*, it did not back away from the purposes and values behind the private attorney general enforcement system. Instead, the Court emphasized how its decision would encourage settlement, taking a static, ex post approach focused on how the catalyst theory affects incentives once an enforcement action is commenced. Rejecting the catalyst theory, the majority reasoned, would minimize satellite litigation over fees and also encourage settlement because defendants willing to provide relief voluntarily would not longer be deterred from acting by the cost of the fee award.[75] The dissent took a more dynamic, ex ante view, focusing on how rejecting the catalyst theory would likely affect the system of private enforcement as a whole. Doing away with the catalyst theory, the dissent argued, would "impede access to court for the less well-heeled"[76] and discourage plaintiffs with meritorious but expensive claims from bringing suit. In other words, encouraging settlement in the short run will mean little if over time, opportunities for defendants to comply in response to a legal challenges decline because plaintiffs bring fewer enforcement actions in the first place.

In response, the majority recognized the trade-off between encouraging settlement and preserving access to the judicial process, but minimized these concerns through two empirical assumptions. First, the majority claimed that strategic capitulation was unlikely to be much of a problem.[77] Second, the majority dismissed the argument that restricting fee recovery will discourage plaintiffs with meritorious cases from filing suit, finding these "assertions" to be "entirely speculative and unsupported by any empirical evidence."[78]

---

[75] 532 U.S. at 608-10.

[76] Id. at 623.

[77] Id. at 608-09.

[78] Id. at 608.

This article presents data that call into question the Court's empirical assumptions. Based on these data, we argue that *Buckhannon* has had a chilling effect on the very forms of public interest litigation that Congress intended to encourage through fee shifting provisions. First, through an analysis of post-*Buckhannon* decisions, we illustrate how public interest litigation seeking broad social change involves certain structural features that render it particularly vulnerable to strategic capitulation. Then, drawing on data from our national representative survey of more than 200 public interest organizations, we show that the public interest organizations that take on paradigmatic public interest cases, such as class actions seeking injunctive relief against government actors, are the most likely to be affected by *Buckhannon*. We also present qualitative capitulation, makes settlement more difficult, and discourages both public interest organizations and private counsel from taking on enforcement actions. These far reaching effects, we argue, herald a shift away from private right enforcement toward more government power to both resist rights mandates and control the enforcement, and ultimately the meaning, of civil rights.

In the following sections we present data from our study situated in the context of legal developments before and after *Buckhannon*. Section II discusses how courts interpreted the role of fee shifting statutes in civil rights enforcement in the period before *Buckhannon,* the *Buckhannon* decision itself, and the aftermath of *Buckhannon* for public interest litigation. Section III presents our survey methodology, as well as our predictions and empirical data regarding how *Buckhannon* affects public interest organizations. Section IV offers some conclusions about the implications of *Buckhannon* for rights enforcement and government power.

## III. THE EMPIRICAL REALITY OF *BUCKHANNON*

C. Buckhannon's Impact on Social Change Litigation

The central finding that emerges from our survey data is two-fold. First, organizations that engage in litigation directed at systemic social change are more likely than others to report that they were negatively affected by the Buckhannon decision. Organizations that engage in impact litigation, litigate against government actors, bring class actions, and work in the environmental, civil rights, and poverty areas were the most likely to report negative effects from this decision. Second, qualitative data from our survey indicate that Buckhannon affects far more than fee recovery. These data indicate that Buckhannon both discourages settlement and discourages lawyers from representing plaintiffs in enforcement actions. We discuss these findings in detail below, and then offer some brief conclusions about what these findings might mean for the system of rights enforcement by private attorneys general.

### III. Conclusion

What conclusions can we draw from these data about the implications of Buckhannon for the federal system of civil rights enforcement? One possible interpretation is that Buckhannon is part of a larger trend directed at undermining the ability of advocates to harness the power of courts for social change. Along these lines, some commentators argue that a procedural attack on civil rights is underway.[79] This attack includes doctrinal developments regarding sovereign immunity,[80] legal challenges to the constitutionality of IOLTA funds,[81] legislative restrictions on the activities of legal services lawyers,[82] and political campaigns to limit the ability of law school clinics to represent clients who challenge established interests.[83] What these developments have in common is that they are collateral, not frontal, attacks on civil rights. They do not directly attempt to challenge the normative public policies that support civil rights protections. Instead, they rely on technical legal strategies to erode the procedural and practical mechanisms through which those rights are enforced. As a result, these attacks are less visible than a direct assault on civil rights, and therefore less likely to arouse public opposition or protest. Buckhannon fits this pattern.[84] As one commentator put it, Buckhannon is like the neutron bomb: it leaves the infrastructure still standing but kills the heart of statutes that rely on fee shifting to encourage enforcement.[85]

For public interest organizations, this interpretation is likely to ring true. Many public interest organizations that emerged in the 1960s and 1970s were modeled after progressive civil rights organizations that viewed the courts as the only access to policy making for disenfranchised groups or unpopular causes.[86] The substantive successes of these organizations have

---

[79] See, e.g., Pamela S. Karlan, *DISARMING THE PRIVATE ATTORNEY GENERAL*, 2003 U. ILL. L. REV. 183 (2003); Jed Rubenfeld, *THE ANTI-ANTIDISCRIMINATION AGENDA*, 111 Yale L. J. 1141 (2002); David Luban, *TAKING OUT THE ADVERSARY: THE ASSAULT ON PROGRESSIVE PUBLIC INTEREST LAWYERS*. 91 Cal. L. Rev. 209 (2003); Erwin Chemerinsky, *CLOSING THE COURTHOUSE DOORS TO CIVIL RIGHTS LITIGANTS*. 5 U. Pa. J. Const. L. 537 (2003).

[80] Rubenfeld, supra note [46], at 148-152; Chemerinsky, supra note [46], at 540-41; Karlan. supra note [46], at 188-195.

[81] *See Phillips* v. *Washington Legal Foundation*, 524 U.S. 156 (1998); *Brown* v. *Legal Foundation of Washington*. 538 U.S. 216 (2002); Luban, supra note [46], at 227-236.

[82] *See* William P. Quigley, *THE DEMISE OF LAW REFORM AND THE TRIUMPH OF LEGAL AID: CONGRESS AND THE LEGAL SERVICES CORPORATION FROM THE 1960S THROUGH THE 1990S*, 17 St. Louis Public Law Review 241 (1998); Luban, supra note [46], at 220-226.

[83] Luban, supra note [46], at 236-240.

[84] Karlan, supra note [46], at 205-208; Luban, supra note [46], at 243-45; Chemerinsky, supra note [46], at 547.

[85] Margaret Graham Tebo, *FEE SHIFTING FALLOUT*, ABA Journal, July 2003, at 54.

[86] Joel F. Handler, Betsy Ginsberg. & Arthur Snow, *The Public Interest Law Industry*, in *PUBLIC INTEREST LAW: AN ECONOMIC AND INSTITUTIONAL ANALYSIS* 42, 44-45 (Burton A. Weisbrod, Joel F. Handler, & Neil K. Komesar. eds. 1978).

made them targets for political campaigns to undermine their financial support.[87] Buckhannon seems like one more installment in this campaign, and to be sure, to the extent that progressive movements rely on impact litigation strategies more than conservative movements do, the procedural attack on civil rights enforcement is likely to have a particular political valence.

We believe that this interpretation is definitely part of the story, but we also think Buckhannon has even broader implications. We note that our data indicate that at least among public interest organizations, there is no statistical difference between progressive and conservative organizations in their reports of whether Buckhannon has made it more difficult for them to pursue their goals. Of course, there are far more progressive than conservative public interest law organizations, so this decision clearly weighs more heavily on progressive causes, yet at least among organizations that meet our definition, Buckhannon affects organizations across the political spectrum. This finding makes sense when one considers that conservative public interest organizations have been very successful in recent years in adopting impact litigation as a social change strategy. For example, conservative organizations have represented plaintiffs before the Supreme Court in religious freedom cases seeking access to public facilities for religious groups,[88] and in challenges seeking to prohibit implementation of affirmative action programs.[89]186 These cases, which seek policy changes or injunctive relief, are the kind of actions that are now structurally vulnerable to Buckhannon.

To us, Buckhannon's broad effects across the political spectrum of right litigation indicate that the consequences of this decision extend even beyond the political struggles between left and right. Buckhannon and the larger attack on rights enforcement also may signal an ominous shift of power away from private enforcement of rights and toward government power, both to resist civil rights mandates and to control the enforcement, and ultimately the meaning, of these rights. Even before Buckhannon, the sovereign immunity doctrine insulated states from civil rights challenges; Buckhannon's implications for suits seeking solely injunctive relief extend that insulation even further. Challenges to prison conditions, welfare policies, or decisions to deny access to facilities to religious groups all will be harder to mount because Buckhannon renders fee recovery so uncertain in these actions. In addition, Buckhannon is likely to change the state's litigation

---

[87] Nan Aron, *LIBERTY AND JUSTICE FOR ALL* 14-21 (1989) (discussing the Reagan Administration campaign to defund progressive public interest activities).

[88] See Hans J. Hacker, *THE CULTURE OF CONSERVATIVE CHRISTIAN LITIGATION* (Rowman & Littlefield 2005) (discussing the role of conservative Christian public interest law firms in religious freedom litigation).

[89] *See, e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) (Mountain States Legal Foundation); *Grutter v. Bollinger*, 539 U.S. 306 (2003) (Center for Individual Rights); see also Jean Stefancic & Richard Delgado, *NO MERCY: HOW CONSERVATIVE THINK TANKS AND FOUNDATIONS CHANGED AMERICA'S SOCIAL AGENDA* 47-51 (Temple University Press 1996) (discussing the role of conservative public interest organizations in challenges to affirmative action).

strategy in these cases because it removes a significant incentive for early settlement. Instead, states may feel free to allow litigation to drag on and on, confident that strategic capitulation will protect it against an adverse judgment and fee award. In short, the symbiosis between Buckhannon and the sovereign immunity doctrine leaves little incentive to bring equitable claims against states: why engage in protracted litigation with scant prospect for recovering the costs of that litigation, or even a favorable judicial ruling, in the end?

Second, to the extent that Buckhannon hamstrings the private attorney general, enforcement decisions for a variety of statutes, not limited to civil rights statutes, increasingly will fall to government actors such as underfunded administrative agencies. As a result, at the very least these discretionary decisions will be driven by a different set of incentives than those of the private attorney general. The decision to pursue a claim may become vulnerable to the political whims of changing administrations, and one can imagine circumstances, such as environmental actions or institutional reform claims, in which state and federal interests would align against enforcing rights that might nevertheless be in the public interest.

Even apart from shifting structure of incentives for enforcement, the sheer magnitude of the task is daunting. If Buckhannon reduces private enforcement efforts, and our data suggest that it will, it would require a significant increase in government enforcement to replace the more diffuse and decentralized system of private attorneys general. It seems unlikely that there will be an infusion of funds into state and federal enforcement to fill the breach, particularly given other governmental priorities and likely political opposition from repeat players. Thus, Buckhannon may represent a much broader deregulatory judicial policy despite its guise as a mundane application of mere "statutory interpretation". And, even if an infusion of funds did occur, such a change would have the practical effect of shifting the costs of enforcement to taxpayers and away from defendants who failed to comply with the law, because, of course, government enforcement actions can be "Buckhannoned" too. In short, such a retooling of rights enforcement would lose many of the structural advantages of private attorneys general, and give significantly more power to governmental actors to decide whether to enforce rights, and to choose which rights are worth enforcing at all.

We view such a shift as normatively undesirable, and we note that the Court's fee shifting decisions generally have not questioned the desirability or importance of the private attorney general in enforcing the law. Instead, the Court has minimized the threat its interpretations pose to private enforcement and emphasized the lack of any empirical evidence that limiting fee recovery would discourage claims by private parties. Our empirical findings suggest that this optimism may have been misplaced. Now that the negative implications of limiting fee recovery have begun to emerge, Congress and the courts should reconsider how Buckhannon can best be reconciled with preserving the federal system of rights enforcement though the private attorney general.

# THE CIVIL PLAINTIFF AS A
# PRIVATE ATTORNEY GENERAL UNDER THE CIVIL RICO ACT

Citing from David F. Herr, Annotated Manual for Complex Litigation, (Thomson West, 2006 ed., Chapter 35 Civil Rico, pp. 792-793, footnotes generally omitted):

> Congress enacted the 1920 Racketeer Influenced and Corrupt Organizations Act (RICO) to respond to the "infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." Congress targeted organized crime through a broad statutory scheme that included severe criminal penalties, fines, imprisonment, asset forfeiture, and civil remedies in an effort to undermine the economic power of racketeering organizations. The statute further enabled private individuals to act, in effect, as **private attorneys general**[90] to sue for injury to their businesses or property caused by a RICO violation.

> Civil RICO claims have alleged wrongs actionable under state and common law; as well as other federal statutes. Although the statute was targeted at organized crime, courts have broadly construed RICO's provisions, and its scope has extended well beyond its original aim. Early efforts by lower courts to restrict claims that appeared to exceed RICO's original goals were overruled by Supreme Court decisions that broadened the statute's reach. RICO claims can now be found in a variety of contexts, including insurance and business disputes, antiabortion and other protests, consumer financial services litigation family law, and whistle-blower actions. Although the nontraditional uses of RICO have continued to expand despite significant criticisms by commentators and the courts, Congress has shown little inclination to narrow the statute's focus or reach.

Citing Paul A. Batista, Civil Rico Practice Manual, 2nd Ed. 2006 Cumulative Supplement (Wolters Kluwer Law & Busines, § 6.27, pp. 173-174):

### § 6.27 Civil RICO Litigation Against Foreign Countries:
### When Is It Viable?

Federal law generally immunizes foreign nations from civil lawsuits in the United States. In sweeping language, the Foreign Sovereign Immunities Act of 1976 (FSIA) provides in part: "[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the states . . ." 28 U.S.C. § 1604.

Virtually all general rules are, of course, rife with exceptions, and so it is with the FSIA. And, as the Tenth Circuit's recent decision in *Southway* v. *Central Bank of Nigeria*, 198 F.3d 1210 (10th Circuit 1999), demonstrates, RICO litigation can constitute the vehicle for fulfilling one of the exceptions.

. . .

---

[90] 18 U.S.C. § 1964(c) (West 2003). See Rotella v. Wood, 528 U.S. 549, 557 (2000) ("The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity.").

In their ensuring complaint against the Republic of Nigeria, the Nigerian bank, and others, the Colorado plaintiffs invoked the federal court's jurisdiction under RICO and under the commercial activity exception to the FSIA. The commercial activity exception provides, in substgance, that a "foreign stgate shall not be immune . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state. . . ." 28 U.S.C. § 1605(a)(2).

## § 6.27 — Can Foreign Nations Commit "Indictable" Acts for RICO Purposes?

. . .

Having discounted Nigeria's assertion that it could not be accused of "indictable" RICO predicate acts, the *Southway* decision also quickly rejected Nigeria's assertion that for policy reasons a foreign government and its agencies should not face exposure to claims under RICO:

> Defendants . . . essentially ask us in construing RICO and the FSIA to ascribe an intent to Congress which would effectively insulate foreign states, their agents, and instrumentalities from the scope of civil RICO. We do not believe Congress envisioned such a construction of RICO and the FSIA. Congress' purpose in enacting the FSIA was to codify the "restrictive" principle of sovereign immunity . . . to cases involving acts of a foreign state which are sovereign or governmental in nature, as opposed to acts which are either commercial in nature or those which private persons normally perform. H.R. 94-1487, at 14 (1076), reprinted in 1976 U.S.C.-C.A.N. 6604, 6613. Meanwhile, in enacting RICO, Congress expressly instructed courts to liberally construe its provisions "to effectuate its remedial purpose." Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970). RICO's "'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity," *Sedime S.P.R.L.* v. *Imrex Co., Inc.*, 473 U.S. 479, 498, 105 s.Ct. 3275, 87 L. Ed. 2d 346 (1985), activity which often will be commercial in nature.

*Southway*, 198 F.3d at 1216.

Thus, under the standards identified in *Southway*, the FSIA confers subject matter jurisdiction over civil RICO claims against foreign states, their agencies and instrumentalities, provided that the commercial activity exception, or another exception identified in §§ 1605 through 1607 of the FSIA, applies. *Id.*

- - -

# Plaintiff Disputes *Berger* v. *Pierce*, 933 F.2d 393 (6th Circuit, 1991)

- - -

## § 6.29 Agencies of the United States as RICO Defendants

Decisions such as *Southway* and *Adler* raise the question of whether agencies of the United States are subject to civil RICO actions, since, as Nigeria argued in *Southway*, if the United States and its agencies are immune from civil actions, foreign actions and their agencies should enjoy the same immunity.

Consistency may well be a virtue in many aspects of life, but not always in the law. In fact, the United States and its agencies have been granted immunity from racketeering claims in several decisions, but, as *Southway* demonstrates, foreign nations and their agencies have not been similarly protected.

In *Berger* v. *Pierce*, 933 F.2d 393 (6th Circuit, 1991) — which, like the Tenth, has been highly conservative in its treatment of civil racketeering issues — held that a federal agency is *not* subject to any civil RICO liability:

> Section 1962 states a requirement of "racketeering activity" as a predicate for a civil RICO action. Section 1961(1), in turn, defines "racketeering activity," which requires that the defendant be, variously, "chargeable," "indictable," or "punishable" for violations of specific state and federal criminal provisions. The assertion that the [federal agency] was engaged in RICO conspiracy under section 1926(d) was patently defective as a matter of law, since it is self-evidence that a federal agency is not subject to state or [federal] criminal prosecution.

*Berger* 933 F.2d at 397.

## § 6.30 — Individual Federal Officials as RICO Defendants

The automatic immunity accorded to federal agencies from RICO liability does not extend automatically to individual federal officials. While federal officials may qualify for the absolute or limited immunity available to them in all types of federal civil litigation, they do not receive the same underlying protection that federal agencies receive in the RICO context.

This distinction was made clear in *Mceily* v. *United States*, 6 F.3d 343, 350 (5th Circuit, 1993) in which the Fifth Circuit held that the Federal Deposit Insurance Corporation (FDIC), "as a federal agency, is not chargeable, indictable or punishable for violations of state and federal criminal provisions." *Id.* In contrast, as McNeily stressed, individual FDIC officials could face RICO liability, since individual federal officials can violate RICO's predicate acts. *Id. See also Brown* v. *Nationsbank Corp.*, 188 F.3d 579, 587 (5th Circuit, 1999) ("*McNeily* does not support the grant of immunity to FBI agents").

# CASES KEEP FLOWING IN
# BUT THE JURY POOL IS IDLE

by Adam Liptak
The New York Times
Monday, April 30, 2007
http://www.lexisone.com/news/nlibrary/n043007d.html

Trials are on the verge of extinction. They have been replaced by settlements and plea deals, by mediations and arbitrations and by decisions from judges based only on lawyers' written submissions.

**Federal courts conducted about 3,600 trials in civil cases last year, down from 5,800 in 1962.** That is not an enormous drop— until you consider that the number of cases has quintupled in the meantime.

**In percentage terms, only 1.3 percent of federal civil cases ended in trials last year, down from 11.5 percent in 1962.**

The trends in criminal cases and in the state courts are broadly similar, though not always quite as striking. But it is beyond dispute that even as the number of lawyers has grown twice as fast as the population and even as the number of lawsuits has exploded, actual trials have become quite rare.

Instead of hearing testimony, ruling on objections and instructing jurors on the law, judges spend most of their time supervising the exchange of information, deciding pretrial motions and dealing with settlements and plea bargains.

There is, of course, nothing wrong with settlements, at least when they are the product of reasoned and sensible compromise between evenly matched adversaries. But trials are not disappearing simply because more cases are being settled. Instead, they are increasingly being replaced by summary judgments, in which judges evaluate evidence submitted to them on paper.

"During the last years of the 20th century, summary judgment in the federal courts moved from a small fraction of dispositions by trial to a magnitude several times greater than the number of trials." Marc Galanter, who teaches law at the University of Wisconsin and the London School of Economics and Political Science, wrote last year in The Journal of Dispute Resolution.

Professor Galanter elaborated in an interview. "Summary judgments are being asked for in about 17 percent of cases and granted in about 9 percent," he said, citing recent data from the Federal Judicial Center. That is a big jump from 1960, when no more than 1.8 percent of federal civil cases ended in summary judgment, according to data from the administrative office of the federal courts analyzed in a 1961 law review article.

"We've moved in a way to a more European way of decision-making, by looking at the court file rather than through encounters with living witnesses whose testimony is tested by cross-examination," Professor Galanter said.

In criminal cases, the vast majority of prosecutions end in plea bargains. In an article called "Vanishing Trials, Vanishing Juries, Vanishing Constitution" in the Suffolk University Law Review last year, a federal judge questioned the fairness of the choices confronting many criminal defendants.

Those who have the temerity to "request the jury trial guaranteed them under the U.S. Constitution," wrote the judge, William G. Young of the Federal District Court in Boston, face "savage sentences" that can be five times as long as those meted out to defendants who plead guilty and cooperate with the government.

The movement away from jury trials is not just a societal reallocation of resources or a policy choice. Rather, as Judge Young put it, it represents a disavowal of "the most stunning and successful experiment in direct popular sovereignty in all history."

Indeed, juries were central to the framers of the Constitution, who guaranteed the right to a jury trial in criminal cases, and to the

drafters of the Bill of Rights, who referred to juries in the Fifth, Sixth and Seventh Amendments. Jury trials may be expensive and time-consuming, but the jury, local and populist, is a counterweight to central authority and is as important an element in the constitutional balance as the two houses of Congress, the three branches of government and the federal system itself.

In an article titled *"Why Summary Judgment Is Unconstitutional,'* published last month in the Virginia Law Review, Suja A. Thomas, a law professor at the University of Cincinnati, makes the perfectly plausible argument that the procedure violates the Seventh Amendment, which reserves the job of determining the facts in civil cases to juries.

When judges decide summary judgment motions, Professor Thomas wrote, they intrude on that job. The theory of summary judgment is that judges may rule for one side or the other only after finding that no "genuine" issues of "material" fact are in dispute. They must determine, as the Supreme Court has put it, whether "a reasonable jury could return a verdict" for the party defending against a motion for summary judgment.

All of that pushes judges right up to and sometimes across the constitutional line of determining the facts for themselves.

In 2004, in the process of revitalizing the role of the jury in criminal cases, Justice Antonin Scalia of the Supreme Court wrote that there were good arguments for "leaving justice entirely in the hands of professionals." But that is not the theory of the Constitution, he continued, which enshrined "the common-law ideal of limited state power accomplished by strict division of authority between judge and jury."

The jury trial is a distinctively American tradition in a cultural sense, too. Almost all civil jury trials in the world take place here, and 90 percent of the criminal ones. But that tradition, which Prof. Paul Butler of George Washington University calls "as fundamental a part of our culture as jazz or rock 'n' roll," is dying.

I was on jury duty last week, in a state criminal court in Manhattan. During the orientation on Wednesday, a court officer, with mixed pride and hyperbole, said his was the busiest courthouse in America.

I never saw so much as the inside of a courtroom. After a couple of days of milling around in an assembly room with more than 100 other potential jurors, the State of New York thanked us for our service and sent us home.

Respectfully,

Don Hamrick

## CERTIFICATION:

Service not provided to government defense counsel because I cannot afford the cost.

Respectfully,

Don Hamrick