# In the U.S. District Court of the District of Columbia

333 Constitution Avenue, Washington, DC 20001

## No. 1:07-cv-1616, RMC

| | | |
|---|---|---|
| Don Hamrick, pro se | ) | |
| IN THE CAPACITY OF A | ) | |
| PRIVATE ATTORNEY GENERAL | ) | |
| 5860 Wilburn Road | ) | |
| Wilburn, AR 72179 | ) | **Civil RICO Act** |
| PLAINTIFF/APPELLANT | ) | **18 U.S.C. § 1964(a)** |
| v. | ) | |
| | ) | |
| United Nations | ) | |
| | ) | |
| United States | ) | |
| DEFENDANT/APPELLEE | ) | |

**RECEIVED**

DEC 1 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## *res integra, ex debito justitiae*

*(This is a Case of First Impression; as a matter of right, in accordance with the requirements of justice)*

### RULE 201(d) MANDATORY JUDICIAL NOTICE OF ADJUDICATIVE FACTS
### RULE 301. PRESUMPTIONS IN GENERAL
### RULE 406. HABIT; ROUTINE PRACTICE
### FEDERAL RULES OF EVIDENCE

THE PLAINTIFF HAS VESTED RIGHTS TO ACT IN THE CAPACITY OF A *PRIVATE ATTORNEY GENERAL* AND A *HUMAN RIGHTS DEFENDER* FOR THE SECOND AMENDMENT AS A HUMAN RIGHT BECAUSE THE CIVIL RICO ACT IS INTER-DEPENDANT WITH HUMAN RIGHTS, ESPECIALLY UNDER THE CONVENTION ON THE PREVENTION AND PUNISHMENT OF THE CRIME OF GENOCIDE

Part 1 THE RICO ACT CAN BE USED AGAINST THE UNITED NATIONS AS A RACKETEERING ENTERPRISE

PART 2 THE RICO ACT CAN BE USED AGAINST THE UNITED STATES AS A RACKETEERING ENTERPRISE

FOR RACKETEERING AN UNLAWFUL PROTECTION SCHEME OVER THE HUMAN RIGHT OF ARMED SELF DEFENSE UNDER THE GENOCIDE CONVENTION

*NOTE: Plaintiff's Second Amendment as a human rights case at the Inter-American Commission on Human Rights, Petition No. P-1142-06 following Jessica Gonzales' "No Constitutional Right to Police Protection" case, Petition No. 1490-05, makes the Plaintiff above a Human Rights Defender*

i

# TABLE OF CONTENTS

A. INTRODUCTION TO THE SECOND AMENDMENT AS AN INTERNATIONAL HUMAN RIGHT ....... 1

   1. Change of Conditions..................................................................................................... 1

   2. Change of Circumstances............................................................................................... 1

   3. Compelling Constitutional Reasons .............................................................................. 1

   4. International Maritime Organization (IMO), *PIRACY AND ARMED ROBBERY AGAINST SHIPS: GUIDANCE TO SHIPOWNERS AND SHIP OPERATORS, SHIPMASTERS AND CREWS ON PREVENTING AND SUPPRESSING ACTS OF PIRACY AND ARMED ROBBERY AGAINST SHIPS*, MSC/Circ.623/Rev.3, May 29, 2002. ...................................................................................................................... 4

      *Firearms*............................................................................................................................ 4

      *¶45 The carrying and use of firearms for personal protection or protection of a ship is strongly discouraged.* ................................................................................................... 4

      *¶46 Carriage of arms on board ship may encourage attackers to carry firearms thereby escalating an already dangerous situation, and any firearms on board may themselves become an attractive target for an attacker. The use of firearms requires special training and aptitudes and the risk of accidents with firearms carried on board ship is great. In some jurisdictions, killing a national may have unforeseen consequences even for a person who believes he has acted in self defence.* ................................................................. 4

   5. M. Cherif Bassiouni, *INTERNATIONAL CRIMES: JUS COGENS AND OBLIGATIO ERGA OMNES*, 59 Law & Contemp. Probs. 63 (Autumn 1996)................................................................. 4

   6. Federalist No. 8 *THE CONSEQUENCES OF HOSTILITIES BETWEEN THE STATES* ................................. 7

   7. U.S. Supreme Court Takes on the Second Amendment................................................. 8

B. VESTED RIGHTS........................................................................................................... 8

   1. Marbury v. Madison  5 U.S. 137, 163 (1803) .............................................................. 8

   2. Compiled Case Law Supporting Vested Rights ............................................................ 9

   3. Cohens v. Virginia, 19 U.S. 264, at 404 (6 Wheaton 264) (1821) ............................. 12

   4. *American Communications Association, C.I.O., et al* v. *Douds, Regional Director of the National Labor Relations Board*, 339 U.S. 382, 442-443 (1950) Justice Robert H. Jackson, concurring and dissenting, each in part to Chief Justice Fred M. Vinson's opinion delivered to the Court: ................................................................................................................. 12

   5. *Jordan* v. *Gardner* (9th Cir. 1993) 986 F.2d 1521, 1529:........................................... 12

   6. *Olmstead* v. *United States* 277 U.S. 438, 485 (1928), Justice Brandeis, dissenting: ................... 12

   7. Thomas Jefferson, *LETTER TO THOMAS RITCHIE*, Dec. 12, 1820 .................................. 12

   8. Charles Warren, *THE SUPREME COURT IN UNITED STATES HISTORY* 3:470-71 (1922).................. 13

   9. *People* v. *Banks*  6 Cal.4th 926, 949 (1993), Justice Panelli, dissenting........................ 13

   10. *West Virginia State Board of Education* v. *Barnette* 319 U.S. 624, 638-639 (1943), Justice Robert H. Jackson. ......................................................................................................... 13

   11. *Lucas* v. *Colorado General Assembly*  377 U.S. 713, 736-737 (1964), Chief Justice Warren ... 13

C. LIKE PEAS IN POD: "THE SUBSTANTIAL BENEFIT DOCTRINE," "THE PRIVATE
ATTORNEY GENERAL DOCTRINE," UNDER THE CIVIL RICO ACT SERVE THE SAME
FUNCTIONS AS THE UNITED NATIONS' "HUMAN RIGHTS DEFENDER" .............................13

   1. David F. Herr, *THE ANNOTATED MANUAL FOR COMPLEX LITIGATION*, 4th Edition (2006),
     Thomson/West,  Chapter 35, Civil RICO, p. 792-793 ........................................ 13

   2. *State Board of Tax Commissioners* v. *Town of St. John, et al.* Supreme Court of Indiana,
     No. 49S10-0009-TA-541 (July 18, 2001) ........................................... 14

   3. Overlapping Jurisdictions: Private Attorney General and the Human Rights Defender .............. 15

   4. Two World Bullies Don't Make a Righteous Human Rights Tug of War .................................... 16

      (a) PRWEB: Press Release Newswire: *US Deems UN Human Rights Commission Not
        Competent; Canada Sued* ...................................................... 16

   5. Memorandum From U.S. Civil Society Organizations and Advocates to Members of the U.N.
     Human Rights Committee, Re: *LIST OF CONCERNS FOR THE REVIEW OF THE U.S. SECOND AND
     THIRD PERIODIC REPORT*, dated January 9, 2006: ................................ 17

     Introduction (U.S. Obligations and Reservations) .................................... 17

      *Questions* ........................................................................ 17

     Article 2 (Equal Application of Rights/Effective Remedies for Violations) .......................... 18

      *Art. 2(3) Effective Remedy* ...................................................... 18

      *Civil Rights Claims* .............................................................. 18

   6. Kathleen M. Sullivan's, *UNCONSTITUTIONAL CONDITIONS*, 10 Harv.L.Rev. 1413 (May 1989) .... 18

     *IV. Unconstitutional Conditions as Commodification* ............................... 19

      *1. Paternalism* ................................................................... 19

      *4. Personhood.* ................................................................... 20

     *V. A Systemic Account of Unconstitutional Conditions* .............................. 20

      *A. Constitutional Liberty as Distribution* ........................................ 20

D. IN DEFENSE OF PRO SE LITIGATION ..........................................................21

   1. Amicus Curiae Brief of Halt – an Organization of Americans for Legal Reform in
     *Andrew Pickholtz* v. *Rainbow Technologies, Inc.and Software Security, Inc.* ................ 21

     *Introduction* ...................................................................... 21

     *I. There is a fundamental right to proceed pro se in a civil case.* ............................ 22

     *II. Pro se litigants must have equal access to the discovery process.* ......................... 23

      *A. Equal access to discovery is inherent in the right to procedural due process.* .............. 23

      *B. Pro se litigants must have access to sanctions of equal deterrent effect as those
        afforded to litigants represented by counsel.* ................................... 24

     *III. The district court abused its discretion by failing to impose a sanction sufficient to
      deter misconduct by those litigating against a pro se party.* ................................... 25

      *A. The sanctions imposed by the district court were insufficient to deter discovery
        misconduct committed against an unrepresented party.* .......................... 25

*B. Failure to grant attorneys fees to a pro se litigant for discovery abuses committed by an opposing party violates the due process rights of the pro se party.* ...................... 25

CONCLUSION ...................................................................................................... 27

**E. BLACK'S LAW DICTIONARY DEFINES EQUITABLE ESTOPPEL** ................................. **27**

ESTOPPEL BY SILENCE: ......................................................................................... 27

**F. ARTICLES 1 TO 27 OF THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS (ICCPR)** ....................................................................................................... **27**

**G. EXEMPTIONS TO FOREIGN SOVEREIGN IMMUNITIES ACT OF 1976 APPLY TO MY CASE AGAINST THE UNITED NATIONS** ...................................................................... **36**

General Exceptions to the Jurisdictional Immunity of a Foreign State 28 U.S.C. § 1605 ................ 36

**PART 1 – A HUMAN RIGHTS DEFENDER FOR THE SECOND AMENDMENT** ............ **38**

A. - U.N. Further Weakens Human Rights Council ................................................. 38

*The Council's Disastrous Record* .......................................................................... 38

*U.N. Member States Support a Weaker Council* .................................................. 39

*Conclusion* ........................................................................................................... 40

B. "U.N. To World: You Have No Human Right to Self-Defense" ........................... 41

*Thwarted by the demise of its global gun ban treaty, the United Nations declares the human right of self-defense null and void* ............................................................. 41

[C.] Declaration on Human Rights Defenders .......................................................... 44

*The Declaration on human rights defenders* ......................................................... 44

*1. Legal character* ............................................................................................ 44

*2. The Declaration's provisions* ....................................................................... 44

*(a) Rights and protections accorded to human rights defenders* ................... 45

*(b) The duties of States* ..................................................................................... 46

*(c) The responsibilities of everyone* ............................................................... 46

*(d) The role of national law* .............................................................................. 46

[D.] Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms General Assembly resolution 53/144 ...................................................... 47

*ANNEX* ................................................................................................................. 48

[E. U.N. Letter Re:] Summons and Complaint in the United States District Court for the Eastern District of Arkansas, Northern Division -- Don Hamrick, pro se v. United Nations, et al, Case No. 1:06-cv-0044 ..................................................... 53

F. Plaintiff's Rebuttal to U.N. Letter .......................................................................... 55

G. United Nations' War of Aggression Against the Individual's Human Right of Self-Defense is a Breach of Treaty (The U.N. Charter, Article 2, Clause 7) Under the Vienna Convention on the Law of Treaties of 1969 and the Vienna Convention on the Law of Treaties Between States and International Organizations or Between International Organizations of 1986. ........... 61

   1. Dave B. Kopel, Medellin and the Second Amendment ........................................................ 61

   2. David B. Kopel, Paul Gallant & Joanne D. Eisen, The Human Right of Self-Defense, BYU Journal of Pulbic Law, (Forthcoming 2007) ................................................................ 64

     *Introduction* ........................................................................................................................ 64

     *I. The International Gun Prohibition Agenda and Human Rights* ..................................... 65

     *II. The Frey Report for the Human Rights Commission/Council* ....................................... 68

       *A. The Background of the Creation of the Frey Report* ................................................. 68

       *B. The Human Rights Commission* .............................................................................. 70

       *C. The Frey Report* ....................................................................................................... 71

       *D. No Right of Self-Defense* .......................................................................................... 75

     *VI. Is there an International Human Right to Gun Control?* ............................................. 76

       *A. Due Diligence* ........................................................................................................... 76

       *B. Frey's Erroneous Claims of Empirical Support* ...................................................... 80

       *C. Jus Cogens* ............................................................................................................... 84

     *VII. Does the Right to Self-defense Imply a Right to Arms?* ............................................. 85

       *A. Right to Arms* ........................................................................................................... 85

       *B. Right to Firearms?* ................................................................................................... 87

   3. United Nations Charter, Chapter VI, Pacific Settlement of Disputes ................................... 92

   4. United Nations Convention Against Corruption .................................................................. 92

J. International Bill of Human Rights ............................................................................................ 92

   1. Universal Declaration of Human Rights .............................................................................. 92

   2. International Covenant on Economic, Social and Cultural Rights ........................................ 93

   3. International Covenant on Civil and Political Rights ........................................................... 93

K. Human Rights Defenders ......................................................................................................... 93

   1. Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms: A/RES/53/144 ................................................................................. 93

L. Right to enjoy culture, international cultural development and co-operation ............................. 94

   1. Declaration of the Principles of International Cultural Co-operation ................................... 94

   2. Recommendation concerning Education for International Understanding, Co-operation and Peace and Education relating to Human Rights and Fundamental Freedoms ................. 94

M. Evidence of Internationally Driven Reverse Racism Against Whites ....................................... 95

   1. Baltimore Sun Opinion: Was Ehrlich Right About Multiculturalism? ................................. 95

2. Public Comment to the Baltimore Sun on the Article Above ............................................. 96

N. Gunshot Precedes Anti-North American Union Marches Drive-by incident at organizer's home, but protests carried out in 9 cities ......................................... 106

# PART 2 – A PRIVATE ATTORNEY GENERAL FOR THE SECOND AMENDMENT ... 107

A. The RICO Act Can Be Used Against the United States and the United Nations as Racketeering Enterprises ............................................................................................... 107

1. Judge Reggie B. Walton Memorandum Opinion of this Court, No. 03-2160, dismissing my first RICO Act case.................................................................... 107

*D. Have the Defendants Waived Their Sovereign Immunity Regarding the RICO Claims?* ........................................................................................... 107

2. The Clear, Unequivocal, and Explicit Waiver of Sovereign Immunity is 46 C.F.R. § 1.01-30 and 46 U.S.C. § 1.03-15(j) ............................................ 108

B. GOVERNMENT AS A RICO ENTERPRISE: Brief of the United States in United States v. Lawrence E. Warner & George H. Ryan, Sr., 7th Circuit, Nos. 06-3517 and 06-3528 ............... 110

IV. The RICO Charge Was Legally Sound and the Instructions were Correct....................... 110

*A. Standard of Review* ....................................................................................... 110

*B. Analysis* ........................................................................................................ 110

*1. The State of Illinois Is a Proper RICO Enterprise.* ................................ 110

C. Definition of a Racketeering Enterprise Includes the United State Government as a Governmental Unit ................................................................................................ 112

A. U.S. Department of Justice, *RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS: A MANUAL FOR FEDERAL PROSECUTORS*, Fourth Edition, July 2000 ................... 112

*II. DEFINITIONS: 18 U.S.C. § 1961* ............................................................ 112

*D. Enterprise* ..................................................................................................... 112

*(2). Types of Enterprises* ................................................................................ 112

D. Evidence of Judicial Bias Against the RICO Act for Civil Plaintiffs ......................... 116

◆ *No extraterritorial RICO case has resulted in a judgment.* ............................... 116

◆ *Plaintiffs have filed approximately one dozen extraterritorial RICO cases in United States courts, four of which were dismissed for failure to prove jurisdiction.*......... 116

◆ *In another five cases, plaintiffs established jurisdiction, but their RICO claims were stayed or dismissed.* ................................................................................ 116

◆ *Courts have maintained RICO causes of action against foreign defendants in only four cases.* ......................................................................................................... 116

# CERTIFICATION ................................................................................................. 117

## A. Introduction to the Second Amendment as an International Human Right

Through Internet research I discovered and excavated the legal link between the RICO Act and international human rights. Does Judge Rosemary M. Collyer now dare dismiss my case in light of this evidence supporting my Seventh Amendment right and international human right to a civil jury trial?

Quoting Publius Cornelius Tacitus (c. 116 A.D.) *"The more corrupt the state, the more numerous the laws."* This quote is appropriate to the current condition and circumstances of the United States and the United Nations such that the quote by Juvenal (Roman rhetorician, c. 100 A.D.) *"Quis custodiet ipsos custodes?* Translated, *"Who will watch the watchers?"* The concept of watching the watchers is the basic principle of the *RICO ACT* and the *HUMAN RIGHTS DEFENDER* in conjunction with the unenumerated rights of the Ninth Amendment and the powers reserved to the People in the Tenth Amendment.

### 1. Change of Conditions

"<u>**A statute valid when enacted may become invalid by change in the conditions to which it is applied.**</u>" *Nashville, C. & St. L. R. Co.* v. *Walters*, 294 US 405, 55 S Ct 486, (1935). "<u>**Longevity does not ensure that a statute is constitutional.**</u>" [Per Marshall, J., as Circuit Justice.] *Brennan* v. *U.S. Postal Service*, 439 US 1345, 98 S Ct 22 (1978).

### 2. Change of Circumstances

"<u>**The principle that a statute, valid, when enacted may cease to have validity, owing to a change of circumstances, is applicable to Acts of Congress.**</u>" *Hamilton* v. *Kentucky Distilleries & Warehouse Co.* 251 US 146 (1919), 40 S Ct 106, 64 L Ed 194.

### 3. Compelling Constitutional Reasons

"When the United States Supreme Court is asked to invalidate a statutory provision that has been approved by both houses of Congress and signed by the President, it should do so only for the most compelling constitutional reasons." *Mistretta* v. *United States*, 488 US 361, 109 S Ct 647, 102 L Ed 2d 714 (1989).

The *Change of Circumstances* as the basis for a constitutional challenge to state and federal laws are also available *uberrimae fidei* [1] as a human rights challenge to the United Nations global gun control agenda spearheaded by the *PROGRAMME OF ACTION TO PREVENT, COMBAT AND ERADICATE THE ILLICIT TRADE IN SMALL ARMS AND LIGHT WEAPONS IN ALL ITS ASPECTS* on the basis that it is being used to attack our Second Amendment constitutional rights and the international human right to own and possess firearms for the safety, security, and defense of the international human right to life. The basis in international law for my allegations is found in the United Nations *INTERNATIONAL BILL OF HUMAN RIGHTS*, the *CONVENTION AGAINST CORRUPTION* and the *GENEVA CONVENTION ON THE PREVENTION AND PUNISHMENT OF THE CRIME OF GENOCIDE*, just to name a few.

The *Changes of Circumstances* for a constitutional challenge of state and federal laws (i.e. the new Rule 5.1 of the Federal Rules of Civil Procedure) corresponds with Articles 60, 61, 62, 64 of the *VIENNA CONVENTION ON THE LAW OF TREATIES OF 1969* and the *VIENNA CONVENTION ON THE LAW OF TREATIES BETWEEN STATES AND INTERNATIONAL ORGANIZATIONS OR BETWEEN INTERNATIONAL ORGANIZATIONS OF 1986*. The United States can use these authorities to (1) force the United Nations to cease and desist, to

---

[1] Latin. *"of the utmost good faith"*

1

abandon their global gun control agenda; (2) to withdraw from the United Nations; or (3) to even cause the disbanding of the United Nations for breach of the United Nations Charter under Article 2, clause 7 of the U.N. Charter.

Because the United States has not acted *intra vires*[2] in a timely manner to the [Special Rapporteur's report, *"PREVENTION OF HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS AND LIGHT WEAPONS,"*][3] and because of the federal courts corrupt actions blocking my case from proceeding to a civil jury trial I filed my human rights complaint against the United States with the Inter-American Commission on Human Rights on the hope I will find a fair and unbiased international tribunal, lest the entire world is *going to Hell in a handbasket*.

"University of Minnesota Law Professor Barbara Frey as Special Rapporteur, appointed by the old Human Rights Commission, delivered her final report to the new Human Rights Council on July 27, 2006.[4] On August 24, 2006, the U.N. Human Rights Council's subcommission on the Promotion and Protection of Human Rights endorsed the Frey report, and announced that all national governments were required by international human rights law to implement various listed gun control provisions; the subcommission recommended that the full Human Rights Council also adopt the report and issue a similar mandate.[5] Of course the subcommission has little power to enforce its wishes directly, but the

---

[2] Latin: *"within the powers of," "of or referring to an action taken within the scope of authority."*

[3] www.iansa.org/un/documents/salw_hr_report_2006.pdf.

[4] *See* Human Rights Council, Sub-Commission on the Promotion and Protection of Human Rights, Fifty-eighth session, Item 6 of the provisional agenda, *Prevention of Human Rights Violations Committed with Small Arms and Light Weapons*, Final Report Submitted by Barbara Frey, Special Rapporteur, in accordance with Sub-Commission Resolution 2002/25, U.N. General Assembly, A/HRC/Sub.1/58/27, July 27, 2006, available at http://www.geneva-forum.org/Reports/20060823.pdf (visited Aug. 23, 2006). [hereinafter, "Frey Report."] Also available at

http://daccessdds.un.org/doc/UNDOC/GEN/G06/132/91/PDF/G0613291.pdf?OpenElement (visited Sept. 1, 2006), and http://iansa.org/un/documents/salw_hr_report_2006.pdf.

[5] UN Sub-Commission on the Promotion and Protection of Human Rights in Geneva (Switzerland) on 24 August:

> PRINCIPLES ON THE PREVENTION OF HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS
>
> *Bearing in mind* the primacy of international human rights law as codified in the International Bill of Human Rights,
>
> *Recognizing* that the right to life, liberty and security of the person is guaranteed in the Universal Declaration of Human Rights and reaffirmed in the International Covenant on Civil and Political Rights,
>
> *Acknowledging* that State agents, especially law enforcement officials, play a vital role in the protection of the right to life, liberty and security of person,
>
> ...
>
> *Noting* the need to promote the human rights, safety and wellbeing of all persons by preventing foreseeable small arms violence through appropriate measures to regulate small arms possession and use by private actors, including those suggested in paragraph 5 of Economic and Social Council resolution 1997/28 of 21 July 1997 and in resolution 9 of the Ninth United Nations Congress on the Prevention of Crime and the Treatment of Offenders,
>
> ...
>
> *Emphasizing also* the responsibility of States to promote public education and awareness about the root causes of violence and to promote alternative forms of dispute resolution, as recognized by the Economic and Social Council in its resolution 1997/28 and the Programme of Action to

2

declaration gives national government officials, including courts, considerable support to promote restrictive gun laws which are, according to the U.N., mandated by international law. The full Human Rights Council is scheduled to take up the issue in 2007, and indications at the time of this writing suggest that the full Council will ratify most or all of Frey's report. The Chairman of the full Human Rights Council has already announced his enthusiastic support for the Frey Report, the subcommission's

---

Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All Its Aspects, section II, paragraph 20,

*Solemnly proclaims* the human rights principles set forth below, formulated to assist Member States in their task of ensuring and promoting the proper action by State agents, especially law enforcement officials, with respect to their unequivocal role to protect the right to life, liberty and security of the person, as guaranteed in the Universal Declaration of Human Rights and reaffirmed in the International Covenant on Civil and Political Rights, and urges that every effort be made so that the principles become generally known and respected.

...

Principles on the prevention of human rights violations committed with small arms

B. Due diligence to prevent human rights abuses by private actors

10. In order to ensure the protection of human rights by preventing small arms violence by private actors, Governments shall enact licensing requirements to prevent possession of arms by persons who are at risk of misusing them. Possession of small arms shall be authorized for specific purposes only; small arms shall be used strictly for the purpose for which they are authorized. Before issuing a licence Governments shall require training in proper use of small arms, and shall take into consideration, at a minimum, the following factors: age, mental fitness, requested purpose, prior criminal record or record of misuse, and prior acts of domestic violence. Governments shall require periodic renewal of licences.

11. Governments shall ensure that proper controls are exercised over the manufacturing of small arms through incorporation into national law and by other measures. For the purpose of identifying and tracing small arms, Governments shall require that at the time of manufacture, each small arm has a unique permanent mark providing, at a minimum, the name of the manufacturer, the country of manufacture and the serial number.

12. Governments shall ensure the investigation and prosecution of persons responsible for the illegal manufacture, possession, stockpiling or transfer of small arms. Governments shall impose penalties for crimes involving the misuse of small arms, including to commit domestic violence, and for the unlawful possession of small arms.

13. With the cooperation of the international community, Governments shall develop and implement effective disarmament, demobilization and reintegration programmes, including the effective collection, control, storage and destruction of small arms, particularly in postconflict situations. Governments should take steps to encourage voluntary disarmament. Governments should implement public awareness and Confidence building programmes, in cooperation with civil society and nongovernmental organizations, to prevent a return to armed violence and to encourage alternative forms of dispute resolution. Governments should incorporate a gender perspective in their peacekeeping and public awareness efforts to ensure that the special needs and human rights of women and children are met, especially in postconflict situations.

14. Governments shall prohibit international transfers of small arms which would violate their obligations under international law, including in circumstances in which such arms are likely to be used to commit serious human rights violations.

15. In light of the obligation of a State, under international human rights law, to prevent human rights violations, States are required under international law to provide, upon request, assistance, for the purposes of judicial proceedings in other States, in the provision of information regarding the ownership or purchase of small arms and light weapons in the former State.

adoption of the report, and the prospect of using the Human Rights Council to advance a worldwide gun control mandate.[6]" *See articles* by David Kopel, pages 40-42, 60-62, and 63-89.

I do have every right, judicial standing, and judicial subject matter jurisdiction to proceed to a civil RICO Act jury trial against not only the United States but also against the United Nations as an individual U.S. citizen under federal law and international human rights law.

I will show by this paper, a compilation of authoritative articles I discovered from my own Internet research that the civil RICO Act extends to international human rights under the *UNIVERSAL DECLARATION OF HUMAN RIGHTS*; the *INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHT; the INTERNATIONAL BILL OF HUMAN RIGHTS; through the DECLARATION ON THE RIGHT AND RESPONSIBILITY OF INDIVIDUALS, GROUPS AND ORGANS OF SOCIETY TO PROMOTE AND PROTECT UNIVERSALLY RECOGNIZED HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS.*

For whatever their motives, their agenda, their political or ideological reasons, federal judges have blocked my cases these past 5 years in blind ignorance or in spite of or in collaboration of political events. Political scandal after scandal has plagued the U.S. Department of Justice to such a pervasive extent that it caused obstructions of justice and corruption of the proper administration of justice of the federal courts. The Executive Branch and the Judicial Branch have trampled and decimated not only my constitutional right to a civil jury trial under the Seventh Amendment by also my human right to a fair and impartial jury trial.

The United Nations is waging a War of Aggression against the Second Amendment so relentlessly that my right as a seamen to keep and bear arms in intrastate and interstate travel in the United States and aboard U.S. vessels for defense against piracy on the high seas under maritime law are virtually nullified and void.

## 4. International Maritime Organization (IMO), *PIRACY AND ARMED ROBBERY AGAINST SHIPS: GUIDANCE TO SHIPOWNERS AND SHIP OPERATORS, SHIPMASTERS AND CREWS ON PREVENTING AND SUPPRESSING ACTS OF PIRACY AND ARMED ROBBERY AGAINST SHIPS,* MSC/Circ.623/Rev.3, May 29, 2002.

### Firearms

¶45 The carrying and use of firearms for personal protection or protection of a ship is strongly discouraged.

¶46 Carriage of arms on board ship may encourage attackers to carry firearms thereby escalating an already dangerous situation, and any firearms on board may themselves become an attractive target for an attacker. The use of firearms requires special training and aptitudes and the risk of accidents with firearms carried on board ship is great. In some jurisdictions, killing a national may have unforeseen consequences even for a person who believes he has acted in self defence.

## 5. M. Cherif Bassiouni, *INTERNATIONAL CRIMES: JUS COGENS AND OBLIGATIO ERGA OMNES,* 59 Law & Contemp. Probs. 63 (Autumn 1996)

The legal literature discloses that the following international crimes are *jus cogens*: **aggression**, **genocide**, **crimes against humanity**, war crimes, **piracy**, slavery and slave-related practices, and torture. Sufficient legal basis exists to reach the conclusion that all

---

[6] Luis Alfonso de Alba (President of the Human Rights Council), *The Human Rights Council and efforts to reduce small arms and light weapons related violence, Small Arms and Human Security Bulletin* (Nov. 2006-Feb. 2007, issue 8), at 3-4.

these crimes are part of *jus cogens*.[7] This legal basis consists of the following: (1) international pronouncements, or what can be called international *opinio juris*, reflecting the recognition that these crimes are deemed part of general customary law;[8] (2) language in preambles or other provisions of treaties applicable to these crimes which indicates these crimes' higher status in international law;[9] (3) the large number of states which have ratified treaties related to these crimes;[10] and (4) the *ad hoc* international investigations and prosecutions of perpetrators of these crimes.[11]

*Id.* at 68.

The relationship between *jus cogens* and *obligatio erga omnes* was never clearly articulated by the [Permanent Court of International Justice (PCIJ)] and the [International Court of Justice (ICJ)], nor did the jurisprudence of either court explicitly articulate how a given norm becomes *jus cogens*, or why and when it becomes *erga omnes* and what consequences derive from this. Obviously, a *jus cogens* norm rises to that level when the principle it embodies has been universally accepted, through consistent practice accompanied by the necessary *opinio juris*, by most states.[12] Thus, the principle of territorial sovereignty has risen to the level of a "peremptory norm" because all states have consented to the right of states to exercise exclusive territorial jurisdiction.[13]

*Erga omnes*, as stated above, however, is a consequence of a given international crime having risen to the level of *jus cogens*.[14] It is not, therefore, a cause of or a condition for a crime's inclusion in the category of *jus cogens*.

---

[7] The 1993 INTERNATIONAL TRIBUNAL FOR THE FORMER YUGOSLAVIA and the 1994 INTERNATIONAL TRIBUNAL FOR RWANDA statutes include the Statute of the INTERNATIONAL TRIBUNAL FOR THE FORMER YUGOSLAVIA, U.N. SCOR, 48th Sess., 3217th mtg., at 1, U.N. Doc. S/RES/827 (1993) and the STATUTE FOR THE INTERNATIONAL TRIBUNAL FOR RWANDA, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/RES/955 (1994), and address GENOCIDE, CRIMES AGAINST HUMANITY, AND WAR CRIMES. The 1996 CODE OF CRIMES includes these three crimes plus AGGRESSION. See DRAFT CODE OF CRIMES AGAINST PEACE AND SECURITY OF MANKIND: TITLES AND ARTICLES ON THE DRAFT CODE OF CRIMES AGAINST PEACE AND SECURITY OF MANKIND adopted by the International Law Commission on its Forty-Eighth Session, U.N. GAOR, 51st Sess., U.N. Doc. A/CN.4L.532 (1996), revised by U.N. Doc. A/CN.4L.532/Corr.1 and U.N. Doc. A/CN.4l.532/Corr.3; CRIMES AGAINST U.N. PERSONNEL, in M. Cherif Bassiouni, INTERNATIONAL CRIMINAL LAW CONVENTIONS (1997 in print) [hereinafter Bassiouni, ICL CONVENTIONS].

[8] See Michael Ackehurst, CUSTOM AS A SOURCE OF INTERNATIONAL LAW, 1974 Brit. Y.B. Int'l. L. 1.

[9] See Bassiouni, ICL CONVENTIONS, supra note 7.

[10] See id.

[11] See M. Cherif Bassiouni, FROM VERSAILLES TO RWANDA: THE NEED TO ESTABLISH A PERMANENT INTERNATIONAL CRIMINAL COURT, 10 HARV. HUM. RTS. J. 1, 11 (1996) [hereinafter Bassiouni, FROM VERSAILLES TO RWANDA).

[12] IN RIGHT OF PASSAGE OVER INDIAN TERRITORY (Portugal v. India), 1960 I.C.J. 123, 135 (Apr. 12) (Fernandes, J. dissenting):

It is true that in principle special rules will prevail over general rules, but to take it as established that in the present case the particular rule is different from the general rule is to beg the question. Moreover, there are exceptions to this principle. Several rules cogestes prevail over any special rules. And the general principles to which I shall refer later constitute true rule of jus cogens over which no special practice can prevail.

See also LEGAL CONSEQUENCES FOR STATES OF THE CONTINUED PRESENCE OF SOUTH AFRICA IN NAMIBIA (South West Africa) notwithstanding Security Council Resolution 276, 1971 I.C.J. 66 (June 21) (Fernandes, J., dissenting).

[13] See S.S. "Lotus" (France v. Turk.), 1927 P.C.I.J. (ser. A) No. 10 (Sept. 7).

[14] MERON, supra note [12], at 188-97.

The contemporary genesis of the concept *obligatio erga omnes* for *jus cogens* crimes is found in the ICJ's advisory opinion on *Reservations to the Convention on the Prevention and Punishment of Genocide*.[15] The concept also finds support both in the ICJ's *South West Africa* cases[16] as well as from the *Barcelona Traction*[17] case. However, it should be noted that the *South West Africa* cases dealt *inter alia* with human rights violations and not with [*pg 74] international crimes *stricto sensu*[18] and that the *Barcelona Traction* case concerned an issue of civil law.

It is still uncertain in ICL whether the inclusion of a crime in the category of *jus cogens* creates rights or, as stated above, non-derogable duties *erga omnes*. The establishment of a permanent international criminal court having inherent jurisdiction over these crimes would be a convincing argument for the proposition that crimes such as genocide, crimes against humanity, and war crimes are part of *jus cogens* and that obligations *erga omnes* to prosecute or extradite flow from them.[19]

When the opportunity presented itself in 2002, (the U.S. Coast Guard denying my application for the "National Open Carry Handgun" endorsement on my Merchant Mariner's Document I proceeded with civil litigation in the federal courts. I have been fighting the corrupt federal courts and the equally corrupt U.S. Department of Justice ever since up to the point I filed my human rights complaint against the United States with the Inter-American Commission on Human Rights in 2006, Petition No. 1142-06. The Petition is still pending review.

———

[15] 1951 ICJ REP. 15 (May 28); *see* Gordon Christenson, THE WORLD COURT AND JUS COGENS, 81 AM. J. INT'L L. 93 (1987).

[16] (Preliminary Objections) (*Ethiopia* v. *South Africa*; *Liberia* v. *South Africa*), 1963 ICJ REP. 319 (Dec. 21); *see* Christenson, *supra* note [15].

[17] Barcelona Traction, Light and Power Co. Ltd. (*Belg.* v. *Spain*), 1970 I.C.J. 3 (Feb. 5); *see* Christenson, *supra* note [15].

[18] Lech Gardocki, REPORT, LES CRIMES INTERNATIONAUX ET LE DROIT PÉNAL INTERNE, 60 Revue Internationale De Droit Pénal *91* (1989); Otto Triffterer, REPORT, LES CRIMES INTERNATIONAUX ET LE DROIT PÉNAL INTERNE, 60 Revue Internationale De Droit Pénal 31 (1989).

[19] On the establishment of the permanent international criminal court, *see* REPORT OF THE PREPARATORY COMMITTEE ON THE ESTABLISHMENT OF AN INTERNATIONAL CRIMINAL COURT, U.N. GAOR 51st Sess., Supp No. 22, U.N. Doc A/51/22 (1996); 13 Nouvelles Études Pénales (1997).

### 6. Federalist No. 8 The Consequences of Hostilities Between the States

From the New York Packet.
Tuesday, November 20, 1787.

HAMILTON

To the People of the State of New York:

. . .

There is a wide difference, also, between military establishments in a country seldom exposed by its situation to internal invasions, and in one which is often subject to them, and always apprehensive of them. The rulers of the former can have a good pretext, if they are even so inclined, to keep on foot armies so numerous as must of necessity be maintained in the latter. These armies being, in the first case, rarely, if at all, called into activity for interior defense, the people are in no danger of being broken to military subordination. The laws are not accustomed to relaxations, in favor of military exigencies; the civil state remains in full vigor, neither corrupted, nor confounded with the principles or propensities of the other state. The smallness of the army renders the natural strength of the community an over-match for it; and the citizens, not habituated to look up to the military power for protection, or to submit to its oppressions, neither love nor fear the soldiery; they view them with a spirit of jealous acquiescence in a necessary evil, and stand ready to resist a power which they suppose may be exerted to the prejudice of their rights. The army under such circumstances may usefully aid the magistrate to suppress a small faction, or an occasional mob, or insurrection; but it will be unable to enforce encroachments against the united efforts of the great body of the people.

In a country in the predicament last described, the contrary of all this happens. **The perpetual menacings of danger oblige the government to be always prepared to repel it; its armies must be numerous enough for instant defense. The continual necessity for their services enhances the importance of the soldier, and proportionably degrades the condition of the citizen. The military state becomes elevated above the civil. The inhabitants of territories, often the theatre of war, are unavoidably subjected to frequent infringements on their rights, which serve to weaken their sense of those rights; and by degrees the people are brought to consider the soldiery not only as their protectors, but as their superiors. The transition from this disposition to that of considering them masters, is neither remote nor difficult; but it is very difficult to prevail upon a people under such impressions, to make a bold or effectual resistance to usurpations supported by the military power.**

Since the establishment of the U.S. Department of Homeland Security this nation has been in a state of *perpetual menacings of danger* by a federal government having no regard or instructions for the rights and duties of the American people on their Second Amendment right to keep and bear arms as intended by the Common Defence clause of the Preamble to the U.S. Constitution.

### 7. U.S. Supreme Court Takes on the Second Amendment

One glimmer of hope occurred on November 20, 2007. The U.S. Supreme Court has granted certiorari to DC, et al v. Heller, No. 07-290, the much anticipated Second Amendment case challenging DC gun control laws limiting the case to one question. Whether D.C. Code §§ 7-2502.02(a)(4), 22-4504(a), and 7-2507.02 violate the Second Amendment rights of individuals who are not affiliated with any state-regulated militia, but who wish to keep handguns and other firearms for private use in their homes.

My Second Amendment case for the right to keep and bear arms in intrastate and interstate travel will be the next step at the U.S. Supreme Court in parallel to my Second Amendment as a human rights case at the Inter-American Commission on Human Rights.

The question for the immediate case now before this Court is whether Judge Rosemary M. Collyer will continue following in the footsteps of the other *Cohen*-style treasonous judges will toss my case out on its ear from political-ideological bigotry against the Second Amendment or concede the merits of my case as a ward of the Admiralty as the Court is obligated to do given the evidence of her colleagues at the DC Circuit and the U.S. Supreme Court committing extortion under color of law of filing fees from me. How many crimes against an unrepresented civil plaintiff is enough before I get fair, unbiased, and equal treatment under the law?

There are ample remedies available to resolve the ongoing international War of Aggression on the human right of armed self-defense. Under the Genocide Convention any gun control law is a violation of human rights, especial the right to life in conjunction with the right to defend that life by force of arms against not only against other non-State actors but also against State actors in criminal activities, hence the Convention Against Corruption.

I have presented ample information and evidence compelling the Court to cease and desist in its obstructions of justice and deny *sua sponte* the Government's Motion to Dismiss and expedite my case for a civil jury trial.

## B. VESTED RIGHTS

### 1. *Marbury v. Madison* 5 U.S. 137, 163 (1803)

> If he has a right, and that right has been violated, do the laws of his country afford him a remedy? [5 U.S. 137, 163]   The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.
>
> In the third volume of his Commentaries, page 23, Blackstone states two cases in which a remedy is afforded by mere operation of law.
>
> 'In all other cases,' he says, 'it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded.'
>
> And afterwards, page 109 of the same volume, he says, 'I am next to consider such injuries as are cognizable by the courts of common law. And herein I shall for the present only remark, that all possible injuries whatsoever, that did not fall within the exclusive cognizance of either the

ecclesiastical, military, or maritime tribunals, are, for that very reason, within the cognizance of the common law courts of justice; for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.'

The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a **vested legal right**.

If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case.

## 2. Compiled Case Law Supporting Vested Rights

Limiting government officials' power to stop, search, and seize private citizens was long a guiding principle of American Jurisprudence. The Supreme Court decreed in 1891, "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific Railway Company* v. *Botsford*, 141 U.S. 250, 251 (1891) [20]

When we consider the nature and the theory of our institution of government . . . **we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power** . . . . The very idea that one man may be compelled to hold his life, or the means of living, or **any material right essential to the enjoyment of life**, at the mere will of another, seems intolerable in any country where freedom prevails, as being the essence of slavery itself. *Yick Wo* v. *Hopkins*, 118 U.S. 356, 369 (1886) [21]

**A right vested in a citizen means that he has the power to do certain actions, or to possess certain things, according to the law of this land**. *Calder* v. *Bull*, 3 Dall 386. The Fourteenth Amendment recognizes **liberty and property as coexistent human rights**,[22] and debars the states from any unwarranted interference with either. *Coppage* v. *Kansas*, 236 U.S. 1 (1915), 35 S.Ct. 240, LRA1915C 960,182 59 L.Ed. 441. The liberty protected by the 14th Amendment to the Federal Constitution may not be interfered with, under the guise of protecting the public interests, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect. . . . The liberty guaranteed by the 14th Amendment to the Federal Constitution denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a

---

[20] James Bovard, *LOST RIGHTS: THE DESTRUCTION OF AMERICAN LIBERTY*, Palgrace, New York, ISBN 0-312-12333-7; at 228.

[21] *Id.* at 49.

[22] Firearms under the Second Amendment is property. Property equates to human rights. Human rights equates to defending those rights as "Human Rights Defenders" in United Nations terminology.

home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.185 *Meyeri* v. *Nevada*, 262 U.S. 390 (1923), 43 S.Ct. 625, 29 ALR 1446, 67 L.Ed. 1042. **The due process clause forbids arbitrary deprivations of liberty; where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,**[23] the minimal requirements of the clause must be satisfied. *Goss* v. *Lopez*, 419 U.S. 565 (1975), 95 S.Ct. 729, 42 L.Ed. 725. **Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty**. *O'Connor* v. *Donaldson*, 422 U.S. 563 (1975), 95 S.Ct. 2486, 45 L.Ed.2d 396. **Constitutional rights may not be denied simply because of hostility to their assertion or exercise.**[24] *Watson* v. *Memphis,* 373 U.S. 526 (1963), 83 S.Ct. 1314, 10 L.Ed.2d. 529, *Cox* v. *Lousiana*, 379 U.S. 536 (1965), 85 S.Ct. 453, 13 L.Ed.2d. 471. The Bill of Rights in general, and the due process clause of the Fourteenth Amendment in particular, were designed to protect fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy which may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones. *Fuentes* v. *Shevin,* 407 U.S. 67 (1972), 92 S.Ct. 1983, 32 L.Ed.2d. 556.

Both the substantive and the procedural protections of the due process clause of the Federal Constitution's Fourteenth Amendment may be triggered when the state, by the affirmative, by the affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement. *De Shaney* v. *Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989), 109 S.Ct. 998, 103 L.Ed. 249.

In examining procedural due process questions under the Federal Constitution's Fourteenth Amendment, a court follows a two-step process in which the first step asks whether there exists a liberty or property interest which has been interfered with by the state, and the second step examines whether the procedures attendant upon that deprivation are constitutionally sufficient; to constitute a liberty or

---

[23] The U.S. Coast Guard retaliated for being named as defendants in my civil RICO Act case and conspired with the U.S. Department of Transportation, Office of Security, to issue Bar Notices in 2004 and 2006 prohibiting me from visiting any DOT, FAA, USCG headquarters buildings subject me to arrest and prosecution just because I am exercising my Right to Petition under the First Amendment for my Seventh Amendment right to a civil jury trial. This Court denied or ignored my Motion for an Injunction against the Bar Notices. The Bar Notices remain in effect even though they violate my rights to conduct discovery or pursue evidence supporting my case. The U.S. Marshals Service has threatened me with arrest if I attempt to make citizen's arrest of federal judges or court clerks even when I have evidence of felony extortion under color of law, 18 U.S.C. § 872 in violation of 28 U.S.C. § 1916. I have an appeal to the U.S. Supreme Court from the 8th Circuit on this judicial extortion of filing fees, No. 07m24, my motion to proceed as a seaman without paying the filing fees under the new rule change to Rule 40.2. The U.S. Supreme Court forced me to pay their filing fees in Nos. 03-145 and 04-1150. My Petition for Writ of Certiorari includes my Citizen's Arrest Warrant of Chief Justice John G. Roberts for signing off on two court orders when he was a judge at the DC Circuit.

[24] That includes the public intolerance or animosity of people who want to exercise their Second Amendment right to *openly* keep and bear arms in intrastate and interstate travel under the Thirteenth and Fourteenth Amendments.

property interest for Fourteenth Amendment purposes, an interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope; and an individual claiming a protected interest must have a legitimate claim of entitlement to it. *Kentucky Dept. Of Corrections* v. *Thompson*, 490 U.S. 454 (1989), 109 S.Ct. 1904, 104 L.Ed.2d. 506.

The Constitution requires that the powers of government must be so exercised as not, in attaining a permissible end, unduly to infringe a constitutionally protected freedom. *Cantwell* v. *Connecticut*, 310 U.S. 296 (1940), 60 S.Ct. 900, 128 ALR 1352, 84 1 L.Ed. 1213, *Aptheker* v. *Secretary of State*, 378 U.S. 500 (1964), 84 S.Ct. 1659, 12 L.Ed. 992. Even though a governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved; the breadth of legislative abridgment must be reviewed in the light of less drastic means for achieving the same basic purpose. *Shelton* v. *Tucker*, 364 U.S. 479 (1960), 81 S.Ct. 247, 5 L.Ed. 2d 231, *Aptheker* v. *Secretary of State*, 378 U.S. 500 (1964), 84 S.Ct. 1659, 12 L.Ed. 992. **Acts in themselves legal lose that character when they became part of a unlawful scheme.**[25] *Steele* v. *Bulova Watch Co.* 344 U.S. 280 (1952), 73 S.Ct. 252, 97 L.Ed. 319. **Public officials may become tortfeasors by exceeding the limits of their authority.** *Land* v. *Dollar* 330 U.S. 731 (1947), 67 S.Ct. 1009, 91 L.Ed. 1209. **To sustain an action on the case it must be shown that the defendant has done some wrong, that is, has violated some right of the plaintiff, and that damage has resulted as a direct and proximate consequence of the commission of that wrong; a mere conspiracy or combination to do injurious acts is not sufficient.**[26] *Adler* v. *Fenton*, 24 How. 407., 16 L.Ed. 696. **No consideration need be alleged or proved in an action on the case for misfeasance, as the gist of such an action is the misfeasance.** *Garlandi* v. *Davis*. 4 How. 131, 11 L.Ed. 907. **Intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable if done without just cause or excuse; the intentional infliction of such damage upon another, without justification or excuse, is malicious in law.**[27] *Hitchman Coal & Coke*

[25] Denial of a motion, dismissal of a Second Amendment case in a single instance or even in a few instances may be judicially proper. But 5 years of denials of my pleadings and dismissals of my Second Amendment cases becomes an unlawful scheme. Hence my civil RIOC Act case alleging the United States and the United Nations of racketeering in an unlawful and an unconstitutional protection scheme over the Second Amendment.

[26] In 2002 the U.S. Coast Guard denied my application for an endorsement on my Merchant Mariner's Document (ID Card) for "National Open Carry Handgun" in respect to completing federally required small arms training as a prerequisite for employment as an Able Seaman aboard a U.S. Government ammunition ship coming out of the shipyard in Newport News, Virginia. The Coast Guard admitted to the fact that their were (and still) no federal laws or regulations for or against a "National Open Carry Handgun." Even though the proper course of action would be to rely on the Second Amendment in the absence of federal laws and regulations for guidance the Coast Guard officer relied on personal judgment to determine that there would not provide any benefit to marine safety or security. This occurred less than a year after the terrorist attacks on September 11, 2001.

[27] The combined effect of the federal courts blocking my cases from going to trial with the U.S. Marshals Service, the U.S. Marshals Service, and the U.S. Coast Guard as principal parties to harassment and obstructions of justice were malicious acts in law, and therefore actionable. Meaning that I can proceed to trial.

11

*Co.* v. *Mitchell*, 245 U.S. 229 (1917), 38 S.Ct. 65, 62 L.Ed. 260. The right – whether it be called liberty or property – has value, and to interfere with this right without just cause is unlawful. *Dorchyi* v. *Kansas*, 272 U.S. 306 (1926), 47 S.Ct. 86, 71 L.Ed. 248.

3. *Cohens* v. *Virginia*, 19 U.S. 264, at 404 (6 Wheaton 264) (1821)

It is most true that this Court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. **The one or the other would be treason to the Constitution**. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment and conscientiously to perform our duty. In doing this on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the Constitution and laws of the United States. We find no exception to this grant, and we cannot insert one.

4. *American Communications Association, C.I.O., et al* v. *Douds, Regional Director of the National Labor Relations Board*, 339 U.S. 382, 442-443 (1950) Justice Robert H. Jackson, concurring and dissenting, each in part to Chief Justice Fred M. Vinson's opinion delivered to the Court:

"It is not the function of our Government to keep the citizen from falling into error; it is the function of the citizen to keep the Government from falling into error."

5. *Jordan* v. *Gardner* (9th Cir. 1993) 986 F.2d 1521, 1529:

Official knowledge of risk of harm and failure to act to prevent the harm constitute deliberate indifference which is established by showing knowledge of risk of impending harm that is easily preventable and the failure to prevent it.

6. *Olmstead* v. *United States* 277 U.S. 438, 485 (1928), Justice Brandeis, dissenting:

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means -- to declare that the Government may commit crimes in order to secure the conviction of a private criminal -- would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

7. Thomas Jefferson, *LETTER TO THOMAS RITCHIE*, Dec. 12, 1820

> The judiciary . . . is the subtle corps of sappers and miners constantly working under ground to undermine the foundations of our confederated fabric.

8. Charles Warren, *THE SUPREME COURT IN UNITED STATES HISTORY* 3:470-71 (1922)

> However the Court may interpret the provisions of the Constitution, it is still the Constitution which is the law and not the decision of the Court.

9. *People* v. *Banks* 6 Cal.4th 926, 949 (1993), Justice Panelli, dissenting.

> If we abandon constitutional protections to combat every abhorrent crime which has captured the public's attention, we will find ourselves naked and unprotected in a hurry.

10. *West Virginia State Board of Education* v. *Barnette* 319 U.S. 624, 638-639 (1943), Justice Robert H. Jackson.

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections. In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard.

11. *Lucas* v. *Colorado General Assembly* 377 U.S. 713, 736-737 (1964), Chief Justice Warren

> A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.

## C. LIKE PEAS IN POD: *"THE SUBSTANTIAL BENEFIT DOCTRINE," "THE PRIVATE ATTORNEY GENERAL DOCTRINE,"* UNDER THE CIVIL RICO ACT SERVE THE SAME FUNCTIONS AS THE UNITED NATIONS' *"HUMAN RIGHTS DEFENDER"*

### 1. David F. Herr, *THE ANNOTATED MANUAL FOR COMPLEX LITIGATION*, 4th Edition (2006), Thomson/West, Chapter 35, Civil RICO, p. 792-793.

Congress enacted the 1920 Racketeer (Influence and Corrupt Organizations Act (RICO) to respond to the "infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." Congress targeted organized crime through a broad statutory scheme that included severe criminal penalties, fines,

imprisonment, asset forfeiture, and civil remedies in an effort to undermine the economic power of racketeering organizations. The statute further enabled private litigants to act, in effect, as private attorneys general to sue for injury to their businesses or property caused by a RICO violation.

Civil RICO claims have alleged wrongs actionable under state and common law, as well as other federal statutes. Although the statute was targeted at organized crime, courts have broadly construed RICO's provisions, and its scope has extended well beyond its original aim. Early efforts by lower courts restrict claims that appeared to exceed RICO's original goals were overruled by Supreme Court decisions that broadened the statute's reach. RICO claims can now be found in a variety of contexts, including insurance and business disputes, anti[-]abortion and other protests consumer financial services litigation, family law, and whistle-blower actions. Although the nontraditional uses of RICO have continued to expand despite significant criticism by commentators and the courts, Congress has shown little inclination to narrow the state's focus or reach.

## 2. *State Board of Taxt Commissioners v. Town of St. John, et al.* Supreme Court of Indiana, No. 49S10-0009-TA-541 (July 18, 2001)[28]

### I. The Private Attorney General Doctrine: An Overview

As a prelude to analyzing Indiana law, we note that there are two basic attorney fee schemes: the English rule ("loser pays") and the American rule ("every man for himself"). W. Kent Davis, THE INTERNATIONAL VIEW OF ATTORNEY FEES IN CIVIL SUITS: WHY IS THE UNITED STATES THE "ODD MAN OUT" IN HOW IT PAYS ITS LAWYERS?, 16 Ariz. J. Int'l & Comp. L. 361, 399, 403 (1999). Both schemes are grounded in statute. Id. at 400, 404.

Some view the English rule as more fair, arguing that a legal victory is not complete if one is out of pocket for attorney fees. Id. at 405. Proponents of the American rule respond:

[S]ince litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and [] the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel. Also, the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration.

*Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U.S. 714, 718 (1967) (citations omitted).

Courts in various American jurisdictions have sought a middle ground by using their inherent equitable powers to carve out exceptions to the American rule. *See Saint Joseph's Coll.* v. *Morrison, Inc.*, 158 Ind. App. 272, 279, 302 N.E.2d 865, 870 (1973). The most common exceptions are:

The "obdurate behavior" exception, in which courts impose costs upon defendants as a punishment for bringing frivolous actions or otherwise acting in bad faith. Andrew W. Hull, ATTORNEY'S FEES FOR FRIVOLOUS, UNREASONABLE OR GROUNDLESS LITIGATION, 20 Ind. L. Rev. 151, 152-53 (1987).

---

[28] http://www.in.gov/judiciary/opinions/previous/archive/07180101.rts.html

The "common fund" exception, in which an award benefits members of an ascertainable class, and the court reimburses the prevailing litigant's attorney fees out of that pool of money to prevent the unjust enrichment of free riders. Id. at n.11. **[See unnumbered footnote*]**

The "private attorney general" exception, where courts award fees to litigants who bring actions to protect important social policies or rights. Id.

---

**\*[unnumbered footnote]** One variant on this exception is the "substantial benefit" doctrine, where the **prevailing party attains a significant benefit for an ascertainable class of similarly situated individuals, although no fund of money is created**. See Cmty. Care Ctrs, Inc. v. Indiana Family and Soc. Servs. Admin., 716 N.E.2d 519, 543 (Ind. Ct. App. 1999).

Terminology varies among jurisdictions. **The phrase "substantial benefit" has been used by some courts to describe what we call the private attorney general doctrine**. *See Claremont Sch. Dist. v. Governor*, 761 A.2d 389, 392-93 (N.H. 1999) **(adopting a "substantial benefit doctrine" that mirrors what we call the private attorney general doctrine**); see also Arnold v. Ariz. Dep't of Health Servs., 775 P.2d 521, 536-37 (Ariz. 1989) **(treating "private attorney general doctrine" and "substantial benefits doctrine" as interchangeable terms)**.

---

## 3. Overlapping Jurisdictions: Private Attorney General and the Human Rights Defender

The United States' *PRIVATE ATTORNEY GENERAL DOCTRINE* and the United Nations' *HUMAN RIGHTS DEFENDER* serve essentially the same public policies inherent in public interest legislation on behalf of a significant class of persons that are in the interest of justice. A *PRIVATE ATTORNEY GENERAL* may appear in court "*ex rel.*" on behalf of the "*United States*" or the "*People of the United States of America.*"

Definition of *PRIVATE ATTORNEY GENERAL*, [Black's Law Dictionary, Sixth Edition]

> The "*PRIVATE ATTORNEY GENERAL*" concept holds that a successful private party plaintiff is entitled to recovery of his legal expenses, including attorney fees, if he has advanced the policy inherent in public interest legislation on behalf of a significant class of persons. *Dasher* v. *Housing Authority of City of Atlanta, Ga.*, D.C.Ga., 64 F.R.D. 720, 722. *See also EQUAL ACCESS TO JUSTICE ACT.*

Both statutes [RICO and Clayton Act] bring to bear the pressure of ["*PRIVATE ATTORNEYS GENERAL*"] on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages. *Agency Holding Corp.* v. *Malley-Duff & Associates*, 107 S.Ct. 2759, 483 U.S. 143, 151 (1987).

Citing *Rotella* v. *Wood et al.*, 528 U.S. 549, 557-558 (2000): ". . . [T]here is a clear legislative record of congressional reliance on the Clayton Act when RICO was under consideration, *see Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 489 (1985), and we have recognized before that the Clayton Act's injury-focused accrual rule was well established by the time civil RICO was enacted. Klehr , 521 U. S., at 189 . In rejecting a significantly different focus under RICO, therefore, we are honoring an analogy that Congress itself accepted and relied upon, and one that promotes the objectives of civil RICO as readily as

it furthers the objects of the Clayton Act. **Both statutes share a common congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the respectively prohibited practices. The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, [*"PRIVATE ATTORNEYS GENERAL,"*] dedicated to eliminating racketeering activity.**[29] *Id.,*[30] at 187 (*citing Malley-Duff*, 483 U. S., at 151 ) (civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to investigate"). The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better. It would, accordingly, be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize. The Clayton Act avoids any such policy conflict by its accrual rule that "generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business," *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 401 U. S., at 338 , and the Clayton Act analogy reflects the clear intent of Congress to reject a potentially longer basic rule under RICO.

## 4. Two World Bullies Don't Make a Righteous Human Rights Tug of War

### (a) PRWEB: Press Release Newswire: *US Deems UN Human Rights Commission Not Competent; Canada Sued*

http://www.prweb.com/releases/Canada/UN/prweb569847.htm

*The following statement was recently issued by the UN Human Rights Commission (UNHRC) regarding a Complaint filed against Canada and the US by whistleblower and former CIA financial contractor, Harmon Wilfred, "...the United States of America has not accepted the competence of the Human Rights Committee or that of the Committee against torture to examine individual complaints". The UN Commission has since required the removal of the US from Wilfred's Complaint leaving Canada as the sole offending state*

Geneva, Switzerland (PRWEB) November 15, 2007 -- With this latest required adjustment of Harmon Wilfred's UN Petition, a second revised Complaint solely against Canada was presented on November 7, 2007 to the UN High Commissioner for Human Rights in Geneva, Switzerland. Wilfred's original UN Complaint and UNHCR claim #7440099 against the US was presented and filed on April 12, and May 11, 2007 respectively; with the first Complaint revision naming Canada as an additional offending state, presented on June 12, 2007.

**Although the United States is a long standing member of the International Covenant on Civil and Political Rights (ICCPR); and its direct involvement in the alleged human rights violations under the Clinton Presidency remains material to Wilfred's Petition; the US refuses to recognize the competence of the UN to adjudicate any individual complaints against the American government. "In essence, the US enjoys UN Human Rights Council membership with the authority to accuse and condemn**

---

[29] This objective of encouraging prompt litigation to combat racketeering is the most obvious answer to *Rotella's* argument that the injury and pattern discovery rule should be adopted because "RICO is to be read broadly" and "'liberally construed to effectuate its remedial purposes,'" *Sedima, S. P. R. L.* v. *Imrex Co.,*     473 U. S. 479, 497-498 (1985) (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947).

[30] Emphasis mine.

other member states for human rights violations, but refuses to be held accountable themselves," says Guneet Chaudhary, Wilfred's international human rights attorney.

Wilfred's latest Human Rights Complaint against Canada remains before a UN sub commission under the ICCPR for allegations of tortuous and unlawful incarcerations, degrading treatment, unlawful punishment, and multiple violations of his civil and political rights. The Petition now calls for international condemnation of Canada, and prays for the minimum restitution of $20 Million Canadian Dollars and the restoration of Wilfred and his children's inalienable rights to life, liberty and the pursuit of happiness.

Wilfred renounced his US citizenship on 1 March, 2005 and currently resides in self imposed exile as a stateless refugee claimant with his Canadian wife in Christchurch, New Zealand. He is founder and Director of Combined Technology, a New Zealand based global VoIP Internet Telco.


## 5. Memorandum From U.S. Civil Society Organizations and Advocates to Members of the U.N. Human Rights Committee, Re: List of Concerns for the Review of the U.S. Second and Third Periodic Report, dated January 9, 2006:

### Introduction (U.S. Obligations and Reservations) [31]

A consistent theme throughout the "Second and Third Periodic Report of the United States of America to the UN Committee on Human Rights Concerning the International Covenant on Civil and Political Rights" is U.S. exceptionalism in its implementation of the treaty's obligations. In its tardy submission of this report and other reports to human rights treaty bodies, and in its frequent rejections of the Human Rights Committee's previous recommendations (in its Concluding Observations adopted in 1995), the U.S. government has demonstrated its disdain for even the most basic obligations required of states parties to the treaty. Also of serious concern, the U.S. government's stubborn claim on the limitations of the territorial scope of the treaty's application has grave ramifications for the protection of human rights under U.S. power or effective control around the world. We would urge the Committee to issue specific guidance on the extraterritorial applications of the treaty, the conduct of officials of a State Party abroad, and its application to people under the power and effective control of a State Party but located outside its territory. We would also request that the Committee once again urge the formal withdrawal of existing U.S. reservations to the treaty.

Questions:

1. What is the U.S. doing to ensure that its domestic law and practice are consistent with the Covenant? What affirmative steps has the U.S. taken to enact legislation implementing the ICCPR? Has the U.S. considered withdrawing those reservations that are inconsistent with the treaty's object and purpose, in particular, those to Article 6, para. 5 (in light of the recent U.S. Supreme Court decision overturning the juvenile death penalty), Article 7, and the non-self-executing declaration?

---

[31] http://www.ohchr.org/english/bodies/hrc/docs/ngos/csoa.doc

2. In light of the "federalism" understanding to the Covenant, please explain the types of matters for which state and local governments are obligated to implement the Covenant, and what authority the federal government has to ensure those obligations in the event state governments fail to act. What measures is the federal government taking to ensure that state and local authorities take appropriate measures for the fulfillment of the Covenant?

3. What affirmative steps has the U.S. taken to inform the legislative, executive and judicial branches of the federal and all state governments of their obligations under the ICCPR and to encourage them to enforce and implement the ICCPR?

### Article 2 (Equal Application of Rights/Effective Remedies for Violations)

#### Art. 2(3) Effective Remedy

Individuals whose rights under the Covenant have been violated often do not have an effective remedy. Courts provide the primary mechanism for persons in the U.S. to raise violation of their rights, but the U.S. does not recognize an individual right of action for ICCPR violations. Individuals seeking redress for rights violations must rely upon domestic laws, which often do not fully protect Covenant rights. In addition, recent changes to U.S. law have resulted in the restriction of access to courts for particularly vulnerable populations and immunity for certain government officials.

#### Civil Rights Claims.

Recent Supreme Court cases have also limited the ability of individuals to sue for civil rights violations. The Supreme Court has held that the Constitution's Eleventh Amendment immunity for states prohibits state employees from suing for age and disability discrimination. The Court has also held that individuals have no right of action for violation of disparate impact regulations prohibiting federally funded entities from discriminating based on race, color or national origin. With regard to violence against women, the Court struck down a civil remedy under the Violence Against Women Act, holding that Congress did not have the power to create the cause of action and refused to apply the federal civil rights remedy to local officials who ignore a prior mandatory judicial protective order.

# 6. Kathleen M. Sullivan's, *UNCONSTITUTIONAL CONDITIONS*, 10 Harv.L.Rev. 1413 (May 1989)

*Basic constitutional jurisprudence dictates that courts subject most government benefit decisions to minimal scrutiny, but scrutinize government actions that directly burden preferred liberties more closely. Unconstitutional conditions problems arise at the boundary between these two directives: when government conditions a benefit on the recipient's waiver of a preferred liberty, should courts review the conditioned benefit deferentially, as a benefit, or strictly, as a burden on a preferred liberty? . . . Professor Sullivan criticizes traditional analyses of unconstitutional conditions for focusing wrongly on whether conditions coerce individuals, distort legislative process, or permit alienation of constitutional rights. She articulates an alternative defense of close scrutiny, arguing that rightspressuring conditions on government benefits skew*

*distribution of power between government and rightholders, as well as among rightholders themselves. Professor Sullivan then develops this systemic approach, detailing both the circumstances in which courts should apply close scrutiny, and those in which government justifications may be strong enough to survive such scrutiny.*[32]

The doctrine of unconstitutional conditions holds that government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether. It reflects the triumph of the view that government may not do indirectly what it may not do directly over the view that the greater power to deny a benefit includes the lesser power to impose a condition on its receipt. (Id. at 1415)

[A]ssuming that some set of constitutionally preferred liberties has been agreed upon, and that burdens on those liberties require especially strong justification, unconstitutional conditions doctrine performs an important function. It identifies a characteristic technique by which government appears not to, but in fact does burden those liberties, triggering a demand for especially strong justification by the state. Part I of this Article defines the basic elements of the technique. (Id. at 1419)

The central challenge for a theory of unconstitutional conditions is to explain why conditions on government benefits that "indirectly" pressure preferred liberties should be as suspect as "direct" burdens on those same rights, such as the threat of criminal punishment. (Id. at 1419)

## IV. Unconstitutional Conditions as Commodification

Unconstitutional conditions doctrine has a third possible theoretical explanation: that some constitutional rights are inalienable, and therefore may not be surrendered even through voluntary exchange. This approach identifies the harm in unconstitutional conditions as the commodification of rights the treatment of rights as transferable objects. (Id. at 1477)

### 1. Paternalism.

Making constitutional rights inalienable because citizens may undervalue the worth of those rights to themselves would be classic paternalism overruling individuals' choices for their own good. Individuals' choices may diverge from their "best" interests for many reasons: for example, because they underassess risk or under-value their long-term interests. Choices to waive constitutional rights are no exceptions; invalidating such choices, even if perfectly voluntary, compels citizens to hang onto their rights for their own good. (Id. at 1480)

. . . The very existence of constitutional rights, however, unlike consumer tastes or preferences, results from the prior "paternalistic" act of enacting a Constitution. The framers' decision to place constitutional rights beyond majority decisionmaking reflects the prediction that citizens will undervalue those rights in the ordinary course of politics. Constitutional rights thus represent commitments by a constitutional majority to override the acts of future political majorities' political version of Ulysses and the Sirens. If the Constitution overrides the legislative choices of improvident future political majorities, why not the trading choices of improvident future individual rightholders? This approach would conceive unconstitutional conditions doctrine as a mere backstop to

---

[32] Kathleen M. Sullivan, "Unconstitutional Conditions," 102 Harv.158 L.Rev. 1413 (May 1989), introduction. Italics in original.

constitutionalism itself, which among other things, places rights beyond the reach of politics because citizens, if left to their own devices, will squander them. (Id. at 1480-81)

**4. *Personhood.***

Another sort of argument defends inalienability not because it promotes efficiency or equality, but because some things ought not to be traded on markets at all. Such wholesale anti-commodification arguments rest on various theories. Some, for example, view market boundaries as essential to a distinction between the sacred and the profane. On such a view, reverence, mystery, and awe for something depend on its freedom from the pollution of trade. A second variant argues that noncommodificiation can help preserve social norms of altruism or donation. (Id. at 1484)

Such a "personhood" approach would hold that the opportunity to exchange rights for benefits wrongly commodifies rights. . . . Inalienability here would follow from the view that constitutional rights, like body parts and love, but unlike clothes or mass-market consumer goods, are essential attributes of personal identity. The metaphor of constitutionally protected liberties as a "birthright" captures this view. Free transfer of such rights is a form of dismemberment. If citizens could purchase and sell constitutional rights, they would have a different and inferior conception both of those constitutional rights and of themselves. (Id. at 1485)

## V. A Systemic Account of Unconstitutional Conditions

Neither coercion, corruption, nor commodification theories satisfactorily explain why conditions on benefits that pressure preferred liberties should receive the same strict scrutiny as "direct" constraints. . . . None of these three approaches suffices: coercion theory focuses too narrowly on the individual beneficiary, germaneness theory focuses wrongly on [the corruption of the] legislative process, and inalienability theory focuses too generally on problems with exchange. (Id. at 1489-90)

This Part argues for an alternative approach grounded in the systemic effects that conditions on benefits have on the exercise of constitutional rights. Such an approach starts from the proposition that the preferred constitutional liberties at stake in unconstitutional conditions cases do not simply protect individual rightholders piecemeal. Instead, they also help determine the overall distribution of power between government and rightholders generally, and among classes of rightholders. (Id. at 1490)

Unconstitutional conditions, no less than "direct" infringements, can skew this distribution in three ways.

First they can alter the constitutional liberties generally declare desirable some realm of autonomy that should remain free from government encroachment. Government freedom to redistribute power over presumptively autonomous decisions from the citizenry to itself through the leverage of permissible spending or regulation would jeopardize that realm. Second, an unconstitutional condition can skew the distribution of constitutional rights among rightholders because it necessarily discriminates facially between those who do and those who do not comply with the condition. If government has an obligation of evenhandedness or neutrality with regard to a right, this sort of redistribution is inappropriate. Third, to the extent that a condition discriminates de facto between those who do and do not depend on a government benefit, it can create an undesirable caste hierarchy in the enjoyment of constitutional rights. (Id. at 1490)

### A. *Constitutional Liberty as Distribution*

A systemic approach to unconstitutional conditions problems recognizes that constitutional liberties regulate three relationships: the relationship between government and rightholders, horizontal relationships among classes of right holders, and vertical relationships among rightholders. . . . rights-pressuring conditions on government benefits potentially skew all three. (Id. at 1491)

Such an approach has important advantages over coercion, germaneness, and inalienability theories in illuminating unconstitutional conditions problems. Unlike coercion and unalienability theories, a systemic approach emphasizes the distinctive role of government: citizens' transactions with government require different analysis than interpersonal transactions, an analysis that focuses not on individuals but on the balance of power and freedom in the polity as a whole. (Id. at 1491)

Traveling the various states with a lawfully owned handgun for personal security places one in jeopardy to State and Federal laws due to the severe complexity of the laws of the various states as the following tables convey.

# D. IN DEFENSE OF *PRO SE* LITIGATION

"Following the simple guide of rule 8(f) [Fed.R.Cv.P.] that all pleadings shall be so construed as to do substantial justice"... "The federal rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." The court also cited Rule 8(f) FRCP, which holds that all pleadings shall be construed to do substantial justice. *Conley* v. *Gibson*, 355 U.S. 41 at 48 (1957) "The assertion of federal rights, when plainly and reasonably made, are not to be defeated under the name of local practice." *Davis* v. *Wechler*, 263 U.S. 22, 24 (1923); "... the right to file a lawsuit pro se is one of the most important rights under the constitution and laws." *Elmore* v. *McCammon* 640 F. Supp. 905 (1986). "Allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient"... "which we hold to less stringent standards than formal pleadings drafted by lawyers." *Haines* v. *Kerner*, 404 U.S. 519 (1972). "Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end. Proper pleading is important, but its importance lies in its effectiveness as a means to accomplish the end of a just judgment." *Maty* v. *Grasselli Chemical Co.*, 303 U.S. 197 (1938). "There can be no sanction or penalty imposed upon one because of his exercise of Constitutional Rights." *Sherar* v. *Cullen*, 481 F. 2d 946 (1973)

# 1. Amicus Curiae Brief of Halt – an Organization of Americans for Legal Reform in *Andrew Pickholtz* v. *Rainbow Technologies, Inc.and Software Security, Inc.*

Amicus Curiae Brief of Halt – an Organization of Americans for Legal Reform Supporting Reversal of the District Court in *Andrew Pickholtz* v. *Rainbow Technologies, Inc. and Software Security, Inc.*, U.S. Court of Appeals for the Federal Circuit, No. 01-1173; Appeal from the United States District Court for the Northern District of California in 98-CV-2661, Judge Charles R. Breyer [EXCERPTED] has direct relevance to Plaintiff's case:

### Introduction

The key issue presented in this case is whether the federal courts can treat a pro se litigant as a second class citizen. In circumstances where an award of attorneys fees is an appropriate sanction for discovery abuse, they should be awarded to a litigant proceeding

pro se, just as they would be awarded to a litigant who is represented by counsel. Amicus curiae HALT -- An Organization of Americans for Legal Reform submits that the court below erred in its sweeping ruling that attorneys fees can never be awarded to a pro se litigant.

For tens of millions of Americans who cannot afford to hire a lawyer, litigating pro se is often their only option. There is an overriding public interest in ensuring that these pro se litigants have full access to the protections of our judicial system. Particularly in the context of discovery, where the award of attorneys fees is an integral component of the prophylactic system that protects a party against misconduct by another party, the courts cannot deny attorneys fees solely on the ground that a party is proceeding pro se.

Finally, failing to apply full sanctions against parties who have committed discovery abuses, simply because the opposing party is not represented by counsel, perversely undermines the entire system of sanctions. If a party knows that it can commit discovery abuses against a pro se litigant with a large degree of impunity, the courts are actually fostering the kind of dilatory misconduct that occurred in this case.

## I. *There is a fundamental right to proceed pro se in a civil case.*

The Judiciary Act of 1789 provides that: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct cases therein." 28 U.S.C. § 1654. This ancient protection is rooted in the fundamental principles of our jurisprudence. As the Eleventh Circuit said,

> [T]he right to proceed pro se under 28 U.S.C. § 1654, is a fundamental statutory right that is afforded the highest degree of protection. It is a right which is deeply rooted in our constitutional heritage, and although statutory in origin, "its constitutional aura is underscored by the proposal the very next day of the Sixth Amendment" to the U.S. Constitution.

*Reshard* v. *Britt*, 819 F.2d 1573, 1579 (11th Cir. 1987) (vacated on other grounds) (quoting *United States* v. *Dougherty*, 473 F.2d 1113, 1123 (D.C. Cir. 1972)).

The Supreme Court underscored the historical importance of the right to selfrepresentation in *Faretta* v. *California*, 422 U.S. 806 (1975), noting that

> Thomas Paine, arguing in support of the 1776 Pennsylvania Declaration of Rights said: "Either party ... has a natural right to plead its own cause; this right is consistent with safety, therefore it is retained; but the parties may not be able, ... therefore the civil right of pleading by proxy, that is, by a council [sic], is an appendage to the natural right [of self-representation] ...."

*Faretta*, 422 U.S. at 830 n.39, quoting Thomas Paine on a Bill of Rights, 1777, reprinted in 1 B. Schwartz, *The Bill of Rights: A Documentary History* 316 (1971).

If, as *Faretta* holds, a criminal defendant has the right to proceed pro se, the right applies with even greater force in a civil context. This is because, while impecunious criminal defendants are entitled to representation by counsel at no charge, *Gideon* v. *Wainwright*, 372 U.S. 335 (1963), **no comparable right exists for civil litigants**. However, civil litigants, like criminal defendants, often cannot afford counsel. The American Bar Association estimates that thirty-eight million American households are actually denied access to the civil justice system because they cannot afford a lawyer. See American Bar Association *Consortium on Legal Services and the Public, Agenda for Access: The*

*American People and Civil Justice – Final Report on the Implications of the Comprehensive Legal Needs Study* (1996). For such persons to have access to the courts, their fundamental right to self-representation in civil cases must be afforded the greatest protection.

---

**PLAINTIFF'S NOTE:**

On August 7, 2006, the American Bar Association's House of Delegates (Task Force on Access to Civil Justice) unanimously approved "Civil Gideon Representation"

*"RESOLVED, That the American Bar Association urges federal, state, and territorial governments to provide legal counsel as a matter of right at public expense to low income persons in those categories of adversarial proceedings where basic human needs are at stake, such as those involving shelter, sustenance, safety, health or child custody, as determined by each jurisdiction."*

http://www.abanet.org/legalservices/sclaid/downloads/06A112A.pdf

On August 24, 2006 I filed my Motion for Civil Gideon Representation with the U.S. District Court in Little Rock, Arkansas, No. 1:06mc0025.

On September 18, 2006 Judge William R. Wilson denied my Motion for Civil Gideon court appointed attorney.

---

## II. *Pro se litigants must have equal access to the discovery process.*

Given that a party to a civil action has the right to proceed pro se, it follows that these litigants must be given the same procedural protections and devices that are afforded to a litigant who is represented by counsel. Without the benefit of those same procedural safeguards, the right to proceed pro se is rendered meaningless. The Second Circuit noted as much when it stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of a lack of legal training." *Tragath* v. *Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

Because a civil litigant is not afforded an absolute right to counsel, *Lassiter* v. *Dep't of Soc. Serv.*, 452 U.S. 18, 26-27 (1981), a pro se litigant in a civil court must be given an equity of arms or she will be denied any effective opportunity to vindicate her rights in court. *Degan* v. *United States*, 517 U.S. 820 (1996). Julie M. Bradlow, *Procedural Due Process Rights of Pro Se Litigants*, 55 U. Chi. L. Rev. 659 (1988). Fundamental to one's ability to litigate is the ability to obtain discovery of the opposing party's evidence. Without access to sanctions of an equal deterrent effect as those afforded a represented party, a pro se litigant cannot effectively obtain discovery and therefore is denied the tools necessary to litigate. *Tragath*, 710 F.2d at 95.

### A. *Equal access to discovery is inherent in the right to procedural due process.*

Procedural due process requires that no one be denied a liberty or property interest without both notice and the opportunity to be heard. *Mullane* v. *Cent. Hanover Bank and Trust Co.*, 339 U.S. 306, 313 (1950). The doctrine is not rote in application. As stated by Chief Justice Burger in *Little* v. *Streater*, 452 U.S. 1, 5 (1981):

23

Due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Facist Refugee Comm.* v. *McGrath*, 341 U.S. 123, 162 (1951) (concurring opinion). Rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer*, 408 U.S. 471, 481 (1972).

In this case, denial of sufficient sanctions interfered with the appellant Pickholtz's ability to vindicate his rights. Indeed, without discovery, any litigant would find himself incapable of successfully pursuing his rights in court. As noted in *Montalvo* v. *Hutchison*, 837 F. Supp. 576 (S.D.N.Y. 1993), "discovery is a particularly critical means of securing justice when information is exclusively in the hands of an adversary," as are the circumstances in this case. Because of the critical role played by discovery in the litigation process, courts readily impose sanctions upon parties that fail to comply with proper discovery requests. For a litigant's ability to prove her case almost invariably depends on court-moderated cooperation from the opposing party. In its absence, most cases — if not all — would collapse.

As the Supreme Court noted in *Logan* v. *Zimmerman Brush Co.*, "due process has been interpreted as preventing the States from denying potential litigants use of established adjudicatory procedures, when such an action would be 'the equivalent of denying them an opportunity to be heard'...." 455 U.S. 422, 437 (1982) citing *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971). In this case, defendant's misconduct denied appellant Pickholtz's "opportunity to be heard" for one full year, and sanctions must be applied with full force to vindicate this right.

The district court is asked to do nothing more than to sanction with the same force as it does when a similar request is made by a party represented by counsel. The court should respond to requests for sanctions without regard for whether the requesting party is pro se or not. In addition, under *Haines* v. *Kerner*, 404 U.S. 519 (1972), courts are required to liberally construe the pleadings of pro se litigants. In the present case, though, the court is not even asked to apply a more lenient standard to a request for discovery sanctions by a pro se litigant – only to apply an equal one. That is, the court need only treat a request for sanctions by a pro se litigant the same as it would any sanction request by a represented party. Particularly in light of the Supreme Court's recognition in Haines of the judiciary's special obligation to protect the rights of pro se litigants, this court must maintain equity between parties during the course of discovery process. See also *Tragath*, 710 F.2d at 95 (2d Cir. 1983).

**B. *Pro se litigants must have access to sanctions of equal deterrent effect as those afforded to litigants represented by counsel.***

It is not enough that a court impose sanctions when a party fails to comply with a discovery request. For procedural due process rights to be fully protected, the court must swing the procedural hammer with sufficient force to compel compliance and deter future noncompliance — and both to the same degree for pro se litigants as for represented parties. *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976) (per curiam). To do less affords litigants with the relative luxury to be represented in court greater power to compel discovery than their pro se counterparts. Such unequal treatment of parties to a litigation wholly undermines the essential purpose of Rule 37, "to hold the scales of justice even." See 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, §2284, at 614-615 (1994).

**III.** *The district court abused its discretion by failing to impose a sanction sufficient to deter misconduct by those litigating against a pro se party.*

Since pro se litigants have a fundamental right to self-representation which includes access to meaningful sanctions in the case of misconduct by their opponents, it is the duty of the courts to impose sanctions sufficient to deter misconduct against them. A failure to apply meaningful sanctions allows such litigation abuse to go unpunished, and invites its continuation. A sweeping denial of one of the most potent sanctions to pro se litigants, solely because they are not represented by counsel, constitutes a denial of their due process rights as well as a clear abuse of a court's discretion.

**A.** *The sanctions imposed by the district court were insufficient to deter discovery misconduct committed against an unrepresented party.*

In imposing sanctions upon the defendants-appellees, the magistrate judge found that "[n]o substantial justification exists for the approximate year that it took defendants to produce the source code and supporting documentation in electronic format." Order Imposing Sanctions (April 24, 2000) (hereinafter, "Order"), p. 1, J.A. at 0032. Despite this twelve-month delay in producing documents that were subject to initial disclosure requirements, the sole sanctions imposed by the magistrate judge upon defendants-appellees were (1) to order the production of documents (whose production was previously required); and (2) to order an award of "reasonable expenses and costs" (excluding attorney's fees) to appellant Pickholtz. Id. at 2-4, J.A. at 0033-0035. As noted above, the court has an obligation to "hold the scales of justice even" between litigants. Pro se litigants are held accountable for discovery abuses by imposition of monetary sanctions, including attorneys fees. *Robinson* v. *Eng*, 148 F.R.D. 635 (D. Neb. 1993). The threat of such a sanction acts as an effective deterrent to discovery misconduct. If appellant *Pickholtz* had engaged in discovery abuse similar to that committed by opposing counsel, there would be no basis for summarily rejecting an application for attorneys fees. In sharp contrast, the minimal sanction against defendants-appellees has no significant deterrent effect. Granting a pro se litigant the right to discovery without enforcing that right with the same sanctions available to protect parties who are represented eviscerates and effectively nullifies that right. Amicus curiae HALT submits that this inequality of sanctions violates the due process right of appellant Pickholtz to equal access to discovery.

**B.** *Failure to grant attorneys fees to a pro se litigant for discovery abuses committed by an opposing party violates the due process rights of the pro se party.*

There is no sanction that fulfills the deterrent goal of Rule 37 of the Federal Rules of Civil Procedure more effectively than the imposition of attorneys fees. The Advisory Committee Notes on the most recent 1970 amendment to the Rule explicitly state that the goal of the amendment to Rule 37(a)(4) was to require courts to impose monetary sanctions that will effectively deter future discovery abuses.

"And the potential or actual imposition of expenses is virtually the sole formal sanction in the rules to deter a party from pressing to a court hearing frivolous requests for or objections to discovery." Fed. R. Civ. P. 37(a)(4) advisory committee's note. The lion's share of such expenses inescapably consists of attorneys fees.

Moreover, Rule 37 "requires that expenses be awarded unless the conduct of the losing party or person is found to have been substantially justified." Id. (emphasis supplied).

25

The magistrate in this case found that the opposing party presented no substantial justification for its misconduct, and ordered the production of discovery and an award of expenses. Nevertheless, the court failed to award attorneys fees to pro se plaintiff Pickholtz, solely because he was not represented by counsel. Order, p. 1, J.A. at 0032. However, absent an award of attorneys fees, the nominal expenses imposed against opposing counsel fail to fulfill the deterrent objectives of Rule 37.

In addition to inadequately deterring future misconduct, the court's decision infringes upon pro se litigants' due process rights to self-representation by depriving them of the most effective sanctioning mechanism to ensure discovery compliance. In other cases between represented parties, courts have awarded attorneys fees for failure to timely respond to written interrogatories, *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976); for failing to inquire into the accuracy of discovery documents, *Business Guides* v. *Chromatic Communications Enters.*, 498 U.S. 533 (1991); and have even awarded amounts upwards of $1 million dollars against a party engaging in a series of meritless motions and depositions and refusing to permit discovery, *Chambers* v. *NASCO*, 501 U.S. 32 (1991).

The abusive conduct in this instance is no less egregious than that which required an award of attorneys fees in *National Hockey League*, *Business Guides* and *Chambers*. Appellant Pickholtz was forced to wait for a full year before opposing counsel produced the requested evidence. Order, p. 1, J.A. 0032. Further, opposing counsel deliberately and in bad faith produced dozens of boxes of computer encoded print-outs, when the request for the computer code itself (in electronic form) was clear and unambiguous. Plaintiff's Motion Requesting Sanctions, J.A. 0131-32. In addition, opposing counsel attempted to preclude experts and consultants from reviewing the discovery material handed over to plaintiff by sending letters to Mr. Pickholtz's technical experts and consultants, falsely claiming that Mr. Pickholtz could not legally disclose the facts of the case to them in anticipation of litigation. Plaintiff's Motion Requesting Sanctions, J.A. 0133-34.

Had appellant Pickholtz been represented by an attorney when he was forced by the defendant's misconduct to secure court intervention to compel discovery, his request for an award of attorneys fees would not have been summarily denied by the court below. Amicus curiae HALT respectfully submits that this disparity of treatment between pro se parties and represented parties deprives pro se litigants of meaningful due process during the critical discovery phase of litigation.

In denying attorneys fees, the magistrate judge asserted that there was "no authority that would permit [him] to award plaintiff, as a pro se litigant, attorney's fees." Order, p. 2, J.A. at 0033. Not only is there such authority under the broad sanctions provisions of Rule 37 discussed above, but federal courts also exercise inherent power to control the course of litigation before them and to punish misconduct that abuses the judicial process. *Chambers*, 501 U.S. at 43-46.

A court cannot simply throw up its hands and claim that no remedy is available to the pro se litigant when his rights have been violated. It is the duty of the trial court to exercise its authority and to even-handedly apply the same sanctions to protect the due process rights of its litigants whether they are represented by counsel or are proceeding pro se. That is precisely the course followed by the Northern District of Illinois in In re Napier, Bank. No. 34 96 B 00559 (N.D. Ill. 1997), where the court imposed monetary sanctions against a represented party for discovery violations, including compensation to the pro se plaintiff for his time spent preparing motions before the court.

In sum, the court below clearly erred when it concluded that there was "no authority that would permit it to award plaintiff, as a pro se litigant, attorney's fees" (Order, p. 2, J.A. at 0033), and abused its discretion in denying attorneys fees on this erroneous basis.

*CONCLUSION*

For the foregoing reasons, amicus curiae HALT – An Organization of Americans for Legal Reform respectfully requests that this Court reverse the decision of the United States District Court for the Northern District of California denying attorney fees to plaintiff Andrew Pickholtz, and remand this case with instructions to determine an appropriate attorneys fees award.

# E. BLACK'S LAW DICTIONARY DEFINES *EQUITABLE ESTOPPEL*:

"1. A defensive doctrine preventing one party [*United States*] from taking unfair advantage of another [*Pro Se Plaintiff*] when, through false language or conduct, the person to be estopped [*Counsel for Defense & the United States*] has induced another person [*District Court judge & the U.S. Congress*] to act in a certain way, with the result that the other person [*Pro Se Plaintiff & the American People*] has been injured in some way [*Case dismissed with prejudice & the American People left defenseless against the common criminal and now clandestine terrorists operating in the United States through gun control laws*]. ! This doctrine is founded on principles of fraud. The five essential elements for this type of estoppel are:"

> "(1) that there was a false representation or concealment of material facts,"

> "(2) that the representation must have been known to be false by the party making it, or the party must have been negligent in not knowing its falsity,"

> "(3) that it was believed to be true by the person to whom it was made,"

> "(4) that the party making the representation must have intended that it be acted on, or the person acting on it must have been justified in assuming this intent, and,"

> "(5) that the party asserting estoppel acted on the representation in a way that will result in substantial prejudice unless the claim of estoppel succeeds. — Also termed *estoppel by conduct; estoppel in pais.*"

### *ESTOPPEL BY SILENCE:*

Estoppel that arises when a party is under a duty to speak but fails to do so. — also termed *estoppel by standing by*; *estoppel by inaction.*

# F. ARTICLES 1 TO 27 OF THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS (ICCPR)

**United States Declarations: No. (1)** That the United States declares that the provisions of articles 1 through 27 of the Covenant are not self-executing.

**United States Understandings No. (5)** That the United States understands that this Covenant shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction

over the matters covered therein, and otherwise by the state and local governments; to the extent that state and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the state or local governments may take appropriate measures for the fulfillment of the Covenant."

Article 1

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

2. All peoples may, for their own ends, freely dispose of their natural wealth and resources without prejudice to any obligations arising out of international economic co-operation, based upon the principle of mutual benefit, and international law. In no case may a people be deprived of its own means of subsistence.

3. The States Parties to the present Covenant, including those having responsibility for the administration of Non-Self-Governing and Trust Territories, shall promote the realization of the right of self-determination, and shall respect that right, in conformity with the provisions of the Charter of the United Nations.

PART II

Article 2[33]

1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

2. Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

3. Each State Party to the present Covenant undertakes:

(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

(c) To ensure that the competent authorities shall enforce such remedies when granted.

Article 3

---

[33] **United States Understanding No. (1)** That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or any other status - as those terms are used in **article 2, paragraph 1 and article 26** - to be permitted when such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in **paragraph 1 of article 4** upon discrimination, in time of public emergency, based 'solely' on the status of race, colour, sex, language, religion or social origin, not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

The States Parties to the present Covenant undertake to ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant.

Article 4[34]

1 . In time of public emergency which threatens the life of the nation and the existence of which is officially proclaimed, the States Parties to the present Covenant may take measures derogating from their obligations under the present Covenant to the extent strictly required by the exigencies of the situation, provided that such measures are not inconsistent with their other obligations under international law and do not involve discrimination solely on the ground of race, colour, sex, language, religion or social origin.

2. No derogation from articles 6, 7, 8 (paragraphs I and 2), 11, 15, 16 and 18 may be made under this provision.

3. Any State Party to the present Covenant availing itself of the right of derogation shall immediately inform the other States Parties to the present Covenant, through the intermediary of the Secretary-General of the United Nations, of the provisions from which it has derogated and of the reasons by which it was actuated. A further communication shall be made, through the same intermediary, on the date on which it terminates such derogation.

Article 5 [35]

1. Nothing in the present Covenant may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any of the rights and freedoms recognized herein or at their limitation to a greater extent than is provided for in the present Covenant.

2. There shall be no restriction upon or derogation from any of the fundamental human rights recognized or existing in any State Party to the present Covenant pursuant to law, conventions, regulations or custom on the pretext that the present Covenant does not recognize such rights or that it recognizes them to a lesser extent.

PART III

Article 6

1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

---

[34] **United States Understanding No. (1)** That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or any other status - as those terms are used in **article 2, paragraph 1 and article 26** - to be permitted when such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in **paragraph 1 of article 4** upon discrimination, in time of public emergency, based `solely' on the status of race, colour, sex, language, religion or social origin, not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

[35] Declarations: No. (2) That it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant. For the United States, article 5, paragraph 2, which provides that fundamental human rights existing in any State Party may not be diminished on the pretext that the Covenant recognizes them to a lesser extent, has particular relevance to article 19, paragraph 3 which would permit certain restrictions on the freedom of expression. The United States declares that it will continue to adhere to the requirements and constraints of its Constitution in respect to all such restrictions and limitations.

2. In countries which have not abolished the death penalty, sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to the Convention on the Prevention and Punishment of the Crime of Genocide. This penalty can only be carried out pursuant to a final judgement rendered by a competent court.

3. When deprivation of life constitutes the crime of genocide, it is understood that nothing in this article shall authorize any State Party to the present Covenant to derogate in any way from any obligation assumed under the provisions of the Convention on the Prevention and Punishment of the Crime of Genocide.

4. Anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

5. Sentence of death shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women.

6. Nothing in this article shall be invoked to delay or to prevent the abolition of capital punishment by any State Party to the present Covenant.

Article 7[36]

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

Article 8

1. No one shall be held in slavery; slavery and the slave-trade in all their forms shall be prohibited.

2. No one shall be held in servitude.

3.

(a) No one shall be required to perform forced or compulsory labour;

(b) Paragraph 3 (a) shall not be held to preclude, in countries where imprisonment with hard labour may be imposed as a punishment for a crime, the performance of hard labour in pursuance of a sentence to such punishment by a competent court;

(c) For the purpose of this paragraph the term "forced or compulsory labour" shall not include:

(i) Any work or service, not referred to in subparagraph (b), normally required of a person who is under detention in consequence of a lawful order of a court, or of a person during conditional release from such detention;

(ii) Any service of a military character and, in countries where conscientious objection is recognized, any national service required by law of conscientious objectors;

(iii) Any service exacted in cases of emergency or calamity threatening the life or well-being of the community;

(iv) Any work or service which forms part of normal civil obligations.

Article 9[37]

---

[36] **United States Reservations: No. (3)** That the United States considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States.

1. Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.

2. Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him.

3. Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release. It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings, and, should occasion arise, for execution of the judgement.

4. Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

5. Anyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation.

Article 10

1. All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

2.

(a) Accused persons shall, save in exceptional circumstances, be segregated from convicted persons and shall be subject to separate treatment appropriate to their status as unconvicted persons;

(b) Accused juvenile persons shall be separated from adults and brought as speedily as possible for adjudication. 3. The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status.

Article 11

No one shall be imprisoned merely on the ground of inability to fulfil a contractual obligation.

Article 12

1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence.

2. Everyone shall be free to leave any country, including his own.

3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law, are necessary to protect national security, public order (ordre public), public health or morals or the rights and freedoms of others, and are consistent with the other rights recognized in the present Covenant.

4. No one shall be arbitrarily deprived of the right to enter his own country.

Article 13

---

[37] **United States Understanding No. (2)** That the United States understands the right to compensation referred to in **articles 9 (5)** and **14 (6)** to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law.

An alien lawfully in the territory of a State Party to the present Covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, be allowed to submit the reasons against his expulsion and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority.

Article 14[38]

1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The press and the public may be excluded from all or part of a trial for reasons of morals, public order (ordre public) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgement rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the guardianship of children.

2. Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.

3. In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality:

(a) To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;

(b) To have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing;

(c) To be tried without undue delay;

(d) To be tried in his presence, and to defend himself in person or through legal assistance of his own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;

(e) To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

(f) To have the free assistance of an interpreter if he cannot understand or speak the language used in court;

(g) Not to be compelled to testify against himself or to confess guilt.

4. In the case of juvenile persons, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation.

5. Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.

6. When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him.

7. No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

---

[38] **United States Understanding No. (2)** That the United States understands the right to compensation referred to in **articles 9 (5)** and **14 (6)** to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law.

Article 15

1 . No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time when the criminal offence was committed. If, subsequent to the commission of the offence, provision is made by law for the imposition of the lighter penalty, the offender shall benefit thereby.

2. Nothing in this article shall prejudice the trial and punishment of any person for any act or omission which, at the time when it was committed, was criminal according to the general principles of law recognized by the community of nations.

Article 16

Everyone shall have the right to recognition everywhere as a person before the law.

Article 17

1. No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation.

2. Everyone has the right to the protection of the law against such interference or attacks.

Article 18

1. Everyone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching.

2. No one shall be subject to coercion which would impair his freedom to have or to adopt a religion or belief of his choice.

3. Freedom to manifest one's religion or beliefs may be subject only to such limitations as are prescribed by law and are necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others. 4. The States Parties to the present Covenant undertake to have respect for the liberty of parents and, when applicable, legal guardians to ensure the religious and moral education of their children in conformity with their own convictions.

Article 19[39]

1. Everyone shall have the right to hold opinions without interference.

2. Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice.

3. The exercise of the rights provided for in paragraph 2 of this article carries with it special duties and responsibilities. It may therefore be subject to certain restrictions, but these shall only be such as are provided by law and are necessary:

---

[39] **United States Declarations: No. (2)** That it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant. For the United States, article 5, paragraph 2, which provides that fundamental human rights existing in any State Party may not be diminished on the pretext that the Covenant recognizes them to a lesser extent, has particular relevance to article 19, paragraph 3 which would permit certain restrictions on the freedom of expression. The United States declares that it will continue to adhere to the requirements and constraints of its Constitution in respect to all such restrictions and limitations.

(a) For respect of the rights or reputations of others;

(b) For the protection of national security or of public order (ordre public), or of public health or morals.

Article 20

1. Any propaganda for war shall be prohibited by law.

2. Any advocacy of national, racial or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law.

Article 21

The right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others.

Article 22

1. Everyone shall have the right to freedom of association with others, including the right to form and join trade unions for the protection of his interests.

2. No restrictions may be placed on the exercise of this right other than those which are prescribed by law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others. This article shall not prevent the imposition of lawful restrictions on members of the armed forces and of the police in their exercise of this right.

3. Nothing in this article shall authorize States Parties to the International Labour Organisation Convention of 1948 concerning Freedom of Association and Protection of the Right to Organize to take legislative measures which would prejudice, or to apply the law in such a manner as to prejudice, the guarantees provided for in that Convention.

Article 23

1. The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

2. The right of men and women of marriageable age to marry and to found a family shall be recognized.

3. No marriage shall be entered into without the free and full consent of the intending spouses.

4. States Parties to the present Covenant shall take appropriate steps to ensure equality of rights and responsibilities of spouses as to marriage, during marriage and at its dissolution. In the case of dissolution, provision shall be made for the necessary protection of any children.

Article 24

1. Every child shall have, without any discrimination as to race, colour, sex, language, religion, national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State.

2. Every child shall be registered immediately after birth and shall have a name.

3. Every child has the right to acquire a nationality.

Article 25

Every citizen shall have the right and the opportunity, without any of the distinctions mentioned in article 2 and without unreasonable restrictions:

(a) To take part in the conduct of public affairs, directly or through freely chosen representatives;

(b) To vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors;

(c) To have access, on general terms of equality, to public service in his country.

Article 26[40]

All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

Article 27

In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their own language.

## G. EXEMPTIONS TO FOREIGN SOVEREIGN IMMUNITIES ACT OF 1976 APPLY TO MY CASE AGAINST THE UNITED NATIONS

It is my claim that the U.S. Coast Guard's declaration of their denial of my application for "NATIONAL OPEN CARRY HANDGUN" endorsement on my MERCHANT MARINER'S DOCUMENT as a FINAL AGENCY ACTION is part and partial to my civil RICO Act claim against the United States of racketeering an unlawful and an unconstitutional protection scheme over the Second Amendment and subsequently my claim against the United Nations for their War of Aggression against the Second Amendment as violating United Nations declarations, conventions, and covenants on human rights. I claim my right to sue the United Nations as a U.S. citizen under the exemptions to the FOREIGN SOVEREIGN IMMUNITIES ACT OF 1976, codified in 28 U.S.C. § 1605, et seq.

GENERAL EXCEPTIONS TO THE JURISDICTIONAL IMMUNITY OF A FOREIGN STATE 28 U.S.C. § 1605

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state **has waived its immunity either explicitly or by implication**, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

---

[40] **Understanding No. (1)** That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or any other status - as those terms are used in **article 2, paragraph 1** and **article 26** - to be permitted when such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in **paragraph 1 of article 4** upon discrimination, in time of public emergency, based `solely' on the status of race, colour, sex, language, religion or social origin, not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

**(2)** in which the action is **based upon a commercial activity carried on in the United States by the foreign state**; or upon **an act performed in the United States in connection with a commercial activity of the foreign state elsewhere**; or upon **an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States**;

**(6)** in which the action is brought, either **to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States**, or to confirm an award made pursuant to such an agreement to arbitrate, if

**(A)** **the arbitration takes place or is intended to take place in the United States,**

**(B)** **the agreement** or award **is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards,**

**(C)** the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

# PART 1 – A HUMAN RIGHTS DEFENDER FOR THE SECOND AMENDMENT

## A. - U.N. FURTHER WEAKENS HUMAN RIGHTS COUNCIL

by Brett D. Schaefer
The Heritage Foundation, WebMemo #1707
November 20, 2007
http://www.heritage.org/Research/InternationalOrganizations/wm1707.cfm

*Brett D. Schaefer is Jay Kingham Fellow in International Regulatory Affairs in the Margaret Thatcher Center for Freedom, a division of the Kathryn and Shelby Cullom Davis Institute for International Studies, at The Heritage Foundation.*

The U.N. General Assembly voted to replace the discredited U.N. Commission on Human Rights with the Human Rights Council (HRC or Council) in 2006. Supporters of the Council expressed hope for the "dawn of a new era" in promoting human rights in the United Nations.

The record of the Council has dashed these hopes. After more than a year in existence, the Council has proven to be just as bad as the Commission; in some ways, it is even less effective than its discredited predecessor. Led by well-known human rights abusers, the Council adopted a number of "institution-building" measures in June 2007 that removed scrutiny of human rights practices in Cuba and Belarus and weakened the ability of the Council to be a forceful advocate of human rights. Sadly, the member states of the United Nations missed an opportunity to rectify these deplorable actions, demonstrating that they do not take the Council or human rights seriously. The United States should recognize this and sever its ties to the Council completely.

**The Council's Disastrous Record**

Despite minimal safeguards to prevent human rights abusers from using the Council as they had the Commission, Council supporters, including U.N. High Commissioner for Human Rights Louise Arbour, were quick to declare that the new body represented the "dawn of a new era" in promoting human rights in the United Nations. Well into its second year and after six regular sessions and five special sessions, the HRC has clearly not lived up to these lofty expectations.

Among the dubious accomplishments of the Council in its first year was the decision to discontinue consideration of the human rights situations in Iran and Uzbekistan under the 1503 procedure and to eliminate the experts focused on Belarus and Cuba, despite extensive evidence of ongoing human rights violations in all of those countries.[1] The Council repeatedly singled out Israel for condemnation while ignoring human rights abuses committed by Hamas and Hezbollah and failing to address far worse human rights situations around the world in places such as Belarus, China, Cuba, North Korea, and Zimbabwe.

The two notable positive actions by the Council on human rights violations resulted from two special sessions--one on Sudan and the other on Burma. Unfortunately, the resolution on Sudan was weak and non-condemnatory; the Council strained to avoid blaming the government of Khartoum for its role in the genocide in Darfur.[2] The resolution on Burma was stronger; the Council deserves credit for condemning the crackdown on protestors by Burma's military junta.[3]

The Burma resolution, however, is low-hanging fruit. Human rights violations in Burma are nothing new. In November 2006, the United Nations Third Committee (Social, Humanitarian, and Cultural), which includes all U.N. member states, passed a resolution calling on Burma to end human rights violations. The Commission on Human Rights passed a resolution on Burma in 2005. The new

Council, however, did not address Burma in its first year. The timing of the special session--and the failure of the Council to address other notorious cases of human rights abuses such as those in Cuba or North Korea--leaves the impression that the resolution was a reaction to international media coverage of Burma rather than a sincere fulfillment of the Council's mandate to condemn human rights violations.

Compounding the situation, the Council made a series of decisions in its 5th session in June 2007 that significantly weaken its ability to objectively advance and advocate human rights.[4] These "institution-building" measures include making it harder to adopt country-specific resolutions against human rights abusers like Burma and Sudan; singling out Israel as the only country subject to a permanent Council mandate; and adopting a restrictive "code of conduct" that will impede the autonomy of the Council's independent experts. As if these counterproductive measures were not enough, they were approved through a highly irregular process that denied Canada its right to vote against the proposals. In a blatant and willful distortion of the record, the Council voted that Canada had indeed agreed to the consensus.[5] As noted by the United States, the procedural maneuvers to obtain consensus on the resolution violated both the spirit and letter of the rules of the Council:

We are concerned about the procedural irregularities employed last night denying Council members the opportunity to vote on this agenda. The Human Rights Council was intended to be the world's leading human rights protection mechanism. Its proceedings should be a model of fairness and transparency. Instead, in the interest of political expediency, procedural irregularities denied members the right to an up or down vote on principled human rights concerns--a right guaranteed by the rules of the institution.[6]

**U.N. Member States Support a Weaker Council**

As a subsidiary body, the Council must submit its actions to the General Assembly for review and approval. The Council's report presented an ideal opportunity for other member states to stand up for the victims of human rights abuses everywhere. The member states of the General Assembly could have rejected the Council's proposals to eliminate scrutiny of human rights in Belarus and Cuba. They could have chastised the Council for violating its own rules and procedures in denying Canada its right to vote on the June 2007 proposal. They could have repealed provisions constraining efforts to introduce country-specific resolutions.

Sadly, U.N. member states did none of these things. Even countries like the United States and Canada--both of which would have liked to remove the counterproductive elements from the Council's report--decided not to propose amendments out of fear that it would open the door for human right abusers to make the report even worse. Instead, the General Assembly sent the report to the Third Committee for review on November 5.

The review by the Third Committee provided another opportunity for countries to voice concerns about the ineffectiveness of the Council. To its credit, the United States did precisely this. During the discussion, the U.S. representative stated that the United States is concerned that some [countries] appear more determined to use the Council to defend abusive governments than to protect the victims of human rights violations. We are particularly concerned with the Council's relentless focus on Israel, with its elimination of the Special Mandates on Belarus and Cuba, and with its reluctance to address principal violators and violations of human rights.[7]

By contrast, well-known human rights abusers voiced support for the report. The following statements were reported by the United Nations Department of Public Information:[8]

Belarus said, "The decision taken by the Council on institution-building had been welcome and valued."

China asserted that "the consensus adoption of the institution-building package had been the greatest achievement of the Human Rights Council in the past year" and expressed hope that "the package

would be adopted by the Assembly by consensus, thus laying the foundation for the Council's substantive work."

Egypt praised the Council as "the beginning of a 'new, long-awaited era,' in which the international community aspired to eliminate obstacles that had restrained its action on consolidating the universal respect of human rights and fundamental freedoms" and "welcomed the adoption of the Council's working methods and rules of procedure."

Iran expressed its "satisfaction that the Human Rights Council's institution-building package had been adopted by consensus stating that it would be counter-productive to reopen it for further negotiations."

Burma, criticized in the recent special session of the Council, argued that the Council's institution-building package did not weaken the Council enough, stating that "country-specific resolutions should have no place on the agenda of the Human Rights Council... The existing system of special procedures had to be reviewed."

The Third Committee concluded its review of the Council's report on November 6. The report was well on its way to being rubber-stamped before Israel--the most frequent target of the Council--demanded that the resolution be put to a vote. The report was split into two parts--one dealing solely with "institution-building" measures and the other with the activities of the Council during its first year. The United States explained its opposition to the institution-building measures:

The United States is compelled to vote "No" on the institution-building package considered by the Committee today. We cast this vote sadly, because we still believe, as we have always believed, that the protection and promotion of human rights are an important part of the United Nations' reason for being....

But the Council's record so far failed to fulfill our hopes.... Key provisions of the institution-building package before us today appear likely to compound the Council's institutional weaknesses.[9]

The concerns voiced by the United States and others made little difference to the outcome. On November 16, the Third Committee overwhelmingly approved, by a vote of 165 to 7 with 3 abstentions, the resolution formally establishing the Council's institutions and working methods.[10] The seven states voting against the resolution were Australia, Canada, Israel, the United States, and three Pacific island states. Along with Israel, the United States expressed its dissatisfaction with the Council's actions in its first year by disassociating from consensus on the vote on the report of the Human Rights Council. Because all U.N. member states vote in the Third Committee and in the General Assembly, a similar result is expected when the General Assembly votes in the near future.

**Conclusion**

The United States was one of only four countries that voted against the General Assembly resolution that created the Council. The U.S. was concerned that the Council lacked the measures necessary to prevent it from repeating the worst mistakes of the Commission it was created to replace. The deplorable record of the Council has validated both the United States' concerns and its decision not to run for a seat on the Council in 2006 and in 2007.

The United States has left the door open for increasing its engagement with the Council if it proves to be an effective instrument for promoting human rights. The only hope for better results is if U.N. member states take action to improve the Council. Toward that end, the General Assembly should refuse to vote human rights abusers to seats on the Council. In the past two elections, the General Assembly has voted to place a number of states with dismal human rights records on the Council. The second way for member states of the General Assembly to improve the Council is to reject efforts by human rights abusers to undermine its effectiveness. Aside from objections by a small number of countries including Australia, Canada, Israel, and the United States, U.N. member states voted

overwhelmingly to support the deleterious Council decisions that weaken its ability to champion human rights.

U.N. member states have refused to act when presented with opportunities to make the Council more effective. Through their actions, they have demonstrated that they do not take the Council or human rights seriously. The United States should recognize this and sever its ties to the Council completely.

# B. "U.N. To World: You Have No Human Right to Self-Defense"

## Thwarted by the demise of its global gun ban treaty, the United Nations declares the human right of self-defense null and void

by Dave Kopel
Second Amendment Project
A Research Center for the Independence Institute
Published in the NRA Magazine "America's 1st Freedom"
November 2006, pp. 26-29, 62-63.
http://www.davekopel.com/2A/Foreign/UN-To-World.htm

Self-defense is a privilege that governments may choose to grant or withdraw. You have no human right to self-defense. If a government does not impose repressive restrictions on gun ownership—more severe than even the laws in New York City or Washington, D.C.—then that government is guilty of violating international human rights.

So says the United Nations in its latest assault on the Second Amendment.

This July, the National Rifle Association and other pro-freedom groups won a tremendous victory at the U.N. Small Arms Review Conference when they helped block the creation of a global gun control treaty. Winning a very important battle, though, is not the same as winning a war. Since then, the global gun prohibition movement has already opened up a major new front in the war on our rights.

This fall, the General Assembly of the United Nations will be considering a new Arms Trade Treaty. The treaty is backed by many governments, as well as by the world's leading gun prohibition group, International Action Network on Small Arms (IANSA). Once the final language of the treaty is approved by the General Assembly, the treaty will be open for signature and ratification by all nations.

At the highest level of generality, the Arms Trade Treaty is based on a very good idea: prohibiting the sale of arms to countries that use them to violate human rights. It would be a good idea, for example, if all nations refused to sell arms to the dictatorships in Burma, Zimbabwe or Cuba, all of which have an atrocious record of human rights violations. (And all of which, like other modern nations that are extreme violators of human rights, have extreme laws against citizen gun ownership.)

However, any nation that has a conscience can already ban arms exports to such evil governments. Conversely, nations such as China, which currently supply arms to human rights abusers all over the world, have a long record of flouting the treaties they sign, so it would be foolish to expect that a new treaty would stop their arms exports to their favorite tyrannical allies.

The Arms Trade Treaty will, however, increase international pressure to cut off arms sales to Israel. Although Israel's human rights record is far superior to any of its neighbors (and superior to the large majority of U.N. members), the United Nations condemns Israel much more than any other nation for supposed violations of human rights.

The Arms Trade Treaty can also be used to attempt to suppress the sale of civilian, police or military arms to the United States. The reason is that the U.N. is working to declare that all American gun laws, as well as the right to self-defense, are violations of human rights.

THE U.N. HAS appointed University of Minnesota Law Professor Barbara Frey as its "Special Rapporteur on the prevention of human rights violations committed with small arms and light weapons." A "Special Rapporteur" is a U.N.-designated expert and researcher on a subject.

Notably, the title the U.N. gave to Frey required her to look exclusively at how small arms are used to violate human rights—and to ignore how small arms

are used to protect human rights, such as when used to resist genocide. But the one-sided nature of Frey's research mission was consistent with her own views; Frey is a member of IANSA and participated in a 2005 strategy meeting in Brazil designed to support the gun prohibition referendum in that nation.

On July 27, Frey issued her final report, declaring that there is no human right to self-defense and that insufficient gun control is a violation of human rights. (The report, "Prevention of human rights violations committed with small arms and light weapons," is available on IANSA's website, www.iansa.org/un/documents/salw_hr_report_2006.pdf.)

On Aug. 21, the U.N. Human Rights Council's Sub-Commission on the Promotion and Protection of Human Rights endorsed the Frey report in total and recommended that the full Human Rights Council (HRC) do so.

It's important to note that the U.N. Human Rights Council, despite its name, is composed of some of the worst human rights violators in the world, such as Cuba and Saudi Arabia. The U.N. rejected efforts by the United States to join the Human Rights Council, and instead allowed dictatorships such as China and Pakistan to join.

It is all but certain that the Human Rights Council will follow the lead of its sub-commission and adopt the Frey Report as an official statement of HRC policy on human rights. At that point, the global and American gun prohibition lobbies can then begin to attack American gun laws because they "violate human rights."

According to Frey, governments have an affirmative human rights obligation to protect their subjects from violence. This obligation includes much more than simply making and enforcing laws against crime. According to Frey, the "due diligence" obligations means that:

"It is reasonable for international human rights bodies to require States to enforce a minimum licensing requirement designed to keep small arms and light weapons out of the hands of persons who are likely to misuse them. ... The criteria for licensing may vary from State to State, but most licensing procedures consider the following: (a) minimum age of applicant; (b) past criminal record including any history of interfamilial violence; (c) proof of a legitimate purpose for obtaining a weapon; and (d) mental fitness. Other proposed criteria include knowledge of laws related to small arms, proof of training on the proper use of a firearm and proof of proper storage. Licences should be renewed regularly to prevent transfer to unauthorized persons."

BY THE FREY/HRC standards, every American jurisdiction is a human rights violator because its gun laws are not severe enough. Even in New York City or Washington, D.C., the government does not require a gun license applicant to prove that he or she has "a legitimate purpose." Once New York City or D.C. finally let you buy a shotgun, you can use it for any legitimate purpose—sporting clays, gunsmithing practice, collecting or even self-defense (assuming that you somehow can retrieve the locked gun in time to use it against a home invader).

At every gun store in the United States, buyers must pass a background check under the National Instant Check System (or a state equivalent). Most states do not require a separate license for handgun purchases and even fewer require a license for long gun purchases. Only a few states mandate that a person who simply wants to continue owning the guns he already has must renew a license from the government every few years. The absence of mandatory, periodic licensing for continued possession of one's own guns is another human rights violation, according to Frey.

Similarly, the vast majority of American states allow children, under parental supervision, to use firearms; the family, not the government, decides when a particular child is ready to take his or her first shots with the family's .22 pistol or rifle. Yet this, too, is a human rights violation, according to Frey and the HRC, since the government has not specified a minimum age for a gun license.

The Frey/HRC rules declare almost all American self-defense laws to be human rights violations. The Frey report declares: "When small arms and light weapons are used for self-defence, for instance, unless the action was necessary to save a life or lives and the use of force with small arms is proportionate to the threat of force, self-defence will not alleviate responsibility for violating another's right to life."

Moreover, "Because of the lethal nature of these weapons and the *jus cogens* (a mandatory norm of general international law from which no two or more nations may exempt themselves or release one another) human rights obligations imposed upon all States and individuals to respect the right to life, small arms and light weapons may be used defensively only in the most extreme circumstances, expressly, where the right to life is already threatened or unjustifiably impinged."

Under international law, a *jus cogens* standard supersedes any contrary rule. Thus, Frey and the HRC are declaring that their restrictive view of self-defense trumps any contrary state, national or international law.

The laws of all American states allow the use of deadly force against certain violent felonies (include

rape, torture and mayhem) when the person being attacked reasonably believes that no lesser force will suffice. Yet Frey and the HRC will allow the use of deadly force only against a life-threatening attack, and not against other violent felonies.

Thanks to NRA leadership, 14 states this year have adopted "Castle Doctrine" laws that state that a person may use a firearm (that is, deadly force) against a violent felon without having to calculate whether lesser force might suffice. The large majority of American jurisdictions state that a person who is attacked in his home need not retreat when attacked, and some jurisdictions also apply the no-retreat rule in public spaces. Yet all of these American protections of the right of self-defense are violations of human rights, according to the adopted report of the U.N.'s Special Rapporteur.

YOU MIGHT WONDER HOW the U.N.'s claim that gun control is a human right, and that suppression of self-defense is a human right, can be reconciled with the actual human right of self-defense. Such a reconciliation is impossible, so the U.N., speaking through its Special Rapporteur, has simply declared that THERE IS NO HUMAN RIGHT TO SELF-DEFENSE.

The Frey report admits that most criminal justice systems acknowledge self-defense, but the report claims that self-defense is merely a government-granted exemption to criminal liability, and that this exemption must be very narrowly construed.

Frey and the U.N. assert that the traditional sources of international law do not support the existence of a right to self-defense. However, this premise is false.

The United Nations' own Universal Declaration of Human Rights recognizes, in its preamble, a last-resort right of self-defense against tyranny: "Whereas it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny

and oppression, that human rights should be protected by the rule of law."

To list all the sources of human rights law that recognize the right of self-defense would take many thousands of words, but the error of Frey's assertion can easily be seen simply by looking to three of the great philosophers universally regarded as founders of international law.

Hugo Grotius (Dutch, On the Law of War and Peace): "When our lives are threatened with immediate danger, it is lawful to kill the aggressor, if the danger cannot otherwise be avoided ... We must observe that this kind of defence derives its origin from the principle of self preservation, which nature has given to every living creature."

Emerich de Vattel (Swiss, The Law of Nations): "Every nation, as well as every man, has, therefore, a right ... to preserve herself from all injuries: and this right is a perfect one, since it is given to satisfy a natural and indispensable obligation ... It is this right to preserve herself from all injury that is called the right to security."

Francisco Suárez (Spanish, 26 volumes, including De Legibus ac Deo Legislatore): Self-defense is "the greatest of rights," encompassing individual protection against criminals, as well as community self-defense against tyrants.

The only way that the United Nations can use international law to deny the right to self-defense is to ignore the fundamental sources of international law itself. Yet many American officials, including some Supreme Court justices, have taken to using international law in defining the scope of the rights guaranteed by the United States Constitution.

Professor Frey and the misnamed U.N. Human Rights Council are creating the tools that could, in the hands of judges or other government officials who are hostile to the Second Amendment, be used to decimate both our right to arms and our right to self-defense.

 **United Nations High Commissioner for Human Rights**

# [C.] *DECLARATION ON HUMAN RIGHTS DEFENDERS*

General Assembly Resolution A/RES/53/144 adopting the Declaration on human rights defenders
http://www.ohchr.org/english/issues/defenders/declaration.htm

**The Declaration on human rights defenders**

Elaboration of the Declaration on human rights defenders began in 1984 and ended with the adoption of the text by the General Assembly in 1998, on the occasion of the fiftieth anniversary of the Universal Declaration of Human Rights. A collective effort by a number of human rights non-governmental organizations and some State delegations helped to ensure that the final result was a strong, very useful and pragmatic text. Perhaps most importantly, the Declaration is addressed not just to States and to human rights defenders, but to everyone. It tells us that we all have a role to fulfill as human rights defenders and emphasizes that there is a global human rights movement that involves us all. The Declaration's full name is the "*DECLARATION ON THE RIGHT AND RESPONSIBILITY OF INDIVIDUALS, GROUPS AND ORGANS OF SOCIETY TO PROMOTE AND PROTECT UNIVERSALLY RECOGNIZED HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS*" – with this longer title is frequently abbreviated to "*THE DECLARATION ON HUMAN RIGHTS DEFENDERS*".

**1. *Legal character***

The Declaration is not, in itself, a legally binding instrument. However, it contains a series of principles and rights that are based on human rights standards enshrined in other international instruments that are legally binding – such as the *INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS*. Moreover, the Declaration was adopted by consensus by the General Assembly and therefore represents a very strong commitment by States to its implementation. States are increasingly considering adopting the Declaration as binding national legislation.

**2. *The Declaration's provisions***

The Declaration provides for the support and protection of human rights defenders in the context of their work. It does not create new rights but instead articulates existing rights in a way that makes it easier to apply them to the practical role and situation of human rights defenders. It gives attention, for example, to access to funding by organizations of human rights defenders and to the gathering and exchange of information on human rights standards and their violation. The Declaration outlines some specific duties of States and the responsibilities of everyone with regard to defending human rights, in addition to explaining its relationship with national law. Most of the Declaration's provisions are summarized in the following paragraphs. [1] It is important to reiterate that human rights defenders have an obligation under the Declaration to conduct peaceful activities.

**(a) Rights and protections accorded to human rights defenders**

Articles 1, 5, 6, 7, 8, 9, 11, 12 and 13 of the Declaration provide specific protections to human rights defenders, including the rights:

- To seek the protection and realization of human rights at the national and international levels; To conduct human rights work individually and in association with others;

- To form associations and non-governmental organizations;

- To meet or assemble peacefully;

- To seek, obtain, receive and hold information relating to human rights;

- To develop and discuss new human rights ideas and principles and to advocate their acceptance;

- To submit to governmental bodies and agencies and organizations concerned with public affairs criticism and proposals for improving their functioning and to draw attention to any aspect of their work that may impede the realization of human rights;

- To make complaints about official policies and acts relating to human rights and to have such complaints reviewed;

- To offer and provide professionally qualified legal assistance or other advice and assistance in defence of human rights;

- To attend public hearings, proceedings and trials in order to assess their compliance with national law and international human rights obligations;

- To unhindered access to and communication with non-governmental and intergovernmental organizations;

- To benefit from an effective remedy;

- To the lawful exercise of the occupation or profession of human rights defender;

- To effective protection under national law in reacting against or opposing, through peaceful means, acts or omissions attributable to the State that result in violations of human rights;

- To solicit, receive and utilize resources for the purpose of protecting human rights (including the receipt of funds from abroad).

**(b) The duties of States**

States have a responsibility to implement and respect all the provisions of the Declaration. However, articles 2, 9, 12, 14 and 15 make particular reference to the role of States and indicate that each State has a responsibility and duty:

- To protect, promote and implement all human rights;
- To ensure that all persons under its jurisdiction are able to enjoy all social, economic, political and other rights and freedoms in practice;
- To adopt such legislative, administrative and other steps as may be necessary to ensure effective implementation of rights and freedoms;
- To provide an effective remedy for persons who claim to have been victims of a human rights violation;
- To conduct prompt and impartial investigations of alleged violations of human rights;
- To take all necessary measures to ensure the protection of everyone against any violence, threats, retaliation, adverse discrimination, pressure or any other arbitrary action as a consequence of his or her legitimate exercise of the rights referred to in the Declaration;
- To promote public understanding of civil, political, economic, social and cultural rights;
- To ensure and support the creation and development of independent national institutions for the promotion and protection of human rights, such as ombudsmen or human rights commissions;
- To promote and facilitate the teaching of human rights at all levels of formal education and professional training.

**(c) The responsibilities of everyone**

The Declaration emphasizes that everyone has duties towards and within the community and encourages us all to be human rights defenders. Articles 10, 11 and 18 outline responsibilities for everyone to promote human rights, to safeguard democracy and its institutions and not to violate the human rights of others. Article 11 makes a special reference to the responsibilities of persons exercising professions that can affect the human rights of others, and is especially relevant for police officers, lawyers, judges, etc.

**(d) The role of national law**

Articles 3 and 4 outline the relationship of the Declaration to national and international law with a view to assuring the application of the highest possible legal standards of human rights.

**UNITED
NATIONS**



**A**

 **General
Assembly**

Distr.
GENERAL
A/RES/53/144
8 March 1999

# [D.] Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms

## General Assembly resolution 53/144

*The General Assembly*,

*Reaffirming* the importance of the observance of the purposes and principles of the Charter of the United Nations for the promotion and protection of all human rights and fundamental freedoms for all persons in all countries of the world,

*Taking note* of Commission on Human Rights resolution 1998/7 of 3 April 1998,[41] in which the Commission approved the text of the draft declaration on the right and responsibility of individuals, groups and organs of society to promote and protect universally recognized human rights and fundamental freedoms,

*Taking note also* of Economic and Social Council resolution 1998/33 of 30 July 1998, in which the Council recommended the draft declaration to the General Assembly for adoption,

*Conscious* of the importance of the adoption of the draft declaration in the context of the fiftieth anniversary of the Universal Declaration of Human Rights,[42]

1. *Adopts* the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, annexed to the present resolution;

2. *Invites* Governments, agencies and organizations of the United Nations system and intergovernmental and non-governmental organizations to intensify their efforts to disseminate the Declaration and to promote universal respect and understanding thereof, and requests the Secretary-General to include the text of the Declaration in the next edition of *Human Rights: A Compilation of International Instruments*.

*85th plenary meeting
9 December 1998*

---

[41] See *Official Records of the Economic and Social Council, 1998, Supplement No. 3* (E/1998/23), chap. II, sect. A.
[42] Resolution 217 A (III).

**ANNEX**

### Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms

*The General Assembly,*

*Reaffirming* the importance of the observance of the purposes and principles of the Charter of the United Nations for the promotion and protection of all human rights and fundamental freedoms for all persons in all countries of the world,

*Reaffirming also* the importance of the Universal Declaration of Human Rights[2] and the International Covenants on Human Rights Resolution 2200 A (XXI), annex. as basic elements of international efforts to promote universal respect for and observance of human rights and fundamental freedoms and the importance of other human rights instruments adopted within the United Nations system, as well as those at the regional level,

*Stressing* that all members of the international community shall fulfil, jointly and separately, their solemn obligation to promote and encourage respect for human rights and fundamental freedoms for all without distinction of any kind, including distinctions based on race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status, and reaffirming the particular importance of achieving international cooperation to fulfil this obligation according to the Charter,

*Acknowledging* the important role of international cooperation for, and the valuable work of individuals, groups and associations in contributing to, the effective elimination of all violations of human rights and fundamental freedoms of peoples and individuals, including in relation to mass, flagrant or systematic violations such as those resulting from apartheid, all forms of racial discrimination, colonialism, foreign domination or occupation, aggression or threats to national sovereignty, national unity or territorial integrity and from the refusal to recognize the right of peoples to self-determination and the right of every people to exercise full sovereignty over its wealth and natural resources,

*Recognizing* the relationship between international peace and security and the enjoyment of human rights and fundamental freedoms, and mindful that the absence of international peace and security does not excuse non-compliance,

*Reiterating* that all human rights and fundamental freedoms are universal, indivisible, interdependent and interrelated and should be promoted and implemented in a fair and equitable manner, without prejudice to the implementation of each of those rights and freedoms,

*Stressing* that the prime responsibility and duty to promote and protect human rights and fundamental freedoms lie with the State,

*Recognizing* the right and the responsibility of individuals, groups and associations to promote respect for and foster knowledge of human rights and fundamental freedoms at the national and international levels,

*Declares:*

*Article 1*

Everyone has the right, individually and in association with others, to promote and to strive for the protection and realization of human rights and fundamental freedoms at the national and international levels.

*Article 2*

1. Each State has a prime responsibility and duty to protect, promote and implement all human rights and fundamental freedoms, *inter alia*, by adopting such steps as may be necessary to create all conditions necessary in the social, economic, political and other fields, as well as the legal guarantees required to ensure that all persons under its jurisdiction, individually and in association with others, are able to enjoy all those rights and freedoms in practice.

2. Each State shall adopt such legislative, administrative and other steps as may be necessary to ensure that the rights and freedoms referred to in the present Declaration are effectively guaranteed.

*Article 3*

Domestic law consistent with the Charter of the United Nations and other international obligations of the State in the field of human rights and fundamental freedoms is the juridical framework within which human rights and fundamental freedoms should be implemented and enjoyed and within which all activities referred to in the present Declaration for the promotion, protection and effective realization of those rights and freedoms should be conducted.

*Article 4*

Nothing in the present Declaration shall be construed as impairing or contradicting the purposes and principles of the Charter of the United Nations or as restricting or derogating from the provisions of the Universal Declaration of Human Rights, the International Covenants on Human Rights and other international instruments and commitments applicable in this field.

*Article 5*

For the purpose of promoting and protecting human rights and fundamental freedoms, everyone has the right, individually and in association with others, at the national and international levels:

   (*a*) To meet or assemble peacefully;

   (*b*) To form, join and participate in non-governmental organizations, associations or groups;

   (*c*) To communicate with non-governmental or intergovernmental organizations.

*Article 6*

Everyone has the right, individually and in association with others:

   (*a*) To know, seek, obtain, receive and hold information about all human rights and fundamental freedoms, including having access to information as to how those rights and freedoms are given effect in domestic legislative, judicial or administrative systems;

   (*b*) As provided for in human rights and other applicable international instruments, freely to publish, impart or disseminate to others views, information and knowledge on all human rights and fundamental freedoms;

   (*c*) To study, discuss, form and hold opinions on the observance, both in law and in practice, of all human rights and fundamental freedoms and, through these and other appropriate means, to draw public attention to those matters.

*Article 7*

49

Everyone has the right, individually and in association with others, to develop and discuss new human rights ideas and principles and to advocate their acceptance.

*Article 8*

1. Everyone has the right, individually and in association with others, to have effective access, on a non-discriminatory basis, to participation in the government of his or her country and in the conduct of public affairs.

2. This includes, *inter alia*, the right, individually and in association with others, to submit to governmental bodies and agencies and organizations concerned with public affairs criticism and proposals for improving their functioning and to draw attention to any aspect of their work that may hinder or impede the promotion, protection and realization of human rights and fundamental freedoms.

*Article 9*

1. In the exercise of human rights and fundamental freedoms, including the promotion and protection of human rights as referred to in the present Declaration, **everyone has the right, individually and in association with others, <u>to benefit from an effective remedy and to be protected in the event of the violation of those rights.</u>**

2. To this end, everyone whose rights or freedoms are allegedly violated has the right, either in person or through legally authorized representation, to complain to and have that complaint promptly reviewed in a public hearing before an independent, impartial and competent judicial or other authority established by law and to obtain from such an authority a decision, in accordance with law, providing redress, including any compensation due, where there has been a violation of that person's rights or freedoms, as well as enforcement of the eventual decision and award, all without undue delay.

3. To the same end, everyone has the right, individually and in association with others, *inter alia*:

> (*a*) To complain about the policies and actions of individual officials and governmental bodies with regard to violations of human rights and fundamental freedoms, by petition or other appropriate means, to competent domestic judicial, administrative or legislative authorities or any other competent authority provided for by the legal system of the State, which should render their decision on the complaint without undue delay;

> (*b*) To attend public hearings, proceedings and trials so as to form an opinion on their compliance with national law and applicable international obligations and commitments;

> (*c*) To offer and provide professionally qualified legal assistance or other relevant advice and assistance in defending human rights and fundamental freedoms.

4. To the same end, and in accordance with applicable international instruments and procedures, everyone has the right, individually and in association with others, to unhindered access to and communication with international bodies with general or special competence to receive and consider communications on matters of human rights and fundamental freedoms.

5. The State shall conduct a prompt and impartial investigation or ensure that an inquiry takes place whenever there is reasonable ground to believe that a violation of human rights and fundamental freedoms has occurred in any territory under its jurisdiction.

*Article 10*

No one shall participate, by act or by failure to act where required, in violating human rights and fundamental freedoms and no one shall be subjected to punishment or adverse action of any kind for refusing to do so.

*Article 11*

Everyone has the right, individually and in association with others, to the lawful exercise of his or her occupation or profession. Everyone who, as a result of his or her profession, can affect the human dignity, human rights and fundamental freedoms of others should respect those rights and freedoms and comply with relevant national and international standards of occupational and professional conduct or ethics.

*Article 12*

1. Everyone has the right, individually and in association with others, to participate in peaceful activities against violations of human rights and fundamental freedoms.

2. The State shall take all necessary measures to ensure the protection by the competent authorities of everyone, individually and in association with others, against any violence, threats, retaliation, de facto or *de jure* adverse discrimination, pressure or any other arbitrary action as a consequence of his or her legitimate exercise of the rights referred to in the present Declaration.

3. In this connection, everyone is entitled, individually and in association with others, to be protected effectively under national law in reacting against or opposing, through peaceful means, activities and acts, including those by omission, attributable to States that result in violations of human rights and fundamental freedoms, as well as acts of violence perpetrated by groups or individuals that affect the enjoyment of human rights and fundamental freedoms.

*Article 13*

Everyone has the right, individually and in association with others, to solicit, receive and utilize resources for the express purpose of promoting and protecting human rights and fundamental freedoms through peaceful means, in accordance with article 3 of the present Declaration.

*Article 14*

1. The State has the responsibility to take legislative, judicial, administrative or other appropriate measures to promote the understanding by all persons under its jurisdiction of their civil, political, economic, social and cultural rights.

2. Such measures shall include, *inter alia*:

> (*a*) The publication and widespread availability of national laws and regulations and of applicable basic international human rights instruments;

> (*b*) Full and equal access to international documents in the field of human rights, including the periodic reports by the State to the bodies established by the international human rights treaties to which it is a party, as well as the summary records of discussions and the official reports of these bodies.

3. The State shall ensure and support, where appropriate, the creation and development of further independent national institutions for the promotion and protection of human rights and fundamental freedoms in all territory under its jurisdiction, whether they be ombudsmen, human rights commissions or any other form of national institution.

*Article 15*

The State has the responsibility to promote and facilitate the teaching of human rights and fundamental freedoms at all levels of education and to ensure that all those responsible for training lawyers, law

enforcement officers, the personnel of the armed forces and public officials include appropriate elements of human rights teaching in their training programme.

### Article 16

Individuals, non-governmental organizations and relevant institutions have an important role to play in contributing to making the public more aware of questions relating to all human rights and fundamental freedoms through activities such as education, training and research in these areas to strengthen further, *inter alia*, understanding, tolerance, peace and friendly relations among nations and among all racial and religious groups, bearing in mind the various backgrounds of the societies and communities in which they carry out their activities.

### Article 17

In the exercise of the rights and freedoms referred to in the present Declaration, everyone, acting individually and in association with others, shall be subject only to such limitations as are in accordance with applicable international obligations and are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society.

### Article 18

1. Everyone has duties towards and within the community, in which alone the free and full development of his or her personality is possible.

2. Individuals, groups, institutions and non-governmental organizations have an important role to play and a responsibility in safeguarding democracy, promoting human rights and fundamental freedoms and contributing to the promotion and advancement of democratic societies, institutions and processes.

3. Individuals, groups, institutions and non-governmental organizations also have an important role and a responsibility in contributing, as appropriate, to the promotion of the right of everyone to a social and international order in which the rights and freedoms set forth in the Universal Declaration of Human Rights and other human rights instruments can be fully realized.

### Article 19

Nothing in the present Declaration shall be interpreted as implying for any individual, group or organ of society or any State the right to engage in any activity or to perform any act aimed at the destruction of the rights and freedoms referred to in the present Declaration.

### Article 20

Nothing in the present Declaration shall be interpreted as permitting States to support and promote activities of individuals, groups of individuals, institutions or non-governmental organizations contrary to the provisions of the Charter of the United Nations.



United Nations    Nations Unies

HEADQUARTERS · SIEGE    NEW YORK, NY 10017

*ACCURATE REPLICA WITH EMPHASIS MINE*

5 April 2007

Excellency,

## [E. U.N. Letter Re:] Summons and Complaint in the United States District Court for the Eastern District of Arkansas, Northern Division -- Don Hamrick, pro se v. United Nations, et al, Case No.  1:06-cv-0044

We write to inform you that on 27 March 2007, the United Nations Secretariat in New York received the above-referenced Summons in connection with the Complaint instituted by Mr. Don Hamrick, a United States citizen, against the United Nations, among others, in the United States District Court for the Eastern District of Arkansas, Northern Division (Case No. 1:06-cv-0044). The United Nations has been directed to answer the Complaint, within 60 days after service of the Summons. Mr. Hamrick has made numerous claims alleging that the United Nations' Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in all its Aspects adopted by the United Nations Conference convened by the General Assembly in July 2001 (hereinafter referred to as the "Programme of Action") has violated his rights under the Second Amendment of the Constitution of the United States of America and other legal instruments.

With the present letter, we hereby return the original Summons and the Complaint an respectfully request the competent United States authorities to take appropriate action to ensure full respect for the privileges and immunities of the United Nations in accordance with the obligations of the United States both under international and United States law.

As you are aware, the United Nations is an international inter-governmental organization established pursuant to Charter of the United Nations (hereinafter referred to as "the UN Charter"), a multilateral treaty signed on 26 June 1945. the UN Charter was ratified by the Government of the United States of America on 8 August 1945 and came into force in the United States on 28 October 1945. See UN Charter, 59 Stat. 1031 (1945), reprinted in 1945 U.S. Code Cong. & Admin. News, 961 et seq.

His Excellency
Mr. Alejandro D. Wolff
Acting Permanent Representative of the United States
    to the United Nations
New York

United Nations  Nations Unies

"As an international organization, the United Nations **has been accorded certain privileges and immunities which are necessary for the fulfillment of the purposes of the Organization**. Pursuant to Article 105, paragraph 1 of the UN Charter, "**[t]he Organization shall enjoy in the territory of each of its Members such privileges and immunities that are necessary for the fulfillment of its purposes.**" Article 105, paragraph 3 stipulates that "**[t]he General Assembly may make recommendations with a view to determining the details of the application of paragraph 1 . . . of this Article or may propose conventions to the Members of the United Nations for this purpose.**" UN Charter, Art. 105, 1945 U.S. Code Cong. & Admin News, at 985.

In order to give effect to Article 105 of the UN Charter, the General Assembly of the United Nations adopted the Convention on the Privileges and Immunities of the United Nations (hereinafter referred to as "the General Convention") on 13 February1946. 1 U.N.T.S. 15 (1946), General Convention on 29 April 1970. 21 U.S.T. at 1418; [1970] TIAS No. 6900.

Article II, Section 2 of the General Convention provides that "[t]he United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process **except insofar as in any particular case it has expressly waived its immunity**. It is, however, understood that no waiver of immunity shall extend to any measure of execution."

The United Nation enjoys the same privileges and immunities under the United States International Organizations Immunities Act ("IOIA"). Pub.L.No.291, 79th Cong., 1st Sess., 29 December 1945 (codified 22 U.S.C 288 et seq.).

In view of the above, we wish to advise that the United Nations expressly maintains its privileges and immunities in respect of the above-mentioned Summons and Complaint in the United States District Court for the Eastern District of Arkansas, Northern Division. Therefore, we wish to respectfully request the competent authorities of the United States to take the appropriate steps with a view to ensuring that the privileges and immunities of the United Nations are maintained in respect of this legal action.

Please accept, Excellency, the assurances of my highest consideration.

Nicolas Michel

Under-Secretary-General for Legal Affairs

The Legal Counsel

---
*ACCURATE REPLICA WITH EMPHASIS MINE*
---

54

# F. PLAINTIFF'S REBUTTAL TO U.N. LETTER

Nicholas Michel, Legal Counsel for the United Nations claims that the United Nations has been accorded certain *privileges and immunities* which are necessary for the fulfillment of the purposes of the Organization. He further claims that Pursuant to Article 105, paragraph 1 of the UN Charter, "*[t]he Organization shall enjoy in the territory of each of its Members such privileges and immunities that are necessary for the fulfillment of its purposes.*" Article 105, paragraph 3 stipulates that "*[t]he General Assembly may make recommendations with a view to determining the details of the application of paragraph 1 . . . of this Article or may propose conventions to the Members of the United Nations for this purpose.*" UN Charter, Art. 105, 1945 U.S. Code Cong. & Admin News, at 985.

Nicholas Michel's claim of *privileges and immunities* does *NOT* give the United Nations the right to intervene in matters which are essentially within the domestic jurisdiction of the United States nor does the United Nations have the right to require the United States to submit to the *PROGRAMME OF ACTION TO PREVENT, COMBAT AND ERADICATE THE ILLICIT TRADE IN SMALL ARMS AND LIGHT WEAPONS IN ALL ITS ASPECTS* to settlement under the present Charter because the *PROGRAMME OF ACTION* violates human rights under the *GENOCIDE CONVENTION*. The United Nations does not have the right nor the moral authority to enforce the *PROGRAMME OF ACTION* upon the United States by directly or indirectly conjuring up an international consensus creating a false customary international law destructive to the Second Amendment.

Citing Article 2, Section 7 of the United Nations Charter, it states: "*Nothing contained in the present Charter shall authorize the United Nations to intervene in matters which are essentially within the domestic jurisdiction of any state or shall require the Members to submit such matters to settlement under the present Charter; but this principle shall not prejudice the application of enforcement measures under Chapter VII.*"

The *PROGRAMME OF ACTION* is not only a direct violation of the non-intervention clause of Article 2, Section 7 of the UN Charter but it directly threatens our national security and the security of a free state as guaranteed to the People of the United States under the Second Amendment right to keep and bear arms as the intent and purpose of the Common Defence clause of the Preamble to the U.S. Constitution. If there is any doubt as to this claim I direct the Court's attention to the Conclusions and Recommendations of Barbara Frey, Special Rapporteur, Final report on *SPECIFIC HUMAN RIGHTS ISSUES: PREVENTION OF HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS AND LIGHT WEAPONS; ITEM 6 OF THE PROVISIONAL AGENDA*, Fifty-eighth session of the United Nations' Human Rights Council's *Sub-Commission on the Promotion and Protection of Human Rights*, in accordance with Sub-Commission resolution 2002/25, dated July 27, 2006, (A/HRC/Sub.1/58/27).

## II. THE PRINCIPLE OF SELF-DEFENCE WITH REGARD TO HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS AND LIGHT WEAPONS

19. This report discusses and recognizes the principle of self-defence in human rights law and assesses its proper place in the establishment of human rights principles governing small arms and light weapons.[43] Those opposing the State regulation of civilian possession of firearms claim that the principle of self-defence provides legal support for a "right" to possess small arms thus negating or substantially minimizing the duty of States to regulate possession.[44] The present report concludes that the principle of self-defence has an important place in international human rights law, but that it does not provide an independent, legal supervening right to small arms possession, nor does it ameliorate the duty of States to use due diligence in regulating civilian possession.

### A. Self-defence as an exemption to criminal responsibility, not a human right

20. Self-defence is a widely recognized, yet legally proscribed, exception to the universal duty to respect the right to life of others. Self-defence is a basis for exemption from criminal responsibility that can be raised by any State agent or non-State actor. Self-defence is sometimes designated as a "right". There is inadequate legal support for such an interpretation. Self-defence is more properly characterized as a means of protecting the right to life and, as such, a basis for avoiding responsibility for violating the rights of another.

21. No international human right of self-defence is expressly set forth in the primary sources of international law: treaties, customary law, or general principles. While the right to life is recognized in virtually every major international human rights treaty, the principle of self-defence is expressly recognized in only one, the Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention on Human Rights), article 2.[45] Self-defence, however, is not recognized as a right in the

---

[43] Because of the severe limits on space and the breadth of issues that need to be covered in this study, the author does not attempt here to undertake a full legal discussion of the principle of self-defence in international law. For an authoritative discussion of this complex topic, see Antonio Cassese, International Criminal Law (2003). In addition, the legal concepts discussed herein assume a non-conflict setting. Situations of mass human rights abuse and armed conflict involve international humanitarian law and security law principles that require an extended if not completely separate set of legal and policy considerations. For the Special Rapporteur's findings and recommendations regarding role of small arms and light weapons in violations of human rights and international humanitarian law in armed conflict, see her progress report (E/CN.4/Sub.2/2004/37).

[44] David Kopel, Paul Gallant, and Joanne Eisen, "Is Resisting Genocide a Human Right?" Notre Dame Law Review, vol. 81, No. 4 (2006), p. 1 ("… The Universal Declaration of Human Rights affirms the existence of a universal, individual right of self-defense, and also a right to revolution against tyranny … Taken in conjunction with Anglo-American human rights law, the human rights instruments can be read to reflect a customary or general international law recognizing a right of armed resistance by genocide victims".).

[45] Convention for the Protection of Human Rights and Fundamental Freedoms, 213 United Nations Treaty Series 222, entered into force on 3 September 1953, as amended by Protocols Nos. 3, 5, 8 and 11, which entered into force on 21 September 1970, 20 December 1971, 1 January 1990 and 1 November 1998, respectively. Article 2 states:

> (1) Everyone's right to life shall be protected by law. No one shall be deprived of his life intentionally save in the execution of a sentence of a court following his conviction of a crime for which this penalty is provided by law.

> (2) Deprivation of life shall not be regarded as inflicted in contravention of this article when it results from the use of force which is no more than absolutely necessary:

> (a) In defence of any person from unlawful violence;

European Convention on Human Rights. According to one commentator, "The function of this provision is simply to remove from the scope of application of article 2 (1) killings necessary to defend against unlawful violence. It does not provide a right that must be secured by the State".[46]

22. Self-defence is broadly recognized in customary international law as a defence to criminal responsibility as shown by State practice. There is not evidence however that States have enacted self-defence as a freestanding right under their domestic laws, nor is there evidence of opinio juris that would compel States to recognize an independent, supervening right to self-defence that they must enforce in the context of their domestic jurisdictions as a supervening right.

23. Similarly, international criminal law sets forth self-defence as a basis for avoiding criminal responsibility, not as an independent right. The International Criminal Tribunal for the Former Yugoslavia noted the universal elements of the principle of self-defence.[47] The International Criminal Tribunal for the Former Yugoslavia noted "that the 'principle of self-defence' enshrined in article 31, paragraph 1, of the Rome Statute of the International Criminal Court 'reflects provisions found in most national criminal codes and may be regarded as constituting a rule of customary international law'".[48] As the chapeau of article 31 makes clear, self-defence is identified as one of the "grounds for excluding criminal responsibility". The legal defence defined in article 31, paragraph (d) is for:

> conduct which is alleged to constitute a crime within the jurisdiction of the Court has been caused by duress resulting from a threat of imminent death or of continuing or imminent serious bodily harm against that person or another person, and the person acts necessarily and reasonably to avoid this threat, provided that the person does not intend to cause a greater harm than the one sought to be avoided.[49]

Thus, international criminal law designates self-defence as a rule to be followed to determine criminal liability, and not as an independent right which States are required to enforce.

24. There is support in the jurisprudence of international human rights bodies for requiring States to recognize and evaluate a plea of self-defence as part of the due process

---

(b) In order to effect a lawful arrest or to prevent the escape of a person lawfully detained;

(c) In action lawfully taken for the purpose of quelling a riot or insurrection.

[46] John Cerone, "A human right of self-defence?", George Mason Journal of Law, Economics, & Policy (accepted for 2006 publication).

[47] Antonio Cassese, International Criminal Law (New York, Oxford University Press, 2003), p. 223, No. 2 (2003) (citing Prosecutor v. Kordić and Čerkez, International Criminal Tribunal for the Former Yugoslavia (Trial Chamber) (26 February 2001) at section 451). "In Kordić and Čerkez a Trial Chamber of the International Criminal Tribunal for the Former Yugoslavia held that self-defence as a ground for excluding criminal responsibility is one of the defences that 'form part of the general principles of criminal law which the International Tribunal must take into account in deciding the cases before it'." Idem at p. 223 (citing Prosecutor v. Kordić and Čerkez, International Criminal Tribunal for the Former Yugoslavia (Trial Chamber) (26 February 2001) at section 449).

[48] Ibid., p. 223, No. 2 (2003) (quoting Prosecutor v. Kordić and Čerkez, International Criminal Tribunal for the Former Yugoslavia (Trial Chamber) (26 February 2001) at section 451).

[49] Rome Statute of the International Criminal Court (A/CONF.183/9), adopted 17 July 1998, as corrected by the procés-verbaux of 10 November 1998, 12 July 1999, and 8 May 2000.

rights of criminal defendants. Some members of the Human Rights Committee have even argued that article 6, paragraph 2, of the International Covenant on Civil and Political Rights requires national courts to consider the personal circumstances of a defendant when sentencing a person to death, including possible claims of self-defence, based on the States Parties' duty to protect the right to life.[50] Under common law jurisdictions, courts must take into account factual and personal circumstances in sentencing to the death penalty in homicide cases. Similarly, in civil law jurisdictions: "Various aggravating or extenuating circumstances such as self-defence, necessity, distress and mental capacity of the accused need to be considered in reaching criminal conviction/sentence in each case of homicide."[51]

25. Again, the Committee's interpretation supports the requirement that States recognize self-defence in a criminal law context. Under this interpretation of international human rights law, the State could be required to exonerate a defendant for using firearms under extreme circumstances where it may be necessary and proportional to an imminent threat to life. Even so, none of these authorities enumerate an affirmative international legal obligation upon the State that would require the State to allow a defendant access to a gun.

## III. CONCLUSIONS AND RECOMMENDATIONS
### (of the Final Report)

40. To meet their obligations under international human rights law, **States must enact and enforce laws and policies to maximize protection of human rights for the most people**. States must consider the **community as a whole and not just the single individual** [52] in carrying out their obligation to minimize violence by promoting law enforcement and suppressing private violence. International human rights law mandates States "to respect and to ensure" human rights to all individuals subject to their jurisdiction. Under this mandate, States have positive obligations to protect individuals from violations by State and non-State actors.

41. States must take effective measures to **reduce the need for people to arm themselves**[53] by ensuring an atmosphere of public safety supported by law enforcement that is committed and trained to protect the rule of law and to prevent illegal acts.

42. States must also take effective measures to minimize violence carried out by armed private actors. States are required to enforce criminal sanctions against persons who use arms to violate the law. States are further required, under the principle of due diligence, to prevent small arms from getting into the hands of those who are likely to misuse them. Under the due diligence standard, international human rights bodies should require States

---

[50] See communication No. 806/1998 of the Human Rights Committee, Thompson v. Saint Vincent and the Grenadines (CCPR/C/70/D/806/1998) of 5 December 2000. In his dissent, Lord Colville said self-defence was an avenue for the defence to counter accusations of homicide which must result in acquittal of any crime, "unless the prosecution can satisfy the tribunal of facts that the defendant's actions, which led to the death, exceed a proportional response, in his own perception of the circumstances, to the threat with which he was faced" (para. 5).

[51] Human Rights Committee, communication No. 1077/2002, Jaime Carpo et al. v. Philippines (CCPR/C/77/D/1077/2002) of 15 May 2003 dissenting opinion of Mr. Nisuke Ando.

[52] Emphasis mine. The community over the individual is the doctrine of Socialism.

[53] A pipe dream of Socialism.

to **enforce a minimum licensing standard designed to prevent small arms from being used by private actors to violate human rights.**[54]

43. Other effective measures consistent with due diligence include the **prohibition of civilian possession of weapons designed for military use;**[55] the sponsoring of effective **amnesty programmes to decrease the number of weapons in active use;**[56] requirement of marking and tracing information by manufacturers; and incorporation of a gender perspective in policies regarding small arms. States have an affirmative duty under international human rights law to protect groups that are most vulnerable to small arms misuse, **including victims of domestic violence.**[57]

44. The **principle of self-defence, as an internationally recognized exemption from criminal responsibility,**[58] is not inconsistent with the **due diligence**[59] responsibilities of States to regulate civilian possession of small arms. **There is no independent or supervening right in international human rights law of self-defence that would require States to provide civilians with access to small arms;**[60] nor does the principle of self-defence diminish the State's responsibility to use due diligence to keep weapons out of the hands of those most likely to misuse them. Rather, States should exercise their due diligence responsibilities in the context of self-defence law, including the likelihood that those possessing firearms will act only out of necessity and with proportionality.

45. Article 51 of the Charter of the United Nations applies to States acting in self-defence in response to armed attacks against their State sovereignty. **It does not apply to situations of self-defence for individual persons.**[61]

---

[54] Violates constitutional rights, the Second Amendment and Fifth Amendment. Licensing destroys rights.

[55] Violates the checks and balance system of our constitutional government. Violates the Genocide Convention.

[56] Presupposes our Second Amendment as a crime against human rights. Effectively sets the stages to disarm the American people in violation of the Genocide Convention.

[57] Another pipe dream of Socialism. Jessica Gonzales v. United States, Inter-American Commission on Human Rights (IACHR), Petition No. P-1490-05 is case in point that opens the door to the Second Amendment as a means of safe guarding human rights by armed self-defense, such as my case at IACHR, Petition No. 1142-06.

[58] Treats the Second Amendment to the U.S. Constitution as a crime were the act of armed self-defence is an exception to criminal law, not the constitutional right. Again, the Socialism Doctrine at play.

[59] Due diligence means a Programme of Action to install Socialism wherever possible.

[60] "That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural and safe defense of a free state..." These are the words of the Virginia Bill of Rights in July 1776. "

The first State of Virginia Militia Act of 1777 states, "If any soldier be certified to the court martial to be so poor that he cannot purchase such arms, the said court shall cause them to be procured at the expense of the publick, to be reimbursed out of the fines on the delinquents of the county, which arms shall be delivered to such poor person to be used at musters, but shall continue the property of the county; and if any soldier shall sell or conceal such arms, the seller or concealer, and purchaser, shall each of them forfeit the sum of six pounds. And on the death of such poor soldier, or his removal out of the county, such arms shall be delivered to his captain, who shall make report thereof to the next court martial, and deliver the same to such other poor soldier as they shall order."

[61] 1941 WWII: Advising Japan's military leaders of the futility of an invasion of the mainland United States because of the widespread availability of guns. Admiral Yamamoto: "You cannot invade mainland United States. There would be a rifle behind each blade of grass." It has been theorized that this was a major contributing factor in Japan's decision not to land on North America early in the war when they had vastly superior military strength. This delay gave our industrial infrastructure time to gear up for the conflict and was decisive in our later victory.

46. The Sub-Commission on the Promotion and Protection of Human Rights should act to clarify the positive responsibilities of States to prevent human rights violations committed with small arms. To this end, the Special Rapporteur with the task of preparing a comprehensive study on the prevention of human rights violations committed with small arms and light weapons would welcome the endorsement by the Sub-Commission of the draft principles on the prevention of human rights violations committed with small arms (E/CN.4/Sub.2/2005/35) as an important contribution to the ongoing delineation of measures regarding small arms and light weapons to be carried out by States in order to give effect to international human rights in communities around the world.[62]

---

[62] This Final Report threatens the national security of the United States.

## G. UNITED NATIONS' WAR OF AGGRESSION AGAINST THE INDIVIDUAL'S HUMAN RIGHT OF SELF-DEFENSE IS A BREACH OF TREATY (THE U.N. CHARTER, ARTICLE 2, CLAUSE 7) UNDER THE *VIENNA CONVENTION ON THE LAW OF TREATIES OF 1969* AND THE *VIENNA CONVENTION ON THE LAW OF TREATIES BETWEEN STATES AND INTERNATIONAL ORGANIZATIONS OR BETWEEN INTERNATIONAL ORGANIZATIONS OF 1986.*

The human right of armed self defense is not explicitly covered in either of the Vienna Conventions above, hereinafter referred to as Vienna '69 and Vienna '86. Both Vienna Conventions affirm that the rules of *customary international law* will continue to govern questions not regulated by the provisions of the those two Vienna Conventions, The United Nations' *PROGRAMME OF ACTION TO PREVENT, COMBAT AND ERADICATE THE ILLICIT TRADE IN SMALL ARMS AND LIGHT WEAPONS* has the potential to become a *customary international norm* that may very will forcibly obligate the United States into repealing the Second Amendment.

### 1. DAVE B. KOPEL, *MEDELLIN AND THE SECOND AMENDMENT*

Posted on Eugene Volokh's blog, *The Volokh Conspiracy*
October 10, 2007
(The same day as the U.S. Supreme Court heard oral arguments on *Medellin*)
http://volokh.com/posts/1192051881.shtml
http://www.supremecourtus.gov/docket/06-984.htm

The Supreme Court's oral argument today in *Medellin v. Texas* has interesting implications for Second Amendment rights. The rationale promoted by the Bush administration, and which apparently has support from at least some of the Supreme Court, offers a roadmap for how a future U.S. President could evade Congress to impose highly restrictive gun controls.

The Bush position is that when the Senate has adopted a non-self-enforcing treaty, the treaty becomes self-enforcing if: 1. The World Court issues a ruling under the treaty in a case in which the United States accepts jurisdiction, and 2. The President then, exercising his foreign policy discretion, decides that the World Court order must be implemented. The position of Medellin's lawyers is even broader, that a World Court ruling is sufficient in itself.

Now let's see how this could work in a gun control hypothetical:

1. President Hillary Rodham Clinton strongly believes in gun control. (Consider that as Senator, she, unlike Senator Obama, actually voted against an appropriations rider to prevent federal funds from being used to fund gun confiscation during/after a natural disaster or similar emergency, even when the confiscation had no legal basis, or was formally prohibited by state law.)

2. She can't get 60 votes in the Senate to pass her domestic anti-gun proposals, much less the 2/3 support necessary for ratification of the new UN international gun control treaty. (Without U.S. Ambassadors to the U.N. like John Bolton, a new U.N. gun control treaty is a certainty within

a few years. Indeed, it is doubtful that any U.S. delegation can block the forthcoming Arms Trade Treaty.)

3. The United States has ratified the International Covenant on Civil and Political Rights, along with a reservation stating that the Covenant is not self-executing.

4. United Nations Special Rapporteur Barbara Frey (a University of Minnesota law professor) has written a report for the United Nations Human Rights Council. The report has been adopted by the Human Rights Council's subcommission on the Promotion and Protection of Human Rights, which claims that the Report accurately describes existing mandatory international law.

5. Under the report's standards, U.S. gun control laws are in massive violation of the international law obligation (contained, inter alia, in the International Covenant) not to violate "the right to life." For example, most states do not require a periodically-renewed license for the possession of handguns, and hardly any do so for long guns. All states allow ordinary citizens, and the police, to use deadly force against certain felonies (e.g., rape, arson, armed robbery, serious assaults), even when the person using deadly force does not believe that deadly force is necessary to save a life. Even New York City's gun laws are deficient, for they allow licensed owners of rifles and shotguns to use their guns for any lawful purpose (e.g., target shooting, hunting, collecting, self-defense in the home) rather than only for a specified purpose. (For details, see pages 12-14 of my forthcoming article in the *BYU Journal of Public Law*, *"THE HUMAN RIGHT OF SELF-DEFENSE."*) [*See next item below!*]

6. In collusion with the Clinton administration, a foreign government brings suit in before the World Court. The suit might be premised on the dangers to the foreign government's nationals when they visit or work in the United States. The Clinton administration accepts the World Court's jurisdiction.

7. The World Court issues a ruling consistent with the standards of the UN Human Rights Council.

8. President Clinton, exercising her foreign policy discretion, declares that all state governments must implement the ruling, by enacting gun licensing systems, and sharply restricting the use of guns for self-defense.

9. We are now at the same point as *Medellin v. Texas*, with one or more state governments claiming that the President cannot force them to obey a World Court ruling about a non-self-implementing treaty.

10. Based on the October 10 oral argument, it appears that there are currently some Justices on the court who think that the President *can*. By President Clinton's second term, there might be a majority of Justices, in a Court whose membership was appointed almost entirely by one Clinton or another, who might agree.

11. What if some states refused to obey a direct order from the Supreme Court? Well, there are lots of ways to pressure the states, including withholding their appropriated federal funding for state and local criminal justice agencies. Would a Supreme Court that upheld President Clinton on the substantive issue be likely to declare it illegal for President Clinton to temporarily suspend the payment of money to states which are attempting to nullify a Supreme Court ruling?

12. There is an even simpler approach. Every firearms retailer holds a Federal Firearms License, and is subject to the regulatory control of the Bureau of Alcohol, Tobacco, Firearms and Explosives. No FFL may sell a gun to a customer without complying with the National Instant Check System, which is administered by the Department of Justice and FBI. President Clinton simply issues an order that no FFL may sell a gun, and NICS may not approve any transfers in any state which has not brought its laws into conformity with the World/Supreme Court rulings. Alternatively, President Clinton just orders administrative changes, so that the federal Form 4473 (which must be filled out by all retail gun buyers) states that it must be renewed every five years. A new line on the 4473 requires the buyer to make a multiple choice selection for one (and only one) purpose for which the gun will be used. Further, BATFE issues regulations under the federal Gun Control Act declaring that internationally-illegal uses of guns (e.g., against a rapist) constitute use of a gun "in a crime of violence", which is a federal crime under the Gun Control Act. President Clinton directs the US Attorneys to prosecute accordingly.

The federal statutes creating BATFE, requiring FFLs, and setting up NICS do not give the President any authority to issue such orders. But President Clinton could argue that she may issue such orders, based on her Article II foreign policy powers, in order to comply with the World and Supreme Court decisions. Moreover, the Senate ratification of the International Covenant implicitly gave her such powers, pursuant to the Supremacy Clause, to implement mandatory U.S. obligations arising from the Covenant.

Would U.S. courts, and, eventually, the Supreme Court, uphold President Clinton's actions regarding FFLs and NICS? It would be unrealistic to be confident that courts would not.

Of course my suggestions about how a U.S. President might proceed after point 10 are just guesses. What is clear, is that with the right President having the opportunity to make a few Supreme Court appointments, getting to point 10 would be quite easy. After that, U.S. history shows that when a determined U.S. President wants to make recalcitrant states obey a U.S. Supreme Court ruling, the President eventually wins, one way or another.

---

## 2. David B. Kopel, Paul Gallant & Joanne D. Eisen, *THE HUMAN RIGHT OF SELF-DEFENSE* BYU Journal of Pulbic Law, (Forthcoming 2007)

### Introduction

Is there a human right to defend oneself against a violent attacker? Is there an individual right to arms under international law? Conversely, are governments which do not enact strict gun controls guilty of human rights violations?

The United Nations and some non-governmental organizations have declared that there is no human right to self-defense or to the possession of defensive arms. The UN and the allied NGOs allies further declare that insufficiently restrictive firearms laws are themselves a human rights violation, so all governments must sharply restrict citizen firearms possession.[63]

This Article investigates the legal status of self-defense by examining a broad variety of sources of international law. Based on those sources, the Article suggests that personal self-defense is a well-established human right under international law, and is an important foundation of international law itself.

Since the 1990s, the United Nations has been focusing increasing attention on international firearms control. UN-backed programs have promoted and funded the surrender and confiscation of citizen firearms in nations all over the world.[64] The United Nations helped subsidize the proponents of an October 2005 national gun confiscation referendum in Brazil.[65] A subcommission of the United Nations Human Rights Council (HRC) has declared that there is no human right to personal self-defense, and that extremely strict gun control (much stricter than the current laws in Washington, D.C., and New York City) is human right which all governments are required to enforce immediately. [66] The full Human Rights Council is expected take up the issue soon, and issue similar orders.[67] The declaration implements a report for the HRC prepared by Special Rapporteur Barbara Frey.[68]

Part I of this Article sets forth the basic claims about human rights and firearms made by the United Nations and by international gun prohibition activists. Part II details the report on gun control,

---

[63] *See* Human Rights Council, Subcommission on the Promotion and Protection of Human Rights, 58th sess., agenda item 8, *Adoption of the Report on the Fiftyeighth Session to the Human Rights Council*, A/HRC/Sub.1/58/L.11/Add.1 (Aug. 24, 2006).

[64] *See, e.g.*, David B. Kopel, Paul Gallant & Joanne D. Eisen, *Microdisarmament: The Consequences for Public Safety and Human Rights*, 73 UMKC L. REV. 969 (2005)(describing efforts to confiscate guns from citizens in Cambodia, Albania, Mali, and other nations).

[65] The referendum was defeated. *See Brazilians Reject Gun Sales Ban*, BBC NEWS, Oct. 24, 2005; *see also infra* text accompanying notes - .

[66] *See* Human Rights Council, Subcommission on the Promotion and Protection of Human Rights, *Adoption of the Report on the Fiftyeighth Session to the Human Rights Council, supra.*

[67] *See infra* text accompanying note .

[68] For Frey's interim reports, *see* Commission on Human Rights, Sub-Commission on the Promotion and Protection of Human Rights, Fifty-fifth session, Item 6 of the provisional agenda, *Prevention of Human Rights Violations Committed with Small Arms and Light Weapons*, Preliminary Report Submitted by Barbara Frey, Special Rapporteur in accordance with Sub-Commission Resolution 2002/25, U.N. Economic and Social Council, E/CN.4/Sub.2/2003/29, June 25, 2003,
        http://www.unhchr.ch/Huridocda/Huridoca.nsf/0/8de4967bdc9b662dc1256d720052bbf1/$FILE/G0314738.pdf
(visited May 29, 2006); Barbara Frey, *Progress Report on the Prevention of Human Rights Violations Committed with Small Arms and Light Weapons*, E/CN.4/Sub.2/2004/37 (2004), June 21, 2004, Sub-Commission on the Promotion and Protection of Human Rights, Fifty-sixth session, Item 6 of the Provisional Agenda, http://www1.umn.edu/humanrts/demo/smallarms2004-2.html (visited May 29, 2006).

self-defense, and human rights prepared by the United Nations Special Rapporteur on firearms and human rights violations.

Part III examines the claims of the UN Report in light of the work of the classical founders of international law, including Hugo Grotius. Part IV examines those same claims in light of the history of major legal systems which have contributed significantly to the creation of international law, including as Roman law, Spanish law, Islamic law, and Anglo-American law. Part V looks at contemporary constitutions, statutes, and treaties.

Part VI addresses the claim that gun control is already an international human right because it is necessarily implicit in the right to life.

Part VII investigates whether a right to self-defense would necessarily imply a right to arms. We conclude that it must imply such a right, although not necessarily a right to possess *firearms* under all circumstances.

## I. The International Gun Prohibition Agenda and Human Rights

Since the end of the Cold War, many peace activists have turned their focus from controlling government-owned arms of mass destruction to prohibiting civilian possession of firearms. Increasingly, firearms prohibition advocates have claimed that firearms prohibition is necessary to protect human rights.[69] The theory posited by the disarmament community is that fewer firearms will lead to fewer human rights abuses.

---

[69] *See, e.g.*:

Scholars:

Derek Miller & Wendy Cukier, *Regulation of Civilian Possession of Small Arms and Light Weapons: Biting the Bullet*, Policy Briefing 16, at 5 ("the proliferation of weapons, and in particular the issue of civilian possession, is regarded as the leading threat to Human Security. Maintaining a focus on the reduction of small arms death and injury in the context of international Human Rights is widely seen as critical."); Wendy Cukier, Antoine Chapdelaine & Cindy Collins, *Globalization and Firearms: A Public Health Perspective*, Fall 2000, at 11, http://dsp-psd.pwgsc.gc.ca/Collection/E2-372-2000E.pdf (visited Sept. 9, 2006) ("The problem of firearms is a concern for a wide range of constituencies...While they focus on different aspects of the problem and solutions appropriate to different contexts, the overarching goal many share is the prevention of firearms injury and death in the context of international humanitarian and human rights."); Carmen Rosa de León-Escribano, *Small Arms and Development in Post Conflict Societies*, IEPADES, July 2006 (citing an IANSA document: "There are clear signs which show that small firearms—as instruments of violence—contribute to human and social destruction, endangering human rights and the rule of law and undermining political stability and economic development.").

Non-Governmental Organizations (NGOs):

Joint Letter on Small Arms, Quaker Council for European Affairs, (undated),
      http://www.quaker.org/qcea/archive/smallarmsletter.htm (visited Sept. 8, 2006)
("...the international NGO community has identified the proliferation and misuse of small arms as a serious humanitarian challenge with implications for development, human rights, peace and global justice."); *UN Arms Control Meet Opens with Call for Global Treaty*, AGENCE FRANCE PRESSE, June 26, 2006 (According to Amnesty International Secretary General Irene Khan, "Arms proliferation has facilitated some of the worst human rights tragedies of our times, including massacres, mass displacement, torture and mistreatment."); Thalif Deen, *Disarmament: Does the World Really Need 14 Billion Bullets a Year?*, INTERPRESS SERVICE, June 15, 2006 ("The bullet trade is out of control," says Oxfam, and "it is fueling conflict and human rights abuses worldwide."); *Small Arms and Human Rights*, Small Arms Working Group,
      http://fas.org/asmp/campaigns/smallarms/sawg/2006factsheets/Small_Arms_and_Human_Rights.pdf
(visited Sept. 8, 2006)("Small arms are used to commit a wide variety of human rights abuses...."); *Shattered Lives: The Case for Tough International Arms Control*, (2003), at 24 ("...the easy availability of arms tends to increase the incidence of armed violence, prolong wars once they break out, and enable grave and widespread abuses of human

rights."); *What is the UN Programme of Action on Small Arms and Light Weapons?* Friends Committee on National Legislation, Aug. 7, 2006,

http://www.fcnl.org/issues/item.php?item_id=1836&issue_id=46

(visited Sept. 8, 2006)("The connection between the growing proliferation of SALW and the usage of these weapons to commit heinous crimes, violate human rights and threaten human security...."); *Curb Trafficking of Small Arms and Light Weapons*, Environmentalists Against War,

http://www.envirosagainstwar.org/know/read.php?itemid=1666

(visited Sept. 8, 2006)("These weapons directly contribute to widespread human rights violations...."); *Small Arms and Human Rights: A Human Rights Watch Briefing Paper for the U.N. Biennial Meeting on Small Arms*, Human Rights Watch, July 7, 2003, http://hrw.org/backgrounder/arms/small-arms-070703.htm (visited Sept. 8, 2006)("Small arms facilitate countless human rights abuses and violations of international humanitarian law around the globe."); SMALL ARMS SURVEY 2004: RIGHTS AT RISK, at 1 ("The widespread proliferation and misuse of small arms threatens the realization of basic human rights and security in various ways."); *2006: Bringing the Global Gun Crisis Under Control* (IANSA), at 8,

http://www.iansa.org/members/IANSA-media-briefing-low-res.pdf

(visited Sept. 8, 2006)("More human rights abuses are committed with small arms than with any other weapon."); *UN: Oral Statement on Small Arms and Light Weapons*, Amnesty International, Aug. 15, 2002,

www.web.amnesty.org/library/Index/ENGIOR400222002?open&of=ENG-325

("A wide variety of cases of serious human rights abuse examined by Amnesty International involve the deliberate or reckless misuse of small arms and light weapons"); *2006 Review Conference at risk of failure, Response from IANSA to the President's Non-paper of 3 July 2006*, July 5, 2006,

http://www.iansa.org/un/review2006/documents/RevConNewsWednesday5july.pdf

(visited Sept. 9, 2006)("Illicit trafficking and proliferation of small arms and light weapons fuels gross violations of international human rights law and serious breaches of international humanitarian law."); *The Arms Trade Treaty: No More Arms for Atrocities*, The Arias Foundation for Peace and Human Progress, at III ("The proliferation and misuse of conventional arms—everything from tanks to grenade launchers to hand pistols—fuels poverty, conflict and human rights violations around our world."); *Targeting the Weapons: Reducing the Human Cost of Unregulated Arms Availability*, International Committee of the Red Cross, June 2005 ("Inadequate controls on arms transfers, combined with the frequent use of weapons in violation of international humanitarian law and human rights, contribute to undermining respect for the law."); World Council of Churches Executive Committee Statement on the Control of Small Arms and Light Weapons, Sept. 16, 2005 ("Their presence [small arms and light weapons] fuels conflict, exacerbates abuses of human rights...."); South Asian Movement Against Small Arms, Issue 1, Aug. 2005 ("[T]he proliferation of small arms and light weapons...also gives rise to abuse of human rights, strengthens the criminals and instills fear among the innocent.").

Media:

*UN World Conference on Small Arms Collapses Without Agreement*, AFRICA NEWS, July 7, 2006 ("The Control Arms Campaign has called on governments to establish such a treaty and to agree global guidelines for small arms sales to stop weapons fuelling human rights abuses and poverty around the world."); *Empty Rhetoric on Gun Control Means Little to Those in Conflict*, THE IRISH NEWS LTD., June 19, 2006 ("...irresponsible arms sales continue to fuel conflicts, undermine development and contribute to countless human rights abuses."); Brian Wood, *A Dirty Trade in Arms*, LE MONDE DIPLOMATIQUE, June 2006, http://mondediplo.com/2006/06/10dirtytrade (visited Sept. 8, 2006)("The proliferation of arms, especially small arms, has had a lasting [negative] impact on human rights.").

UN:

Existing Commitments Related to Human Rights and Humanitarian Law—Select Government Documents on Arms Transfers, *International Documents*, United Nations Security Council Resolution 1467 (March 18, 2003), http://hrw.org/backgrounder/arms/small-arms-annex-070703.pdf (visited Sept. 8, 2006)("The Security Council expresses its profound concern at the impact of the proliferation of small arms and light weapons...These contribute to serious violations of human rights and international humanitarian law, which the Council condemns."); *Disarmament Forum: Taking Action on Small Arms*, United Nations Institute for Disarmament Research, Feb. 2006, at 3 ("...small arms play a huge role in crime, sexual violence, domestic violence, suicide and human rights abuses such as torture.").

The theory is enthusiastically promoted by the world's leading gun control lobby, the International Action Network Against Small Arms (IANSA), an umbrella network to which almost all national and regional gun control groups belong.[70] IANSA favors a prohibition on possession of a firearm for self-defense.[71] IANSA also works towards the confiscation of all non-governmentally-owned firearms, except for single-shot low-power rifles owned by hunters.[72] Amnesty International Oxfam work very closely with IANSA, and the three of them have formed a fourth lobbying group, known as "Control Arms."[73]

IANSA and the United Nations work together in support of their common agenda. IANSA is "the organization officially designated by the U.N. Department of Disarmament Affairs (DDA) to coordinate civil society involvement to the U.N. small arms process."[74] On June 26, 2006, the day the United Nations gun control conference opened, U.N. Secretary-General Kofi Annan welcomed IANSA head Rebecca Peters, and re-iterated the U.N.'s support for her efforts.[75] At the conference, IANSA staff served on the delegations of some nations.

---

Governments:

*Parliamentarians In Nairobi Urge All Parties To Ensure That Food Relief Should Not Be Used For Political Ends*, Inter-Parliamentary Union Press Release, No.9, May 12, 2006, http://www.ipu.org/press-e/nai9.htm (visited Sept. 8, 2006)(...they urged parliaments to combat SALW proliferation and misuse as a key element in national strategies on conflict prevention, peace-building, sustainable development, protection of human rights...."); *Malawi Forms NGO to Control Firearms*, AFRICA NEWS, Apr. 27, 2006 (Acting Inspector General of Malawi Police, Often Thyolani: "The availability and spread of these weapons [small arms] is one of the main factors undermining development and fuelling conflict, crime and human rights abuses.").

[70] IANSA is headquartered in London.

[71] When IANSA head Rebecca Peters debated Wayne LaPierre, the Executive Vice President of the National Rifle Association, at the Oxford Union, LaPierre argued that people should be able to have guns to resist criminals or genocidaires. Peters retorted: "It's not going to be up to each individual person to be like a hero in a movie defending against this threat to freedom."

LaPierre touted a NRA advertising campaign which had asked: "Would you shoot a rapist before he slit your throat?"

Peters replied:

Women need to be protected by police forces, by judiciaries, by criminal justice systems. People who have guns for self-defense are not safer than people who don't....having a gun in that situation escalates the problem.

Rebecca Peters, IANSA, debate with Wayne LaPierre, National Rifle Association, Oxford Union, Oxford University, United Kingdom, Oct. 12, 2004, transcript at http://www.iansa.org/action/nra_debate.htm.

[72] *See, e.g.*, Oxford Union debate, *supra*; *Q&A Early Afternoon* (CNN International television broadcast, Oct. 23, 2002 (Peters: civilians should not have "rifles that they can kill someone at 100 meters distance, for example. There needs to be a much greater degree of proportionality in the firepower that's available.")

[73] *See, e.g.*, *Shattered Lives: The Case for Tough International Arms Control*, joint publication of Oxfam and Amnesty International (2003).

[74] *IANSA's 2004 Review—The Year in Small Arms*,

http://www.iansa.org/documents/2004/iansa_2004_wrap_up_revised.doc.

[75] *Annan receives arms petition by one-millionth signer, vows to transmit call onward*, UN NEWS CENTRE, June 26, 2006, http://www.un.org/apps/news/story.asp?NewsID=18997&Cr=small&Cr1=arms; *see also* Control Arms http://www.controlarms.org/events/unreview.htm.

The 2006 gun control conference was the follow-up to the UN's first major gun control conference, held in 2001.[76] The conferences were intended to produce a treaty, or some other legally binding international instrument. One proposed provision was a ban on the transfer of firearms to "non-state actors", which meant anyone not approved by the national government; examples would include the Kurds in Iraq under the Saddam Hussein regime, rebel groups in Sudan, and the army and navy of Taiwan (which the UN considers to be a province of China). Historically, the "non-state actor" ban would have outlawed aid to anti-Nazi guerillas during World War II, anti-communist rebels during the Cold War, and the American rebels during the War for Independence.[77] Another objective was complete registration of all firearms and all firearms owners, in national and international databases.[78] Because of opposition from the United States and some other countries, neither of the conferences achieved their goal, and no treaty or other binding international legal instrument was produced.[79]

Shortly after the end of the 2006 conference, a subcommittee of the United Nations Human Rights Council declared that strict gun control is *already* mandated by international human rights law.[80] Oxfam and Amnesty International have also stated this position.[81]

## II. The Frey Report for the Human Rights Commission/Council

### A. The Background of the Creation of the Frey Report

On August 14, 2002, the United Nations Human Rights Commission appointed University of Minnesota Law Professor Barbara Frey as Special Rapporteur on the prevention of human rights

---

[76] Preparatory conferences were held in 2003 and 2005. The post-2001 conferences were held under the title of the "the Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All its Aspects."

[77] *See, e.g.* David B. Kopel, Paul Gallant & Joanne D. Eisen, *Firearms Possession by "Non-State Actors": the Question of Sovereignty*, 8 TEX. REV. L. & POLITICS 373 (2004); David B. Kopel, *The UN Small Arms Conference*, 23 SAIS REV. 319 (2003).

[78] *See, e.g.*, David B. Kopel, *Gunning Against Guns*, NAT'L REV. ONLINE, Aug. 1, 2001, http://davekopel.com/NRO/2001/Gunning-Against-Guns.htm.

[79] *See, e.g.*, David B. Kopel, *The UN Small Arms Conference*, 23 SAIS REV. 319 (2003); Nick Wadhams, *U.N. Conference on Arms Ends in Failure*, ASSOCIATED PRESS, July 7, 2006 ("A two-week U.N. conference reviewing efforts to fight the illegal weapons trade ended in failure Friday, with nations too divided on too many contentious issues to agree on the best way to combat a scourge that fuels conflict worldwide."); Lynne Griffith-Fulton, *The Small Arms Review Conference Ends With No Agreement*, THE PLOUGHSHARES MONITOR (Autumn 2006, vol. 27, No. 3), at 3-4,

http://www.ploughshares.ca/libraries/monitor/mons06a.pdf (visited Mar. 8, 2007).

[80] *See* Subcommission on the Promotion and Protection of Human Rights, *supra* .

[81]

> Under international human rights law, every person has a duty to respect another's right to life. More importantly, states have a duty to take positive measures to prevent acts of violence and unlawful killings, including those committed by private persons. There is a growing recognition that states' duties under international human rights law include exercising due diligence to ensure that basic rights—certainly the right to life and security of the person—are not abused by private actors. Where a foreseeable consequence of a failure to exercise adequate control over the civilian possession and use of arms is continued or increased violence, then states might be held liable for this failure under international human rights law.

*Shattered Lives: The Case for Tough International Arms Control*, joint publication of Oxfam and Amnesty International (2003), at 81.

violations committed with small arms and light weapons.[82] Frey was already known to the Human Rights Commission, since she was an alternate expert member of the U.S. delegation to a HRC subcommission, having been nominated in 2000 to a four-year term by the Clinton administration, which strongly supported UN gun control efforts.[83]

In international organizations, a Special Rapporteur is an expert who is chosen to advise the organization on a particular issue.[84] A Special Rapporteur has a duty of "impartiality," at least in theory.[85] The Human Rights Commission's description of the Special Rapporteur's mandate indicated the kind of reports the Commission wanted; the mandate precluded any investigation of whether firearms are ever used to protect human rights, or whether the confiscation of firearms (or other restrictions on firearms) are ever enforced in ways which violate human rights. Rather, the Special Rapporteur's sole mission was to detail the link between firearms possession and human rights violations.[86]

As Special Rapporteur, Frey began producing interim papers and studies.[87] On March 16-18, 2005, in her capacity as Special Rapporteur, Frey participated in a multi-day political strategy meeting in Brazil, intended to assist the proponents of an October 2005 referendum to ban the personal possession of firearms in Brazil. The meeting was part of a public relations program for the gun confiscation

---

[82] United Nations High Commissioner for Human Rights, Sub-Commission on Human Rights Resolution 2002/25, The Prevention of Human Rights Violations Caused by the Availability and Misuse of Small Arms and Light Weapons, para. 5,

http://www.unhchr.ch/huridocda/huridoca.nsf/6d123295325517b2c12569910034dc4c/10a32527edc27cd4c1256c1d 0038ee46?OpenDocument (visited Mar. 07, 2007).

[83] The Clinton administration

[84] *See, e.g., Special Procedures of the Commission on Human Rights, Office of the United Nations High Commissioner for Human Rights, Urgent Appeals and letters of allegations on human rights violations* (describing functions of Special Rapporteurs for the Human Rights Commission), http://www.ohchr.info/english/bodies/chr/special/communications%20english.pdf (visited Feb. 17, 2007).

[85] Office of the United Nations High Commissioner for Human Rights, *Special Procedures assumed by the Human Rights Council*, http://www.ohchr.org/english/bodies/chr/special/index.htm (visited Oct. 13, 2006).

[86] United Nations High Commissioner for Human Rights, Sub-Commission on Human Rights Resolution 2002/25, The Prevention of Human Rights Violations Caused by the Availability and Misuse of Small Arms and Light Weapons, para.5, (Frey was tasked with "preparing a comprehensive study on the prevention of human rights violations committed with small arms and light weapons ..."),

http://www.unhchr.ch/huridocda/huridoca.nsf/6d123295325517b2c12569910034dc4c/10a32527edc27cd4c1256c1d 0038ee46?OpenDocument (visited Mar. 07, 2007).

"Small arms and light weapons" is a term which includes mortars, machine guns, portable anti-tank weapons, and a variety of other military weapons. Frey, however, wrote only about firearms, and presumed that all firearms (including non-military type firearms) were "small arms and light weapons."

[87] *See* Commission on Human Rights, Sub-Commission on the Promotion and Protection of Human Rights, Fifty-fifth session, Item 6 of the provisional agenda, *Prevention of Human Rights Violations Committed with Small Arms and Light Weapons*, Preliminary Report Submitted by Barbara Frey, Special Rapporteur in accordance with Sub-Commission Resolution 2002/25, U.N. Economic and Social Council, E/CN.4/Sub.2/2003/29, June 25, 2003,

http://www.unhchr.ch/Huridocda/Huridoca.nsf/0/8de4967bdc9b662dc1256d720052bbf1/$FILE/G0314738.pdf (visited May 29, 2006); Barbara Frey, *Progress Report on the Prevention of Human Rights Violations Committed with Small Arms and Light Weapons*, E/CN.4/Sub.2/2004/37 (2004), June 21, 2004, Sub-Commission on the Promotion and Protection of Human Rights, Fifty-sixth session, Item 6 of the Provisional Agenda, http://www1.umn.edu/humanrts/demo/smallarms2004-2.html (visited May 29, 2006).

referendum which was funded by UNESCO.[88] (In the election, 64 percent of Brazilian voters rejected the gun prohibition referendum.[89])

## B. The Human Rights Commission

In December 2005, the United Nations abolished the Human Rights Commission. The Commission had long ago lost sight of human rights, and had instead become a forum for dictatorships to make spurious human rights complaints against democracies, thereby deflecting attention from their own abuses. The Human Rights Commission had encouraged terrorist bombings of Israeli civilians,[90] defeated resolutions criticizing human rights violations perpetrated by the genocidal regime in Zimbabwe, successfully worked to eliminate the position of the U.N. investigator of human rights abuses in Sudan, and refused to express a word of condemnation about the Sudanese slave trade.[91] Mary Robinson, the U.N.'s High Commissioner for Human Rights, helped pervert the Durban Conference Against Racism, turning it into a festival of anti-semitism, and refusing to mention the existence of—let alone condemn—the current slave trade in Africa.[92] In 2005, the Commission was chaired by a representative of the Libyan dictatorship of Moammer Qaddafi, [93] a regime which, ever since Qaddafi's coup in 1969, has had one of the worst human rights records in the world.

---

[88] *Brazil...Strengthening of Communications Networks and International Partnerships* (International Programme for the Development of Communications, UNESCO),

http://portal.unesco.org/ci/en/file_download.php/53d7121e58db595db8571998a273f592Latin+America+and+Caribb ean+2005++new+projects+approved+.pdf.

[89] *See Brazilians Reject Gun Sales Ban*, BBC NEWS, Oct. 24, 2005. Among the reasons for the defeat were Brazil's traditions of hunting and target shooting; concerns about the notoriously corrupt Brazilian police; the need for self-defense in Brazil's crime-ridden cities, many of which enjoy little protection from the police; and concerns about corruption in the regime of President Lula da Silva, who was the main proponent of the referendum.

[90] A few days after thirty Israelis celebrating the Passover Seder were murdered by a terrorist bomber, the Human Rights Commission adopted a resolution endorsing "all available means including armed struggle" against Israelis. *See* Anne Bayefsky, *How the U.N.'s Human Rights Investigations Do Yasser Arafat's Dirty Work*, NEW YORK SUN, Apr. 29, 2002. The resolution was understood as endorsing suicide bombing of civilians; hence, Britain and Germany, which often abstain on anti-Israel resolutions, voted against the resolution. The resolution passed by 40-5. *See* DORE GOLD, TOWER OF BABBLE: HOW THE UNITED NATIONS HAS FUELED GLOBAL CHAOS 41-42 (2005).

[91] Abolish: The Anti-Slavery Portal, *Protest Libya's "UN-Human" Rights Record*, Jan. 27, 2003, http://ga0.org/freedom_action/alert-description.html?alert_id=2002698 (visited Mar. 08, 2007).

[92] Ms. Robinson is a strong advocate of the U.N.'s gun control campaign. *See*

 http://www.controlarms.org/famous_faces/mary_robinson.htm;
http://www.thedailystar.net/2004/01/18/d40118130381.htm.

The World Conference Against Racism began to go off-track when the February 2001 pre-conference in Tehran turned into anti-Israel fest, and Mrs. Robinson applauded the conference's results. As the Durban conference neared, Robinson sided with the Arab dictatorships in equating Israel with Nazi Germany. Under Robinson's supervision, the Tehran pre-conference barred participation by Jewish, Baha'i, and Kurdish NGOs. Tom Lantos, *The Durban Debacle: An Insider's View of the World Racism Conference at Durban*, 26 FLETCHER FORUM OF WORLD AFF. (2002).

[93] Najat Al-Hajjaji, the Libyan ambassador to the United Nations.

One of the best-known HRC's Special Rapporteurs is Jean Ziegler, Special Rapporteur on the Right to Food. Mr. Ziegler is also vice president of North-South XXI, the organization that bestows the "Moammar Khaddafi Human Rights Prize." Mr. Ziegler has won the $250,000 prize himself in 2002, sharing the award that year with French holocaust denier Roger Garaudy. United Nations Watch, *Jean Ziegler's Campaign Against America: A Study of the Anti-American Bias of the U.N. Special Rapporteur on the Right to Food*, (Geneva, Switzerland: Oct. 2005),

http://www.unwatch.org/pdf_files/Jean_Ziegler's_Campaign_Against_America.pdf; *see also*

Given the Human Rights Commission's complicity with genocidaires, terrorists, slave-traders, and given that some Commission member governments are state sponsors of genocide of terrorism, terrorism, and slave-trading, those governments' interest in appointing a Special Rapporteur dedicated to gun prohibition was consistent with those governments' pragmatic interest in preventing resistance by the victims of genocide, slave-capturing, and state terrorism.[94]

Replacing the Human Rights Commission had been a long-standing goal of United Nations reformers. In early 2006, the old U.N. Human Rights Commission was replaced by the new U.N. Human Rights Council. As with the old Commission, the new Council did not require that members have a democratic form of government, or meet any minimum standards regarding human rights. Current members of the Council include dictatorships such as Cuba, Saudi Arabia, Tunisia, Russia, China and Pakistan. The Council has forty-seven members, of which only half (twenty-four) are rated "free" by Freedom House.[95] The new Human Rights Council appears to often follow the same path as the old Human Rights Commission.[96] For example, like the Commission, the Council identifies a litany of human rights abuses allegedly perpetrated by Israel, but never any abuses perpetrated by Israel's adversaries. In the Council's first year of operation, the only country which was named as actually being engaged in human rights violations was Israel.[97]

## C. The Frey Report

Having been selected as Special Rapporteur by the old Human Rights Commission, Frey delivered her final report to the new Human Rights Council on July 27, 2006.[98] On August 24, 2006, the

---

www.unwatch.org/ziegler/, www.gaddafiprize.org.

[94] For one notable example of the type of resistance that successful gun confiscation would prevent, *see* Vahram Leon Shemmassian, The Armenian Villagers of Musa Dagh: A Historical-Ethnographic Study, 1840-1915 (1996)(unpublished Ph.D. dissertation, UCLA): Armenian villagers in Musa Dagh, Turkey, in 1915, under the threat of genocide, retreated to a strategically defensible mountain armed with weapons and supplies. Four thousand Armenians survived for fifty-three days, until they were rescued by Allied ships, and were taken to safe havens until the end of the war. Without their firearms, they would have been overwhelmed by Turkish forces immediately.

[95] Brett D. Schaefer, *The United Nations Human Rights Council: Repeating Past Mistakes*, Heritage Foundation Lecture #964 (delivered Sept. 6, 2006), Sept. 19, 2006,

http://www.heritage.org/Research/WorldwideFreedom/hl964.cfm; Freedom House, Freedom in the World 2006: *Selected Data from Freedom House's Annual Global Survey of Political Rights and Civil Liberties* (Sept. 1, 2006), http://www.freedomhouse.org/uploads/pdf/charts2006.pdf.

[96] Schaefer.

[97] Schaefer; Human Rights Council, *Report to the General Assembly on the First Session of the Human Rights Council*, 1st session, June 19-30, 2006, A/HRC/1/L.10/Add, July 5, 2006, (Sept. 1, 2006) http://www.ohchr.org/English/bodies/hrcouncil/docs/L.10add.1.doc; Human Rights Council, *2nd Special session of the Human Rights Council, Geneva, 11 August 2006* (Sept. 1, 2006)(condemning Israel for its tactics in the war in Lebanon, but not criticizing any of the numerous violations of international human rights law by Hezbollah, including the use of civilians as human shields, and the deliberate targeting of Israeli civilians for terrorist missile attacks),

www.ohchr.org/english/bodies/hrcouncil/specialsession/2/index.htm.

[98] *See* Human Rights Council, Sub-Commission on the Promotion and Protection of Human Rights, Fifty-eighth session, Item 6 of the provisional agenda, *Prevention of Human Rights Violations Committed with Small Arms and Light Weapons*, Final Report Submitted by Barbara Frey, Special Rapporteur, in accordance with Sub-Commission Resolution 2002/25, U.N. General Assembly, A/HRC/Sub.1/58/27, July 27, 2006, available at http://www.geneva-forum.org/Reports/20060823.pdf (visited Aug. 23, 2006). [hereinafter, "Frey Report."] Also available at

http://daccessdds.un.org/doc/UNDOC/GEN/G06/132/91/PDF/G0613291.pdf?OpenElement (visited Sept. 1, 2006), and http://iansa.org/un/documents/salw_hr_report_2006.pdf.

U.N. Human Rights Council's subcommission on the Promotion and Protection of Human Rights endorsed the Frey report, and announced that all national governments were required by international human rights law to implement various listed gun control provisions; the subcommission recommended that the full Human Rights Council also adopt the report and issue a similar mandate.[99] Of course the

---

[99] UN Sub-Commission on the Promotion and Protection of Human Rights in Geneva (Switzerland) on 24 August:

PRINCIPLES ON THE PREVENTION OF HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS

*Bearing in mind* the primacy of international human rights law as codified in the International Bill of Human Rights,

*Recognizing* that the right to life, liberty and security of the person is guaranteed in the Universal Declaration of Human Rights and reaffirmed in the International Covenant on Civil and Political Rights,

*Acknowledging* that State agents, especially law enforcement officials, play a vital role in the protection of the right to life, liberty and security of person,

…

*Noting* the need to promote the human rights, safety and wellbeing of all persons by preventing foreseeable small arms violence through appropriate measures to regulate small arms possession and use by private actors, including those suggested in paragraph 5 of Economic and Social Council resolution 1997/28 of 21 July 1997 and in resolution 9 of the Ninth United Nations Congress on the Prevention of Crime and the Treatment of Offenders,

…

*Emphasizing also* the responsibility of States to promote public education and awareness about the root causes of violence and to promote alternative forms of dispute resolution, as recognized by the Economic and Social Council in its resolution 1997/28 and the Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All Its Aspects, section II, paragraph 20,

*Solemnly proclaims* the human rights principles set forth below, formulated to assist Member States in their task of ensuring and promoting the proper action by State agents, especially law enforcement officials, with respect to their unequivocal role to protect the right to life, liberty and security of the person, as guaranteed in the Universal Declaration of Human Rights and reaffirmed in the International Covenant on Civil and Political Rights, and urges that every effort be made so that the principles become generally known and respected.

…

Principles on the prevention of human rights violations committed with small arms

B. Due diligence to prevent human rights abuses by private actors

10. In order to ensure the protection of human rights by preventing small arms violence by private actors, Governments shall enact licensing requirements to prevent possession of arms by persons who are at risk of misusing them. Possession of small arms shall be authorized for specific purposes only; small arms shall be used strictly for the purpose for which they are authorized. Before issuing a licence Governments shall require training in proper use of small arms, and shall take into consideration, at a minimum, the following factors: age, mental fitness, requested purpose, prior criminal record or record of misuse, and prior acts of domestic violence. Governments shall require periodic renewal of licences.

11. Governments shall ensure that proper controls are exercised over the manufacturing of small arms through incorporation into national law and by other measures. For the purpose of identifying and tracing small arms, Governments shall require that at the time of manufacture,

subcommission has little power to enforce its wishes directly, but the declaration gives national government officials, including courts, considerable support to promote restrictive gun laws which are, according to the U.N., mandated by international law. The full Human Rights Council is scheduled to take up the issue in 2007, and indications at the time of this writing suggest that the full Council will ratify most or all of Frey's report. The Chairman of the full Human Rights Council has already announced his enthusiastic support for the Frey Report, the subcommission's adoption of the report, and the prospect of using the Human Rights Council to advance a worldwide gun control mandate.[100]

The Frey Report, then, is not simply a scholarly paper that will be filed away in a United Nations library. It is an effort to establish a new norm of international human rights law, and this effort to establish the new norm is supported by the United Nations Human Rights Council, as one aspect of the UN's far-ranging support for restrictive and confiscatory firearms policies.

The United Nations General Assembly began work on the drafting of an international Arms Trade Treaty in late 2006. The stated purpose of the Arms Trade Treaty is to prohibit arms transfers which violate human rights. As interpreted by the HRC and Frey, every firearms sale in the United States would be a human rights violation; this is because even the most restrictive jurisdictions in the United States, such as Washington, D.C., or New York City, do not meet the minimum Frey/HRC gun control standards.[101]

---

each small arm has a unique permanent mark providing, at a minimum, the name of the manufacturer, the country of manufacture and the serial number.

12. Governments shall ensure the investigation and prosecution of persons responsible for the illegal manufacture, possession, stockpiling or transfer of small arms. Governments shall impose penalties for crimes involving the misuse of small arms, including to commit domestic violence, and for the unlawful possession of small arms.

13. With the cooperation of the international community, Governments shall develop and implement effective disarmament, demobilization and reintegration programmes, including the effective collection, control, storage and destruction of small arms, particularly in postconflict situations. Governments should take steps to encourage voluntary disarmament. Governments should implement public awareness and Confidence building programmes, in cooperation with civil society and nongovernmental organizations, to prevent a return to armed violence and to encourage alternative forms of dispute resolution. Governments should incorporate a gender perspective in their peacekeeping and public awareness efforts to ensure that the special needs and human rights of women and children are met, especially in postconflict situations.

14. Governments shall prohibit international transfers of small arms which would violate their obligations under international law, including in circumstances in which such arms are likely to be used to commit serious human rights violations.

15. In light of the obligation of a State, under international human rights law, to prevent human rights violations, States are required under international law to provide, upon request, assistance, for the purposes of judicial proceedings in other States, in the provision of information regarding the ownership or purchase of small arms and light weapons in the former State.

[100] Luis Alfonso de Alba (President of the Human Rights Council), *The Human Rights Council and efforts to reduce small arms and light weapons related violence*, *Small Arms and Human Security Bulletin* (Nov. 2006-Feb. 2007, issue 8), at 3-4.

[101] For example, New York City and Washington, D.C., allow persons to acquire long guns (rifles or shotguns) to be used for any and all lawful purposes. This violates the HRC subcommission requirement that "Possession of small arms shall be authorized for specific purposes only; small arms shall be used strictly for the purpose for which they are authorized." See note infra.

The HRC subcommission requires that gun possession be allowed only with a license that must be periodically renewed. Although all American states require some form of background check for retail purchases of

With the proposed Arms Trade Treaty being strongly supported by IANSA and its allied delegations at the United Nations, the Frey/HRC declarations about human rights and firearms will likely be incorporated into the new treaty.

While it is unlikely that a severely restrictive international gun control treaty could be ratified by 2/3 of the United States Senate, there are many mechanisms by which unratified treaties can work their way into US law. For example, some eminent international disarmament experts have taken the position that the President of the United States may announce that a treaty has entered into force, and thereby become the law of the United States even if the US Senate has never voted to ratify the treaty.[102] The United States Supreme Court has cited unratified treaties (and even an African treaty) as guidance for interpreting United States constitutional provisions.[103] Likewise, other scholars, writing in a U.N. publication, argue that United Nations gun control documents (notwithstanding the fact that the documents, on their face, have no binding legal effect) represent "norms" of international law.[104] Attorney Joseph Bruce Alonso has detailed how the theories being developed by IANSA and its allies would allow American manufacturers to be sued in foreign courts.[105]

---

firearms (and some have a similar requirement for informal private transfers, such as gifts) only a few American states require a license for handgun possession; hardly any states require a license for long gun possession. Hardly anywhere, except in New York State for handguns, does the licensing requirement inquire (as the HRC demands) into the applicant's "purpose" for wanting a gun.

The HRC subcommission states that "Governments should take steps to encourage voluntary disarmament." Some American cities occasionally encourage disarmament, by promoting "buy-back" programs in which people receive cash or some other benefit for surrendering their guns. But the much more common program is for American governments to encourage armament, by running hunter safety education programs which encourage people to learn how to use firearms safely.

While all American states require safety training in order to acquire a hunting license, and most states require safety training in order to obtain a permit to carry a concealed handgun for protection in public places, very few states require any form of safety test or training to possess a handgun, and almost none impose a training requirement for long guns. The HRC subcommssion states that safety training should be mandatory for possession of any gun.

[102] Baker Spring, *Weapons of Mass Destruction, Current Nuclear Proliferation Challenges,* Heritage Lecture no. 968, Sept. 26, 2006 (published Oct. 4, 2006), at 4,

http://www.heritage.org/Research/NationalSecurity/hl968.cfm, discussing Weapons of Mass Destruction Commission, *Weapons of Terror: Freeing the World of Nuclear, Biological, and Chemical Arms,* June 1, 2006, at http://www.wmdcommission.org/files/Weapons_of_Terror.pdf (October 2, 2006).

[103] *E.g.,* Roper v. Simmons, 543 U.S. 55 (2005)(rejecting a U.S. Senate reservation to the ratification of the International Covenant on Civil and Political Rights; citing the United Nations Convention on the Rights of the Child, which the United States has not ratified, and the African Charter on the Rights and Welfare of the Child); Grutter v. Bollinger, 539 U.S. 306 (2003)(Ginsburg, J., concurring, joined by Justice Breyer)(citing the never-ratified Convention on the Elimination of All Forms of Discrimination against Women); Lawrence v. Texas, 539 U.S. 558 (2003)(citing European court cases, and favorably citing an amicus brief filed by Mary Robinson, a gun prohibitionist who promoted anti-Semitic propaganda at the U.N. Durban Conference on Racism, *supra*); Atkins vs. Virginia, 536 U.S. 304 (2002)(citing the European Union's position on capital punishment).

[104] Nadia Fischer, *Outcome of the United Nations process: the legal character of the United Nations Programme of Action,*" in SMALL ARMS AND LIGHTS WEAPONS: LEGAL ASPECTS OF NATIONAL AND INTERNATIONAL REGULATIONS 165-66, vol. 4 of ARMS CONTROL AND DISARMAMENT LAW (Erwin Dahinden, Julie Dahlitz & Nadia Fischer eds., 2002).

[105] Joseph Bruce Alonso, *The Second Amendment and Global Gun Control,* 15 J. FIREARMS & PUB. POL. 1 (2003).

**D. No Right of Self-Defense**

The most startling of the claims in the Frey/HRC report is that there is no human right of self-defense. She states:

> No international human right of self-defence is expressly set forth in the primary sources of international law: treaties, customary law, or general principles. While the right to life is recognized in virtually every major international human rights treaty, the principle of self-defence is expressly recognized in only one, the Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention on Human Rights), article 2.[106]

Frey specifically cites, and rejects, an article arguing that there is a human right of self-defense against genocide.[107]

Frey then argues that a state's failure to restrict self-defense is itself a human rights violation. According to Frey, a government violates the human right to life to the extent that a state allows the defensive use of firearm "unless the action was necessary to save a life or lives." Thus, firearms "may be used defensively only in the most extreme circumstances, expressly, where the right to life is already threatened or unjustifiably impinged."[108] Frey also states that law enforcement officials may only use firearms in similar circumstances.[109]

In other words, it is a human rights violation for a state to allow its citizens or its law enforcement officers to use firearms to protect victims of rape, robbery, or mayhem. As we will detail *infra*, in Parts III, IV, and V, Frey's hyper-narrow conditions on permissible self-defense—and her denial of the existence of a human right to self-defense—are inconsistent with a long and well-established tradition of human rights law.

The issue of whether international law mandates highly restrictive gun control, as Frey and the HRC claim, is discussed in Part VI. Then, Part VII addresses the related question of to what extent, if any, an international right of self-defense would imply a right to some type of arms, or to firearms.

---

[106] Frey Report, para. 21.

[107] Frey Report, n. 14, discussing David B. Kopel, Paul Gallant & Joanne D. Eisen, *Is Resisting Genocide a Human Right?* 81 NOTRE DAME L. REV. 1275 (2006)("… The Universal Declaration of Human Rights affirms the existence of a universal, individual right of self-defense, and also a right to revolution against tyranny … Taken in conjunction with Anglo-American human rights law, the human rights instruments can be read to reflect a customary or general international law recognizing a right of armed resistance by genocide victims".).

[108] Frey Report, paras. 26-27 (citation markers omitted):

> 26. International bodies and States universally define self-defence in terms of necessity and proportionality. Whether a particular claim to self-defence is successful is a fact-sensitive determination. When small arms and light weapons are used for self-defence, for instance, unless the action was necessary to save a life or lives and the use of force with small arms is proportionate to the threat of force, self-defence will not alleviate responsibility for violating another's right to life.

> 27. The use of small arms and light weapons by either State or non-State actors automatically raises the threshold for severity of the threat which must be shown in order to justify the use of small arms or light weapons in defence, as required by the principle of proportionality. Because of the lethal nature of these weapons and the *jus cogens* human rights obligations imposed upon all States and individuals to respect the right to life, small arms and light weapons may be used defensively only in the most extreme circumstances, expressly, where the right to life is already threatened or unjustifiably impinged.

[109] Frey Report, paras. 28-29.

. . . .

## VI. Is there an International Human Right to Gun Control?

A very large body of international law sources affirms that self-defense is a human right. But Frey has invented standards so rigorous that she almost never has to admit to the existence of those sources.

The Statute of the International Court of Justice tells us that the opinions of scholars are sources of international law, but Frey ignores them, as they are not "primary."[110] (Even though she readily cites other scholars for other points.)

The Statute of the International Court of Justice tells us that the "general principles" of the law of "civilized nations" are sources of international law,[111] and we have seen that self-defense is a part of every major legal system that gave rise to international law,[112] and of every contemporary legal system.[113] But this too does not count for Frey, because she claims that there are not "express" statements that self-defense is a right.[114] Yet there are in fact a multitude of "express" statements, and besides that, the Statute asks for "general principles" not "express" statements.[115]

All the rest of the evidence Frey waves away with the bizarre—and plainly incorrect—theory that self-defense is violation of the criminal's rights.[116]

Frey is not so rigorous, however, when she declares that current international law mandates highly restrictive gun control, and that the international mandate is so powerful that it over-rides every contrary law, including national constitutions. In support of her declaration, the Special Rapporteur offers no direct support from any source of international law—not even a "subsidiary" citation to a single commentator.

Instead, she offers a theory based on a series of deductions she draws from some general rules of international law. The Special Rapporteur does not appear to be applying intellectually consistent standards in her report. Her operative rule could be stated as "No evidence is good enough." That is, when the question is the right of self-defense, it is impossible for even a large quantity of legal authority to be sufficient. When the question is the "right" of gun control, the case can be proven without need for legal authority.

## A. Due Diligence

The basis for Frey's right to gun control is the principle that a state must exercise "due diligence" in preventing human rights violations.[117] For example, if police officers are not trained in how to use

---

[110] *See supra* text accompanying notes -.

[111] *See supra* text accompanying notes -.

[112] *See supra* text accompanying notes -.

[113] *See supra* text accompanying notes -.

[114] *See supra* text accompanying notes -.

[115] *See supra* text accompanying notes -.

[116] *See supra* text accompanying notes -.

[117] Frey Report at 5-8 paras. 8-18, 33-37; *see also* Barbara A. Frey, *Small Arms and Light Weapons: The Tools Used to Violate Human Rights*, DISARMAMENT FORUM 37 (no. 3, 2004). "Due diligence" can be subject to widely varying interpretations. Perhaps the first international law use of the term was in the 1871 Washington Treaty, settling various disputes between the United States and the United Kingdom. Washington Treaty for the Amicable Settlement of All Causes of Difference between the Two Countries, 1871, U.S.-U.K, 143 Consol. Treaty Series 145, 149. While the treaty as a whole was successful, the "due diligence" language proved difficult to interpret and enforce. DINSTEIN, at 29.

firearms safely, and if an untrained officer fired wildly into a crowded street in order to catch a fleeing thief, and the officer misses the thief but hits a dozen innocent bystanders, then the state might be culpable of a human rights violation, for having failed to exercise "due diligence" in training.

Similarly, a state can be responsible when it allows groups that exercise *de facto* state power (even though the groups are nominally not state actors) to attack people. One good example (although not cited by Frey) would be the contemporary government of Sudan, which supports Arab tribal proxies in the extermination of the Africans of Darfur.[118] Likewise, the government of Mississippi (like several other American states) had a long-standing practice of tolerating, and tacitly encouraging, Ku Klux Klan terrorist violence against blacks and other supporters of civil rights.[119] (It might be noted in passing that the depredations of the Sudanese Arabs and the American Klan were made possible in part because the governments had previously disarmed the intended victims.[120])

She also cites a few due diligence cases in which a government did nothing to protect persons in peril, such as refusing to investigate death threats against an individual in Colombia.[121]

Frey's summary of due diligence rules, and cases and commentary thereon provides no precedent for any government being required to enact items from a list of regulatory laws drawn up by a commentator or by an international organization. Nevertheless, Frey and the HRC subcommission proclaim that every government in the world must implement their gun control agenda, or else be judged guilty of failing to practice due diligence.[122]

Even if we hypothesize that each of Frey's gun controls would be a good idea, there is no support in international law for the proposition that "due diligence" about the general risk of crime can be used as an international law hammer to force governments to adopt particular types of regulatory laws.

---

[118] *See, e.g.*, Kopel, Gallant, Eisen, *Is there a Human Right to Resist Genocide?* at .

[119] *See, e.g.*, Cottrol, *supra*; Cottrol & Diamond *supra*. *Cf.* WILLIAM B. ZIFF, THE RAPE OF PALESTINE 121-29 (1938)(describing the disarmament of Jews in Hebron, Palestine, in 1929, by British officials. After the disarmament, British officials incited a pogrom against the Jews by Arabs, and failed to respond to the ensuing violence for eight days.).

[120] *See, e.g.*, [sources cited in the two previous footnotes.]

[121]

[122] Frey Report, at 7-8, 12-13. The closest she gets to precedential support for her mandate about citizen gun control is a quote from a 1975 law review article that under the European Convention's right to life provisions, a crime victim should have "a general duty to avoid the use of force where non-violent means of self-protection are reasonably open to the person attacked." Frey Report at n. 36 (citing A.J. Ashworth, *Self-defence and the right to life*, 34 CAMBRIDGE L.J. 289 (1975). At most, the law review article might raise questions about laws in many American states that some persons (e.g., a person in her own home) who are attacked by violent felons have no duty to retreat. Some American states also state that a person who is attacked by a violent felon (again, such laws most often apply to the home) and who, under the circumstances had the right to use force in self-defense, cannot be prosecuted for using deadly force. Even these laws are not necessarily in conflict with Ashworth's law review article. The legislative decision that a victim should not be forced to retreat reflects the social judgment that it is *not* reasonable too force a victim to retreat from a place where she has a right to be (especially her own home). Likewise, the laws against prosecutions for a particular level of force reflect the social consensus (as reflected in legislation) that it is unreasonable for prosecutors to second-guess a decision that a victim must make in split seconds. As the United States Supreme Court put it: "detached reflection is not required at the point of an uplifted knife." Brown v. United States, 256 U.S. 335, 344 (1921).

In any case, the law review article's analysis of the proper rules for self-defense have nothing to do with Frey's claim that due diligence requires governments to enact her laundry list of laws about the acquisition of firearms.

As noted *supra*, Frey's standards for the minimum "due diligence" required under her purported right to gun control are so severe that even the laws of New York City and Washington, D.C., would be considered to be human rights violations, since they are not sufficiently restrictive.[123]

Frey has elsewhere suggested that under international law the minimum investigational standards for issuing a firearms possession license should be "akin to in scope to those required for the effective investigation of an individual's death."[124] By this standard, even the gun laws of Japan and the United Kingdom, the most restrictive in the industrialized world, would be insufficient. Both nations have very intrusive licensing systems, including (in the United Kingdom) a home inspection, but even so, the police resources devoted to issuing a single gun license do not come remotely close to the resources ordinarily used to investigate a homicide.

It is hard to see why a sensible government would devote the same resources to issuing a single gun license as to investigating a single homicide. Homicide investigation is well known to be a very resource-intensive investigation. Because homicide is the worst of all crimes, it is easy to understand why a single homicide investigation is given much greater resources than the investigation of a single robbery, a single burglary, and so on.

In the United States, there were 17,732 homicides in 2003,[125] and there are tens of millions of lawful gun owners.[126] If the police began devoting homicide-investigation-level resources to gun licenses (which Frey and the HRC subcommission would require for every gun owner, with periodic renewals[127]), the police would be able to do little else. In the United Kingdom, there were approximately 1,100 homicides in 2002/2003.[128] Authorities in the UK reported approximately 760,000 firearms and shotgun certificates "on issue."[129] The criminal justice results would be catastrophic if each gun license application were ramped up to homicide investigation levels.

---

[123] *See supra* text accompanying notes - .

[124] Frey, DISARMAMENT FORUM, at 43.

[125] *See Deaths: Preliminary Data for 2004*, National Vital Statistics Reports, Centers for Disease Control, and Prevention, Vol. 54, Number 19, June 28, 2006, Table 2. *But see* FBI UNIFORM CRIME REPORTS, CRIME IN THE UNITED STATES – 2003, Table 2.4 (14,408 murder victims)

http://www.fbi.gov./ucr/03cius.htm (visited Mar. 15, 2007).

[126] *See* L. Hepburn, M. Miller, D. Azrael & D. Hemenway, *The US Gun Stock: Results from the 2004 National Firearms Survey*, 13 INJ. PREV. 15 (2007)(57 million adult gun-owners in the U.S.)

[127] Frey Report at 8, para. 16; Human Rights Council subcommission, at _.

[128] *See* CRIME IN ENGLAND AND WALES 2002/2003: SUPPLEMENTARY VOLUME 1: HOMICIDE AND GUN CRIME 1 (David Povey ed., 2004),

http://uk.sitestat.com/homeoffice/homeoffice/s?rds.hosb0104pdf&ns_type=pdf&ns_url=%5Bhttp://www.homeoffic e.gov.uk/rds/pdfs2/hosb0104.pdf%5D (visited Mar. 10, 2007)("There were 1,045 deaths initially recorded as homicides in England and Wales based on cases recorded by the police in 2002/03. This includes 172 victims of Dr Harold Shipman (see note 1 on page 3) all of which relate to offences committed in previous years."); *see also* STATISTICS RELEASE HOMICIDE IN SCOTLAND, 2003 – STATISTICS Published, 4 November 2004, http://www.scotland.gov.uk/Publications/2004/11/20292/47178 (visited Mar. 15, 2007) ("In 2003, there were 108 cases currently recorded as homicide by the police.")

[129] *See* Olivia Christophersen, & Jason Lal, *Firearm Certificates in England and Wales, 2002/2003*, Home Office Online Report 03/04,

http://uk.sitestat.com/homeoffice/homeoffice/s?rds.rdsolr0304pdf&ns_type=pdf&ns_url=%5Bhttp://www.homeoffi ce.gov.uk/rds/pdfs2/rdsolr0304.pdf%5D (visited Mar. 10, 2007). In England and Wales, the renewal cycle for rifles and shotguns is 5 years. *See Renewal of a Rifle Certificate*, Metropolitan Police, Firearms Enquiries, http://www.met.police.uk/firearms-enquiries/f_renew.htm, (visited Mar. 19, 2007); *Renewal of a Rifle Certificate*,

Practically speaking, there could be two results: the police could try conscientiously to process the license applications within a few weeks or months (the time for a typical homicide investigation); if so, police resources available for patrol and for investigation of crimes would be reduced to nothing. Alternatively, the police could simply decide that the investigations take too much time, and so license applications would languish for years; law-abiding gun owners would be turned into felons as their license renewal applications sat in an immense stack in a police office. That is what has happened in South Africa, thanks to a highly-restrictive gun owner licensing law enacted several years ago.[130]

---

Metropolitan Police, Firearms Enquiries, http://www.met.police.uk/firearms-enquiries/s_renew.htm (visited Mar. 19, 2007); *see also Frequently Asked Questions*, Sussex Police Online, http://www.sussex.police.uk/online_forms/firearms_faq.asp (visited Mar. 19, 2007). In Scotland, the renewal cycle is also five years for rifle and for shotgun certificates. *See* STATISTICAL BULLETIN CRIMINAL JUSTICE SERIES CRJ/2004/4 FIREARM CERTIFICATES STATISTICS, SCOTLAND, 2003 (May 2004),

http://www.scotland.gov.uk/Publications/2004/05/19425/38096#2 (visited Mar. 10, 2007).

[130] *See, e.g.,* David B. Kopel, Paul Gallant & Joanne Eisen, *South African Stupidity* NAT'L REV. ONLINE. Oct. 11, 2000, http://www.davekopel.com/NRO/2000/South-African-Stupidity.htm. A South African gun-owner describes how the new gun licensing system functions:

> You can apply for renewal of your gun licences: If you have a competency certificate. To get a competency certificate you have to pass a written test on law, safety, firearm handling, safekeeping, transportation, firearm maintenance, etc. at an accredited instructor. Right now there are no more than a handful of instructors that have been accredited in a country covering 471,445 square miles. Let us say there are 20 accredited instructors. That means that there is one instructor per 23,572 square miles in this country, or one accredited instructor per 140,000 members of the population. If you want a new gun licence you need to pass not only the written test, but a practical shooting test on an accredited range as well. We do not have 30 accredited ranges in this country due to administrative backlogs. All the ranges that have functioned without incident for decades are now illegal unless re-inspected, and approved at great cost.
>
> Once you have passed your proficiency tests at an accredited instructor...he has to send your papers to the Standards of Education Authority (SETA). The SETA can then take up to 10 weeks to issue your certificate. Once SETA recognises your ability you can then apply to the Police for a Competency Certificate. The Police may or may not issue your certificate in 9-12 months. Once you have the competency certificate you can then apply for either renewal of your existing licences (which we do not know how long it will take as it has not been done), or for a new licence which takes up to 12 months.
>
> ...
> If your licence application is refused you can appeal. Problem is the so-called appeal board is not functional and there is a backlog of tens of thousands of appeals still to be heard.
>
> ...
> From the more than 700 gunshops in this country and 15,000 guns retailed per month we have dropped to zero.

Lizel Steenkamp, *No Legal Guns Sold Since July*, NEWS24.COM (Johannesburg) Sept. 27, 2004,

http://www.news24.com/News24/South_Africa/News/0,,2-7-1442_1595913,00.html; *see also* Wyndham Hartley, *Firearms Control Act well wide of its target,* BUSINESS DAY (South Africa), Sept. 20, 2005, http://www.businessday.co.za/articles/topstories.aspx?ID=BD4A93763

("Implementation of the Firearms Control Act is threatening to spiral out of control with government's Central Firearms Registry processing only a fraction of the hundreds of thousands of reapplications for gun licences it was scheduled to process this year."; Sheena Adams, *Firearms Registry slammed for 'ineptitude'*, INDEPENDENT ONLINE (South Africa), Sept. 15, 2005,

If the Frey/HRC theory that "due diligence" mandates highly restrictive gun control were to be accepted, then the same reasoning would mandate an almost limitless series of international law mandates for repressive legislation on many subjects. For example, in all industrial countries, including the United States, more people die from automobile accidents than from gunfire.[131] A fortiori, governments would have to act with "due diligence" to protect the right to life by enacting extremely strict anti-automobile laws. Like firearms, automobiles are already pervasively regulated,[132] but "due diligence" for the right to life would seem to require much, much more.

Not that there is any need for international organizations to actually create anti-automobile treaties, or for such treaties to be ratified by national governments. The requirement for severe anti-automobile legislation is already (by Frey's theory) a mandatory requirement of international human rights law. Any government which has ratified a treaty respecting the right to life has, by necessary implication, accepted a requirement to enact drastic automobile control legislation, in order to fulfill Frey's mandate that governments "must maximize protection of the right to life."[133] The maximization rule (which is invented by Frey[134]) offers nearly limitless opportunities for coercive utopians to use international law to force governments to enact extremely restrictive laws on almost everything.

We suggest that there are many good pro and con arguments about what kind of automobile controls are best—and that nations have not foreclosed their choices about automobile regulation simply by ratifying treaties guaranteeing the right to life.

The same point can be made about firearms control. Whatever the arguments for or against particular gun laws, Frey's theory that the right to life necessarily creates an international law mandate for her favorite forms of gun control has no precedential support.

## B. Frey's Erroneous Claims of Empirical Support

As a Special Rapporteur, Frey was obligated to inform the Human Rights Council of the leading research on her topic. Unfortunately, while insisting that her proposed gun controls should become international mandates, Frey did not inform the HRC of significant research which casts serious doubt on her claim that her proposals would be effective.

---

http://www.iol.co.za/index.php?set_id=1&click_id=6&art_id=vn20050915060958770C464804

("Of the 20,397 applications for competency certificates received since January, 3,937 had been finalized.")

[131] In 2003, there were 37,341 fatalities of vehicle occupant and motorcycle riders; there were also 5,543 non-motorist fatalities. Thus, the total of automobile-related fatalities in 2003 was 42,884. *See* Fatality Analysis Reporting System (FARS) Web-Based Encyclopedia, NHTSA, http://www-fars.nhtsa.dot.gov/ (visited Mar. 16, 2007); *see also Deaths: Final Data for 2003*, 54 Nat'l Vital Statistics Reps. (no. 13, Apr. 19, 2006, Centers for Disease Control and Prevention), at 80, table 19 (listing total firearm-related deaths for 2003 as 30,136, including justifiable homicides).

[132] *See* David B. Kopel, *Treating Guns Like Consumer Products*, 148 U. PENN. L. REV 1701 (2000)(detailing how U.S. laws for possession for carrying guns in public places, or for possessing/using guns on private property are much more restrictive than the laws for driving automobiles in public places or possession/driving on private property; also detailing how firearms are much more highly regulated than alcohol or prescription drugs).

[133] Frey Report at 5, para. 9.

[134] Frey's only citation for her alleged duty of maximization is a book which never claims that there is a duty of maximization:

See B.G. Ramcharan, *The Right to Life in International Law* (Biggleswade, Brill, 1985), p. 15 ("As a norm of *jus cogens*, no Government may deny the existence of the right to life and a higher duty and standard of protection of the right is imposed upon Governments".).

Cited in Frey Report, 15, n. 3.

For example, in 2003, the Centers for Disease Control and Prevention (CDC), released a meta-study of the efficacy of gun control. The report included a review of fifty-one published studies on a variety of restrictive gun laws, including bans on specific firearms and ammunition, measures prohibiting felons from purchasing guns, mandatory waiting periods, firearm registration, and background checks.[135] The CDC summarized the report: "A sweeping federal review of the nation's gun control laws--including mandatory waiting periods and bans on certain weapons-- found no proof such measures reduce firearm violence."[136]

The National Academy of Sciences reached a similar conclusion in 2004: no link could be established between restrictive firearm laws and lower violent crime rates, firearm-related violence, or even firearm accidents. The 328 page report contained a review of 253 journal articles, 99 books, and 43 government publications, as well as independent research by the NAS.[137]

There is no requirement that other scholars, such as Frey, agree with the CDC or NAS assessments of the research evidence. But it is surprising that a Special Rapporteur would not even inform the HRC about the existence of the two most extensive meta-studies ever conducted on gun control efficacy.

Agnostic on gun control, the CDC and NAS also declared that the current evidence did not yield a clear answer on the benefits (if any) of defensive gun ownership.

The Frey Report attempted to argue that gun possession for self-defense is ineffective and dangerous. Unfortunately, Frey's argument—while omitting the meta-studies—relies on assertions that are not even supported by her own cited sources.

Frey claims that "research indicates that firearms are rarely used to stop crimes or kill criminals."[138] Her lone support for this assertion is that the FBI's Uniform Crime Reports recorded "only 203 justifiable homicides by private citizens using firearms"[139] in 2003. From this datum she infers that guns are rarely useful for self-defense. What inhumane method of measuring anti-crime efficacy. By Frey's reasoning, we could compare the efficacy of police departments in different jurisdictions by counting how many criminals they fatally shoot, and concluding that whoever kills more criminals must be better at protecting the public.

Frey is apparently unaware of research data indicating that the FBI figures, which are based only on initial police reports, are a gross undercount, because they do not include determinations later made by prosecutors, grand juries, petit juries, or appellate courts that an individual acted in self-defense.[140]

In any case, Frey provided data only about how often firearms are used to "kill criminals" while providing no data about how often firearms are used "to stop crimes." Although her footnote cites the Centers for Disease Control (for data about non-justifiable firearms deaths), she does not discuss the report from the Centers for Disease Control showing that in the United States, firearms are used over half

---

[135] *See First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws,* Centers for Disease Control and Prevention (2003),

http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5214a2.htm (visited February 14, 2007).

[136] *Id.*

[137] *See* Charles F. Wellford, John V. Pepper, and Carol V. Petrie (eds.), FIREARMS AND VIOLENCE: A CRITICAL REVIEW, National Academy of Sciences (2004).

[138] *See* Frey Report, at 12, para. 36.

[139] *See* Frey Report, at 12, para. 36.

[140] GARY KLECK, TARGETING GUNS (1997); GARY KLECK, POINT BLANK (1991).

a million times a year against home invasion burglars; usually the burglar flees as soon as he finds out that the victim is armed, and no shot is ever fired.[141]

     Frey also asserts that guns "are often turned on the very person who may have the best arguments for self-defence—the woman herself."[142] Yet her citation for this assertion, a study led by Kimberly Grassel,[143] provides no support for Frey's statement. The Grassel study did not collect such data.[144] Nor were all the women in the Grassel study murdered with firearms. Indeed, the authors admitted that they do not even know whether the subjects owned a gun at the time of their deaths.[145]

---

[141] See Robert M. Ikeda et al., *Estimating Intruder-Related Firearms Retrievals in U.S. Households, 1994*, 12 VIOLENCE AND VICTIMS 363 (1997)(reporting results of study conducted by the CDC). *See generally* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. LAW & CRIMINOLOGY 150, 164 (1995)(survey data showing 2.5 million defensive gun uses annually in the United States, most without firing a shot). Pro-control criminologist Marvin Wolfgang reluctantly praised the methodology used by Kleck and Gertz, and, without reservation, was persuaded that the Kleck/Gertz figure was an accurate estimate, stating:

> I am as strong a gun-control advocate as can be found among the criminologists in this country....[Kleck and Gertz] have provided an almost clear-cut case of methodologically sound research in support of something I have theoretically opposed for years, namely, the use of a gun in defense against a criminal perpetrator....the methodological soundness of the current Kleck and Gertz study is clear. I cannot further debate it.

Marvin E. Wolfgang, *A Tribute to a View I Have Opposed*, 86 J. CRIM. LAW & CRIMINOLOGY 188 (1995).

[142] See Frey Report, at 12, para. 36.

[143] K.M. Grassel, G. J. Wintemute, M.A. Wright and M.P. Romero, *Association Between Handgun Purchase and Mortality from Firearm Injury*, 9 INJ. PREV. 48 (2003).

[144] Grassel, at .

     Data from the National Crime Victimization Survey show that a victim's weapon is taken by the attacker in, at most, one percent of cases in which the victim resists with a weapon. *See* Gary Kleck, TARGETING GUNS 168-169 (1997). The data from the National Crime Victimization Survey and other sources show that "There is no sound empirical evidence that resistance does provoke fatal attacks." *See* Jongyeon Tark & Gary Kleck, *Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes*, 42 CRIMINOLOGY 861, 903, (2004).

[145] Grassel, at .

     Frey parenthetically describes the Grassel article as "reporting that women who were murdered were more likely, not less likely, to have purchased a handgun in the three years prior to their deaths." *See* Frey Report, at 12, para. 36.

     It is not surprising that women who accurately perceive that they are at high risk of criminal victimization would be more likely to take protective measures; women who are more at risk of fatal illness are also more likely to take protective measures, such as going to a doctor. That sick people go to doctors does not mean that doctors make people worse off; that women at risk of victimization take protective measures does not mean that the protective measures are harmful.

     Suppose a study showed that female murder victims were more likely to have bought high-quality locks for their homes. Would the study prove that locks are not useful for protection? Would the study prove that locks "are often turned on the very person who may have the best arguments for self-defence – the woman herself"?

     It is not surprising that women at risk would be more likely to take protective measures. To tell whether the protective measures were effective, one would have to compare the murder victims with a sample of women who were equally at risk, but who survived. Comparing an at-risk population with the general population does not tell us about the efficacy of any given protective measure.

     Mere association (murder victims were more likely to have bought locks or guns; people who die of cancer are more likely to have gone to a hospital in the three years before their death) does not prove causation. Increased

Frey cites another study, by Bailey et al., for the proposition that "having one or more guns in the home makes a woman 7.2 times more likely to be murdered by an intimate partner."[146] This would be a frightening statistic if odds ratios were equivalent to risk factors. However, Frey wrongly described the article's adjusted odds ratio of 7.2 for "keeping 1 or more guns" as a risk factor for violent death.[147]

---

levels of ice cream sales are associated with hot days, but the association does not prove that ice cream makes the weather hotter. In evaluating the relationship between a particular action and a particular outcome, it is a mistake to assume that the action necessarily causes the outcome *See* Jane L. Garb, UNDERSTANDING MEDICAL RESEARCH: A PRACTITIONER'S GUIDE 27-28 (1996):

> To test hypotheses about the relationship between a risk factor and an outcome, one must always compare two or more groups....When we find a difference between the groups, we must consider the possible explanations for this difference:
>
> A spurious association: The difference in the groups is due to non-comparability - that is, a difference in the composition of the groups. This association is the subject of bias and confounding.
>
> A chance association: The difference in the groups is due to chance. This association is the basis of statistical analysis.
>
> A causal association: The difference in the groups is due to a true causal association between the risk factor and the outcome.
>
> In order to prove our hypothesis and conclude that the last explanation is correct - that is, that the risk factor led to or caused the outcome, we must first rule out the other two explanations.

For example, ice cream, cold drinks, and sleeveless shirts are associated with the heat of summertime. But although these three items are associated, they are not causal to each other, nor to the heat of summer, and one would have to be ignorant about association and causality to so state. The Grassel study does show an association, but does not show causation. Gary Kleck, *Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?: The Anatomy of an Implausible Causal Mechanism*, 5 HOMICIDE STUD. 64 (2001).

[146] *See* Frey Report, at para. 36, citing James E. Bailey et. al., *Risk Factors for Violent Death of Women in the Home*, 157 ARCH. INTERNAL MED. 777, 780 (1997).

[147] Odds ratios are not equivalent to risk factors, and it is odds ratios which are used in the analysis of the Bailey article. When studying a population group that is at high risk for a disease (e.g., coal miners for black lung disease), it is scientifically inappropriate to replace risk factors with odds ratio.

Dr. Jeanine Baker explains that "Although homicide is quite rare in the general population, caution is required when interpreting odds ratios on subsets of the population with high risks for the variable being examined. In these situations, the odds ratio overestimates the risk." E-mail from Jeanine Baker, Post-

Doctoral Fellow, University of Adelaide (Australia), to Paul Gallant & Joanne D. Eisen (Mar. 17, 2007)(on file with authors). Baker continued:

> More importantly, in studies such as that described by Bailey et al. (1997), an overestimated odds ratio combined with the biases and confounding factors introduced by comparing a high risk sub-groups with the general population will result in the authors postulating causal association, thus masking the real causes....It is sad that the Frey report has failed to recognise the methodological constraints of odds ratios[,] and distressing that the real issues facing women[,] and highlighted in the Bailey et al. study[,] are mental illness and living alone [, which] have been ignored. These are key areas that still lack real input from the international aid agencies and are neglected by the community and government funding.

## C. Jus Cogens

The Vienna Convention on the Law of Treaties states that under the principle of *jus cogens*, a treaty is void if it contradicts "a norm accepted and recognized by the international community of States as a whole as norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."[148]

Charles de Visscher, one of the most influential of all international judges and scholars in the twentieth century, observed that "the proponent of a rule of *jus cogens*...will have a considerable burden of proof."[149] In *Principles of Public International Law*, Ian Brownlie writes that "more authority exists for the category of *jus cogens* than exists for its particular content....However, certain portions of *jus cogens* are the subject of general agreement, including the rules relating to the use of force by states, self-determination, and genocide. Yet even here many problems of application remain..."[150]

Frey contends that her gun control program is not only part of the "right to life" protected by various treaties, but also a *jus cogens*—meaning that it over-rides every other contrary law, including constitutional rights.[151]

Put another way, in 1992, the United States ratified the International Convention on Civil and Political Rights, which declares that "Everyone has a right to life."[152] According to Frey, the United

---

*See also* Louise-Anne McNutt, John P. Holcomb, Jr., and Bonnie E. Carlson, *Logistic Regression Analysis: When the Odds Ratio Does Not Work: An Example Using Intimate Partner Violence Data*, 15 J. INTERPERSONAL VIOLENCE 1050 (2000) 1050. The authors note:

> Often researchers are interested in estimating the strength of association between a risk factor...and an adverse outcome....Many areas of research involve the investigation of events that occur frequently. Intimate partner violence (IPV) is one such event. Estimates of the prevalence in clinic populations range between 10% and 25%, and sometimes as high as 50%....The prevalence ratio is a measure of association between the exposure status [e.g. exposure to a firearm] and the outcome status [e.g. violent death]....Another measure of association is the odds ratio.... The odds ratio is one of the most common measures used to assess the relationship between exposure to violence and adverse health outcomes...[because] it is relatively easy to calculate....[I]f the measure of association needs to be adjusted for other factors...the odds ratio is much easier to calculate [than the prevalence ratio]. And more important, the confidence intervals for the odds ratios are simpler to calculate compared with the prevalence ratios' confidence intervals. Using the knowledge that the odds ratio approximates the value of the prevalence ratio when the outcome is rare (less than 10%), the odds ratio gained popularity in scientific research....Many articles in the violence and health literature incorrectly interpret odds ratios...as relative risks or prevalence ratios. When the incidence or prevalence of the health outcome is more than 10%, this will typically result in an overestimation of the effects of violence on women's health.

*See also* Ulka B. Campbell, Nicolle M. Gatto & Sharon Schwartz, *Distributional Interaction: Interpretational Problems When Using Incidence Odds Ratios to Assess Interaction*, 2 EPIDEMIOLOGIC PERSPECTIVES & INNOVATIONS (2005), http://www.epi-perspectives.com/content/2/1/1 (visited Mar. 16, 2007)("The incidence odds ratio is a very convenient measure of effect with many appealing statistical properties including estimability in a case-control study. However, when assessing interaction, as when assessing main effects, interpreting the incidence odds ratio as if it were a risk ratio can be misleading.")

[148] Vienna Convention on the Law of Treaties, 1969 U.N. Juridicial Y.B. 140, art. 53.

[149] CHARLES DE VISSCHER, THÉORIES ET RÉALITIES EN DROIT INTERNATIONAL 295-96 (1970, 4th ed.), quoted in IAN BROWNLIE, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 490 (2003).

[150] BROWNLIE, at 490.

[151] Frey Report, at .

States thereby signed up for her 2006 gun control program. And since the gun control program is a *jus cogens*, it necessarily supersedes the Second Amendment and forty-four of the state constitutional right to arms provisions,[153] and all thirty-seven of the state constitutions which declare that self-defense is a human right.[154] Not to mention the multitude of state and federal statutes which authorize self-defense in circumstances far broader than Frey's standard that lethal self-defense cannot be used when it is necessary to prevent a rape or any other major violent felony short of homicide.[155] Also crushed under Frey's *jus cogens* are all the constitutional self-defense guarantees in other nations which authorize self-defense—against lone criminals and against criminal tyrants—in circumstances disfavored by Frey.[156]

All the flaws of Frey's attempt to claim that the right to life mandates her gun control and anti-self-defense program are magnified by her claim that the program is a *jus cogens*.

One of the reasons that international law is viewed with intense suspicion in some circles is the tendency of some activists to twist international law so that it evades people's right to self-government and self-determination, imposing an elitist, far left social policy agenda on a population against its will. Frey's *jus cogens* claim, and the Human Rights Council's acquiescence, represents the worst of this tendency.[157]

## VII. Does the Right to Self-defense Imply a Right to Arms?

If there is a right to self-defense, is there a right to arms? In answering this, we must be careful to distinguish two questions: "Is there a right to possess *some* kind of defensive arms?" and "Is there a right to possess *firearms* for defense?" The answer to the second question is much more complicated than the answer to the first.

### A. Right to Arms

A common-sense principle is embodied in the legal maxims "When the law grants anything to any one, all incidents are tacitly granted"[158] and "When the law gives a man anything, it gives him that

---

[152] International Convention on Civil and Political Rights, *supra*, art. 6, part 1; Office Of The United Nations High Commissioner for Human Rights, *Status Of Ratifications Of The Principal International Human Rights Treaties* 11 (2004), http://www.unhchr.ch/pdf/report.pdf.

[153] *Supra*.

[154] *Supra*.

[155] *Supra*.

[156] *Supra*.

[157] As we discuss in the next Part, we have argued for a *jus cogens* right of the victims of an on-going genocide to acquire defensive arms. *See* Kopel, Gallant, Eisen, *Is Resisting Genocide a Human Right? supra*. We should point out that our *jus cogens* claim is much, much smaller than the one that Frey makes; the article makes the *jus cogens* claim, on the basis of the Genocide Convention, solely in the context of an continuing genocide in which the international community has failed to take effective steps to stop the genocide. Moreover, we cite international case law which directly states a *jus cogens* right of genocide victims to acquire defensive arms. *Id.*, at _, citing Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia & Herzegovina v. Yugoslavia (Serbia and Montenegro), 1993 I.C.J. 3, 438 (Request for the Indication of Provisional Measures Order of April 8)(Lauterpacht, J., concurring). Our genocide article does not assert that the narrow application of *jus cogens* to cases of active genocide (or, perhaps, imminent genocide) means that all nations are required to adopt types of firearms laws which we would favor as a matter of policy, or that a wide range of national firearms laws which we disfavor on policy grounds are necessarily invalid.

[158] "Quando lex aliquid alicui concedit, omnia incidentia tacite conceduntur." Central Bureau of Investigation v. Shri Ravi Shankar Srivastava, IAS and Anr., No. Appeal (crl.) 36 of 2002, 10/08/2006 (Supreme Court of India), http://judis.nic.in/supremecourt/qrydisp.asp?tfnm=27925.

also without which the thing itself cannot exist."[159] So if people have a right to the free exercise of religion, then they must necessarily have the right to possess, buy, and sell the scriptures of their religion, and related religious writings. If people have a right to freedom of the press, then the people must have a right to possess, buy, and sell newspapers and magazines. And since the right to publish newspapers is an incident of the right to freedom of the press, the publication of newspapers must not be hindered by, for example, a heavy tax imposed solely on newspaper ink.[160] Likewise the freedom of the press and of religion both imply that people have a right to learn how to read.[161]

To recognize a right while forbidding the means to exercise it would make the right a nullity. So as Thomas Hobbes wrote: "since 'tis in vain to have a Right to the End, if one has not likewise a Right to the Means, therefore every Man has a Right of using all Means, and of doing all Actions, without which he cannot defend and ensure himself."[162]

If there is a right of self-defense, there must necessarily be a right to possess some defensive arms—for otherwise the right would be a practical nullity. How can a 110 pound woman defend herself against a pair of 250 pound rapists, if she cannot use arms? How can a frail 85-year-old man protect himself against three young men who are intent on robbing and killing him?

It is true that *some* people can successfully defend themselves, in some circumstances, through martial arts, or similar techniques of unarmed combat. But, typically, it takes very extensive practice for a person to obtain proficiency.

Suppose that a government said, "Yes, we admit that our citizens have a right to freedom of the press. However, we have completely outlawed all non-government publications in the native language of our nation. Even so, we are not violating the right to freedom of the press, since we allow independent publications to be published in Ancient Greek."

Although Ancient Greek is a beautiful and useful language, to prohibit vernacular newspapers, while allowing only newspapers in Ancient Greek, would obviously be contrary to the freedom of the press. Only a small, élite portion of the public would ever be able to master the Ancient Greek language sufficiently to take advantage of the freedom of the press. Likewise, to ban the possession of all defensive arms, while allowing only unarmed self-defense, would be to confine the right of self-defense to a small élite possessing the physical capability, the time, and the money to pay for a long and arduous course of training.

So it seems clear that, because there is a universal human right to self-defense, there must be a universal human right to *some* arms.

Because there is a right to possess *some* (not necessarily "any" or "all") arms, there must necessarily be a right to learn how to use those arms. If there is a right to freedom of religion, then the government cannot forbid people to be instructed in the tenets of their faith. If there is a right to freedom of the press, then the government cannot forbid teaching people how to read and write. The ability to

---

[159] Quando lex aliquid alicui concedit, conceditur et id sine quo res ipsa esse non protest.

[160] Minneapolis Star & Tribune v. Comm. of Revenue, 460 U.S. 575 (1988); Grosjean v. American Press Company, 297 U.S. 233 (1936).

[161] This does not necessarily mean a positive right for the government to teach them how to read, but at least a negative right that the government not forbid them from learning how to read, not forbid educators from teaching people to read, and not forbid the sale, possession, and use of tools which help people learn how to read (such as audio tapes, Montessori materials, and so on).

[162] HOBBES, DE CIVE, *supra*.. Hobbes of course agreed with the other philosophers about the primacy of self-defense: "That the first Foundation of natural Right, is the Liberty which each man hath, to preserve, as far as he is able, his own Life and Limbs, and to apply all his Endeavors towards the guarding his Body from Death, and from Pains." *Id.*, quoted in PUFENDORF, at 106.

receive instruction that makes it possible for a person to exercise a right is, necessarily, an incident of that right.

Accordingly, a government may not forbid instruction in self-defense—either in self-defense with legal arms, or in unarmed self-defense, or in self-defense with improvised weapons (e.g., throwing a paperweight at an attacker's head, or using a keyring in one's fist to strike an attacker).

Functionally speaking, firearms, and especially handguns, are ideal defensive arms. As the International Committee of the Red Cross observes, firearms are among the types of weapons that "are easy to handle effectively with a minimum of training."[163]    What do the data say about efficacy of the use of firearms for self-defense, and defense of others? [164]

In answering the question, we need data about the *order* in which events took place in a crime. For example, if we know that the victim was injured, we need to know if the injury occurred *before* the victim used the gun (which might suggest that use of the gun stopped the crime in progress), or if the victim was injured *after* he used the gun (which might suggest that the display of the gun prompted the criminal to injure the victim). Before 1992, there were no useful data on the subject. [165] In 1992, the National Crime Victimization Surveys began to record the sequence of criminal events and victim response.

After analyzing the new data, Tark and Kleck discovered that "A variety of mostly forceful tactics, including resistance with a gun, appeared to have the strongest effects in reducing the risk of injury...."[166] They concluded that "the best available evidence indicates that victim resistance to crimes is generally wise."[167] Further, "armed and other forceful resistance does not appear to increase the victim's risk of injury."[168]

## B. Right to Firearms?

Does the human right to possess defensive arms encompass the right to possess firearms? We can begin the inquiry by, again, examining the practices of the major legal systems. The constitutions of the United States,[169] of almost every American state,[170] of Mexico,[171] Haiti,[172] and Guatemala,[173] all contain

---

[163] *Arms Availability and the Situation of Civilians in Armed Conflict, International Committee of the Red Cross,* June 1999, at 21.

[164] The CDC and NAS studies described *supra* did not attempt to analyze data regarding the efficacy of armed victim resistance.

[165] Philip J. Cook, *The Relationship between Victim Resistance and Injury in Noncommercial Robbery,* 15 J. LEGAL STUD. 405, 414-416 (1986):

> Since we cannot distinguish between the influence of the robber's actions on the victim's response and the influence of the victim's actions on the robber's response, we are left simply not knowing how to interpret the statistical patterns of association between resistance and injury....the temporal sequence of events may not tell us enough about the causal process to support definitive conclusions.

[166] Tark & Kleck, at 861.

[167] Tark & Kleck, at 904.

[168] Tark & Kleck, at 902.

[169] U.S. CONST., amend 2. *See supra* text accompanying notes - .

[170] *See supra* text accompanying notes - .

[171] MEXICO CONST., art. 10, *supra.*

[172] *Supra.*

a right to possess arms, particularly firearms, for personal defense. The English Bill of Rights and the common law also contain an explicit right to possess firearms for lawful personal defense[174]; as noted *supra*, the English system is part of the foundation of the law in approximately one-third of the planet. Of course it should also be acknowledged that, particularly in the last decade, many Commonwealth nations have not respected the right to arms provision of the 1689 Bill of Rights, and have also disrespected many of the other rights in that Bill of Rights.[175]

As detailed *supra*, Roman law (which was foundational for the law in most of continental Europe and its colonies), recognized a right to arms. The original Roman law was created long before firearms were invented. However, the Roman law continued in force in Europe until the nineteenth century, by which time firearms had been in common use for centuries.

We do not, in this Article, contend for a universal right to firearms under all circumstances. We have elsewhere argued that current international law, including the Genocide Convention, guarantees a right of self-defense by groups which are the victim of an on-going genocide; we further argued that the right includes the right to defensive firearms.[176] Our main case in point is the current genocide in Darfur. We argued that Darfur refugees have a right to use firearms to protect themselves against genocide, rape, ethnic cleansing, and other atrocities being perpetrated at the direction of the government of Sudan. When Darfuris are prosecuted in Sudanese courts for possessing arms in violation of Sudan's extremely stringent (but selectively enforced) gun control laws, the Darfur refugees would have a valid claim that their international law right to use arms for protection against active genocide trumps the Sudanese gun control laws. (We acknowledge that Sudanese courts are hardly likely to respect international human rights law.) Our legal argument was limited solely to the narrow context of actual genocide, while we noted that the argument could be extended to cases of threatened genocide.

In a non-genocide context, it would be wrong to use international law to attempt to impose the gun laws of the American state of Wyoming on Japan (or vice versa). We suggest that the narrowest statement of international human rights law would be that all people have a human right to self-defense, and therefore a human right to possess and learn how to use *some* arms, and that this right encompasses a right to firearms under *some* circumstances.[177]

It is important to distinguish nations where there is a direct, explicit right to arms (the United States, Mexico, Haiti, and Guatemala, and, in a weaker sense, the common law nations[178]) from other nations. In the former, the possession of arms is itself a right. The express right is not dependent on the citizen showing that he has a "need" (let alone a "necessity") to exercise the right.

In many other countries, arms possession is not a right in itself. Arms possession would be only a derivative right of the primary right of self-defense (which is a universal right[179]). In the latter nations, the right to arms would exist *only to the extent reasonably necessary* to effectuate the primary right of self-

---

[173] GUATEMALA CONST., art. 38, *supra*.

[174] *See supra* text accompanying notes - .

[175] *See supra* text accompanying notes - .

[176] David B. Kopel, Paul Gallant & Joanne D. Eisen, *Is Resisting Genocide a Human Right?* 81 NOTRE DAME L. REV. 1275 (2006).

[177] There are always implicit exceptions to almost every broadly-stated rule. For example, a person in a prison or in an institution for the insane would not have a right to arms. And as detailed in Part VI, violent criminal aggressors forfeit their legal right to self-defense. *See supra* text accompanying notes – .

[178] *See supra* text accompanying notes – .

[179] *See supra* text accompanying notes – .

defense. Similarly, a right to firearms would exist only to the extent that the possession of other arms could not reasonably effectuate the self-defense right.

We offer two suggestions in which a right to arms, derivative of the right of self-defense, would appear to be at its strongest. First of all: in the home. As discussed, *supra*, the right to arms and the right to security of the home are closely-related in the common law tradition.[180] The sanctity of the home against violent and unexpected invasion is a widely-expressed fundamental human right all over the world.[181] More broadly, a violent home invasion is an especially atrocious crime because it destroys the peace and security of the home which are the right of every person and family. That is one reason why breaking into a home is usually punished more severely than breaking into an unoccupied warehouse. Accordingly, the primary right to self-defense, and the derivative right to arms, are at their apex in the home.

Conversely, prudential concerns about the risks of arms possession—such as the mistaken shooting of a stranger—are significantly lower in one's own home than in a public place. The Wisconsin Supreme Court, interpreting the state's newly-enacted right to arms, rejected a right to carry arms in an automobile, while affirming a right to carry arms in one's home or privately-owned business for precisely this reason.[182]

The situation in which the right to arms for self-defense would be at its apex would be when a particular arm (including, in some situations, a firearm) would be *necessary* for self-defense. At the least, the human right to defensive arms would become a human right to defensive *firearms* in situations when, like genocide victims, the potential victim faces grave danger, and, practically speaking, there is no adequate substitute for a defensive firearm. There are a wide variety of interpretations that can be placed on "necessary"; at the least, "necessary" means more than "under no circumstances."

So, for example, in Canada, the law states that a person may be issued a permit to possess a handgun for defensive purposes (as opposed to collecting or target shooting) only to protect life where other protection is inadequate.[183] Yet currently in Canada, a nation of more than thirty million people, some of whom live in very dangerous areas of Toronto or Vancouver, or who live in very isolated areas many hours or days from the nearest police, *no-one* has been issued a permit to possess a handgun for

---

[180] *See supra* text accompanying notes – .

[181] *See supra* text accompanying notes – .

[182] State v. Hamdan, 665 N.W.2d 785, 807 (Wis. 2003), quoting Moore v. East Cleveland, 431 U.S. 494, 500 (1977) (Powell, J., plurality opinion):

> None of these rationales is particularly compelling when applied to a person owning and operating a small store. Although a shopkeeper is not immune from acting on impulse, he or she is less likely to do so in a familiar setting in which the safety and satisfaction of customers is paramount and the liability for mistake is nearly certain. There is less need in these circumstances for innocent customers or visitors to be notified that the owner of a business possesses a weapon. Anyone who enters a business premises, including a person with criminal intent, should presume that the owner possesses a weapon, even if the weapon is not visible. A shopkeeper is not likely to use a concealed weapon to facilitate his own crime of violence in his own store. The stigma of the law is inapplicable when the public expects a shopkeeper to possess a weapon for security.[Thus,] a citizen's desire to exercise the right to keep and bear arms for purposes of security is at its apex when undertaken to secure one's home or privately owned business. Conversely, the State's interest in prohibiting concealed weapons is least compelling in these circumstances, because application of the CCW statute has but a tenuous relation to alleviation of the State's acknowledged interests.

[183] R.S.C., ch. C-46, § 109(3)(c)(i).

89

defense of life.[184] A government policy of ignoring an express statutory command, and refusing to issue defensive handgun permits in even the most compelling, demonstrated cases of necessity would appear to be inconsistent with the right of self-defense.

Defensive arms possession in cases of necessity—as a derivative of the right of self-defense—might be effectuated by a fact-specific analysis of the dangers to the family or individual, and the practical adequacy of other defensive measures.[185]

The derivative right of arms possession might also imply that "alternative defensive measures" not be construed to include the sacrifice of express rights in the relevant jurisdiction (e.g., "You wouldn't need a gun for protection from terrorists if you would just order your newspaper staff to stop writing editorials in favor of religious liberty.")[186]

---

## H. WHERE IS THE PRESIDENT'S FOREIGN POLICY ON THE SECOND AMENDMENT HAS A HUMAN RIGHT?

The President can have the Ambassador to the United Nations, Warren W. Tichenor, deliver the United States denunciation of United Nations' *PROGRAMME OF ACTION TO PREVENT, COMBAT AND ERADICATE THE ILLICIT TRADE IN SMALL ARMS AND LIGHT WEAPONS IN ALL ITS ASPECTS* and the *CONCLUSIONS AND RECOMMENDATIONS* in Barbara Frey, Special Rapporteur, *FINAL REPORT ON SPECIFIC HUMAN RIGHTS ISSUES: PREVENTION OF HUMAN RIGHTS VIOLATIONS COMMITTED WITH SMALL ARMS AND LIGHT WEAPONS; ITEM 6 OF THE PROVISIONAL AGENDA*, Fifty-eighth session of the United Nations' Human Rights Council's *Sub-Commission on the Promotion and Protection of Human Rights*, in accordance with Sub-Commission resolution 2002/25, dated July 27, 2006, (A/HRC/Sub.1/58/27)[187] as threats to the peace, a breaches of the peace, and as acts of aggression against not only against the Second Amendment as a human right of United States citizens but against the human right to life of all people under the *CONVENTION ON THE PREVENTION AND PUNISHMENT OF THE CRIME OF GENOCIDE* (hereinafter, *GENOCIDE CONVENTION*) as violating the non-intervention in domestic matters of Member States as stipulated in Clause 7, Article 2 of the *UNITED NATIONS CHARTER*.

A violation of the *U.N. CHARTER* of that magnitude not only invokes Chapter VI remedies (Article 33 through Article 38) and Chapter VII remedies (Article 39 through Article 51) of the *UNITED NATIONS CHARTER* but also invokes Section 3 Termination and Suspension of the Operation of Treaties, Article 54 through Article 64 of the *VIENNA CONVENTION ON THE LAW OF TREATIES BETWEEN STATES AND INTERNATIONAL ORGANIZATIONS OR BETWEEN INTERNATIONAL ORGANIZATIONS OF 1986* the consequences *in extremis* being the disbanding of the United Nations with a preferred consequence of the United Nations abandoning its global disarmament of the citizens of Member States and affirming the human right of armed self-defense in accordance with the Genocide Conventions.

---

[184] R.C.M.P., letter to M.P. Garry Breitkruz (on file with authors).

[185] This does not mean that the licensing authority would have to devote resources equivalent to a criminal homicide investigation. *Supra.*

[186] In the United States, the principle that the government cannot withhold a license in order to coerce people into surrendering a right is known as the doctrine of unconstitutional conditions. *E.g.*, 44 Liquormart v. Rhode Island, 517 U.S. 484 (1996); Speiser v. Randall, 357 U.S. 513, 526 (1958); Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413 (1989).

[187] http://www.iansa.org/un/documents/salw_hr_report_2006.pdf

The current activities of the United Nations calls in into question on what exactly are the *Purposes and Principles of the United Nations* as eluded to in Chapter I of the *U.N. CHARTER*.

The President can direct the Attorney General coordinate with the Secretary of State and prepare an amicus curiae brief favorable to my human rights Petition No. 1142-06 at the *INTER-AMERICAN COMMISSION ON HUMAN RIGHTS*, if they have not already done so in response to the Commission's investigation.

The President can also direct the Attorney General to intervene in support of my case in this Court in the interest of justice under Rule 5.1 or Rule 24 of the Federal Rules of Civil Procedure.

# I. CONTINUING MY REBUTTAL TO THE LETTER FROM NICHOLAS MICHEL, LEGAL COUNSEL FOR THE UNITED NATIONS

The United Nations does not *enjoy* privileges and immunities to violation human rights of individual citizens of Member States to the United Nations as prohibited by Article 2, paragraph 7 of the UN Charter.

He states in the third paragraph on page 2:

**1.** Article II, Section 2 of the General Convention provides that "[t]he United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process **except insofar as in any particular case it has expressly waived its immunity**.

The United Nations, in fact and law, **has waived its immunity either explicitly or by implication**, in accordance with 28 U.S.C. § 1605(a)(1), (2), & (6), *GENERAL EXCEPTIONS TO THE JURISDICTIONAL IMMUNITY OF A FOREIGN STATE* of the *FOREIGN SOVEREIGN IMMUNITIES ACT OF 1976*,

Again, I cite from the first paragraph on page 2 of the letter from the Legal Counsel of the United Nations, Nicholas Michel referring to the UN Charter:

**2.** Article 105, paragraph 3  stipulates that "**[t]he General Assembly may make recommendations with a view to determining the details of the application of paragraph 1 . . . of this Article or may propose conventions to the Members of the United Nations for this purpose.**" UN Charter, Art. 105, 1945 U.S. Code Cong. & Admin News, at 985.

The United Nations, in fact and international law, has waived its immunity either explicitly or by implication, in several United Nations declarations, conventions, and covenants on human rights, including the UN Charter, which give individual citizens courses of remedies for human rights violations. The following list of United Nations human rights documents verify the explicit or implicated waiver:

**3. United Nations Charter**, Chapter VI, Pacific Settlement of Disputes

Article 33 through 38

**4. United Nations Convention Against Corruption**

Article 13 Participation of society
Article 25 Obstruction of justice
Article 30 Prosecution, adjudication and sanctions
Article 35 Compensation for damage
Article 37 Cooperation with law enforcement authorities
Article 38 Cooperation between national authorities
Article 39 Cooperation between national authorities and the private sector
Article 43 International cooperation
Article 66 Settlement of disputes

# J. International Bill of Human Rights

(partil list)

**1. Universal Declaration of Human Rights**

Article 10

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

Article 12

No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks.

Article 17

1.Everyone has the right to own property alone as well as in association with others.

2. No one shall be arbitrarily deprived of his property.

Article 27

1.Everyone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits.

2. Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author.

Article 29

1. Everyone has duties to the community in which alone the free and full development of his personality is possible.

2, In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society.

3. These rights and freedoms may in no case be exercised contrary to the purposes and principles of the United Nations.

Article 30

Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein.

## 2. International Covenant on Economic, Social and Cultural Rights

Article 1

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and **cultural development**.

Article 3

The States Parties to the present Covenant undertake to ensure the equal right of men and women to the enjoyment of all economic, social and **cultural rights** set forth in the present Covenant.

## 3. International Covenant on Civil and Political Rights

Article 1

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

# K. HUMAN RIGHTS DEFENDERS

## 1. Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms: A/RES/53/144

Article 9

1. In the exercise of human rights and fundamental freedoms, including the promotion and protection of human rights as referred to in the present Declaration, **everyone has the right, individually and**

93

in association with others, <u>to benefit from an effective remedy and to be protected in the event of the violation of those rights.</u>

*(see pages 5-10 of this letter for the full Declaration above)*

# L. RIGHT TO ENJOY CULTURE, INTERNATIONAL CULTURAL DEVELOPMENT AND CO-OPERATION

**1. Declaration of the Principles of International Cultural Co-operation**

Article 1

1. Each <u>**culture**</u> has a dignity and value which must be respected and preserved.

2. Every people has the right and the duty to develop its culture.

3. In their rich variety and diversity, and in the reciprocal influences they exert on one another, all cultures form part of the common heritage belonging to all mankind.

Article 2

Nations shall endeavour to develop the various branches of culture side by side and, as far as possible, simultaneously, so as to establish a harmonious balance between technical progress and the intellectual and moral advancement of mankind.

**2. Recommendation concerning Education for International Understanding, Co-operation and Peace and Education relating to Human Rights and Fundamental Freedoms**

———————

# M. EVIDENCE OF INTERNATIONALLY DRIVEN REVERSE RACISM AGAINST WHITES

## 1. BALTIMORE SUN OPINION: WAS EHRLICH RIGHT ABOUT MULTICULTURALISM?

By Robert Holland
Baltimore Sun
October 30, 2007
http://www.baltimoresun.com/news/opinion/oped/bal-op.multicultural30oct30,0,4084309.story

*Robert Holland is a policy analyst for the Lexington Institute, a free-market-oriented think tank in Arlington, Va. His e-mail is holland@lexingtoninstitute.org.*

When he was governor of Maryland in 2004, Robert L. Ehrlich Jr. stirred a hornet's nest when he denounced multiculturalism as "bunk" on a talk-radio show. Because many Americans believe multiculturalism merely means teaching children in a wholesome way about diverse cultures, Mr. Ehrlich drew heat.

Now, the National Association for Multicultural Education (NAME), the main advocacy organization for multiculturalism, is coming to Baltimore to hold its 17th annual national convention tomorrow through Sunday.

Here is a perfect opportunity to examine the agenda and see if the former governor had a point.

School board members ought to be particularly interested, because they approve the doling out of taxpayers' money for K-12 teachers from every state to attend the NAME convention.

They ought to be welcome to sit in on any of the workshops and determine what multicultural messages their teachers are absorbing for use in the classroom.

The co-sponsors of multiculturalism's biggest gathering include several beneficiaries of tax money, including the Maryland affiliate of the National Education Association (a longtime NAME ally), George Mason University and even the Maryland State Department of Education.

School board members could start by attending one of the half- or full-day workshops on Halloween. Here are some of the choices from the NAME program:

• "The Unbearable Whiteness of Being: Dismantling White Privilege and Supporting Anti-Racist Education in Our Classrooms and Schools." Taught by a professor from St. Cloud State University in Minnesota, this session "is designed to help educators identify and deconstruct their own white privilege and in so doing more deeply commit themselves to anti-racist teaching and critical multicultural teaching."

• "Talking About Religious Oppression and Unpacking Christian Privilege." This session, taught by a team of professors, "will examine the dynamics of Christian privilege and oppression of minority religious groups and nonbelievers as constructed and maintained on three distinct levels: individual, institutional and societal. A historical and legal lecturette will be presented and participants will engage in interactive learning modules."

• "Beyond Celebrating Diversity: Teaching Teachers How to be Critical Multicultural Educators." Taught by NAME regional director Paul Gorski, founder of the activist group EdChange, this session will start from the premise that multiculturalism's greatest danger "comes from educators who ostensibly support its goals, but whose work - cultural plunges, food fairs, etc. - reflects a compassionate conservative consciousness rather than social justice. This session focuses on preparing teachers, not for celebrating diversity, but for achieving justice in schools and society."

Workshops at NAME annual conventions (six of which I have attended since 1993) repeatedly advocate the teaching of "social justice." That

95

term never seems to be defined, but its users simplify all American life as a saga of the oppressed vs. the oppressors. Skin color, national origin, gender, religion and sexual preference are among the qualities that put all individuals into one category or the other.

There is method in such vagueness. The great free-market economist Friedrich Hayek once observed that entire tomes on social justice never offer a definition. As Michael Novak elaborated in an article in the December 2000 edition of the journal First Things, the term becomes "an instrument of ideological intimidation for the purpose of gaining the power of legal coercion."

Not just in the daylong institutes but also in more than 150 smaller-group sessions that go on almost hourly throughout a NAME convention, presenters instruct teachers to go back to their schools and become social justice warriors. Those who are white are supposed to transcend their oppressor status by becoming change agents. Those who are Christian should feel just as guilty as the whites for all those their faith has victimized. Nothing but evil has come from the European cultures that led the way in America's founding.

It is not necessary to accept my contention that ideological indoctrination permeates the multiculturalists' deliberations. Go to www.NAMEorg.org and read the full convention program. Better yet, ask to attend sessions that are of particular interest to you. After all, your tax money is paying for them, and for the lessons that teachers bring back for your children.

Then, decide for yourself whether Bob Ehrlich was right.

# 2. PUBLIC COMMENT TO THE
# BALTIMORE SUN ON THE ARTICLE ABOVE

Tuesday October 30, 2007

Susana, Rocky Mount, NC

So, every culture is fabulous except for the white Christian culture? Isn't this discrimination under a new name? I, for one, embrace my European-American culture! Let others do the same.

Mike Holbrook, Arlington, VA

What a bizzare way for western civilization to decline, by it's own sword. It doesn't surprise me that the only thing capable to bring down the noble establishment of the western, white culture is the establishment itself. God knows that the brownskins couldn't do it without the help of the traitorous socialist whites.

Shallee Page, Orono, ME

A definition for social justice? Hmm, how about helping out those less fortunate than you, whether they be white, black, latino, asian, muslim, jew, christian, samaritan, lesbian, gay, straight, attractive, unattractive, liberal or conservative.

Hayekian, Kansas City, MO

I could write a book in response to the anti-intellectual drivel emanating from the retrogrades at this Marxist conference, but I will refrain, and instead, offer a brief response.

Two words : VOUCHERS NOW !!!

Aaron, Indianapolis, IN

Shallee, you're right. Unfortunately that isn't the definition being applied.

If NAME and its sort used your definition strictly, they wouldn't represent such an awful threat to american culture and the free exercise of religion as guaranteed by the 1st amendment.

Right, Indianapolis, IN

Certainly it would be interesting to see how many of those high school teachers in attendance "teach" at the 1700 high schools in aqmerica labelled "drop out fqctories" by a Johns Hopkins University study out yesterday. Surely all the Baltimore school and The District of Columbia schools are horror stories of multiculturalism trumping learning.

As long as you leave school a devout liberal atheist, it doesn't matter is you can spell the name of the street you live on for your application at some menial job.

Hayekian, Kansas City, MO

What they really mean by "social justice" is watered down Marxism. When you strip away the veneer from these clowns, you will find that the "social

justice" advocates, multiculturalists and anti-globalization activists are the same people with the same agenda. The common thread which unites all of these people, and which explains why they are ALWAYS on the same side of every battle, is a hatred of free market capitalism. This is cultural Marxism, pure and simple.

TexasNole, AOL

> I am sorry about how you feel. You are not smart enough to question the great icons of multiculturalism. Get down on your knees and appologize for all the things western culture has done....i mean science advances democracy aid freedom education freedom of religion speech communications computers transportation.....we could all be third world contries if it was not for the stupidit of white men.
>
> You just don't understand.

Quadrangle, Baltimore, MD

> Shallee:
>
> You are getting closer than those at the NAME convention. How about "love others as you would have others love you?" That definition of social justice doesn't require any arbitrary categorizatons or stereotypes to determine who might or might not be less fortunate. I, for one, would add love of God before that in order to give true meaning to the term "love", but that can be your personal choice or journey.
>
> The biggest critcsim of the NAME drivel is that it hypocritically requires stereotying and discrimination (reverse or otherwise), as well as a claim of victimhood, in order to claim entitlement to prevail over discrimination and victimhood. It is false, delusional and unproductive.
>
> Q

Baltimore City Resident, Baltimore, MD

> More reasons to send children to private schools. More reasons to home school your children.

Six-ft-seven, Ellicott City, MD

> The ultimate test of multiculturalists is how accepting they are of Erlich's remarks.
>
> Anyway, without multiculturalism, what else would all these people be doing today, other than, say, working at the jobs they're getting paid to do, rather than wining and dining at a convention in beautiful, downtown, multicultural Baltimore?

W Layer, Dumfries, VA

> "Multiculturalism is bunk." That's being too complimentary. Multiculturalism is rot eating away at liberty and society. It is Marxist deconstructionism led by the very types Lenin's Cheka eliminated. NAME is just another reason

colleges of education and the "degrees" they produce are worthless.

Wolverine, Cumberland, MD

> *Baltimore City Resident wrote:*
>
> *More reasons to send children to private schools. More reasons to home school your children.*
>
> Exactly. Our are home schooled with a extremely hard Christian curriculum.

Disgusted Marylander, Jacksonville, FL

> This 'organization' could not have chosen a more appropriate location for their convention.
>
> Why is there so much self-hatred amongst white/Christian academics? Neither terrorism nor Islamic extremism will cause the end of western civilization...political correctness will bring the end of all we cherish. Say no to drugs, and public education.

Alan, Scottsdale, AZ

> Thanks you Mr. Holland for exposing the rank racism being taught in our schools by the haters of our culture. I have heard of these type session titles before at other "multicultural" events, and every time I do I think of early Nazi indoctrination of Germans against the Jews. I shudder to think of what events would occur if these folks had the power they accuse the groups they hate of wielding. As a white male Christian my ancestors were persecuted too - somewhere, sometime. What hateful idiots. As a former 60's liberal, I unfortunately become less tolerant every time I'm reminded how much these self hating groups hate me.

JayCeezy, United States

> Ask just about any high school or college student today, and they will barely know the concept of western civilization. Tearing down the first world will not improve the third; but it might make the third world feel better, and public school teachers consider that a worthwhile goal.

Jeffro, Garland, NC

> I've traveled to cultural-dysfunctional communities around the world. Let's see.. Middle Eastern -close to idiots, women suppressed, men stupid, country is forever old, never amounted to squat. See Afganistan, it's just street gangs on camels, no law, no education for women, women raped on a regular basis. Sort of like black America. China finally fiqured out that western white men were smarter and are now trying not to starve their people into submission, poor, disorganized, country forever old, never amounted to squat. Africa ..enough said. You really need to get out into the world and learn the multi-culturalism is a bunch of people hanging on to nothing at all to be

97

proud of. If not for western white men that push themselves, the rest of the world would still be in the stone ages. Some places still are. I wouldn't degrade myself to hang on to bizarre and detrimental behaviors that promote nothing at all.

multi-crap analyst, Anderson, IN

If only the people who are being duped by this could read this article.

Rozabell, Baltimore, MD

How appalling my tax dollars are funding workshops with titles like the Unbearable Whiteness of Being and Unpacking Christian Privilege. As a white Christian I see this as inflamatory and dangerous. We face a "hate whitey" rhetoric every day. What is truly sad is that European Americans are not rising up against this blatant discrimination. America is through, in my opinion, and it is the elite class that is responsible for the demise of the greatest civilization the planet has ever known.

Jeffro, Garland, NC

People criticize the South, but the Yankees move here to escape multiculturalism and themselves. They promote it, then they can't live with it. They move to Southern as they "civilized " communities were people attend church and still have manners and decent conduct. I've been up North it's a dysfunctional social nightmare, an absolute social mess.The liberals up north say they love it, but they won't live around it.

Livewiremd, Baltimore, MD

Ehrlich was definitely right. He had the guts to say it too. I sat through a mandated class of this "bunk" at a hospital downtown. The purpose of this class was to negate anything white (pro-affirmative action) and Christianity (pro gay rights) but it mentioned nothing about other issues like pollitical persecution (MD) or things like anti-sematism. There was NO discussion permitted about why minorities suffer so much at the hands of their own communities. It is always easier to play the guilt trips and blame someone else. Anyone who speaks up against this "bunk" will get called a racist. Watch the replies to my post here and you will see.

Freddy M, College Park, MD

Shalee wrote: "A definition for social justice? Hmm, how about helping out those less fortunate than you, whether they be white, black, latino, asian, muslim, jew, christian, samaritan, lesbian, gay, straight, attractive, unattractive, liberal or conservative."

Ummm...isn't that either welfare or charity (depending on whether it comes from the government or private sector)? If this is all

"social justice" means, then why not call it my its traditional names: welfare and charity?

I'll tell you why: the words "social justice" are pregnant with more meaning than helping the poor. It means social "fairness," where "fairness" means something like "equality." Advocates for social justice are interested in forced equality in both the legal and purely social realms. No one is better than another. No culture is better than another. No moral code is better than another. Social justice means forcing people in their everyday social lives to live by twisted rules of equality: accept homosexuals (not just legally but socially and morally). Accept gangster rap its just music of a diverse culture. Accept taking from the rich to give to the poor, not in small amounts to help the poor but in large amounts solely for the purpose of equality of wealth. Don't offend anyone by taking a moral stand. Every person, every culture, every moral principle is equal (except conservatives and religious Christians, of course.

"Social justice" is is forced blandness. It is social pressure to make everyone conform to the lowest common denominator. Its government and peer-pressure in the interests of social pablum.

Sandra, Akron, OH

I am really sick of the "self-hatred" that is being taught in this country. We may not be perfect, but our Christian heritage when practiced correctly and not in a self serving manner is the ONLY reason we are a "multi-cultural" nation, not a theocracy. I'm sick and tired of our children being taught to be ashamed of being Americans. This kind of thinking which is being perpetuated by the "elitist-white left" is detrimental to true education and growth and change for the better.

Glade Roos

I believe that Governor Ehrlich Jr. was correct in his view because there is no such thing as "social justice." Society, according to Hayek, is like a cosmos in that it just exists -- it is neither just nor unjust. In similar fashion to an ecosystem, or a market, society is made up of individual actors trying to maximize their rational self interest. The result is both just and unjust outcomes -- many of which are unintended. However, out of the ensuing confusion order spontaneously emerges. Therefore, how can anyone define what is "just" for society? What standard will be used that everyone in that society will support? Anyone that proposes to do anything in the name of "social justice" is merely attempting to impose their sense of values on society at large in order to benefit a particular group at the expense of this society. If they insist on benefiting that group they can attempt to do so without rallying around the false banner of social justice.

most concerned, Baltimore, MD

Where are our leaders on this issue? Back in their offices planning for re-election? What is the position of the current governor of Maryland on this distortion of "multiculturalism".( Our country was built on multi-cultures.) Do our senators, representatives, delegates, council members and school boards not know that precious funds are being wasted on the dismantling of history's shining example of a true democracy? Are we now without statesmen, and forever stuck with professional politicians?

Jeffro, Garland, NC

My father told a complaining minority this:

Did you go school? Yeah man. Did you read the books? Not too much. Did you study? Naw. Well.. you see..you had the chance to better yourself in the greatest free education system in the world but you DIDN''T WANT TO. It's not jimmy's fault, johnny's fault or the white man's fault. It's yours and your family's . It's not my fault or any other white guy. It was your decision alone, no one can stop a man from educating himself in this country. It's by self choice.

J Mpeppe, Richmond, VA

I suppose this is a perfect opportunity for every oppressed white male to give us us a purple faced rant about how the "librus" are responsilke for the downfall of civilization. Thank God Bobby Haircut is no longer Governor and some sense has been returned to the good state of MD.

Straight white male, Cumberland, MD

Yes, J Mpeppe, just like the Roman empire. A little history lesson is in order for you.

JPP, Bedford, VA

I have to agree with the former Governor....Multiculturalism is BUNK.

**Elixelx, Caserío Santa Ana, Spain**

When I attended Teachers' Training at the "cutting edge" TT College in Greenwich, London, in 2002, the first question the instructor asked was "What is the function of Education?" and then, barely pausing to hear what his students thought, he replied **"TO CHANGE BEHAVIOUR!"**

I immediately asked "from what to what?" and for the next three months suffered the "troublemaker" moniker that comes with asking troublemaking questions!

I was a teacher all over the world for 32 years, before taking that refresher at Greenwich, and I had never ever anywhere anytime heard that definition of the function of education.

**I have since come to the conclusion that what I believed all my life was incorrect--not all education is a blessing, and in some cases it may actively be a curse!**

Skeletor, Zeeland, MI

I suppose this is a perfect opportunity for every oppressed white male to give us a purple faced rant about how the "libruls" are responsible for the downfall of civilization.

And the perfect time for the self-righteous to explain why our privilege is what deprives us of the right counter criticism of anyone darker, gayer, or more oppressed-er than us.

It's crap. And while it is troubling a bit, most children are already wise to it, and ignore it. The truth is that the opportunity for knuckleheads to "speak truth to power" is a sign of the fact that we really know we have nothing to fear from it.

Leftoids are too self-defeating and disorganized to warrant oppression.

John Tuberski, Nutley, NJ

This stuff makes me sick. I don't have kids, but I may someday and it infuriates me that this kind of garbage is allowed and, in fact, incouraged in our educational system. The people who espouse this type of thinking should all go live in a country with a non-Christian/white/western/ majority and see how it works for them. I'm not even Christian, but they get a bad rap from the multi-cults and I'll take this over living in a Muslim majority country any day of the week.

Youreright, Verona, NJ

I agree,I live in North Jersey. I'd like to add that this is one of the reasons I can't vote for Democrats. I'm not in a republican income bracket,But I believe its only Republicans that will protect us from this nonsense. These people have had control of the schools for 30 years and what have the produced other than curriculums that rival Monte Python in silliness.

*Jeffro wrote:*

*People criticize the South, but the Yankees move here to escape multiculturalism and themselves. They promote it, then they can't live with it. They move to Southern as they "civilized " communities were people attend church and still have manners and decent conduct. I've been up North it's a dysfunctional social nightmare, an absolute social mess. The liberals up north say they love it, but they won't live around it.*

Bill Sanford, Zeeland, MI

This is ridiculous. It is no wonder that people view public education as an institution in decline.

I think the next great disaster facing our country is education; The public schools have gone crazy, and

higher education hs gone money crazy as well as political.

Dave H

Multiculturism is just an aspect of Critical Theory, which seeks to advance "Social Justice", which means (HERE'S THAT DEFINITION) turning tables on existing "oppressive" relationships. It's bastardized Marxism. It does not advocate fairness for all, only for the oppressed, since majorities, being "oppressors" by definition, are useful only by being overthrown. At which point, as in Communist countries and American academia, the formerly "oppressed" run the show and may freely discriminate against the former "oppressors" to achieve "social justice" for the latter's historical crimes against the "oppressed". Although Marx was an economist, the theory has been adapted for non-economic relationships, which are more immutable. Poor people can become rich (in the U.S., if not in Marx's Europe) but black people can't become white and women can't become men (or, if they do, they join their own special group of the "oppressed"). So no matter how powerful a black person or a woman becomes, he or she will always be "oppressed" and therefore privileged (to use a legal term in its proper meaning) to continue discriminating against members of the majority: which, in America, means white Christian men. The other great feature of Critical Theory is that it brooks no dissent, since to criticize it by means of logic and facts is to adopt the oppressors methods. Since only the "oppressed" can further social justice, proving yourself an oppressor by using logic and facts simply makes your opinions irrelevant as belonging to an "oppressor" and therefore not worth listening to.

Rozabell, Baltimore, MD

I attended the "stop the murder" rally in front of City Hall on Sunday. It appears most of those killed are African-American (by other African-Americans). Where were the Sharptons, Jesse Jackson's et al - all missing in action. This is a huge problem and as a white woman I was shocked that those who suffer the most receive no representation from the race hustlers who have dedicated their lives to the "get whitey philosophy." America is a dying culture and it is the white elite and their "multicultural" ilk responsible. Want nothing more to do with this, but I still will stand up for what is left of my right to speech, even though I am a white Christian.

Samuel Davis III, Saint Louis, MO

This is pure Marxism. It's only purpose is the destruction of Western Culture. The educational establishment is working every day to undermine our society. We have lost a generation to the propagandists of division and self-hate, and we

are in the process of losing another. This is very serious, very widespread, and very entrenched. It may already be too late.

An Unbearable Whiteness, West Hartford, CT

Multiculturalism has never worked and will never work. It's human nature. The sooner these left-wing lunatics realize that, the better off EVERYONE, including those of the non-whiteness variety, will be.

notMD4bush, San Jose, CA

WOW, this isn't multiculturalism. This is bigotry and intolerance wrapped in warm fuzzy do the right thing social engineering. The obvious point is the Eurocentric history of this country and the reasons for its founding are all evil and need to be abolished. That the mores and values of systems that don't favor individual responsibility, initiative or the natural freedom of man should be the standard by which are future is shaped. There are commissars, governors, and party aparatchiks that should decide how we should act how are children need to be raised. It takes a village or commune, or party to decide the individual is evil.

Wolverine, Cumberland, MD

Hey buddy, there is a village calling for you, they want their idiot back. Social engineering.

In A Real paper, Elliott City, MD

without a political agenda, the news department would be covering the doctrinaire, fascist foolishness. In fact it would be on the frontpage. When you hear the libs cry about no money in schools, remember this boondoggle.

Mike, Upper Marlboro, MD

Reading these comments causes me pain. Complaining about multi-culturalism and how oppressed Christians and whites are in this country? Please. You control the White House, Congress, and the Supreme Court. You have been oppressing people for centuries, and the second someone brings it up, you cry "reverse-racism" in an attempt to maintain your power and make others feel bad for trying to rise above.

Wolverine, Cumberland, MD

*Mike wrote:*

*Reading these comments causes me pain. Complaining about multi-culturalism and how oppressed Christians and whites are in this country? Please. You control the White House, Congress, and the Supreme Court. You have been oppressing people for centuries, and the second someone brings it up, you cry "reverse-racism" in an attempt*

100

*to maintain your power and make others feel bad for trying to rise above.*

Horsehockey - "trying to rise above" while doing the very same thing they criticize the white Christian males for having done. Yeah that's progress.

Jim Carmine, Pittsburgh, PA

Social Justice, or as it has morphed in colleges, "Service Learning" is bunk. Real social justice entails giving our students the education they paid extortionate rates to receive. If you leave college only marginally literate, you have been robbed by your college.

Flyingcow, Hurlock, MD

Western white people are the only "tribe" in the world who refuse to defend their own interests as an ethnic group--in their wish to respect other cultures, whites are well down the path to racial suicide, and will soon be gone.

If you like Zimbabwe today (or Baltimore City), you will LOVE the soon-to-be brave new world without white people....

HRC, Ellicott City, MD

Spoken like someone who has fallen and can't get up. Are you waiting for someone to help you up or are you just getting comfortable down there?

*Mike wrote:*

*Reading these comments causes me pain. Complaining about multi-culturalism and how oppressed Christians and whites are in this country? Please. You control the White House, Congress, and the Supreme Court. You have been oppressing people for centuries, and the second someone brings it up, you cry "reverse-racism" in an attempt to maintain your power and make others feel bad for trying to rise above.*

Samuel Davis III, Saint Louis, MO

There is no such thing as social justice. The concept of justice applies only to individuals, not to groups.

Hayekian, Kansas City, MO

Samuel Davis III is exactly right ! In reality, there is NO SUCH THING as "social justice". It is a false concept.

ABE, Roanoke, VA

What a country, eh? We have the real-life Reactionary-Right Ehrlichs fomenting anger and hate via their most-favored propaganda media format, and now, comes former grand dragon of Richmond Times-Dispatch's Op-Ed page--Robert "Bob" Holland. They're everywhere, and they keep on getting it wrong-wrong-wrong!?!

**Wednesday October 31, 2007**

Rott, Glen Burnie, MD

What we're listening to here is the whining death throes of the predominantly white, christian, northern european culture that created, has pervaded and run this country since it's inception. And it doesn't matter whether you or I or "Bobby Haircut" think multiculturalism is bunk or a marxist plot, or whether they hold that NAME conference here or anywhere or nowhere--our predominantly white, northern european christian culture is literally being overrun by the other cultures immigrating to the US. Just look at the numbers--by 2050 in the US white folks of northern european descent will be in the MINORITY here.

So unless y'all start having more babies--eventually there'll be a lot less of y'all making these comments.

Debbie, New York, NY

I wish they would stop with this "Christian white racist homophobe" stuff.(Did they forget that the Muslem leader from Iran said there are no homosexuals in his country?) My favorite is "white priviledge." I'm white and definitely not rich or priviledged and working my way down like everyone else, unless we stop hashing and rehashing. It's 2007 - ENOUGH ALREADY! Oh well, what's the use. It's too late. We're already Balkanized.

Baltimore native, Baltimore, MD

As a lifelong resident of Baltimore, I am ashamed that our city is hosting such a ridiculous conference. Wouldn't true "social justice" be achieved if we looked beyond peoples race and religion and instead viewed them as individuals? But individualism goes sharply against what the (Marxist)socialists running this conference truly want.

TiredoftheCrap, Chicago, IL

*Freddy M wrote:*

*Shalee wrote: "A definition for social justice? Hmm, how about helping out those less fortunate than you, whether they be white, black, latino, asian, muslim, jew, christian, samaritan, lesbian, gay, straight, attractive, unattractive, liberal or conservative."*

*Ummm...isn't that either welfare or charity (depending on whether it comes from the government or private sector)? If this is all "social justice" means, then why not call it my its traditional names: welfare and charity?*

*I'll tell you why: the words "social justice" are pregnant with more meaning than*

helping the poor. It means social "fairness," where "fairness" means something like "equality." Advocates for social justice are interested in forced equality in both the legal and purely social realms. No one is better than another. No culture is better than another. No moral code is better than another. Social justice means forcing people in their everyday social lives to live by twisted rules of equality: accept homosexuals (not just legally but socially and morally). Accept gangster rap its just music of a diverse culture. Accept taking from the rich to give to the poor, not in small amounts to help the poor but in large amounts solely for the purpose of equality of wealth. Don't offend anyone by taking a moral stand. Every person, every culture, every moral principle is equal (except conservatives and religious Christians, of course.

"Social justice" is is forced blandness. It is social pressure to make everyone conform to the lowest common denominator. Its government and peer-pressure in the interests of social pablum.

I'll pick apart your comments because you have some good points, though I cannot tell from reading them what side of the fence you are on... or if you are ON the fence. Others will use your comments to, as many others do, lace their own agendas.

Free speech is great - gangster rap as a form of music I understand... but NOT when it is reek with hate, and speaks as a language of those who target our police, or as a voice of violence.

Accept taking from the rich to give to the poor - You have to be kidding. Instead, why don't we teach those who would to get off their asses and WORK. Those that have the bucks did... and the pursuit thereof is why millions flock to this country. Taking away from one and giving it to the other is just socialism.

I don't want to be bland... I want to be free to pursue my own form of happiness and the American dream. I am proud of my heritage, and will not be blended into the mass GREY that has no form, no voice... no pride.

STOP KILLING EACH OTHER!

nfa, Silver Spring,

"Those who are Christian should feel just as guilty as the whites for all those their faith has victimized. Nothing but evil has come from the

European cultures that led the way in America's founding."

That's a total distortion of NAME's message, and a grosser oversimplification than even they would make.

Look, America -- like humankind generally -- is awesome but deeply flawed. We can only benefit by recognizing our historical errors and the ways they've affected us (and continue to affect us today). Racism exists. Sexism exists. Xenophobia -- as many of these responses indicate -- is thriving.

People, don't be threatened by this message. There's no shame in acknowledging the fact that we've got work to do. America is the quintessential land of struggle against oppression, and it's that quality -- not our racial, religious, ethnic roots -- that make us great.

Kim, Greenfield, IN

The definition of racism that is being taught in some universities state that only whites regardless of religion or economic status can be racist. What effect is this having on our youth and on America as a whole? My question to fellow Americans and bloggers is why are we not taking a stand? Why are we not saying no and teaching our children differently? This is our tax dollars that is funding government schools so let's make a change. Let's demand better. America has fallen asleep and has grown accustom to others fighting their battles and sadly relying on our government to take care of us. We must tell Delaware University for their teaching of racism and the school/universities in our states no. We must call them out and not fear being called a racist. We must do what is right and not give up or give in. I think a grassroots effort needs to start and we need to demand different teachings in our tax paid schools. Otherwise, I suggest you find ways to afford private schools.

to Dave H,Washington, DC

Dave H wrote:

Multiculturism is just an aspect of Critical Theory, which seeks to advance "Social Justice", which means (HERE'S THAT DEFINITION) turning tables on existing "oppressive" relationships. It's bastardized Marxism. It does not advocate fairness for all, only for the oppressed, since majorities, being "oppressors" by definition, are useful only by being overthrown. At which point, as in Communist countries and American acedemia, the formerly "oppressed" run the show and may freely discriminate against the former "oppressors" to achieve "social justice" for the latter's historical crimes against the "oppressed". Although

*Marx was an economist, the theory has been adapted for non-economic relationships, which are more immutable. Poor people can become rich (in the U.S., if not in Marx's Europe) but black people can't become white and women can't become men (or, if they do, they join their own special group of the "oppressed"). So no matter how powerful a black person or a woman becomes, he or she will always be "oppressed" and therefore privileged (to use a legal term in its proper meaning) to continue discriminating against members of the majority: which, in America, means white Christain men. The other great feature of Critical Theory is that it brooks no dissent, since to criticize it by means of logic and facts is to adopt the oppressors methods. Since only the "oppressed" can further social justice, proving yourself an oppressor by using logic and facts simply makes your opinions irrelevant as belonging to an "oppressor" and therefore not worth listening to.*

Well put!! The reason it's important to combat racism, sexism, homophobia, etc., is so that individuals can treated with respect and dignity and not be saddled with stereotypes that undermine their right to life, liberty, and the pursuit of happiness.

Identity politics keeps alive the practice of stereotyping people by traits such as race, gender, sexual orientation, etc.

It also places too much emphasis on our differences as defined by these traits and not our greater commonality as human beings.

Not all straight white males are living a life of prosperity and privilege, and not all people who aren't straight white males are mired in poverty and deprived of opportunity.

Sure, we as a society should continue to strive to eliminate barriers of bigotry, but this should be done as a way to bring us together as equals, not drive us apart.

Also, social responsibility, however it's defined, will never supplant the need for individuals to exercise personal responsibility. Some people may have more "privilege" than others in some ways, but by and large, most of us are in a similar place in life when it comes to having to work for a living, trying to keep ourselves out of trouble, and trying to keep our kids out of harm's way.

Chloe, Orlando, FL

Rott wrote:

*What we're listening to here is the whining death throes of the predominantly white, christian, northern european culture that created, has pervaded and run this country since it's inception. And it doesn't matter whether you or I or "Bobby Haircut" think multiculturalism is bunk or a marxist plot, or whether they hold that NAME conference here or anywhere or nowhere-- our predominantly white, northern european christian culture is literally being overrun by the other cultures immigrating to the US. Just look at the numbers--by 2050 in the US white folks of northern european descent will be in the MINORITY here.*

*So unless y'all start having more babies-- eventually there'll be a lot less of y'all making these comments.*

Why is it that y'all want to be here and not elsewhere. Could it be that our country is better. I think it is hilarious that the very people that benefit from living here continuously put down northern Europeans culture. If other cultures are so wonderful, why isn't everyone clamouring to go there. I am tired of all the whining and complaining. I believe in the melting pot of this country. But, give credit where credit is due. If we were really all that narrow in our scope, the only people admitted into this country would be British.

dunwitwining, Bloomington, IL

Rott wrote:

*What we're listening to here is the whining death throes of the predominantly white, christian, northern european culture that created, has pervaded and run this country since it's inception. And it doesn't matter whether you or I or "Bobby Haircut" think multiculturalism is bunk or a marxist plot, or whether they hold that NAME conference here or anywhere or nowhere-- our predominantly white, northern european christian culture is literally being overrun by the other cultures immigrating to the US. Just look at the numbers--by 2050 in the US white folks of northern european descent will be in the MINORITY here.*

*So unless y'all start having more babies-- eventually there'll be a lot less of y'all making these comments.*

Well apparently there a lot of people that want to join our white northern euopean culture, then defile it,

then wonder why it is turning into the 3rd world pit they came from. Shut up and go some where in the 3rd world with your big talk. Not even the most degenerate project dweller would make 2 seconds in Africa. The WHITE MAN rocks and is responsible for the access you all have for your little whine fest. You will all be sorry when America isn't the white anglo culture that it has been for 200+ years but the same crappy place the whiners emigrated from.

STARMAN, Redford, MI

White Christians are the stated enemy and target of these "people". The Draft should be brought back, put these sniveling maggots under the gentile tuteladge of a Marine corps drill sergeant and let's see how far their "multiculturalism" gets them.

Rozabell, Baltimore, MD

I am amazed at the number of comments about this organization. I wouldn't mind so much if it weren't poluting our schools which my tax dollars fund. To make matter worse, NAME is supported by my tax dollars. I plan to investigate this and find out just how much it is costing. They are planning massive cuts to art programs in Maryland, and I think NAME should be on the chopping block as well. Everyone who has commented should do some research, and then call & write their State & federal representatives and demand funding for this vile, racist organization be slashed.

1blkbaltimorefem , Baltimore, MD

*kim wrote:*

*The definition of racism that is being taught in some universities state that only whites regardless of religion or economic status can be racist. What effect is this having on our youth and on America as a whole? My question to fellow Americans and bloggers is why are we not taking a stand? Why are we not saying no and teaching our children differently? This is our tax dollars that is funding government schools so let's make a change. Let's demand better. America has fallen asleep and has grown accustom to others fighting their battles and sadly relying on our government to take care of us. We must tell Delaware University for their teaching of racism and the school/universities in our states no. We must call them out and not fear being called a racist. We must do what is right and not give up or give in. I think a grassroots effort needs to start and*

*we need to demand different teachings in our tax paid schools. Otherwise, I suggest you find ways to afford private schools.*

what the hell are you saying.....how does a world where you are boss look any different that they way it looks now

white folks are always afraid. perpetual fear must not be a happy place...is that why so many of you hate everyone else so very much? and feel justified in doing so? how can you hate and be christian?

1blkbaltimorefem, Baltimore,

*Rozabell wrote:*

*I attended the "stop the murder" rally in front of City Hall on Sunday. It appears most of those killed are African-American (by other African-Americans). Where were the Sharptons, Jesse Jackson's et al - all missing in action. This is a huge problem and as a white woman I was shocked that those who suffer the most receive no representation from the race hustlers who have dedicated their lives to the "get whitey philosophy." America is a dying culture and it is the white elite and their "multicultural" ilk responsible. Want nothing more to do with this, but I still will stand up for what is left of my right to speech, even though I am a white Christian.*

You are Christian and yet this post came from you. WOW! I wish people like you would have just stayed home.

SCARY WOMAN!

Craig Smith, Paxico, KS

Superlative, and will be added to my new, growing files on this virus.

**Thursday, November 1,2007**

Phil, Saint Louis, MO

There is a method to such vuageness. What exactly is Holland disagreeing with? He is, obviously, against multiculturalism. But other than stating that there is a large conference on it where teachers are brought in and educated, what's he complaining about? Is he argueing that white christians don't experience privileges that non-white, non-christians simply don't have? Is he suggesting that teachers should remain ignorant of their own privliaged status? Don't tell me he's confusing the definition of "anit-racist".

The message that schools send to students about other cultures is, in short, candy coated. True. It also attempts to inject some humility about our own culture. True. But I think the worst thing to be teaching kids is that we're perfect and everyone else is stupid.

104

Ehrlich was wrong.

**Friday, November 2, 2007**

TiredoftheCrap, Chicago, IL

> *1blkbaltimorefem wrote:*
>
> *what the hell are you saying.....how does a world where you are boss look any different that they way it looks now*
>
> *white folks are always afraid. perpetual fear must not be a happy place...is that why so many of you hate everyone else so very much? and feel justified in doing so? how can you hate and be christian?*

"white folks are always afraid"... lol; and you are a dimwit. Thanks for proving the point of previous posters, you have now become that which you struggle against.

**Tuesday, November 6, 2007**

1blkbaltimorefem, Baltimore, MD

> *TiredoftheCrap wrote:*
>
> *<quoted text>*
>
> *"white folks are always afraid"... lol; and you are a dimwit. Thanks for proving the point of previous posters, you have now become that which you struggle against.*

give me a break buddy. I stand by my assessment. dimwit....LOL! ok ill be that.

**Wednesday November 7, 2007**

Dunwitwining, Bloomington, IL

> *1blkbaltimorefem wrote:*
>
> *give me a break buddy. I stand by my assessment. dimwit....LOL! ok ill be that.*

Do you ever stop with your uninformed , uneducated, ignorant rants. I will reiterate, your type of thinking is why Baltimore is degenerate violent pit. Gee, where is that "caught in the cross fire" when you need it.

**Thursday November 8, 2007**

TiredoftheCrap, Chicago, IL

> *dunwitwining wrote:*
>
> *Do you ever stop with your uninformed , uneducated, ignorant rants. I will reiterate, your type of thinking is why Baltimore is degenerate violent pit. Gee, where is that "caught in the cross fire" when you need it.*

... I salute you, spot on! Maybe it believes that if you say something often enough, it becomes true? In this case... lol, NOT! I'm tired of this crap!

1blkbaltimorefem, Baltimore, MD

> *dunwitwining wrote:*
>
> *Do you ever stop with your uninformed , uneducated, ignorant rants. I will reiterate, your type of thinking is why Baltimore is degenerate violent pit. Gee, where is that "caught in the cross fire" when you need it.*

Hon, you dont know me...what are you talking about?

Im in the street of baltimore on the front lines.. trying to make a difference....what pray tell are you doing?

YOU just wanted to say something to me.....didn't you! Im the reason baltimore is messed up you say....ok. Ill be that too.

1prdblkMAN, Upper Marlboro,

Ahh the good old days.. thats what they are longing for.. the days when white might was right.. to the detriment of all others.. The days when it was every white man's right to kill black folks without fear of prosecution.. the days when it was ok to wear your hoods and sheets in public.. Its uncanny how some white folks can separate themselves from the "white trash" they call their own kind,

But so easily group all people of color together based on their own "trash" whether you like it or not, we are all AMERICANS folks.. some by choice.. some by force.. We should all realize that we are not really that different beyond the color of our skins for most of us. I am neither conservative or liberal.. depending on the issue, im a mix of both. I hate crime just as much as you folks do. etc etc.

and oh yeah.. FYI

What white America has been historically.. and it appears to still be in some parts, based on this board.. racism.. a belief or doctrine that inherent differences among the various human races determine cultural or individual achievement, usually involving the idea that one's own race is superior and has the right to rule others.

What people of color tend to do.. based on what the folks above.. prejudice..

1. an unfavorable opinion or feeling formed beforehand or without knowledge, thought, or reason.

2. any preconceived opinion or feeling, either favorable or unfavorable.

3. unreasonable feelings, opinions, or attitudes, esp. of a hostile nature, regarding a racial, religious, or national group.

4. such attitudes considered collectively: The war against prejudice is never-ending.

know the difference..*s*

**Friday, November 9, 2007**

TomNoDoubts. Glen Burnie, MD

> Rott wrote:
>
> *What we're listening to here is the whining death throes of the predominantly white, christian, northern european culture that created, has pervaded and run this country since it's inception. And it doesn't matter whether you or I or "Bobby Haircut" think multiculturalism is bunk or a marxist plot, or whether they hold that NAME conference here or anywhere or nowhere--our predominantly white, northern european christian culture is literally being overrun by the other cultures immigrating to the US. Just look at the numbers--by 2050 in the US white folks of northern european descent will be in the MINORITY here.*

So unless y'all start having more babies--eventually there'll be a lot less of y'all making these comments.

welcome to New Dafur

---

WorldNedDaily: PREMEDITATED MERGER

# N. GUNSHOT PRECEDES
# ANTI-NORTH AMERICAN UNION MARCHES

### Drive-by incident at organizer's home, but protests carried out in 9 cities

By Jerome R. Corsi
WorldNetDaily.com, November 20, 2007

Protest rallies against the controversial Security and Prosperity Partnership of North America were held successfully in nine U.S. cities, marred only by a drive-by shot fired without causing injury into the home of the organizer of the Atlanta march.

Organizer Jim Stachowiak of Freedom Fighter Radio explained that a 9 mm gunshot round was fired into his suburban home Saturday at about 5:40 a.m. on the day of the marches.

Stachowiak told WND no one in the home was injured by the gunshot and Atlanta police were called.

The police removed the round for analysis and filed a report on the incident. No suspects were identified.

Stachowiak told WND he had no proof who may have fired the gunshot, although he felt confident it was done in anger to discourage his efforts to organize the protest.

Despite the incident, Stachowiak attended the Atlanta March for America, which began on the state capitol steps and proceeded to the CNN world headquarters as planned.

On April 10, 2006, and again on May Day 2006, tens of thousands of illegal immigrants and their supporters took to the streets of over 100 U.S. cities, often marching under the Mexican flag.

The "Stop SPP" marches Saturday were small by comparison, numbering in the hundreds.

Still, Jonnie Crivello, organizer of the March for America!, told WND she believed the rallies were successful, with protest participants meeting or exceeding expectations in all nine cities.

Crivello told WND the March for America! website is being updated to post photos from the Saturday marches.

Video of the march in Westwood, Calif., has been posted to YouTube.com as well as of the Las Vegas event.

Over an hour of separate videos from various cities participating in the march are listed on YouTube.com.

## PART 2 – A PRIVATE ATTORNEY GENERAL FOR THE SECOND AMENDMENT

## A. THE RICO ACT CAN BE USED AGAINST THE UNITED STATES AND THE UNITED NATIONS AS RACKETEERING ENTERPRISES

It is my Presumption in General (Rule 301) based upon the judicial histories of my several cases in this Court and other courts as evidence of Habit and Routine Practive (Rule 406) that because I am an unrepresented civil plaintiff, a seaman, with a civil RICO Act against the United States and now against the United Nations and the United States specifically challenging the wrongful acts of the U.S. Coast Guard; and specifically challenging the wrongful actions of federal judges and of the U.S. Department of Justice over Second Amendment rights of seamen from a seaman's point of view that has multi-jurisdictional applications to the constitutionality of local and State law, Federal laws and regulations, and international human rights laws over the United Nations global gun control agenda as a War of Aggression threatening the Second Amendment in our Bill of Rights, a challenge that makes mine a case of first impression. My case is one that the federal courts and the U.S. Department of Justice have pulled every dirty trick to keep my case from going to trial.

Regardless of how well I research my various subject matters, no matter how much case law I cite, no matter what direction I approach the subject matters or uniqueness my legal arguments are, the federal courts simply derail my cases with inapplicable boilerplate case law misconstruing and fabricating facts about my cases setting them up for dismissal.

## 1. Judge Reggie B. Walton Memorandum Opinion of this Court, No. 03-2160, dismissing my first RICO Act case.

### D. Have the Defendants Waived Their Sovereign Immunity Regarding the RICO Claims?

The plaintiff's claims for racketeering against the Second Amendment, Compl. at 15-16, for prohibited racketeering activities under 18 U.S.C. § 1962, Compl. at 16-27, and against the Attorney General for his failure to investigate these supposed RICO violations, Compl. at 27-28, must be dismissed because the defendants have not waived their sovereign immunity.[188] Cases that involve government officials being sued in their official capacity "'generally represent only another way of pleading an action against an entity of which the officer is an agent[,]' [which] 'is, in all respects other than name, to be treated as a suit against the entity.'" Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (citations omitted). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." FDIC v. Meyer, 520 U.S. 471, 475 (1994) (citations omitted). Thus, "the United States may not be sued without its consent and [] the existence of consent is a prerequisite for jurisdiction." Id. (citation omitted). If, then, government officials have been sued by the plaintiff in their official capacity, and the

---

[188] The Court notes that it is not clear from the plaintiff's complaint w 4 hich defendants are the subject of his claims for racketeering against the Second Amendment and the prohibited racketeering activities under 18 U.S.C. § 1962.

**government has not consented to waive its sovereign immunity, this Court must dismiss the RICO claims because it lacks subject matter jurisdiction.** See First Virginia Bank v. Randolph, 110 F.3d 75, 77 (D.C. Cir. 1997). **A waiver of sovereign immunity must be "unequivocally expressed in statutory text . . . ."** Lane v. Pena, 518 U.S. 187, 192 (1996) (citations omitted).

In this case, the officials are clearly being sued in their official, and not their individual, capacity. "The definition of 'person' in RICO does not explicitly mention the federal government . . . [and] cannot, on its own, effect a waiver of the federal government's sovereign immunity" **because such a waiver must be clear and unequivocal.** Donahue v. FBI, 204 F. Supp. 2d 169, 174 (D. Mass. 2002) (citations omitted). Other courts have held that sovereign immunity is not waived under RICO when federal officials are acting in their official capacities **because the waiver is not explicit.** Nat'l Commodity & Barter Ass'n v. Gibbs, 886 F.2d 1240, 1246-47 (8th Cir. 1989) (citation omitted). See also Deutsch v. DOJ, 881 F. Supp. 49, 55 (D.D.C. 1995), aff'd 93 F.3d 986 (D.C. Cir. 1996). This Court agrees with that position and accordingly, the plaintiff's RICO claims against the government officials must be dismissed for lack of subject matter jurisdiction.

## 2. The Clear, Unequivocal, and Explicit Waiver of Sovereign Immunity is 46 C.F.R. § 1.01-30 and 46 U.S.C. § 1.03-15(j)

If I may be so bold as to invoke *MANDATORY JUDICIAL NOTICE OF ADJUDICATIVE FACTS* and refute Judge Reggie B. Walton's fraudulent use of case law citations: *"The United States has expressly granted waiver of sovereign immunity to seamen seeking judicial review (46 C.F.R. § 1.01-30) of any decision or action by the Commandant, U.S. Coast Guard pursuant to regulations in 46 U.S.C. § 1.03-15(j) in that: "Any decision made by the Commandant, or by the Assistant Commandant for Marine Safety and Environmental Protection, or by an office chief pursuant to authority delegated by the Commandant is* **final agency action** *on the appeal. It is when the federal courts themselves, the U.S Department of Justice, the U.S. Marshals Service, the U.S. Department of Transportation, and the U.S. Coast Guard act, either independently in a conspiracy, to harass me and obstruct my case from proceeding past the Motion to Dismiss that the United States with their various departments and agencies become a Racketeering Enterprise against the Seventh Amendment rights to a civil jury trial that I have the right, the justification, and the standing to sue as a Private Attorney General under the civil RICO Act those involved whether as individuals or as members of a Governmental Unit."*

**46 U.S.C. § 1.03-15(j) Final Agency Action:** "Any decision made by the Commandant, or by the Assistant Commandant for Marine Safety and Environmental Protection, or by an office chief pursuant to authority delegated by the Commandant is final agency action on the appeal."

**46 C.F.R. § 1.01-30(a) Judicial Review:** "Nothing in this chapter shall be construed to prohibit any party from seeking judicial review of any Commandant's decision or action taken pursuant to the regulations in this part . . ."

Therefore, it is the combination of both 46 U.S.C. § 1.03-15(j) *Final Agency Action* and    46 C.F.R. § 1.01-30(a) *Judicial Review* is unequivocally expressed in statutory text that makes a mandatory

waiver of sovereign immunity available in my case. Moreover, I can now flip Judge Reggie B. Walton's citations above and paraphrase them to read:

> The waiver of sovereign immunity under 46 U.S.C. § 1.03-15(j) Final Agency Action of the U.S. Coast Guard and 46 C.F.R. § 1.01-30(a) Judicial Review of such Final Agency Action "unequivocally expressed in statutory text" granting the right to sue the United States and such expressed statutory text is an expressed consent to be sued for purposes of jurisdiction." Thus, "If, then, government officials have been sued by the plaintiff in their official capacity, and the government, by expressed statutory text has consented to waive its sovereign immunity, the Court must NOT dismiss the RICO claims because the Court therefore has subject matter jurisdiction.

Consequently, every Court that dismissed my cases in ignorance or willful disregard of        46 U.S.C. § 1.03-15(j) *FINAL AGENCY ACTION* and 46 C.F.R. § 1.01-30(a) *JUDICIAL REVIEW* or of the case law the follows were acts of treason against the U.S. Constitution and were violations of my Seventh Amendment right to a civil jury trial.  How can I rectify these wrongful acts when the federal judges are themselves corrupt but to emply the civil RICO Act against them as members of a Racketeering Enterprise?

If the RICO Act can be used against State government by the United States (*see United States* v. *Warner & Ryan,* (7th Circuit, Nos. 06-3517 and 06-3528, Brief of the United States, next page), then the Egual Justice Under the Law Doctrine dictates that the RICO Act can be used against the United States as part of the checks and balance system of our constitutional government, especially sense a seaman has the statutory waiver of sovereign immunity in 46 C.F.R. § 1.01-30(a) *Judicial Review*.

The showing that the RICO Act includes the United States Government as a Racketeering Enterprise:

# B. GOVERNMENT AS A RICO ENTERPRISE: BRIEF OF THE UNITED STATES IN UNITED STATES V. LAWRENCE E. WARNER & GEORGE H. RYAN, SR., 7TH CIRCUIT, NOS. 06-3517 AND 06-3528

>EXCERPT<

>**BOLDING AND UNDERLINING** FOR EMPHASIS ARE MINE<

## IV. The RICO Charge Was Legally Sound and the Instructions were Correct.

### A. Standard of Review

Challenges to the sufficiency of an indictment are reviewed de novo. *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). A district court's decision regarding the language of a proposed jury instruction is reviewed for abuse of discretion when the defendant has made a proper objection. *United States v. Irorere*, 228 F.3d 816, 825 (7th Cir. 2000).

### B. Analysis

#### 1. The State of Illinois Is a Proper RICO Enterprise.

Count One charged appellants with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). R110:Ct1,¶8(JA240). It alleged that the defendants, acting through Ryan's governmental offices, used the State of Illinois as the "enterprise" for their illegal activity. R110: Ct1, ¶¶ 1, 2, 5, 8 (JA228, 233, 239, 240). Although the statute defines "enterprise" to include "any legal entity"      (18 U.S.C. § 1961(4)), Ryan argues that states cannot be enterprises for purposes of the RICO statute. Br56-58. Ryan's argument overlooks well-established authority, in this Circuit and others, holding "enterprise" is broadly construed to include governmental and public entities.

**More than twenty-five years ago, in *United States v. Grzywacz*, 603 F.2d 682, 685-87 (7th Cir. 1979), this Court held that a public entity (in that case, the Madison, Illinois police department) could be charged as the "enterprise" for racketeering activity. This Court has reaffirmed that the racketeering statute should be construed broadly and that public and governmental entities may be charged as "enterprises."** *United States v. Hocking*, 860 F.2d 769, 778 (7th Cir. 1988) (state Department of Treasury), overruled on other grounds, *United States v. Levy*, 955 F.2d 1098, 1103n.5 (7th Cir. 1992); *United States v. Conn*, 769 F.2d 420, 424-25 (7th Cir. 1985) (Cook County Circuit Court); *United States v. Kovic*, 684 F.2d 512, 516 (7th Cir. 1982) (Chicago Police Department); *United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313, 1316-19 (7th Cir. 1981) (Sheriff's Office of Madison County, Illinois). *See also United States v. Genova*, 187 F. Supp. 2d 1015, 1028-29 (N.D. Ill. 2002) (Calumet City), rev'd on other grounds, 333 F.3d 750 (7th Cir. 2003); *United States v. Lobue*, 751 F.Supp. 748, 755 (N.D. Ill. 1990) (Chicago Heights). **This Court's interpretation of "enterprise" as including public and governmental entities is consistent with that of other circuits.** *Lee Stoller Enterprises*, 652 F.2d at 1318n.9 (collecting cases). *See also United States v. Turkette*, 452 U.S. 576, 580 (1981) (**"[t]here is no restriction upon the associations embraced by the definition" of "enterprise"**).

Faced with this overwhelming precedent, appellants rely on *United States v. Mandel*, 415 F. Supp. 997, 1022 (D. Md. 1976), a district court decision pre-dating virtually all of the circuit court decisions on the issue. Br57. In *Mandel*, the court concluded that the State of Maryland could not be a valid enterprise. Id. at 1022. But *Mandel* did not differentiate between the naming of sovereign States and the naming of any other public entities as enterprises; by its reasoning, no public entities could be "enterprises"under the racketeering statute.

*Mandel* has been discredited by all courts that have considered the issue, including the Fourth Circuit, which includes the District of Maryland. *See United States v. Angelilli*, 660 F.2d 23, 33 n.10 (2d

Cir. 1981); *United States* v. *Long*, 651 F.2d 239, 241 (4th Cir.1981); *United States* v. Clark, 646 F.2d 1259, 1261-67 (8th Cir. 1981).

In arguing that states may not be considered "legal entities" under the racketeering statute, appellants miscast a straightforward issue of statutory interpretation into an issue of federalism. Br58. Their reliance on cases dealing with federalism or state sovereignty, such as *Alden* v. *Maine,* 527 U.S. 706, 748 (1999), is misplaced. **Nothing in RICO precludes the states from addressing corruption or infringes in any way on the legitimate functioning of state government or on its sovereignty.**

Appellants overlook the fundamental principle that the racketeering enterprise, whether it be a legitimate business, governmental entity or association in fact, is merely the vehicle through which defendants conduct alleged racketeering activities. *See United States* v. *McDade,* 28 F.3d 283, 296 (3d Cir.1995) **(proper to charge Congressional committee as enterprise, since "major purpose of the RICO statute was to protect legitimate enterprises by attacking and removing those who had infiltrated them for unlawful purposes")** (citations omitted). **To define a governmental unit as an enterprise does not impugn its employees or subjects, nor disadvantage the entity.**

Ryan argues that Congress did not intend for sovereign states to be enterprises because RICO authorizes statutory remedies like "dissolution or reorganization." Br57. That argument was rejected by this Court in *Grzywacz*, 603 F.2d at 685-86, and further repudiated by the Supreme Court in *Turkette*, 452 U.S. at 585, which noted:

> Even if one or more of the civil remedies might be inapplicable to a particular illegitimate enterprise, this fact would not serve to limit the enterprise concept. Congress has provided civil remedies for use when the circumstances so warrant. It is untenable to argue that their existence limits the scope of the criminal provisions.

The statute does not mandate the imposition of any particular remedy, but rather, depending on the situation, offers an array of possible remedies. **Governmental units may be enterprises under the RICO statute.** The indictment properly charged the State of Illinois as being the racketeering enterprise used by the defendants.

---

## C. Definition of a Racketeering Enterprise Includes the United State Government as a Governmental Unit

A. U.S. Department of Justice, *Racketeer Influenced & Corrupt Organizations: A Manual for Federal Prosecutors*, Fourth Edition,[189] July 2000:

### II. DEFINITIONS: 18 U.S.C. § 1961

#### D. Enterprise

The term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). (For a full discussion of the enterprise's required relationship to interstate and foreign commerce, see infra Section III(C)(3)). It is now settled that the term "enterprise" encompasses both legitimate and illegitimate enterprises. *United States* v. *Turkette*, 452 U.S. 576 (1981).[190] Prosecution under RICO, however, does not require proof that either the defendant or the enterprise was connected to organized crime.[191]

#### (2). Types of Enterprises

The courts have given a broad reading to the term "enterprise." Noting that Congress mandated a liberal construction of the RICO statute in order to effectuate its remedial purposes and pointing to the expansive use of the word "includes" in the statutory definition of the term, courts have held that the list of enumerated entities in Section 1961(4) is not exhaustive but merely illustrative.[192] Thus public and **governmental**

---

[189] Prepared by the Staff of the Organized Crime and Racketeering Section (OCRS), U.S. Department of Justice, Washington, DC 20530, (pp. 39-46). Available Online at:
http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/rico.pdf,

[190] See also United States v. Doherty, 867 F.2d 47, 68 (1st Cir. 1989); United States v. Blackwood, 768F.2d 131 (7th Cir.), cert. denied, 474 U.S. 1020 (1985); United States v. Ruggiero, 726 F.2d 913, 923 (2d Cir.), cert. denied, 469 U.S. 831 (1984); United States v. Cauble, 706 F.2d 1322, 1330 (5th Cir. 1983), cert. denied, 465 U.S. 1005 (1984); United States v. Lemm, 680 F.2d 1193, 1198 (8th Cir. 1982), cert. denied, 459 U.S. 1110 (1983); United States v. Bledsoe, 674 F.2d 647, 662 (8th Cir. 1982), cert. denied, 459 U.S. 1040 (1983); United States v. Thevis, 665 F.2d 616, 626 (5th Cir.), cert. denied, 456 U.S. 1008 (1982); United States v. Griffin, 660 F.2d 996, 999 (4th Cir. 1981), cert. denied, 454 U.S. 1156 (1982); United States v. Martino, 648 F.2d 367, 380-81 (5th Cir. 1981), rev'd in part on other grounds, 681 F.2d 952 (5th Cir.) (en banc), cert. denied, 456 U.S. 949 (1982); United States v. Clark, 646 F.2d 1259, 1267 n.7 (8th Cir. 1981); United States v. Sutton, 642 F.2d 1001, 1006-09 (6th Cir. 1980) (en banc), cert. denied, 453 U.S. 912 (1981); United States v. Errico, 635 F.2d 152, 155 (2d Cir. 1980), cert. denied, 453 U.S. 911 (1981); United States v. Provenzano, 620 F.2d 985, 992-93 (3d Cir.), cert. denied, 449 U.S. 899 (1980); United States v. Aleman, 609 F.2d 298, 304-05 (7th Cir. 1979), cert. denied, 445 U.S. 946 (1980); United States v. Rone, 598 F.2d 564, 568-69 (9th Cir. 1979), cert. denied, 445 U.S. 946 (1980); United States v. Swiderski, 593 F.2d 1246, 1248-49 (D.C. Cir. 1978), cert. denied, 441 U.S. 993 (1979). An enterprise, however, cannot be an inanimate object such as a bank account, Guidry v. Bank of LaPlace, 954 F.2d 278, 283 (5th Cir. 1992), or an apartment building, Elliott v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989).

[191] See National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 260 (1994); H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 245, 248-49 (1989); United States v. Aucoin, 964 F.2d 1492, 1496 (5th Cir.), cert. denied, 506 U.S. 1023 (1992); United States v. Ruiz, 905 F.2d 499, 502 (1st Cir. 1990); Plains Resources, Inc. v. Gable, 782 F.2d 883, 886-87 (10th Cir. 1986); United States v. Hunt, 749 F.2d 1078, 1088 (4th Cir. 1984), cert. denied, 472 U.S. 1018 (1985); United States v. Romano, 736 F.2d 1432, 1441 (11th Cir. 1985); United States v. Cauble, 706 F.2d 1322, 1330 (5th Cir. 1983), cert. denied, 465 U.S. 1005 (1984). See also United States v. Gottesman, 724 F.2d 1517, 1521 (11th Cir. 1984); Moss v. Morgan Stanley, Inc., 719 F.2d 5, 21 (2d Cir. 1983), cert. denied, 465 U.S. 1025 (1984); Bennett v. Berg, 685 F.2d 1053, 1063 (8th Cir.), aff'd in part, rev'd in part, 710 F.2d 1361 (8th Cir. 1982), cert. denied, 464 U.S. 1008 (1983); United States v. Bledsoe, 674 F.2d 647, 663 (8th Cir. 1982), cert. denied, 459 U.S. 1040 (1984); United States v. Uni Oil, Inc., 646 F.2d 946, 953 (5th Cir. 1981), cert. denied, 455 U.S. 908 (1982); United States v. Aleman, 609 F.2d 298, 303 (7th Cir. 1979), cert. denied, 423 U.S. 946 (1980); United States v. Campanale, 518 F. 1975), cert. denied, 423 U.S. 1050 (1976).

[192] See United States v. London, 66 F.3d 1243-44 (1st Cir. 1995) (association-in-fact enterprise consisting of bar and check cashing business), cert. denied, 116 S. Ct. 1542 (1996); United States v. Aimone, 715 F.2d 822, 828 (3d Cir. 1983), cert. denied,

**entities** as well as private entities may constitute a RICO "enterprise",[193] including commercial entities such as corporations[194] or groups of corporations[195] (both foreign and domestic),[196] partnerships,[197] sole proprietorships[198] and cooperatives;[199] benevolent and non-profit organizations such as unions and union benefit funds,[200] schools,[201] and

---

468 U.S. 1217 (1984); United States v. Thevis, 665 F.2d 616, 625 (5th Cir.), cert. denied, 456 U.S. 1008 (1982); United States v. Angelilli, 660 F.2d 23, 31 (2d Cir. 1981), cert. denied, 455 U.S. 945 (1982). See also United States v. Huber, 603 F.2d 387, 394 (2d Cir. 1979), cert. denied, 445 U.S. 927 (1980); United States v. Perkins, 596 F. Supp. 528, 530-31 (E.D. Pa.), aff'd, 749 F.2d 28 (3d Cir. 1984), cert. denied, 471 U.S. 1015 (1985). Cf. United States v. Turkette, 452 U.S. 576, 580 (1981) ("[t]here is no restriction upon the associations embraced by the definition [of enterprise]").

[193] See United States v. Lee Stoller Enterprise, 652 F.2d 1313, 1318 (7th Cir.), cert. denied, 517 U.S. 1155 (1981); United States v. Clark, 646 F.2d 1259, 1263 (8th Cir. 1981); United States v. Frumento, 563 F.2d 1083, 1090-92 (3d Cir. 1977), cert. denied, 434 U.S. 1072 (1978); see also United States v. Brown, 555 F.2d 407, 415-16 (5th Cir. 1977), cert. denied, 435 U.S. 904 (1978); United States v. Barber, 476 F. Supp. 182 (S.D. W. Va. 1979), aff'd, 668 F.2d 778 (4th Cir.), cert. denied, 459 U.S. 829 (1982).

[194] See United States v. Kravitz, 738 F.2d 102, 113 (3d Cir. 1984) (health care delivery corporation), cert. denied, 470 U.S. 1052 (1985); United States v. Hartley, 678 F.2d 961, 988 n.43 (11th Cir. 1982) (corporation producing seafood products), cert. denied, 459 U.S. 1170 (1983); United States v. Webster, 639 F.2d 174, 184 n.4 (4th Cir.) (tavern and liquor store), cert. denied, 454 U.S. 857 (1981); United States v. Zemek, 634 F.2d 1159, 1167 (9th Cir. 1980) (taverns), cert. denied, 450 U.S. 916 (1981); United States v. Weisman, 624 F.2d 1118, 1120 (2d Cir.) (theater), cert. denied, 449 U.S. 871 (1980); United States v. Swiderski, 593 F.2d 1246, 1248 (D.C. Cir. 1978) (restaurant serving as front for narcotics trafficking), cert. denied, 441 U.S. 933 (1979); United States v. Brown, 583 F.2d 659, 661 (3d Cir. 1978) (auto dealership), cert. denied, 440 U.S. 909 (1979); United States v. Forsythe, 560 F.2d 1127, 1135-36 (3d Cir. 1977) (bail bond agency).

[195] See Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 262-64 (2d Cir. 1995) (defendant and two corporations constituted the RICO enterprise), cert. denied, 516 U.S. 1114 (1996); United States v. Kirk, 844 F.2d 660, 664 (9th Cir.)(group of corporations), cert. denied, 488 U.S. 890 (1988); United States v. Huber, 603 F.2d 387, 394 (2d Cir. 1979) (group of corporations can be an enterprise within meaning of RICO), cert. denied, 445 U.S. 927 (1980); United States v. Perkins, 596 F. Supp. 528, 530-31 (E.D. Pa.), aff'd, 749 F.2d 28 (3d Cir. 1984) (group of corporations set up by defendant to defraud government constituted a RICO enterprise), cert. denied, 471 U.S. 1015 (1985); United States v. Pryba, 674 F. Supp. 1504, 1508 (E.D. Va. 1987) (enterprise could consist of group of individuals and corporations); Snider v. Lone Star Art Trading Co., 659 F. Supp. 1249, 1253 (E.D. Mich. 1987)(combination of individuals and corporations meets enterprise definition); Trak Microcomputer Corp. v. Wearne Bros., 628 F. Supp. 1089, 1094-95 (N.D. Ill. 1985) (group of corporations can constitute RICO enterprise).

[196] See United States v. Parness, 503 F.2d 430, 439 (2d Cir. 1974) (foreign corporation can constitute a RICO enterprise), cert. denied, 419 U.S. 1105 (1975).

[197] See United States v. Cauble, 706 F.2d 1322, 1331 (5th Cir. 1983) (limited partnership), cert. denied, 465 U.S. 1005 (1984); United States v. Zang, 703 F.2d 1186, 1194 (10th Cir. 1982) (partnership), cert. denied, 464 U.S. 828 (1983); United States v. Griffin, 660 F.2d 996, 999 (4th Cir. 1981) (partnership may be enterprise), cert. denied, 454 U.S. 1156 (1982); Eisenberg v. Gagnon, 564 F. Supp. 1347, 1353 (E.D. Pa. 1983) (limited partnership); United States v. Jannotti, 501 F. Supp. 1182, 1185-86 (E.D. Pa. 1980), rev'd on other grounds, 673 F.2d 578 (3d Cir.) (en banc) (law firm operated through payment of bribes), cert. denied, 457 U.S. 1106 (1982).

[198] See United States v. Benny, 786 F.2d 1410, 1414-15 49 (9th Cir.), cert. denied, 479 U.S. 1017 (1986); McCullough v. Suter, 757 F.2d 142 (7th Cir. 1985); United States v. Tille, 729 F.2d 615, 618 (9th Cir.), cert. denied, 471 U.S. 1064 (1984); United States v. Melton, 689 F.2d 679, 685 (7th Cir. 1982); State Farm Fire & Casualty Co. v. Estate of Caton, 540 F. Supp. 673, 676 (N.D. Ind. 1982). However, the sole proprietorship is not favored as a RICO enterprise. See cases infra at pp. 73-75.

[199] See United States v. Bledsoe, 674 F.2d 647, 660 (8th Cir. 1982) (dicta), cert. denied, 459 U.S. 1040

(1983).

[200] See United States v. Norton, 867 F.2d 1354, 1359 (11th Cir. 1989) (the Laborers International Union of North America, its subordinate local unions and its affiliated employee benefit funds); United States v. Robilotto, 828 F.2d 940, 947 (2d Cir. 1987) (Local 294 of the International Brotherhood of Teamsters), cert. denied, 484 U.S. 1011 (1988); United States v. Provenzano, 688 F.2d 194, 199-200 (3d Cir.) (Local 560 of the Teamsters Union), cert. denied, 459 U.S. 1071 (1982); United States v. LeRoy, 687 F.2d 610, 616-17 1982) (Local 214 of Laborers International Union of North America), cert. denied, 459 U.S. 1174 (1983); United States v. Scotto, 641 F.2d 47, 51, 54 (2d Cir. 1980) (Local 1814 of the International Longshoremen's Association), cert. denied, 452 U.S. 961 (1981); United States v. Rubin, 559 F.2d 975, 989 (5th Cir. 1977) (unions and employees welfare benefit plans), vacated and remanded, 439 U.S. 810 (1978), aff'd in part and rev'd in part on other grounds, 591 F.2d 278 (5th Cir.), cert. denied, 444 U.S. 864 (1979); United States v. Kaye, 556 F.2d 855, 861-62 (7th Cir.) (Local 714 of the International Brotherhood of Teamsters), cert. denied, 434 U.S. 921 (1977); United States v. Campanale, 518 F.2d 352, 355 (9th Cir. 1975) (applying RICO without discussion to Local 626 of the International Brotherhood of Teamsters), cert. denied, 423 U.S. 1050 (1976); United

113

political associations;[202] **governmental units such as the offices of governors, state and congressional legislators,**[203] **courts and judicial offices,**[204] **police departments and sheriffs' offices,**[205] **county prosecutors' offices,**[206] tax bureaus,[207] fire

---

States v. Local 560, International Brotherhood of Teamsters, 581 F. Supp. 279, 335 (D.N.J. 1984), aff'd, 780 F.2d 267 (3d Cir. 1985) (Local 560 and its benefit fund), cert. denied, 476 U.S. 1140 (1986); United States v. Field, 432 F. Supp. 55, 57-58 (S.D.N.Y. 1977) (International Longshoremen's Association), aff'd, 578 F.2d 1371 (2d Cir.), cert. denied, 439 U.S. 801 (1978); United States v. Ladmer, 429 F. Supp. 1231 (E.D.N.Y. 1977) (applying RICO without discussion to the International Production Service & Sales Employees Union, but dismissing action for failure to establish a pattern of racketeering activity); United States v. Stofsky, 409 F. Supp. 609 (S.D.N.Y. 1973) (applying RICO to a union representing workers in New York's fur garment manufacturing industry), aff'd, 527 F.2d 237 (2d Cir. 1975), cert. denied, 429 U.S. 819 (1976).

[201] See United States v. Weatherspoon, 581 F.2d 595, 597-98 (7th Cir. 1978) (beauty college approved for veterans' vocational training by the Veterans Administration).

[202] See Hudson v. LaRouche, 579 F. Supp. 623, 628 (S.D.N.Y. 1983) (unincorporated national political association affiliated with a political candidate).

[203] See United States v. Blandford, 33 F.3d 685, 703 (6th Cir.) (Office of the Representative for House District 14 together with individuals employed therein), cert. denied, 514 U.S. 1095 (1995); United States v. McDade, 28 F.3d 283, 295-96 (3d Cir.) (Congressman McDade and his Congressional offices in Washington, D.C. and in the 10th Congressional District of Pennsylvania), cert. cert. denied, 514 U.S. 1003 (1995); United States v. Freeman, 6 F.3d 586, 596-97 (9th Cir. 1993)(Offices of the 49th Assembly District), cert. denied, 511 U.S. 1077 (1994); United States v. Thompson, 685 F.2d 993 (6th Cir. 1982) (en banc) (applying RICO to the Tennessee Governor's Office, but questioning the wisdom of not defining the enterprise in the indictment as a "group of individuals associated in fact that made use of the office of Governor of the State of Tennessee"), cert. denied, 459 U.S. 1072 (1983); United States v. Long, 651 F.2d 239, 241 (4th Cir.) (office of Senator in the South Carolina legislature), cert. denied, 454 U.S. 896 (1981); United States v. Sisk, 476 F. Supp. 1061, 1062-63 (M.D. Tenn. 1979), aff'd, 629 F.2d 1174 (6th Cir. 1980) (Tennessee Governor's Office), cert. denied, 454 U.S. 1084 (1981); see also United States v. Gillock, 445 U.S. 360, 373 n.11 (1979) ("[o]f course, even a member of Congress would not be immune under the federal Speech or Debate Clause from prosecution for the acts which form the basis of the . . . [RICO] charges here"). But see United States v. Mandel, 415 F. Supp. 997, 1020-22 (D. Md. 1976), rev'd on other grounds, 591 F.2d 1347 (4th Cir.), aff'd on reh'g, 602 F.2d 653 (4th Cir. 1979) (en banc) (state of Maryland not an "enterprise" for RICO purposes), cert. denied, 445 U.S. 961 (1980). Mandel, however, has been discredited by all courts that have considered the issue, including the Fourth Circuit. See, e.g., United States v. Angelilli, 660 F.2d 23, 33 n.10 (2d Cir. 1981), cert. denied, 455 U.S. 945 (1982); United States v. Long, 651 F.2d 239, 241 (4th Cir.), cert. denied, 454 U.S. 896 (1981); United States v. Clark, 646 F.2d 1259, 1261-67 (8th Cir. 1981); United States v. Altomare, 625 F.2d 5, 7 n.7 (4th Cir. 1980); United States v. Baker, 617 F.2d 1060, 1061 (4th Cir. 1980); see also United States v. Powell, No. 87 CR 872-3 (N.D. Ill. February 27, 1988) (City of Chicago proper enterprise for purposes of RICO); State of New York v. O'Hara, 652 F. Supp. 1049 (W.D.N.Y. 1987) (in civil RICO suit, City of Niagara Falls proper enterprise); Commonwealth v. Cianfrani, 600 F. Supp. 1364 (E.D. Pa. 1985) (Pennsylvania Senate).

[204] See United States v. Grubb, 11 F.3d 426, 438 (4th Cir. 1993)(55 Office of the 7th Judicial Circuit); United States v. Conn, 769 F.2d 420, 424-25 (7th Cir. 1985) (Cook County Circuit Court); United States v. Blackwood, 768 F.2d 131, 137-38 (7th Cir.) (Cook County Circuit Court), cert. denied, 474 U.S. 1020 (1985); United States v. Angelilli, 660 F.2d 23, 30-34 (2d Cir. 1981) (New York City Civil Court), cert. denied, 455 U.S. 945 (1982); United States v. Sutherland, 656 F.2d 1181 (5th Cir. 1981) (applying RICO without discussion to Municipal Court of El Paso, Texas), cert. denied, 455 U.S. 949 (1982); United States v. Stratton, 649 F.2d 1066, 1074-75 (5th Cir. 1981) (judicial circuit); United States v. Bacheler, 611 F.2d 443, 450 (3d Cir. 1979) (Philadelphia Traffic Court); United States v. Joseph, 526 F. Supp. 504, 507 (E.D. Pa. 1981) (Office of the Clerk of Courts of Lehigh County, Pennsylvania); United States v. Vignola, 464 F. Supp. 1091 (E.D. Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979) (same), cert. denied, 444 U.S. 1072 (1980).

[205] See United States v. DePeri, 778 F.2d 963 (3d Cir. 1985) (Philadelphia Police Department), cert. denied, 475 U.S. 1109 (1986); United States v. Alonso, 740 F.2d 862, 870 (11th Cir. 1984) (Dade County Public Safety Department, Homicide Section), cert. denied, 469 U.S. 1166 (1985); United States v. Ambrose, 740 F.2d 505, 512 (7th Cir. 1984) (Chicago Police Department), cert. denied, 472 U.S. 1017 (1985); United States v. Davis, 707 F.2d 880, 882-83 (6th Cir. 1983) (Sheriff's Office of Mahoning County, Ohio); United States v. Lee Stoller Enterprise, Inc., 652 F.2d 1313, 1316-19 (7th Cir.) (Sheriff's Office of Madison County, Illinois), cert. denied, 454 U.S. 1082 (1981); United States v. Bright, 630 F.2d 804, 829 (5th Cir. 1980) (Sheriff's Office of DeSoto County, Mississippi); United States v. Karas, 624 F.2d 500, 504 (4th Cir. 1980) (Office of County Law Enforcement Officials), cert. denied, 449 U.S. 1078 (1981); United States v. Baker, 617 F.2d 1060, 1061 (4th Cir. 1980) (Sheriff's Department of Wilson County, North Carolina); United States v. Grzywacz, 603 F.2d 682, 685-87 (7th Cir. 1979) (Police Department of Madison, Illinois), cert. denied, 446 U.S. 935 (1980); United States v. Burnsed, 566 F.2d 882 (4th Cir. 1977) (applying RICO without discussion to the Vice Squad of the Charleston, South Carolina Police Department), cert. denied, 434 U.S. 1077 (1978); United States v. Brown, 555 F.2d 407, 415-16 (5th Cir. 1977) (Macon, Georgia Municipal Police Department), cert. denied, 435 U.S. 904 (1978); United States v. Cryan, 490 F. Supp. 1234, 1239-44 (D.N.J.) (applying RICO to Sheriff's Office of Essex

114

departments,[208] and executive departments and agencies.[209] An enterprise may also be comprised of a combination of entities[210] called an association-in-fact.[211]

---

County, New Jersey, but limiting RICO culpability to only those defendants who actually committed or authorized the acts charged in the indictment), aff'd, 636 F.2d 1211 (3d Cir. 1980).

[206] See United States v. Goot, 894 F.2d 231, 239 (7th Cir.), cert. denied, 498 U.S. 811 (1990); United States v. Yonan, 800 F.2d 167-68 (7th Cir. 1986) (Cook County State's Attorney's Office), cert. denied, 479 U.S. 1055 (1987); United States v. Altomare, 625 F.2d 5, 7 n.7 (4th Cir. 1980) (Office of Prosecuting Attorney of Hancock County, West Virginia).

[207] See United States v. Burns, 683 58 F.2d 1056, 1059 n.2 (7th Cir. 1982) (Cook County, Illinois, Board of Tax Appeals), cert. denied, 459 U.S. 1173 (1983); United States v. Frumento, 563 F.2d 1083, 1089-92 (3d Cir. 1977) (Pennsylvania Department of Revenue's Bureau of Cigarette and Beverage Taxes), cert. denied, 434 U.S. 1072 (1978).

[208] See United States v. Balzano, 916 F.2d 1273, 1290 (7th Cir. 1990)(Chicago Fire Department).

[209] See United States v. Hocking, 860 F.2d 769, 778 (8th Cir. 1988) (Illinois Department of Transportation); United States v. Dozier, 672 F.2d 531, 543 and n.8 (5th Cir.) (Louisiana Department of Agriculture), cert. denied, 459 U.S. 943 (1982); United States v. Angelilli, 660 F.2d 23, 33 n.10 (2d Cir. 1981), cert. denied, 455 U.S. 945 (1982); United States v. Long, 651 F.2d 239, 241 (4th Cir.), cert. denied, 454 U.S. 896 (1981); United States v. Clark, 646 F.2d 1259, 1261-67 (8th Cir. 1981); United States v. Altomare, 625 F.2d 5, 7 n.7 (4th Cir. 1980); United States v. Baker, 617 F.2d 1060, 1061 (4th Cir. 1980); United States v. Davis, 576 F.2d 1065, 1067 (3d Cir.) (warden of county prison), cert. denied, 439 U.S. 836 (1978); State of Maryland v. Buzz Berg Wrecking Co., 496 F. Supp. 245, 247-48 (D. Md. 1980) (Construction and Building Inspection Division of the Department of Housing and Community Development for the City of Baltimore); United States v. Barber, 476 F. Supp. 182, 191 (S.D. W. Va. 1979) (West Virginia Alcohol Beverage Control Commission).

[210] See United States v. Parise, 159 F.3d 790, 794-95 (3d Cir. 1998) (enterprise consisted of four organizations); United States v. London, 66 F.3d 1227, 1243-44 (1st Cir. 1995)(two or more legal entities), cert. denied, 511 U.S. 1155 (1996); United States v. Console, 13 F.3d 641, 652 (3d Cir. 1993)(law firm and medical practice), cert. denied, 511 U.S. 1076 (1994); United States v. Blinder, 10 F.3d 1468, 1473 (9th Cir. 1993)(six corporations); United States v. Butler, 954 F.2d 114, 120 (2d Cir. 1992)(broad enterprise consisting of Local 200, the pension funds, and Local 362); United States v. Collins, 927 F.2d 605 (6th Cir.)(Table)(group of corporations), cert. denied, 502 U.S. 858 (1991); United States v. Masters, 924 F.2d 1362, 1366 (7th Cir.)(law firm, two police departments, and three individuals who are defendants), cert. denied, 500 U.S. 919 (1991); United States v. Stolfi, 889 F.2d 378, 379-80 (2d Cir. 1989) (local union and its welfare benefit fund); United States v. Feldman, 853 F.2d 648, 655-59 (9th Cir. 1988) (association of five corporations and two individuals, including the defendant), cert. denied, 489 U.S. 1030 (1989); United States v. Perholtz, 842 F.2d 343, 352-54 (D.C. Cir.) (group of individuals, corporations, and partnerships), cert. denied, 488 U.S. 821 (1988); United States v. Pryba, 674 F. Supp. 1504, 1508 (E.D. Va. 1987) (enterprise could consist of group of individuals and corporations); Snider v. Lone Star Art Trading Co., 659 F. Supp. 1249, 1253 (E.D. Mich. 1987) (group of individuals and corporations proper enterprise); United States v. Dellacroce, 625 F. Supp. 1387, 1390 (E.D.N.Y. 1986) (two "crews" of the Gambino Crime Family and their supervisor sufficient RICO enterprise); United States v. Aimone, 715 F.2d 822, 826 (3d Cir. 1983) (enterprise may be comprised of a combination of "illegal" entities and a group of individuals associated in fact), cert. denied, 468 U.S. 1217 (1984); United States v. Thevis, 665 F.2d 616, 625-26 (5th Cir.), cert. denied, 456 U.S. 1008 (1982); United States v. Huber, 603 F.2d 387, 393-94 (2d Cir. 1979), cert. denied, 445 U.S. 927 (1980); United States v. Campanale, 518 F.2d 352, 357 n.11 (9th Cir. 1975) (enterprise composed of two corporations and a union), cert. denied, 423 U.S. 1050 (1976).

[211] See United States v. Turkette, 452 U.S. 576, 581 (1981); United States v. Nabors, 45 F.3d 238 (8th Cir. 1995) (association-in-fact consisting of the defendants); United States v. Stefan, 784 F.2d 1093, 1103 (11th Cir.) (enterprise consisting of a group of individuals associated in fact sufficient where individuals identified by name), cert. denied, 479 U.S. 1009 (1986); United States v. Mitchell, 777 F.2d 248, 259 (5th Cir. 1985) (group of individuals associated together for the purpose of importing marijuana sufficient for RICO enterprise), cert. denied, 476 U.S. 1184 (1986); United States v. Local 560, Int'l Brotherhood of Teamsters, 780 F.2d 267, 273 (3d Cir. 1985) ("Provenzano group," group of individuals, could constitute enterprise), cert. denied, 476 U.S. 1140 (1986); United States v. Santoro, 647 F. Supp. 153, 176 (E.D.N.Y. 1986) ("Luchese Family" alleged as association-infact enterprise), aff'd, 880 F.2d 1319 (2d Cir. 1989); Van Dorn Co. v. Howington, 623 F. Supp. 1548, 1554 (N.D. Ohio 1985) (unnamed association of defendants could constitute proper enterprise).

115

# D. EVIDENCE OF JUDICIAL BIAS AGAINST THE RICO ACT FOR CIVIL PLAINTIFFS

◆ **No extraterritorial RICO case has resulted in a judgment.**

◆ Plaintiffs have filed approximately one dozen extraterritorial RICO cases in United States courts, four of which were dismissed for failure to prove jurisdiction.

◆ In another five cases, plaintiffs established jurisdiction, but their RICO claims were stayed or dismissed.

> (1) See Republic of Phil. v. Marcos, 818 F.2d 1473, 1490 (9th Cir. 1987) (holding RICO claims barred by act of state and political question doctrines);
>
> (2) S.A. Mineracao da Trinidade-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 191 (2d Cir. 1984) (staying "non-arbitrable" RICO claims pending arbitration of other claims);
>
> (3) FMC Corp. v. Varonos, No. 87-C-9640 (N.D. Ill. Oct. 20, 1988) (LEXIS, Genfed library, Dist file) (finding RICO claims insufficient);
>
> (4) Selman v. American Sports Underwriters, No. 84-0099-C (W.D. Va. Oct. 4, 1988) (LEXIS, Genfed library, Dist file) (same);
>
> (5) Chisholm & Col. v. Bank of Jamaica, 643 F. Supp. 1393, 1404-05 (S.D. Fla. 1986) (same).

◆ Courts have maintained RICO causes of action against foreign defendants in only four cases.

> (1) See In re All Terrain Vehicles Litig., No. 88-237 (E.D. Pa. Feb. 23, 1989) (LEXIS, Genfed library, Dist file) (denying foreign defendant's motion to dismiss);
>
> (2) Chamarac Properties, N.V. v. Pike, Fed. Sec. L. Rep. (CCH) 93,761 (S.D.N.Y. 1988) (same);
>
> (3) North Carolina v. Alexander & Alexander Servs., 680 F. Supp. 746, 750 (E.D.N.C.), certification for immediate appeal denied, 685 F. Supp. 114, 117 (E.D.N.C. 1988) (same);
>
> (4) Shulton, Inc. v. Optel Corp., 1987-1 Trade Cas. (CCH) 67,436 (D.N.J. 1986) (same).

Respectfully

Don Hamrick

## CERTIFICATION

The above was not delivered to the Defense Counsel because I am now unemployed and cannot afford the cost of service. However, I did email the above in PDF format to the U.S. Department of Justice and the U.S. Attorney's Office in Washington, DC.

Respectfully

Don Hamrick

