# In the U.S. District Court of the District of Columbia

333 Constitution Avenue, Washington, DC 20001

## No. 1:07-cv-1616, RMC

| | | |
|---|---|---|
| Don Hamrick, pro se | ) | |
| IN THE CAPACITY OF A | ) | |
| PRIVATE ATTORNEY GENERAL | ) | |
| 5860 Wilburn Road | ) | |
| Wilburn, AR 72179 | ) | **Civil RICO Act** |
|     PLAINTIFF/APPELLANT | ) | **18 U.S.C. § 1964(a)** |
| v. | ) | |
| | ) | |
| United Nations | ) | |
| | ) | |
| United States | ) | |
|     DEFENDANT/APPELLEE | ) | |

## PLAINTIFF' MOTION FOR PERMANENT INJUNCTION AGAINST THE U.S. DEPARTMENT OF TRANSPORTATION'S BAR NOTICES OF 2004 AND 2006

## PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION AGAINST THE U.S. COAST GUARD TO CEASE AND DESIST ALL HARASSMENT OF AND RETALIATION AGAINST THE PLAINTIFF

## PREDICATE ACTS OF RACKETEERING UNDER THE RICO ACT:

18 U.S.C. § 1503. Obstruction of Justice and Conspiracy to Obstruct Justice
18 U.S.C. § 1512(a)(2). Tampering with a victim.
18 U.S.C. § 1513(b), (e), and (f) Retaliating against a victim.

*I have filed this motion in every court that I have had cases in
for the last 5 years and the motion has been ignored every time.*

*So, here I go again with the same motion in this court, again
I am getting blue in the face.*

# RECEIVED

DEC 1 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1



# The Three Monkeys

"Hear no evil,"   "Say no evil"   and   "See no evil"

Among the most famous masterpieces of the Toshogu sculptures.

http://www.jgc.co.jp/waza/a2_nikko/toshog01.htm



# ON SILENCE ... AND MONKEYS

by William Braud, Ph.D.[1]
ITP Dissertation Express, Vol.3, No.1, Fall, 1995
Institute of Transpersonal Psychology
Palo Alto, California

### *I've heard that there is, in Africa, a belief that monkeys can speak; they refrain from speaking, however, to avoid having to work.*

Silent monkeys are found in Japan, in the tradition of the *San-en* or Three Monkeys. We are familiar with the set of three joined monkeys—one covering its eyes, one covering its ears, one covering its mouth. We affectionately call these three characters See-No-Evil, Hear-No-Evil, and Speak-No-Evil. These are worthy moral injunctions. But there is more to this tradition. In the Japanese language, "*saru*" or "*zaru*" means both "don't" and "monkey." So, what is normally rendered as monkeys that see, hear, and speak no evil could be rendered, more directly and accurately, as "don't see, don't hear, don't speak"—reminders to occasionally close or shut the doors of the conventional senses and of the conventional (verbal) mode of expression.[2] When we follow this more esoteric injunction, what do we encounter?

In Egypt, one sees statues of Horus in the form of an infant standing beside or seated in the lap of his mother, Isis. This form of the child Horus was known to the late Egyptians as Harpa-khruti and to the Greeks and Romans as Harpocrates. Harpocrates is invariably represented in statues with a finger of one hand on his mouth. Overtly, this gesture of a finger to the lips may signify Harpocrates' infancy. (*"Heaven lies about us in our infancy!"*—William Wordsworth) Covertly, this same gesture may be an injunction to silence, for those who understand. Interestingly, in these same statues, Harpocrates holds in his other arm a cornucopia. Could the latter be symbolic of the rewards in store for one who follows the admonition to silence?

Another silent one was *"Harpo"* of the Marx Brothers, the madcap comedy team famous for their vaudeville and feature film monkeyshines in the 1920s and 30s. One of their earliest movies was called Monkey Business (1931). It is of interest that it was Harpo who was a silent, never-speaking brother. Surely this is merely a curious coincidence; who would ever accuse the Marx Brothers of possessing esoteric knowledge?

Harpo was a mime. Monkeys, too, pantomime, mime, mimic. *"Monkey see, monkey do."* Via the Japanese equivalency mentioned above, this familiar phrase can become *"Don't see; don't do."* Could the latter be a veiled injunction to close and shut down the familiar avenues of perception and expression, opening the way for new possibilities?

Monkeys are mischievous; monkeys are fools; monkeys do not speak. *"Silence is the virtue of fools,"* wrote Francis Bacon, and *"Silence is the understanding of fools and one of the virtues of the wise,"* wrote Chevalier Bernard de Bonnard. There are persons who spend much of their lives in silence; they are called monks.

---

[1] http://www.itplibrary.org/Resources/Dissertation_Thesis/DissExpress/DissExp3-1.pdf

[2] "Mi-zaru" (*"don't see"*) suggests *"don't see monkey"* or, if "evil" (*that which is not to be seen*) is implicit or understood, *"don't-see evil monkey."* Similarly, "Kika-zaru" (*"don't hear"*) becomes *"don't hear monkey"* or *"don't-hear-evil monkey,"* and "Iwa-zaru" (*"don't speak"*) becomes *"don't speak monkey"* or *"don't-speak-evil monkey."*

Monkeys are clowns. There is a pronounced clownish element in many of the wisdom traditions, especially in the art and literature of Zen. In other traditions as well, we find crazy wisdom and holy fools. The wise never take themselves too seriously; they monkey around a lot.

*Don't see, don't hear, don't speak, don't do*—to follow these injunctions is to enter the realm of Harpocrates, the realm of silence, the realm of the mystical. The very word "mystical" is associated with Greek words that echo these meanings—mystes (*one who is closemouthed or initiated in the mysteries*), and myein (*to shut the eyes*). The wisdom traditions are rich in suggestions to enter fully into the realm of silence in order to encounter new ways of knowing and being:

*"Darkness within darkness. The gate-way to all understanding."*—Lao-tzu

*"Practice not-doing, and everything will fall into place."*—Lao-tzu

*"Lovers put out the candles and draw the curtains when they wish to see the god and the goddess; and in the higher communion the night of thought is the light of perception."*—Coventry Patmore

*"Leave off doing, that you may be. Leave off analysis, that you may know."*—Anon.

*"So the soul, if she would work inwardly ... must hide . . . from all images and forms . . . . [One] must be in a stillness and silence, where the Word may be heard. One cannot draw near to this Word better than by stillness and silence: then it is heard and understood in utter ignorance. When one knows nothing, it is opened and revealed."*—Meister Eckhart

And in a more modern vein:

> *"Hello darkness my old friend*
> *I've come to talk with you again*
> *Because a vision softly creeping*
> *Left its seeds while I was sleeping*
> *And the vision that was planted*
> *In my brain still remains*
> *Within the sound of silence."*
> — Paul Simon

# Stop Monkeying Around With My
# Seventh Amendment Right to a Civil Jury Trial!

---

## Case Law
## From the U.S. Attorneys' Manual
## Title 4 Civil Resource Manual
## § 214 Injunctions

Affirmative relief by way of injunction is sought from time to time **to advance major public interests**[3] or **enforce governmental functions**.[4] Such injunction actions may be specifically provided for by statute. *See, e.g., United Steelworkers of America* v. *United States*, 361 U.S. 39 (1959) (injunction under the Taft-Hartley Act). **Injunction actions may also be maintained to enforce statutes which do not specifically provide for such a remedy**. *See, e.g., In re Debs*, 158 U.S. 564 (1895); *United States* v. *United Mine Workers*, 330 U.S. 258 (1947). Injunctive relief may also be sought from an appellate tribunal under the All Writs Act, 28 U.S.C. § 1651(a). *See, e.g., FTC* v. *Dean Foods Co.*, 384 U.S. 597 (1966).

**A preliminary injunction is an extraordinary and drastic remedy.**[5] *Canal Authority of State of Florida* v. *Callaway*, 489 F.2d 567, 572-73 (5th Cir. 1974). **No injunction will issue if there is an adequate remedy at law.**[6] *See Matthews* v. *Rodgers*, 284 U.S. 521, 525 (1932); *Aircraft & Diesel Equipment Corp.* v. *Hirsch*, 331 U.S. 752 (1947); *Porto Rico Telephone Co.* v. *P.R. Communications Auth.*, 189 F.2d 39 (1st Cir.), cert. denied, 342 U.S. 830 (1951). **Irreparable injury is an essential prerequisite to the issuance of a preliminary injunction.**[7] *County of Santa Barbara* v. *Hickel*, 426 F.2d 164 (9th Cir. 1970), cert. denied, 400 U.S. 499 (1971). **Temporary loss of income or other alleged injury involving only the loss of money is not irreparable injury.**[8] *Sampson* v.

---

[3] My Emphasis. The rights and duties of seamen as unrepresented civil plaintiff a suits against the United States whether or not the civil RICO Act is employed and whether or not the seaman is acting in the capacity of a Private Attorney General or as a Human Rights Defender under the United Nations Declaration on Human Rights Defenders are major public interests.

[4] The U.S. Department of Transportation and the U.S. Coast Guard conspired against my rights in order to avoid performing their constitutional and legal governmental functions in regard to their functions as governmental agencies as an defendants in my lawsuit. These actions constitution obstructions of justice subjecting the individuals committing the conspiracies to obstruct justice to criminal prosecution if done by a non-governmental citizen.

[5] My Emphasis. The U.S. Department of Transportation issuing Bar Notices in 2004 and 2006 based on hearsay evidence from the U.S. Coast Guard banning me from entering the District of Columbia is a drastically unlawful measure that demands a permanent injunction.

[6] My Emphasis. There is no other remedy.

[7] My reputation is irreparably injured by the Bar Notices because in the eyes of the law I committed a breach of the peace on the hearsay testimony of the U.S. Coast Guard retaliating for the lawsuit as a civil defendant. This goes to a malicious motive and intent to defame and harass.

[8] The irreparable injury includes but is not limited to loss of income. It also includes defamation, injury to reputation, obstruction of justice because I cannot perform discovery as an unrepresented civil plaintiff or even visit Washington, DC as a seaman on maritime business or even as a tourist on vacation. This goes to my Ninth, Tenth, Thirteenth and Fourteenth Amendments right to travel which is also injured.

*Murray*, 415 U.S. 61, 90 (1974). **The injury alleged must be immediate and non-speculative.**[9] *Louisiana Environmental Society, Inc.* v. *Coleman*, 524 F.2d 930, 933 (5th Cir. 1975). **There must be a convincing showing of irreparable injury, and mere litigation expense will not suffice.**[10] *Sierra Club* v. *Morton*, 405 U.S. 727 (1972). **Even if there will be irreparable injury, the granting of a temporary injunction is not a matter of right and may be refused in the exercise of judicial discretion.**[11]

**In the exercise of its discretion a court "of equity should pay particular regard for the public consequence in employing the extraordinary remedy of injunction."**[12] *See Weinberger* v. *Romero-Barcelo*, 456 U.S. 305, 312 (1982). **If an injunction will impair the public interest, it should be denied.**[13] Cf., *Yakus* v. *United States*, 321 U.S. 414, 440 (1944); *see also Hecht Co.* v. *Bowles*, 321 U.S. 321, 331 (1944).

**Liability is for "resulting and consequential" damages.** *See Silvers* v. *TTC Industries, Inc.*, 484 F.2d 194 (6th Cir. 1973).

---

## ON THE NEED FOR THE PERMANENT INJUNCTION

On September 17, 2004, and August 11, 2006 the U.S. Coast Guard willfully and maliciously conspired with the Mr. Prendergast, Associate Director of Security Operations, U.S. Department of Transportation, in violation of 18 U.S.C. § 1001 *FRAUD AND FALSE STATEMENTS*, 18 U.S.C. § 241 *CONSPIRACY AGAINST RIGHTS,* 18 U.S.C. § 242 *DEPRIVATION OF RIGHTS UNDER COLOR OF LAW,* 18 U.S.C. § 245. *FEDERALLY PROTECTED ACTIVITIES*, for the issuance of Bar Notices in retaliation for my activities as an unrepresented civil plaintiff acting in the capacity of a *Private Attorney General* under the civil RICO Act and as then unknowningly acting in the capacity of a Human Rights Defender under the United Nations' *DECLARATION ON THE RIGHT AND RESPONSIBILITY OF INDIVIDUALS, GROUPS AND ORGANS OF SOCIETY TO PROMOTE AND PROTECT UNIVERSALLY RECOGNIZED HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS OF DECEMBER 9, 1998* .

I did not commit any such offense. *PERIOD!* I am denied administrative and judicial remedies!

The U.S. Department of Homeland Security has took over general superintendence over the U.S. merchant marine and merchant marine personnel under 46 U.S.C. § 2103 when the U.S. Coast Guard was transferred out from under the U.S. Department of Transportation and placed under the U.S. Department of Homeland Security in 2003.

Mr. Prendergast used a photograph of me in the BAR NOTICE of 2004 that could have only

---

[9] The injuries are not speculative. They are explicitly stated in the Bar Notices.

[10] The Bar Notices are a convincing showing of injury.

[11] Always giving the U.S. Government a "Free Pass." The granting of a "Permanent Injunction" in this matter is not only a matter of right for the injured plaintiff but a moral, constitutional, and judicial duty of the Court to combat corruption and unlawful conduct in the U.S. Government. Denying this Motion for Permanent Injunction will fortify the reputation of the federal courts as a corrupt racketeering enterprise over the distribution of powers under the Tenth Amendment.

[12] Denying this Motion for Permanent Injunction will empower the U.S. Coast Guard to violate the Seventh Amendment rights of seaman again and again. The public benefit far outweigh the public consequence in granting the Permanent Injunction.

[13] The Permanent Injunction will protect the public interest in equal justice under the law. Therefore, it must be granted.

come from an article I wrote and posted on the Internet criticizing the U.S. Coast Guard for their misguided denial of my application for the National Open Carry Handgun endorsement on my Merchant Mariner's Document in 2002. That photo was taken of me sitting in front of an Internet computer at a cyber café in Klaipeda, Lithuania after I was taken off a U.S. Government pre-position vessel as an Able Seaman because the U.S. Coast Guard found an imaginary threat in a Second Amendment article that I emailed to them.

The 2004 Bar Notice did not present any evidence of a chargeable offence nor did it include an affidavit from an accuser nor from a witness nor did it even narrate an actual offense that I am alleged to have committed as justification for the Bar Notices. The 2004 Bar Notice did not even include any federal law or regulation as authority for such action.

I never received the 2004 Bar Notice. Uaware of the 2004 Bar Notice I visited U.S. Coast Guard on August 10, 2006 as an unrepresented civil plaintiff in the capacity of a Private Attorney General. In retaliation the U.S. Coast Guard again willfully and maliciously conspired with Mr. Prendergast to issue another Bar Notice. The following day Mr. Prendergast did issuance the August 11, 2006 Bar Notice completing the *CONSPIRACY AGAINST RIGHTS*, (18 U.S.C. § 241); causing *DEPRIVATION OF RIGHTS UNDER COLOR OF LAW*, (18 U.S.C. § 242); of *FEDERALLY PROTECTED ACTIVITIES*, (18 U.S.C. § 245).

The 2006 Bar Notice states:

> At the request of the U.S. Coast Guard, you are hereby notified  that you are **barred from entering the U.S. Coast Guard Headquarters or any U.S. Department of Transportation (DOT) Headquarters Building**.
>
> If you should have any official business at the U.S. Coast Guard Headquarters or any DOT Headquarters Building, you must first notify DOT Office of Security, M-40, telephone number (202) 366-4677 and arrange for clearance to enter/access the respective building/facility.
>
> This Bar Notice is issued by this Office in accordance with CFR Title 41, Chapter 102-74.390 and District of Columbia Code, Chapter 22-3302, Unlawful Entry onto Property. Violations of these citations may subject [me] to arrest and prosecution. **The penalty for Unlawful Entry in the District of Columbia is imprisonment for up to six (6) months or a fine of up to $100, and/or both**.

Merriam-Webster Dictionary defines:

HEARSAY           *"something heard from another : report, rumor."*

HEARSAY EVIDENCE  *"legal testimony that consists in a narration by one person of matters told him by another; broadly : evidence that does not derive its value solely from the credit given to the witness himself as such but that rests in part on the veracity and competency of some other person or sometimes of the witness at another time"*

HEARSAY RULE      *"a rule barring the admission of hearsay evidence as testimony by reason of the unavailability of the sanctions of cross-examination to test the accuracy of the statement."*

**First**, the two Bar Notices do not present any documented evidence of an offense committed by me nor does it present any affidavits from accusers or witnesses. No arrest reports. No security reports. No eye witness reports. No surveillance-security camera evidence. Nothing!

**Second**, the two Bar Notices do not include instructions on my rights to appeal the Bar Notices.

**Third**, the 2006 Bar Notice begins by barring me from visiting the U.S. Coast Guard

Headquarters or any U.S. Department of Transportation (DOT) Headquarters Building and ends with "Unlawful Entry in the District of Columbia." The U.S. Department of Transportation does not have the administrative authority to deny me my right to travel into and out of the District of Columbia as a U.S. Citizen under the Fourteenth Amendment except by the criminal or civil due process of the Fourth, Fifth, Sixth and/or the Seventh Amendments.

**Fourth**, Mr. Prendergast acted only on hearsay evidence from the U.S. Coast Guard in both Bar Notices. These are the fundamental actions of illegal conspiracies against my rights that presents actionable deprivations of my rights under color of law simply because the U.S. Coast Guard retaliated in response to my activities as an unrepresented civil plaintiff with a civil RICO Act acting in the capacity capacity of a *Private Attorney General* under the civil RICO Act and as then unknowningly acting in the capacity of a Human Rights Defender under the United Nations' *DECLARATION ON THE RIGHT AND RESPONSIBILITY OF INDIVIDUALS, GROUPS AND ORGANS OF SOCIETY TO PROMOTE AND PROTECT UNIVERSALLY RECOGNIZED HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS OF DECEMBER 9, 1998 .*

### COAST GUARD NON-RETALIATION POLICY
http://www.uscg.mil/comdt/non-retaliation_policy.asp

The Coast Guard proudly maintains the following policy:

"**If you question or lodge a complaint regarding a Coast Guard policy or action, to us or to anyone else, or if you seek outside help in dealing with a Coast Guard policy or action, the Coast Guard will not retaliate against you in any fashion. The Coast Guard wants you to be able to comment, question, or lodge a complaint about our policies or actions without fear that we will retaliate or try to discourage future questions or complaints. If you think the Coast Guard has broken this promise, we will investigate, take appropriate action, and make sure that mistakes are not repeated.** You may comment, ask questions, or file a complaint about Coast Guard policies or actions by contacting your local Coast Guard office, or you can also contact the Small Business Administration Office of the National Ombudsman at 888-REG-FAIR (734-3247), fax: 202-481-5719, email: ombudsman@sba.gov.

"Small businesses generally are independently owned and operated and are not dominant in their field. If you need help determining whether or not your business qualifies as a 'small business', contact the SBA's Office of the National Ombudsman using the information given in the preceding paragraph."

Admiral Thomas H. Collins (then Commandant of the U.S. Coast Guard)
Commandant, United States Coast Guard
February 11, 2004 (Federal Register, 69 FR 12864, March 18, 2004)

Does the above policy apply only to small business owners and not to seafarers of the U.S. Merchant Marine?

Today and on into the future, Mr. Prendergast's Bar Notices places me in a Catch-22 situation putting me under a threat of arrest and prosecution if I visit any DOT, FAA, or U.S. Coast Guard headquarters building whether I am lawfully acting in the capacity of an unrepresented plaintiff with a Civil RICO Act case against the U.S. Coast Guard or as a U.S. merchant seaman on lawful maritime business. The actions of Mr. Prendergast and the U.S. Coast Guard violate my right to travel to and from Washington, DC as a free United States citizen under the Thirteenth and Fourteenth Amendments.

# ON THE RIGHT TO TRAVEL INTERSTATE & INTRASTATE

*Patricia Johnson and Michael Au France*, v. *City of Cincinnati*,
6th Circuit, No. 00-4477. (September 26, 2002)

## IV. B.

In analyzing whether a particular right implicates the protection of the Due Process Clause, we first carefully define the asserted right and then ask whether it is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.E.2d 772 (1993) (internal quotation marks and citations omitted); *see also Michael H. v. Gerald D.*, 491 U.S. 110, 122, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Given these instructions, we believe the relevant, asserted right implicated by this case is a right to travel locally through public spaces and roadways. *See Lutz*, 899 F.2d 255, 268 (3d Cir. 1990) ("The right or tradition we consider may be described as the right to travel locally through public spaces and roadways.") While the terms are often used interchangeably, we do not use the right to travel locally through public spaces and roadways synonymously with a right to freedom of movement. To be sure, a right to freedom of movement could encompass a right to localized travel, but it could also include interstate and international travel components. While we draw from historical sources discussing a freedom of movement, and find their authority instructive, our holding is limited to the right to travel locally through public spaces and roadways. Moreover, while we can conceive of different articulations of a right to intrastate travel, the right we address - the right to travel locally through public spaces and roadways - is fundamentally one of access.

## C.

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *see also Saenz*, 526 U.S. at 498 (describing the constitutional right to travel as "firmly embedded" in the Supreme Court's jurisprudence). It is "assertable against private interference as well as government action . . . . a virtually unconditional personal right, guaranteed by the Constitution to us all." *Shapiro*, 394 U.S. at 643 (Stewart, J., concurring). The right to interstate travel embraces three different components: (1) "the right of a citizen of one State to enter and to leave another state"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz*, 526 U.S. at 500. The Supreme Court has not yet identified the source of the first travel right, but the latter two components are expressly protected by the Privileges and Immunities Clause. *Id.* at 501-03.

The Supreme Court has not yet addressed whether the Constitution also protects a right to intrastate travel. *Mem'l Hosp.*, 415 U.S. at 255-56. Both the district court in this case, 119 F. Supp. 2d at 745-46, and the Ohio Supreme Court in *Burnett*, 755 N.E.2d at 865-66, recognized a limited constitutional right to intrastate travel and concluded that the Ordinance impermissibly infringed on this right. *See also Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) (recognizing that the Constitution "protects the right to travel freely within a single state"); *Lutz*, 899 F.2d at 268 (holding that "the right to move freely about one's own neighborhood or town" is a fundamental liberty interest protected by the Due Process Clause); *Hutchins v. District of Columbia*, 188 F.3d 531, 561-62

(D.C. Cir. 1999) (Rogers, J., dissenting in part, concurring in part, joined by Tatel and Wald, JJ.) ("[P]recedents recognize a fundamental right to walk through public streets without thereby subjecting oneself to police custody."); *see also id.* at 538 (plurality) (Silberman, J.) (accepting that a "draconian curfew" might implicate substantive due process); *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1578-81 (S.D. Fla. 1992);[14] *City of Seattle v. McConahy*, 937 P.2d 1133, 1141 (Wash. App. 1997).[15]

Although the Supreme Court has not expressly recognized a fundamental right to intrastate travel, as early as the Articles of Confederation, state citizens "possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom." *United States v. Wheeler*, 254 U.S. 281, 293, 41 S.Ct. 133, 65 L.E. 270 (1920). As Chief Justice Taney observed:

> For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and as members of the same community, must have the right to pass and repass through every part of it without interruption, *as freely as in our own States.*

*Smith v. Turner*, 48 U.S. (7 How.) 283, 492, 12 L.Ed. 702, 790 (1849) (Taney, C.J., dissenting) (emphasis added); *see also Civil Rights Cases*, 109 U.S. 3, 39, 3 S.Ct. 18, 27 L.E.2d 835 (1883) (Harlan, J., dissenting) (noting that "personal liberty consists, says Blackstone, in the power of locomotion, of changing situation, or removing one's person to whatever place one's own inclination may direct, without restraint, unless by due course of law") (internal quotations omitted). Or as the Supreme Court noted at the turn of the twentieth century: "[T]he right to remove from one place to another according to inclination, is an attribute of . . . liberty . . . secured by the Fourteenth Amendment and by other provisions of the Constitution." *Williams v. Fears*, 179 U.S. 270, 274, 21 S.Ct. 128 (1900). More recently, Justice Stevens, joined by Justice Souter and Justice Ginsburg, observed:

> [I]t is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage" *Kent v. Dulles*, 337 U.S. 116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 130 (1765).

---

[14] *But see Wright* v. *City of Jackson*, 506 F.2d 900, 902-03 (5th Cir. 1975).

[15] A number of state courts have also ruled that their respective state constitutions protect a right to intrastate travel. *See Watt* v. *Watt*, 971 P.2d 608, 615 (Wyo. 1999) ("The right to travel freely throughout the state is a necessary and fundamental aspect of our emancipated society, and it is retained by the citizens."); *Brandmiller* v. *Arreola*, 544 N.W.2d 894, 899 (Wisc. 1996) ("[W]e recognize that the right to travel intrastate is fundamental among the liberties preserved by the Wisconsin Constitution. This right to travel includes the right to move freely about one's neighborhood, even in an automobile."); *State* v. *Shigematsu*, 483 P.2d 997, 1001 (Haw. 1971) (recognizing right to freedom of movement, which "include[s] the right of men to move from place to place, to walk in the fields in the country or on the streets of a city, [and] to stand under open sky."); *State* v. *Cuypers*, 559 N.W.2d 435, 437 (Minn. App. 1997) ("Minnesota also recognizes the right to intrastate travel."); *City of New York* v. *Andrews*, 719 N.Y.S.2d 442, 452 (N.Y. Sup. Ct. 2000) ("There can be no doubt that our State Constitution, no less than the Federal Constitution, supports the right to travel freely within the State."); *see also City of Bismark* v. *Stuart*, 546 N.W.2d 366, 367 (N.D. 1996) (implying existence of right).

*City of Chicago v. Morales*, 527 U.S. 41, 54, 119 S.Ct. 1849, 144 L.E.2d 67 (1999); *see also Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (noting that anti-loitering statute, which required individuals to provide "credible and reliable" identification, "implicated consideration of the constitutional right to freedom of movement"); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (describing walking, loitering, and wandering as "historically part of the amenities of life as we have known them."); *Guest*, 383 U.S. at 759 ("[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution."); *Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) ("Citizens have a fundamental right of free movement, 'historically part of the amenities of life as we have known them.'") (citation omitted); *Burnett*, 755 N.E.2d at 865 ("This freedom of mobility is a tradition extending back to when the first settler crossed into what would eventually become this great state, and it is a tradition no Ohioan would freely relinquish."); *Gomez v. Turner*, 672 F.2d 134, 143-44 n. 18 (D.C. Cir. 1982) (noting that the ability to "walk the streets, without explanation or formal papers is surely among the cherished liberties that distinguish this nation from so many others.").[16]  In light of these cases, we find that the right to travel locally through public spaces and roadways enjoys a unique and protected place in our national heritage.

In addition to its solid historical foundation, the tremendous practical significance of a right to localized travel also strongly suggests that such a right is secured by substantive due process. The right to travel locally through public spaces and roadways - perhaps more than any other right secured by substantive due process - is an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function. In the words of Justice Douglas:

> Freedom of movement, at home and abroad, is important for job and business opportunities - for cultural, political, and social activities - for all the commingling which gregarious man enjoys. Those with the right of free movement use it at times for mischievous purposes. But that is true of many liberties we enjoy. We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberty so as to give rise to punishable conduct is part of the price we pay for this free society.

*Aptheker v. Secretary of State*, 378 U.S. 500, 519-20, 184 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring); *see also Hutchins*, 188 F.3d at 561 (Rogers, J.)(dissenting in part, concurring in part). The Ordinance itself references an individual's "significant private interest in being able to travel and associate freely in all areas of the City." In view of the historical endorsement of a right to intrastate travel and the practical necessity of such a right, we hold that the Constitution protects a right to travel locally through public spaces and roadways.

---

[16] Writing in 1971, the Second Circuit keenly observed that "[i]t would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *King* v. *New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971); *see also Burnett*, 755 N.E.2d at 865("Without the one, there would never be the other."). While we credit this observation, we cannot rely on this proposition because recent Supreme Court cases demonstrate that the Court has not yet definitely located the textual source of the right to interstate travel. *Lutz*, 899 F.2d at 261. As the Third Circuit noted: "One consequence of the Court's refusal in *Shapiro* and its progeny to ground the right to travel in particular constitutional text is that there exists some uncertainty as to whether it is, in fact, 'a fundamental precept of personal liberty.'" *Id.* Of course, if the right to interstate travel is, in fact, grounded in substantive due process, the Second Circuit's point is "unimpeachable." *Id.*

## ON MY SEVENTH AMENDMENT RIGHT TO A CIVIL JURY TRIAL

Citing from Robert L. Tsai, *CONCEPTUALIZING CONSTITUTIONAL LITIGATION AS ANTI-GOVERNMENT EXPRESSION: A SPEECH-CENTERED THEORY OF COURT ACCESS*, 51 Am. U. L. Rev. 835, 884-886 (2002)

### IV. ENFORCING A SPEECH-BASED RIGHT OF ACCESS

*A. Interlude: Defining the Parameters of Access*

As we move from our discussion of constitutional litigation and its As we move from our discussion of constitutional litigation and its theoretical underpinnings, let us tackle the doctrinal implications of a speech-bound ideal of court access.

Although there may be no right to actually receive any *particular* remedy unless it is the only feasible way to address a constitutional violation,[17] or even to demand that a suit is resolved on the merits, several general principles should frame our understanding of the right of access. The right to engage in constitutional litigation effectively is evidenced in the First Amendment's Petition Clause, which was "inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble," and thus should be construed as generously as these other freedoms, from which it is "inseparable."[18]

As to suits to establish constitutional wrongdoing by government, which represents "the core of the First Amendment's protective ambit,"[19] the right to seek redress is meaningful only if it encompasses more than simply the ability to file a complaint. Rather, it logically includes the right to articulate one's claim intelligently. The right to engage in this form of contrariaous speech extends to the "collective activity undertaken to obtain meaningful access to the courts,"[20] as well as the individual right to dissent by pursuing well founded appeals to constitutional limits on governmental authority. This principle should apply to all stages of the proceedings, protecting not only the legal theories and arguments advanced in court, but also the actions taken to bring client and attorney together to prepare for the case and to publicize their activities. The Constitution's free speech guarantees consistently have been construed to encompass one's ability to engage in speech "effectively."[21]

Professor Laurence Tribe makes a similar point when he notes that the Free Speech Clauses impose additional "external" constraints on the lawmaking branches' power to regulate, directly or indirectly, federal courts' jurisdiction or the process of

---

[17] *See* Laurence H. Tribe, *AMERICAN CONSTITUTIONAL LAW*, 273 (3d ed. 2000).

[18] *McDonald* v. *Smith*, 472 U.S. 479, 485 (1985) (recognizing venerable right to petition).

[19] *In re Primus*, 436 U.S. 412, 424 (1978) (adding that any regulation designed to limit these rights must do so with "narrow specificity").

[20] *See United Transp. Union* v. *Michigan Bar*, 401 U.S. 576, 585 (1971) (acknowledging group legal action as a fundamental right).

[21] *See, e.g., Meyer* v. *Grant*, 486 U.S. 414, 424 (1988) ("The First Amendment protects [the] appellee's right not only to advocate their cause but also to select what they believe to be the most effective means for doing so"); *Thornhill* v. *Alabama*, 310 U.S. 88, 101 (1940) (holding that state may not impair effective exercise of right to free speech); *see also Ward* v. *Rock Against Racism*, 491 U.S. 781, 802-03 (1989) (holding that even content-neutral restriction on speech must leave channels of "effective communication").

adjudication.[22] The First Amendment would impose limits on laws that restrict access to the federal courts on the basis of a litigant's race, religion, gender or political affiliation or viewpoint. Moreover, laws *designed* to hinder the exercise of constitutional rights are, to that degree, unconstitutional. Likewise, even those jurisdictional statutes which unintentionally *burden* the exercise of such rights warrant strict scrutiny.[23]

The underlying point, however, is the same: the Constitution guarantees by implication, a "meaningful" opportunity to contest government policy and relief where it is warranted.[24]

Even those who emphatically deny that Congress or the Executive must reply to petitions agree that federal courts are under a special duty to address the lawsuits presented. Professors Lawson and Seidman argue in favor of a more context-dependent approach to understanding this duty to respond.[25] While they see a "clear obligation to consider and respond to petitions" on the part of federal courts, they find no constitutional duty on the part of Congress or the Executive to respond to citizen grievances.[26] This debate, however, obscures more central questions as to what constitutes meaningful access. **In all events, the First Amendment should reach any rule or enactment having the effect of burdening or discouraging one's ability to pursue constitutional claims, or which presents the danger of "distorting" the process by which constitutional rights are adjudicated.**[27]

**Consistent with the strong protections afforded criticism directed explicitly at the state, "[b]road, prophylactic rules in the area of free speech are suspect."**[28] **What is more, any interest advanced by the state in support of its restriction must be well supported by the facts, not based on conjecture.**[29] Finally, the means by which government addresses its concerns must be closely tailored to meet the problem and burden no more speech than is absolutely necessary. **Because the right to challenge**

---

[22] *See* Tribe, *supra* note [1], at 270-86 (distinguishing "external" constraints on lawmaking branches from "internal" constraints imposed by Article III).

[23] *Id.* at 273. This principle would extend in theory to rules that govern how constitutional claims are presented to the court, even though Congress has broad authority "to make rules governing the practice and pleading in [federal courts]." *Hanna* v. *Plumer*, 380 U.S. 460, 471-72 (1965).

[24] *See California Motor Transp. Co.* v. *Trucking Unlimited*, 404 U.S. 508, 512 (1972) (declaring that First Amendment guarantees "meaningful access to the agencies and courts").

[25] *See* Gary Lawson & Guy Seidman, DOWNSIZING THE RIGHT TO PETITION, 93 Nw. U. L. REV. 739, 740 (1999).(asserting that an examination of history and inferences drawn from the structure and text of the Constitution demonstrate that the right to petition does not oblige Congress to consider all petitions submitted).

[26] *See id.* at 758 (arguing that "the First Amendment right to petition restates and emphasizes the federal courts' obligations to consider filings—petitions brought to their attention—and to respond in some fashion to those filings").

[27] *Legal Servs. Corp.* v. *Velazquez*, 531 U.S. 533, 544 (2001). *See United States* v. *Jackson*, 390 U.S. 570, 583 (1968) (holding that Congress penalize assertion of a constitutional right); *see also Shapiro* v. *Thompson*, **394 U.S. 618, 629-31 (1969) (declaring that residency requirement burdened right to travel)**.

[28] *In re Primus*, 436 U.S. 412, 432 (1978).

[29] *Id.* at 434 n.27.

**existing law lies at the heart of the First Amendment, "government may regulate in the area only with narrow specificity."**[30]

Additionally, irrespective of whether there is a close fit between goals and methods, any official action taken with the actual intent to suppress or discourage the pursuit of colorable claims because the authorities are hostile to the individual's message would violate an independent principle: the ban on viewpoint discrimination.[31]  In other words, if the rule or law is created to deter the exercise of one's constitutional rights or because the state disagrees with the litigant's point of view, the law must be stricken under the principle of speech neutrality. As the *Velazquez* decision suggests,[32]268 the rule against taking sides in matters of opinion might very well be transgressed when government restricts a plaintiff-dissident's capacity to articulate, or the courts' ability to intelligently consider, constitutional claims.

---

[30] *Id.* at 424 (citing *NAACP* v. *Button*, 371 U.S. 415, 433 (1963)); *see also Sable Communications* v. *FCC*, 492 U.S. 115, 126 (1989) ("The Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.").

[31] *See, e.g., Texas* v. *Johnson*, 491 U.S. 397, 414 (1989).

[32] *See Velazquez*, 31 U.S. at 544-46; *see supra* Part II.B.

## ON MY RIGHT TO EQUAL PROTECTION UNDER THE LAW
## IN RE: FEDERAL RULES OF CIVIL PROCEDURE

Citing William B. Rubenstein, *THE CONCEPT OF EQUALITY IN CIVIL PROCEDURE,* 23 Cardozo Law Review 1865, 1869-70 (2002)

The concept of equality employed in American constitutional law is one with a particular historical meaning,[33] "some variety of [an] antidiscrimination principle."[34] If the clarifying question — "Equality of what?"—is posed, the constitutional answer is: "**Equality of respect by the government.**"[35] Constitutional equality aims to root out caste-like government practices.[36] Generally speaking, this is not the work that the

---

[33] Ken Karst has demonstrated that equality, as used in American jurisprudence, is "not derived from dictionaries or deductive logic, but from centuries of American experience. It is not a philosopher's universal, but a culturally specific and evolving ideal." Kenneth L. Karst, *WHY EQUALITY MATTERS,* 17 Ga. L. Rev. 245, 249 (1983).

[34] Laurence H. Tribe, *AMERICAN CONSTITUTIONAL LAW* § 16-21, at 1514 (2d ed. 1988) (citing Owen Fiss, *GROUPS AND THE EQUAL PROTECTION CLAUSE,* 5 Phil. & Pub. Aff. 107, 108 (1976), and Paul Brest, *FOREWORD: IN DEFENSE OF THE ANTIDISCRIMINATION PRINCIPLE,* 90 Harv. L. Rev. 1 (1976)).

[35] *See* Kenneth L. Karst, *THE SUPREME COURT, 1976 TERM—FOREWORD: EQUAL CITIZENSHIP UNDER THE FOURTEENTH AMENDMENT,* 91 Harv. L. Rev. 1 (1977) (defining the constitutional principle as "the right to be treated by organized society as a respected, responsible, and participating member").

[36] To restrict the Fourteenth Amendment to concerns about caste-creating government action may be neither precise, as a descriptive matter, nor satisfying, as a normative one. That equal protection law emanates from the anti-caste principle is most evident in the practice of applying "strict scrutiny" to laws that disfavor groups that have suffered a history of prejudicial treatment. *See* United States v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938); *see generally* John E. Nowak & Ronald D. Rotunda, *CONSTITUTIONAL LAW* §14.3 (6th ed. 2000). Yet several aspects of equal protection jurisprudence appear to exceed the anti-caste principle.

Fundamental rights equal protection law urges strict scrutiny of government actions that burden certain rights no matter what group's ox is being gored. *See, e.g., Reynolds* v. *Sims,* 377 U.S. 533 (1964) (fundamental right to vote); *Shapiro v. Thompson,* **394 U.S. 618 (1969)** (fundamental right to travel). It is the nature of the oxen, not the caste of the owner, that triggers equal protection concern. Equal protection law also protects "classes of one" — single individuals harmed by state actions, regardless of their class status. *See Village of Willowbrook* v. *Olech,* 528 U.S. 562 (2000). This too would suggest a state of equal protection law that exceeds the anti-caste principle. And the Court's recent application of strict scrutiny to affirmative action programs, *see, e.g., Adarand Constructors, Inc.* v. *Pena,* 515 U.S. 200 (1995); *City of Richmond* v. *Croson,* 488 U.S. 469 (1989)—laws that arguably discriminate, if discrimination it is, against the class of white persons—do not seem to follow from an anti-caste principle. Yet all of these aspects of equal protection law are highly contested. Arguably, our discomfort with them emanates, in part, from the very fact that they deviate from the core anti-caste principle.

Not only *does* the equal protection clause police more than pure caste-like practices, perhaps it *should*. To be clear: many scholars' concern about equal protection jurisprudence is not with the anti-caste principle, per se, but rather with the narrow manner in which the Court has identified caste-creating practices. *See, e.g.,* Charles R. Lawrence III, *THE ID, THE EGO, AND EQUAL PROTECTION: RECKONING WITH UNCONSCIOUS RACISM,* 39 Stan. L. Rev. 317 (1987) (criticizing the Court's narrow definition of racially-discriminatory motivations). This scholarship does not detract from my characterization of the equal protection clause as castebased. Other commentators do, by contrast, conceptualize the equal protection clause in ways that provide it with more breadth than that of rooting out pure caste-like practices. *See, e.g.,* Joseph Tussman & Jacobus tenBroek, *THE EQUAL PROTECTION OF THE LAWS,* 37 CAL. L. REV. 341 (1949) (defining, at a more abstract level, the concept of "fit" and the related notions of overbreadth and underinclusion).

Characterizing the Fourteenth Amendment as an "anti-caste" principle may therefore be both an imprecise description and an insufficient aspiration. However, it is a short-hand that sufficiently captures the core aspect of equal protection for purposes of comparing that clause's history and jurisprudence to the other forms of equality identified here.

concept of equality does in the field of procedure. Without a doubt, this form of equality — concern about the stigmatizing effects of government actions — can and does arise in procedure. A procedural system that denies jury service to blacks on the basis of their race, or women on the basis of their sex, surely triggers precisely this constitutional form of inequality.[37] However, as this Article will demonstrate, the organizing equalities of civil procedure are not synonymous with the animating principle of the Fourteenth Amendment.[38]

## THE U.S. GOVERNMENT & THE FEDERAL COURTS TREATING ME AS A POLITICAL DISSIDENT

Merriam-Webster defines dissident as:

1   a : not agreeing : Dissenting : not concurring; especially : differing often contentiously with an established political or religious system or belief of a country or people

   b : Quarrelsome, Contentious

2   : clashingly unharmonious

## Quotations

● "We must dare to think 'unthinkable' thoughts. We must learn to explore all the options and possibilities that confront us in a complex and changing world. We must learn to welcome and not to fear the voices of dissent. We must dare to think about 'unthinkable things,' because when things become unthinkable, thinking stops and action becomes mindless." James W. Fulbright(1905-1995), Speech, U. S. Senate, 27 March 1964.

● "In a number of cases dissenting opinions have in time become the law" Charles Evans Hughes quotes (American jurist and statesman. 1862-1948)

● "You do not become a 'dissident' just because you decide one day to take up this most unusual career. You are thrown into it by your personal sense of responsibility, combined with a complex set of external circumstances. You are cast out of the existing structures and placed in a position of conflict with them. It begins as an attempt to do your work well, and ends with being branded an enemy of society." Vaclav Havel, former president of the Czech Republic, and writer

● "Assent – and you are sane – , d emur – you're straightway dangerous – , and handled with a Chain." Emily Dickinson

---

[37] See, e.g., Strauder v. West Virginia, 100 U.S. 303 (1879) (holding unconstitutional a West Virginia statute excluding any but "white male persons" from juries).

[38] Since scholars rarely argue that the Fourteenth Amendment does or should influence the field, my contention that the Fourteenth Amendment primarily polices only one aspect of procedural inequality may seem like an attack upon a straw man. This criticism is unwarranted. First, as the Article will demonstrate, litigants frequently deploy the equal protection clause to challenge all types of procedural inequities. Thus, courts are regularly called upon to interpret the relationship between constitutional equality and procedural equalities. Second, the fact that the Constitution has little effect on civil procedure—even if widely known—remains perplexing, has rarely been addressed directly, and has never been explained. Finally, constitutional equality is a useful foil because it helps demonstrate that equality has different applications and thus helps elucidate the argument that there are different forms of procedural equality.

- "No matter that patriotism is too often the refuge of scoundrels. Dissent, rebellion, and all-around hell-raising remain the true duty of patriots." Barbara Ehrenreich

- What the advocates of conformity and carefully regulated dissident opinion forget is that a free society cannot be a heavily controlled society. In their zeal to suppress the real and imagined enemies of the status quo, the intelligence agencies and their private allies tend to leave democracy behind and move in the direction of the totalitarian societies they abhor. DONNA A. DEMAC, Liberty Denied: The Current Rise of Censorship in America, 1990.

- Privacy in one's associations...may in many circumstances be indispensable to freedom of association, particularly where a group espouses dissident beliefs. JOHN MARSHALL HARLAN (1899-1971), U. S. Supreme Court Justice, NAACP v. Alabama, 1958.

- Denial of the political offender's existence and legitimacy has forced extremism where conciliation would have been more productive. Labeled and hunted as common criminals and denied the opportunity for an orderly public airing of their grievances, political dissidents have often been unduly and unnecessarily radicalized. NICHOLAS N. KITTRIE, Rebels With a Cause: The Minds and Morality of Political Offenders, 1971

- "Has there ever been a society which has died of dissent? Several have died of conformity in our lifetime." Jacob Bronowski

- "Find more pleasure in intelligent dissent rather than passive agreement; for if you value intelligence as you should, the former implies a deeper agreement than the latter." Bertrand Russell quotes (English logician and philosopher 1872-1970)

- "The dissenter is every human being at those moments of his life when he resigns momentarily from the herd and thinks for himself." Archibald Macleish

- "In a time of universal deceit, telling the truth becomes a revolutionary act." George Orwell

- "Without debate, without criticism, no administration and no country can succeed -- and no republic can survive." John F. Kennedy

- "Discussion in America means dissent." James Thurber

## GOVERNMENT MUST GIVE SUFFICIENT WEIGHT TO INDIVIDUAL RIGHTS

Before enacting a policy authorities must consider an issue carefully and afford sufficient weight to the constitutional rights of individuals. *Jordan* v. *Gardner* (9th Cir. 1993) 986 F.2d 1521, 1529. The failure to treat constitutional provisions with appropriate respect constitutes deliberate indifference to the rights the policy seeks to limit. Id. Authorities cannot disrespect constitutional rights "because of an exaggerated regard for pragmatic interests of lesser significance and a lack of proper concern for the serious infringement of a countervailing constitutional interest." Id., 1530.

## JUDGES' DUTY IS TO BE GUARDIANS OF PEOPLES' LIBERTY

Judges have a duty to protect citizens' rights against any stealthy encroachments thereon. *Boyd* v. *United States* 116 U.S. 616, 635 (1886). Judges must protect citizens against overbearing, harassing, police conduct which trenches upon personal security without the objective evidentiary justification which the Constitution requires. *Terry* v. *Ohio* 392 U.S. 1, fn 15 (1968). When such conduct is identified, it must be condemned by the judiciary. Id. Judges should not permit themselves to be made a party to lawless

invasions of the constitutional rights of citizens. Id., 13. A judge who rules on the issue of probable cause should keep firmly in mind the high purpose of the Fourth Amendment and remain ever vigilant to forestall any encroachment on its fundamental guarantees. *People* v. *Superior Court* 3 Cal.3d 807, 828 (1970). Concerns about crime, drugs, and terrorists do not relieve judges and jurors from their duty to honor the Constitution's commands, even when the nation is under severe stress. *Coolidge* v. *New Hampshire* 403 U.S. 443, 455 (1971).

It is dangerous to allow a zeal for effective law enforcement to blind us to the peril to our free society that lies beyond the Fourth Amendment's protections. Id. Judges must not let law enforcement officers enlarge a specific authorization to search, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will. *Minnesota* v. *Dickerson* 508 U.S. 366 (1993).

Courts must continually condemn any law enforcement practice which imposes adverse treatment on an individual who dares to exercise his or her constitutional rights intended to protect against such adversity. *People* v. *Bower* 24 Cal.3d 638, 648 (1979).

## CITIZENS HAVE A RIGHT TO STAND ON THEIR RIGHTS AND TO ENJOY THE BENEFITS OF THE U.S. CONSTITUTION

"The individual may stand upon his constitutional rights as a citizen. . . . His rights are such as existed by the law of the land long antecedent to the organization of the State, and can only be taken from him by due process of law, and in accordance with the Constitution. Among his rights are . . . the immunity of himself and his property from arrest or seizure except under warrant of the law. He owes nothing to the public so long as he does not trespass upon their rights." *Hale* v. *Henkel* 201 U.S. 43, 74 (1906). [Emphasis added.]

Citizens are "entitled. . . to the benefit of the Constitution." *Uniformed Sanitation Men Assn., Inc.*, et al. v. *Commissioner of Sanitation of the City of New York* et al. 392 U.S. 280, 284 (1968).[Emphasis added.]

A person may elect to stand on his constitutional right not to cooperate with a police officer who is intent on securing evidence against him. When that happens, probable cause for a search or an arrest or both must be predicated on a suspect's specific acts and circumstances other than a mere failure to cooperate with an investigating officer. *Gallik* v. *Superior Court* 5 Cal.3d 855 (1971).

"If the individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity, his Fourth Amendment rights are implicated and he is entitled to the safeguards of the rules set forth above." In re *Tony C*. 21 Cal.3d 888, 895 (1978). [Emphasis added.]

## POLICE MAY NOT MISUSE THEIR AUTHORITY (INCLUDING U.S. COAST GUARD OFFICERS BY IMPLICATION)

A police officer may not use the authority of his uniform and badge to promiscuously bother citizens. *Batts* v. *Superior Court* 23 Cal.App.3d 435, 439 (1972); In re *Tony C*. 21 Cal.3d 888, 893 (1978); People v. *Aldridge* 35 Cal.3d 473, 479 (1984).

## SUPREMACY CLAUSE

Article VI, Section 2 of the U.S. Constitution declares that it, and the laws of the United States made pursuant to it, "shall be the supreme law of the land; and judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." [Emphasis added.] The U.S. Constitution is "a superior, paramount law, unchangeable by ordinary means," binding on all government officials at all levels of government, including judges; therefore, judges cannot violate the U.S. Constitution because they each take an oath to support it. To permit otherwise would be "worse than a solemn mockery." *Marbury* v. *Madison* 5 U.S. 137, 179-180 (1803).; Any law repugnant to the constitution is void. Id. Courts, as well as other departments, are bound by the U.S. Constitution. Id.

Federal law is enforceable in state courts because the Constitution and laws passed pursuant to it are as much laws in the State as laws passed by the state legislature. *Howlett By and Through Howlett v. Rose* 496 U.S. 356 (1990).; The governments and court of both the Nation and the several States are not charged with the duty to safeguard and enforce the right of every citizen without reference to the particular exercise of governmental power from which the right may have arisen. Id. A federal or state statute that conflicts with the U.S. Constitution never trumps the Constitution. *Conway v. Pasadena Humane Society* 45 Cal.App.4th 163, 176 (1996).

## ESSENCE OF CIVIL LIBERTY

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison* 5 U.S. 137, 163 (1803); Where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded. Id. An individual's constitutional rights cannot be deprived, or denied judicial effectuation, because of the existence of a non-judicial remedy through which relief might be achieved. *Lucas v. Colorado General Assembly* 377 U.S. 713, 736 (1964).

A citizen's constitutional rights cannot be infringed merely because a majority of the people choose that it be infringed. *Lucas v. Colorado General Assembly* (1964) 377 U.S. 713, 736-737.

It is clear that constitutional law is not a matter of majority vote. *Lucas v. Colorado General Assembly* 377 U.S. 713, 737 (1964), fn 30; *Westbrook v. Mihaly* 2 Cal.3d 765, 797 (1970)

The protection of constitutional rights must not be approached pragmatically or expediently. *Westbrook v. Mihaly* 2 Cal.3d 765, 797 (1970); Judges, true to their oath, must not uphold unconstitutional legislation even when supported by a large majority. Id. The entire philosophy of the Fourteenth Amendment is this: Personal rights shall be protected against the majority's will. Id.; *Lucas v. Colorado General Assembly* 377 U.S. 713, 737 (1964), fn 30

"The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." *Hunter v. Erickson* 393 U.S. 385, 392 (1969); *Lucas v. Colorado General Assembly* 377 U.S. 713, 736-737 (1964).

## CITIZENS HAVE A WELL ESTABLISHED RIGHT TO BE FREE OF UNWARRANTED INTRUSION

The Fourth Amendment right to be free from arrest without probable cause was clearly established at least as early as 1989. *Kennedy v. Los Angeles Police Dept.* 901 F.2d 702, 706 (9th Cir. 1989).

The right to be free from warrantless searches absent an applicable exception to the warrant requirement was clearly established as early as 1991. *California v. Acevedo* 500 U.S. 565, 569 (1991).

An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. *Brown v. Texas* 443 U.S. 47, 51 (1979). The Fourth Amendment requires that a seizure must be based on specific, objective facts. Id., 51-52. When a person's activity is no different from the activity of other pedestrians, the police may not detain anyone. Id. An understandable desire to assert a police presence does not negate Fourth Amendment guarantees. Id. In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference. Id, 52 The protection of fundamental constitutional rights should not depend upon unconstrained administrative discretion because when "a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." Id.

   I hereby motion for the Court to issue a permanent against the Bar Notices with a letter of apology from the Secretary of Transportation, the Secretary of Homeland Security, and the Commandant of the U.S. Coast Guard.

Respectfully

Don Hamrick

## CERTIFICATION

The above was not delivered to the Defense Counsel because I am now unemployed and cannot afford the cost of service. However, I did email the above in PDF format to the U.S. Department of Justice and the U.S. Attorney's Office in Washington, DC.

Respectfully

Don Hamrick

*EXHIBIT HUMAN RIGHTS ISSUES*

# *Don Hamrick, Petition No. 1142-06*     Tuesday, November 27, 2007

5860 Wilburn Road, Wilburn, Arkansas 72179; *Email:* 4donhamrick@gmail.com

## Inter-American Commission on Human Rights
1889 F Street, N.W.
Washington, D.C., 20006

## In Re: Jesica Gonzales, Petition No. 1490-05; Report No. 52/07 dated July 24, 2007,

Dear Sir,

The accompanying court document is evidence in support of my Petition No. 1142-06. The merits of my Petition include but are not limited to the same Articles of the *AMERICAN DECLARATION OF THE RIGHTS AND DUTIES OF MAN* as Jessica Gonzales' Petition No. 1490-05. Jessica Gonzales' case, in fact and law, opens the door for the Commission to accept my Petition for the *"Human Right of Self Defense"* and the *"Human Right to Own, Possess, and Bear Arms for the Personal Protection, Safety and Security"* of not only the *"Human Right to Life"* but also to preserve freedoms and liberties under any form a government in accordance with the *GENOCIDE CONVENTION* in like manner to Jessica Gonzales' case of *"No Constitutional Right to Police Protection."*

In ¶ 1 of Section I. Summary in the above Report No. 52/07:

> *The petition was presented on behalf of Ms. Jessica Gonzales (Lenahan), a U.S. national who claims that the police failed to respond to her repeated and urgent calls over several hours informing that her estranged husband had taken their three minor daughters (ages 7, 8 and 10) in violation of a restraining order issued against him, which resulted in their death. The United States Supreme Court allegedly validated the law enforcement officials' conduct, by holding that Ms. Gonzales was not entitled under the United States Constitution to have the restraining order enforced by the police.*

In ¶ 60 of the above Robert the Commission concluded that it has the competence to examine the Petitioners' allegations, and that the petition is admissible for the alleged violations of Articles I, II, V, VI, VII, XVIII and XXIV of the [*AMERICAN DECLARATION OF THE RIGHTS AND DUTIES OF MAN*] and in accordance with the Commission's Rules of Procedure.

Article I.    Every human being has the **right to life**, **liberty** and the **security of his person**.

Article II.    All persons are **equal before the law** and have the rights and duties established in this Declaration, without distinction as to race, sex, language, creed or any other factor.

Article V.    Every person has the **right to the protection of the law** against abusive attacks upon his honor, his reputation, and his private and family life.

Article VI.    Every person has the **right to establish a family**, the basic element of society, and **to receive protection therefor**.

Article VII. All women, during pregnancy and the nursing period, and all children have the right to special protection, care and aid.

Article XVIII.    Every person may **resort to the courts to ensure respect for his legal rights**. There should likewise be available to him **a simple, brief procedure whereby the courts will protect him from acts of authority that, to his prejudice, violate any fundamental constitutional rights**.

Article XXIV.    Every person has the **right to submit respectful petitions to any competent authority, for reasons of either general or private interest**, and **the right to obtain a prompt decision thereon**.

Jessica Gonzales' case presents a case of self-defense with a firearm as a human right for the means to defend the much touted "Right to Life." The remorseful question is if Jessica Gonzales had chosen the "Human Right of Armed Self-Defense" as a function of the American "Gun Culture" their most likely would have been a different outcome than the death of her three minor daughters (ages 7, 8 and 10), an outcome where no one would be killed because firearms have defensive purposes.

My Petition is based on two additional Articles of the *AMERICAN DECLARATION OF THE RIGHTS AND DUTIES OF MAN* to that of Jessica Gonzales' Petition. These additional two Articles are:

Article II.      All persons are **equal before the law** and have the **rights and duties** established in this Declaration, without distinction as to race, sex, language, creed **or any other factor**.

Article XVII.    Every person has the **right to be recognized everywhere as a person having rights and obligations, and to enjoy the basic civil rights**.


In October 2005 Brazil voted down a referendum on a nationwide ban on the sale of guns and ammunition. An overwhelming 63.9% of Brazilians – practically two thirds of the vote – said No to the proposed government ban. In an editorial titled *BRAZIL SAYS NO TO GUN CONTROL* by Diogo Waki (São Paulo state coordinator for the Campaign for Legitimate Self-Defense) posted on the Website of The American Society for the Defense of Tradition, Family and Property (not dated, est. Monday, October 24, 2005):[1]

> The Day after
>
> Today's Brazil is a far cry from the Brazil of yesterday. A certainty has been established in public opinion that **people must stand up for their rights** and that, by organizing and putting up a struggle, they can accomplish their goals. Is this not the same wave of conservatism that one sees in the United States, which also echoes the No vote by France and Holland on the European Constitution? Time will tell.

*Id.*

The remark highlighted above, "*people must stand up for their rights*" expresses in 2005 the same sentiment as Frederick Douglass, a pre-United States Civil War African-American abolitionist in 1857. In a speech at Canandaigua, New York, August 3, 1857 Frederick Douglass said:

> "Let me give you a word of the philosophy of reform. The whole history of the progress of human liberty shows that all concessions yet made to her august claims, have been born of earnest struggle. The conflict has been exciting, agitating, all-absorbing, and for the time being, putting all other tumults to silence. It must do this or it does nothing. If there is no struggle there is no progress. Those who profess to favor freedom and yet depreciate agitation, are men who want crops without plowing up the ground, they want rain without thunder and lightening. They want the ocean without the awful roar of its many waters."
>
> "This struggle may be a moral one, or it may be a physical one, and it may be both moral and physical, but it must be a struggle. Power concedes nothing without a demand. It never did and it never will. Find out just what any people will quietly submit to and you have found out the exact measure of injustice and wrong which will be imposed upon

---

[1] https://www.tfp.org/TFPForum/TFPCommentary/brazil_says_no_to_gun_control.htm

them, and these will continue till they are resisted with either words or blows, or with both. The limits of tyrants are prescribed by the endurance of those whom they oppress. In the light of these ideas, Negroes will be hunted at the North, and held and flogged at the South so long as they submit to those devilish outrages, and make no resistance, either moral or physical. Men may not get all they pay for in this world; but they must certainly pay for all they get. If we ever get free from the oppressions and wrongs heaped upon us, we must pay for their removal. We must do this by labor, by suffering, by sacrifice, and if needs be, by our lives and the lives of others."

Source: Frederick Douglass. [1857]. "*THE SIGNIFICANCE OF EMANCIPATION IN THE WEST INDIES*." Speech, Canandaigua, New York, August 3, 1857; collected in pamphlet by author. *IN THE FREDERICK DOUGLASS PAPERS. SERIES ONE: SPEECHES, DEBATES, AND INTERVIEWS*. Volume 3: 1855-63. Edited by John W. Blassingame. New Haven: Yale University Press, p. 204. (1985).

## Please Dowload and Print Law Review Article as Supporting Evidence for this Letter

Because I cannot afford the cost of including the 119 page law review article by David B. Kopel, Paul Gallant, and Joanne D. Eisen, titled, *THE HUMAN RIGHT OF SELF-DEFENSE*, [hereinafter referred to as *THE HUMAN RIGHT OF SELF-DEFENSE*]I will excerpt information from that article for discussion herein. However, please download and print the above legal article and included with this letter as evidence in support of this letter to the Commission. The article is available online at: http://www.davekopel.com/2A/LawRev/The-Human-Right-of-Self-Defense.pdf

### THE HUMAN RIGHT OF SELF-DEFENSE

By David B. Kopel,1 Paul Gallant2 & Joanne D. Eisen

*Abstract: Does a woman have a human right to resist rape or murder? Do people have a human right to resist tyranny? The United Nations Human Rights Council has said "no"—that international law recognizes no human right of self-defense. To the contrary, the Human Rights Council declares that very severe gun control—more restrictive than even the laws of New York City--is a human right.*

*Surveying international law from its earliest days to the present, this Article demonstrates that self-defense is a widely-recognized human right which no government and no international body have the authority to abrogate.*

*The issue is especially important today, as many international advocates of international gun prohibition are using the United Nations to deny and then eliminate the right of self-defense. For example, the General Assembly is creating an "Arms Trade Treaty" which would define arms sales to citizens in the United States as a human rights violation, because American law guarantees the right to use lethal force, when no lesser force will suffice, against a non-homicidal violent felony attack.*

*The article analyzes in detail the Founders of international law—the great scholars in the fourteenth through eighteenth centuries who created the system of international law. The Article then looks at the major legal systems which have contributed to international law, such as Greek law, Roman law, Spanish law, Jewish law, Islamic law, Canon law, and Anglo-American law. In addition, the article covers the full scope of contemporary*

*international law sources, including treaties, the United Nations, constitutions from Afghanistan to Zimbabwe, and much more.*

*The Article shows that international law—particularly its restraints on the conduct of warfare—is founded on the personal right of self-defense.*

*This is a draft of an article that will be published in the BYU Journal of Public Law.*

## Human Rights Included in Constitutions of 16 Nations

The constitutions of at least sixteen nations explicitly affirm that human rights are inherent (or "natural" or created by God); they affirm human rights are recognized by governments, but not created by governments.[2]

| | |
|---|---|
| Afghanistan Const., art. 23, | ("Life is a gift of God and a natural right of human beings."); |
| Andorra Const., art. 4 | ("The Constitution reco    gnizes the intangibility of the human dignity and guarantees the person's inviolable and imprescriptible rights...."); |
| Azerbaijan Const., art. 24 | ("Everyone...possess inviolable and inalienable rights and liberties."); |
| Belive Const., pmbl. | ("inalienable rights with which all members of the human family are endowed by their Creator...."); |
| Egypt Const., art. 41 | ("Individual freedom is a natural right not subject to violation...."); |
| Ethiopia Const., art. 10 | ("Human rights and freedoms, emanating from the nature of mankind, are inviolable and inalienable."); |
| Liberia Const., art. 11, | ("All persons...have certain natural, inherent and inalienable rights...."); |
| Lithuania Const., art. 18 | ("The rights and freedoms of individuals shall be inborn."); |
| Luxembourg Const., art. 11 | ("The State guarantees the natural rights of the individual...."); |
| Paraguay Const., art. 4 | ("The right to the life is inherent to the human person."); |
| Saint Lucia Const., Part II, sched. III, b | (" all persons have been endowed equally by God with inalienable rights...."); |
| Saudi Arabia Const., art. 26 | ("The state protects human rights in accordance with the Islamic Shari'ah."); |
| Spain Const., art. 10 | ("inviolable rights which are inherent...."); Syria const., art. 25 ("Freedom is a sacred right."); |
| Trinidad & Tobago Const., pmbl. | ("the equal and inalienable rights with which all members of the human family are endowed by their Creator...."); |
| Turkey Const., art. 12 | ("Everyone possesses inherent fundamental rights...."). |

---

[2] *SELF-DEFENSE.* The following list is from footnote 263 of *SELF-DEFENSE.*

### D. The United Nations Charter

Article 51 of United Nations Charter affirms "the inherent right" of self-defense.[3] Frey accurately states that Article 51 is directly concerned with the defense of states, and not of individuals.[4] We agree.

But what Frey elides is that the right of *national* self-defense is the child of the right of *personal* self-defense—as we detailed *supra*.[5] Notably, the U.N. Charter does not purport to *grant* states a right of self-defense. The charter simply recognizes an "inherent" right. In the French text of the U.N. charter, it is a "droit naturel" (natural right or natural law). As Yoram Dinstein observes, "The choice of words has overtones of *jus naturale*, which appears to be the fount of the right to self-defense."[6] ("Jus naturale" is Latin for "natural law"; as discussed above, *jus naturale* included a strong right of personal defense.[7])

Given the U.N. Charter's choice of language which explicitly invoked natural right, it was not surprising that the International Court of Justice wrote: "The Court therefore finds that Article 51 of the Charter is only meaningful on the basis that there is a 'natural' or 'inherent' right of self-defense...."[8]

Elucidating Article 51, Dinstein writes: "The legal notion of self-defence has its roots in inter-personal relations, and is sanctified in domestic legal systems since time immemorial. From the dawn of inter-State relations, writers sought to apply this concept to inter-State relations, particularly in connection with the just war doctrine."[9]

If one explicitly recognizes the existence of the child, then one can scarcely deny the implication that a parent exists. "I admit that there was a person named Martin Luther King, Jr., but I deny the existence of Martin Luther King, Sr." The previous sentence is illogical—and so is Frey's claim that the explicit recognition of the natural, inherent right of national self-defense in Article 51 can be reconciled with the denial of the natural, inherent right of personal self-defense.

---

[3] *See also* General Treaty for the Renunciation of War ("Kellogg-Briand Pact") 94 L.N.R.S. 57 (1928); 22 AM. J. INT'L L. 109-13 (formal notes exchanged between the signatories, reserving the right to selfdefense).

[4] Frey Report at 13, para. 39 (" Article 51 was not intended to apply to situations of self-defence for individual persons.")

[5] *See supra* text accompanying notes - .

[6] DINSTEIN, at 179. Dinstein goes on to reject the overtone, because he rejects the whole concept of natural law, for reasons detailed *supra* at text accompanying notes .

[7] *See supra* text accompanying notes – (natural law and the classical founding scholars of international law), and – (Roman law *jus naturale*).

[8] Military and Paramilitary Activities (Nicaragua v. United States), 1986 I.C.J. Rep. 14, 94, para. 176.

[9] DINSTEIN, at 176; *see also* M. A Weightman, *Self-Defense in International Law* , 37 VIR. L. R EV. 1095, 1099-1102 (1951).

### E. Contemporary Constitutions and Statutes

#### 1. Personal Self-defense

The International Court of Justice is instructed to use as a source of law "the general principles" from the laws of "civilized nations."[10] Without arguing about what nations currently count as "uncivilized", we note that personal self-defense is part of the law of every legal system in the world today.[11] In addition, many nations have constitutionalized self-defense, in a variety of forms.

Before surveying the constitutions, we must acknowledge that around the world, many constitutional rights are honored only in the breach. For example, the constitution of Zimbabwe guarantees the right of free assembly[12] but all forms of dissent are ruthlessly suppressed. Recently, opposition leader Morgan Tsvangirai was badly beaten by the government.[13] In Kenya, the constitution is clear: "No person shall be deprived of his life save in execution of the sentence of a court...."[14] However, shoot-to-kill orders were recently issued to police who executed the orders with a series of extrajudicial killings. [15] Even so, the expression of a standard in a national constitution is a signal of the importance of that standard in the national and international community, such that even governments which do not obey the standard feel compelled to assert that they do.[16]

---

[10] *Supra.*

[11] *See* Schlomit Wallerstein, *Justifying the Right to Self-Defense: A Theory of Forced Consequences* , 91 VA. L. REV. 999, 999 (2005) ("the right to self-defense is recognized in all jurisdictions").

[12] ZIMBABWE const. Ch. III, art. 21 (1) ("no person shall be hindered in his freedom of assembly and association... and in particular to form or belong to political parties...").

[13] *See Tsvangirai Held in Intensive Care* , BBC News, Mar. 14, 2007. Concerning breach of Zimbabwe's guarantees ("Zimbabwean opposition leader Morgan Tsvangirai is being treated in an intensive care unit as doctors examine wounds he received in police custody.... He and dozens of other activists were arrested at a rally on Sunday.")

[14] KENYA CONST., ch. 5, art. 71(1).

[15] *See* Cyrus Ombati, *Govt Burns 8,000 Guns As Minister Orders Police to Kill Thugs* , THE EAST AFRICAN STANDARD (Nairobi), Mar. 16, 2007. (Internal Security minister John Michuki stated: "An illegal weapon in the hands of a criminal has no other purpose except to kill an innocent person. It is, therefore, justifiable for the law enforcers to take equal measure against such a person.").

[16] "Hypocrisy is the tribute that vice pays to virtue." François, Duke of La Rochefoucauld. "If a State acts in a way prima facie incompatible with a recognized rule, but defends its conduct by appealing to exceptions or justifications contained within the rule itself, then whether or not the State's conduct is in fact justifiable on that basis, the significance of that attitude is to confirm rather than weaken the rule." Nicaragua v. United States, at 98.

6

From Antigua to Nigeria to Zimbabwe, there are thirteen nations which use nearly-identical language to constitutionalize self-defense:

◆ Antigua & Barbuda, CONST. art. 4:

    1. No person shall be deprived of his life intentionally save in execution of the sentence of a court in respect of a crime of treason or murder of which he has been convicted.

    2. A person shall not be regarded as having been deprived of his life in contravention of this section if he dies as the result of the use, to such extent and such circumstances as are permitted by law, of such force as is reasonably justifiable

        a. for the defence of any person from violence or for the defence of property;

        b. in order to effect a lawful arrest or to prevent the escape of a person lawfully detained;

        c. for the purpose of suppressing a riot, insurrection or mutiny; or

        d. in order lawfully to prevent the commission by that person of a criminal offence, or if he dies as the result of a lawful act of war.

◆ the Bahamas, CONST., art. 16.

◆ Barbados, CONST., art. 12.

◆ Belize, CONST., art. 4.

◆ Grenada, CONST, art 2.

◆ Guyana, CONST., art. 138.

◆ Jamaica, CONST., art. 14.

◆ Malta, CONST., § 33.

◆ Nigeria, CONST., art. 33.

◆ St. Kitts & Nevis, CONST., art. 4.

◆ Saint Lucia, CONST., art. 2.

◆ Saint Vincent and the Grenadines, CONST., art. 2.

◆ Zimbabwe. CONST., art. 12:

    (1) No person shall be deprived of his life intentionally save in execution of the sentence of a court in respect of a criminal offence of which he has been convicted.

    (2) A person shall not be regarded as having been deprived of his life in contravention of subsection (1) if he dies as the result of the use, to such extent and in such circumstances as are permitted by law, of such force as is reasonably justifiable in the circumstances of the case

        (a) for the defence of any person from violence or for the defence of property;

        (b) in order to effect a lawful arrest or to prevent the escape of a person lawfully detained;

        (c) for the purpose of suppressing a riot, insurrection or mutiny or of dispersing an unlawful gathering; or

> (d) in order to prevent the commission by that person of a criminal offence; or if he dies as the result of a lawful act of war.
>
> (3) It shall be sufficient justification for the purposes of subsection (2) in any case to which that subsection applies if it is shown that the force used did not exceed that which might lawfully have been used in the circumstances of that case under the law in force immediately before the appointed day.

♦ Slovakia uses a variation of the formula, CONST., art. 15:

> (1) Everyone has the right to life. Human life is worthy of protection even prior to birth.
>
> (2) No one must be deprived of life.
>
> (3) Capital punishment is not permitted.
>
> (4) If someone was deprived of life as a result of an action that does not represent a criminal act, this does not constitute a violation of rights according to this Article.

## 2. Self-defense against tyranny

As Grotius, Pufendorf, and many other legal and moral philosophers have elaborated, self-defense against tyranny is just a larger application of self-defense against a lone criminal. Many nations have constitutionalized the right of self-defense against tyrants. In five countries, the constitutionalization is framed as a constitutional intention to assist the liberation of other nations from tyranny:

Algeria Const., art. 27:  "Algeria associates itself with all the peoples fighting for their political and economic liberation, for the right of self determination and against any racial discrimination." Art: 33: "Individual or associative defense of the fundamental human rights and individual and collective liberties is guaranteed."

Angola Const., art. 16:  "The Republic of Angola shall support and be in solidarity with the struggles of peoples for national liberation and shall establish relations of friendship and cooperation with all democratic forces in the world."

Cuba Const., art. 12 :  The Republic of Cuba espouses the principles of anti-imperialism and internationalism, and

(h) considers wars of aggression and of conquest international crimes; recognizes the legitimacy of the struggle for national liberation, as well as of armed resistance to aggression; and considers that its solidarity with those under attack and with the peoples that struggle for their liberation and self-determination constitutes its internationalist duty;

Portugal Const., art. 7(3):  "Portugal recognizes the right of peoples to revolt against all forms of oppression, in particular colonialism and imperialism."

Suriname Const., art 7.  1. The Republic of Suriname recognizes and respects the right of nations to self determination and national independence on the basis of equality, sovereignty and mutual benefit....

4. The Republic of Suriname promotes the solidarity and collaboration with other peoples in the combat against colonialism, neo-colonialism, racism, genocide and in the combat for national liberation, peace and social progress.

8

**Right and Duty of Citizens to Resist or Revolt**
**Against Domestic or Foreign Tyranny**

In thirteen nations, the constitution affirms a right and duty of citizens to resist or revolt against domestic or foreign tyranny:

Andorra Const., article 5:   "The Universal Declaration of Human Rights is binding in Andorra."[17]

Argentina Const., § 36: [18]   (1) This Constitution shall rule even when its observance is interrupted by acts of force against the institutional order and the democratic system. These acts shall be irreparably null.

(2) Their authors shall be punished with the penalty foreseen in Section 29, disqualified in perpetuity from holding public offices and excluded from the benefits of pardon and commutation of sentences.

(3) Those who, as a consequence of these acts, were to assume the powers foreseen for the authorities of this Constitution or for those of the provinces, shall be punished with the same penalties and shall be civil and criminally liable for their acts. The respective actions shall not be subject to prescription.

(4) All citizens shall have the right to oppose resistance to those committing the acts of force stated in this section.

(5) He who, procuring personal enrichment, incurs in serious fraudulent offense against the Nation shall also attempt against the democratic system, and shall be disqualified to hold public office for the term specified by law.

(6) Congress shall enact a law on public ethics which shall rule the exercise of public office.

Congo Const., article 17:   "Any citizen may oppose the execution of an order received when it touches the rights and liberties contained in the present Constitution."

Greece Const., art. 120(4)   "Observance of the Constitution shall be committed to the patriotism of the Greeks who shall have the right and the obligation to resist by any means anybody who tries to subvert it violently."

Guatemala Const., art. 45:   Action against violators and legitimacy of resistance. The action to judge the violators of the human rights is public and can be exerted by means of simple denunciation, without caution nor some formality. The resistance of the town for the protection and defense of the rights and guarantees briefed in the Constitution is legitimate.[19]

Honduras Const., art. 3:   Nobody must be obedient to an usurping government nor to those who assume functions or uses public by the force of the average arms or using procedures that break or do not know what this Constitution and the laws establish. The acts verified by such authorities are null. the town must right to resort to the insurrection in defense of the constitutional order.[20]

---

[17] Original in Spanish. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

The Universal Declaration affirms the right of violent resistance to tyranny, so the incorporation of the Universal Declaration into a national constitution thereby incorporates the rightfulness of resisting tyranny. (Kopel, et al)

[18] Section (2), (5), and (6) omitted in Kopel, et al, THE HUMAN RIGHT OF SELF DEFENSE. Section (2), (5), and (6), in their operation is the parallel function of the "Common Defence" clause in the Preamble to the United States Constitution and the Powers reserved to the People in the Tenth Amendment of the Bill of Rights to the United States Constitution.

[19] Original in Spanish. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

[20] *Id.*

| | |
|---|---|
| Hungary Const., art. 2(3): | "No activity of any person may be directed at the forcible acquisition or exercise of public power, nor at the exclusive possession of such power. Everyone has the right and obligation to resist such activities in such ways as permitted by law." |
| Lithuana Const. art. 3: | "(1) No one may limit or restrict the sovereignty of the People or make claims to the sovereign powers of the People. (2) The People and each citizen shall have the right to oppose anyone who encroaches on the independence, territorial integrity, or constitutional order of the State of Lithuania by force." |
| Mauritania Const., pmbl.: | *Trusting in the omnipotence of Allah, the Mauritanian people proclaims its will to guarantee the integrity of its territory, its independence, and its national unity and to take upon itself its free political economic and social development. Believing strongly in its spiritual values and in the spreading of its civilization* "it also solemnly proclaims its attachment to Islam and to the principles of democracy as they have been defined by the Universal Declaration of Human Rights of 10 Dec 1948 and by the African Charter of Human and Peoples Rights of 28 June 1981 as well as in the other international conventions which Mauritania has signed." *Judging that liberty, equality, and the dignity of Man may be assured only in a society which establishes the primacy of law, taking care to create the durable conditions for a harmonious social development respectful of the precepts of Islam, the sole source of law, but responsive as well to the exigencies of the modern world, the Mauritanian people proclaims in particular the inalienable guarantee of the following rights and principles:* |

> *- the right to equality;*
>
> *- the fundamental freedoms and rights of human beings;*
>
> *- the right of property;*
>
> *- political freedom and freedom of labor unions;*
>
> *- economic and social rights; and*
>
> *- the rights attached to the family, the basic unit of Islamic society.*

| | |
|---|---|
| | *Conscious of the necessity of strengthening its ties with brother peoples, the Mauritanian people, a Muslim, African, and Arab people, proclaims that it will work for the achievement of the unity of the Greater Maghreb of the Arab Nation and of Africa and for the consolidation of peace in the world.* (incorporating right of resistance articulated in the Universal Declaration and the African Charter. See supra text accompanying notes - , - .).[21] |
| Peru Const. art. 46: | "Nobody have to be obedient to an usurping government, nor to those who they assume public functions in violation of the Constitution and the laws. The civil populace has the right of insurgency in defense of the constitutional order. The acts are null of those who usurp public functions."[22] |
| Portugal Const., art. 21: | "Everyone has the right to resist any order that infringes his rights, freedoms, or safeguards and to repel by force any form of aggression when recourse to public authority is impossible…" See also id., at ___ (Portuguese constitution shall be construed "in accordance with the Universal Declaration of human rights."; as discussed at note ___, supra, the Universal Declaration recognizes the right of violent self-defense against tyranny.) |

---

[21] *Italics* parts omitted in original. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

[22] Spanish in original. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

| Romania const., art 20 | (1) Constitutional provisions concerning the citizens' rights and liberties shall be interpreted and enforced in conformity with the Universal Declaration of Human Rights, with the covenants and other treaties Romania is a party to. (2) Where inconsistencies exist between the covenants and treaties on fundamental human rights Romania is a party to and internal laws, the international regulations shall take precedence. (incorporating right of resistance articulated in the Universal Declaration of Human Rights. |
|---|---|
| Slovakia Const., art. 32: | "Citizens have the right to put up resistance to anyone who would eliminate the democratic order of human rights and basic liberties listed in this Constitution, if the activity of constitutional bodies and the effective use of legal means are rendered impossible." |

### 3. Security against home invasion

Finally, a very common item in constitutions which include a Bill of Rights is the right to security against home invasion. Sometimes—as in the United States' Fourth Amendment [U.S. CONST.,   amend. 4.]—the right is stated in terms that apply only to home invasions by the government. Very frequently, however, the right is stated in terms which are not limited to government actors.

| Afghanistan Const., art. 38.1-2: | "Other than the situations and methods indicated in the law, no one, including the state, is allowed to enter or inspect a private residence without prior permission of the resident or holding a court order." |
|---|---|
| Andorra Const., art. 14: | "Inviolability of the dwelling shall be guaranteed. No one shall enter a dwelling or any other premises against the will of the owner or without a warrant, except in case of flagrant delicto." |
| Angola Const., art. 44: | "The State shall guarantee the inviolability of the home and the secrecy of correspondence, with limitations especially provided for by law." |
| Antigua & Barbuda., ch. 2(3)(c): | "protection for his family life, his personal privacy, the privacy of his home and other property and from deprivation of property without fair compensation,…" |
| Armenia Const., art. 21: | "Everyone is entitled to privacy in his or her own dwelling. It is prohibited to enter a person's dwelling against his or her own will except under cases prescribed by law." |
| Azerbaijan Const., art. 33.1-2: | "Everyone has the right for sanctity of his/her home. Except cases specified by law or decision of law court nobody has the right to enter private home against the will of its inhabitants." |
| Bahamas Const., ch. 3.15(c): | "protection for the privacy of his home and other property and from deprivation of property without compensation…" |
| Belarus Const., art. 29: | "The right of the people to be secure in their houses and other legitimate effects shall be guaranteed. No person shall have the right, save in due course of law to enter the premises or other legal property of a citizen against one's will." |
| Belgium Const., art. 15 | "The domicile is inviolable; no visit to the individual's residence can take place except in the cases provided for by law and in the form prescribed by law." |
| Belize Const., art. II.9.1 | "Except with his own consent, a person shall not be subjected to the search of his person or his property or the entry by others on his premises." |

| | |
|---|---|
| Benin Const., art. 20: | "The domicile shall be inviolable. House visits or searches may be carried out only according to the forms and conditions provided by law."[23] |
| Bolivia Const., art. 21: | "All house is an asylum inviolable; at night it will not be possible to be entered her without consent of which it inhabits it and by day only the entrance to requisition written and motivated of competent authority will be crossed, except for the case of crime 'in fragantí.' "[24] |
| Brazil Const., art. 5: | XI - the home is the inviolable refuge of the individual, and no one may enter therein without the consent of the dweller, except in the events of *flagrante delicto* [25] or disaster, or to give help, or, during the day, by court order;[26] |
| Bulgaria Const., art. 33.1-2 | "The home is inviolable. No one shall enter or stay inside a home without its occupant's consent, except in the cases expressly stipulated by law. Entering a home or staying inside without the consent of its occupant or without the judicial authorities' permission shall be allowed only for the purposes of preventing an immediately impending crime or a crime in progress, for the capture of a criminal, or in extreme necessity." |
| Burkina Faso Const., art. 6: | "The residence, the domicile, private and family life, secrecy of correspondence of every person are inviolable. It can only be affected according to the forms and in the cases specified by the law."[27] |
| Burundi Const., art. [43]:[28] | "No one cannot be the subject of interference arbitrary in its private life, its family, her residence or its correspondence, nor of attacks to its honor and its reputation. It can be ordered searchings or house searches only under the forms and the conditions envisaged by the law."[29] |
| Cambodia Const., art. 40: | "The right to privacy of residence and to the secrecy of correspondence by mail, telegram, fax, telex and telephone shall be guaranteed." |
| China Const., art 39. | "The home of citizens of the People's Republic of China is inviolable. Unlawful search of, or intrusion into, a citizen's home is prohibited." |
| Cuba Const., art. 56: | "The home is inviolable. Nobody can enter the home of another against his will, except in those cases foreseen by law." |
| Domican Republic Const.: | art. 8.3 "The inviolability of the home. No home visit can be verified but in the cases anticipated by the law and with the formalities that it prescribes."[30] |

---

[23] Original in Spanish. English version found online at:
http://www.chr.up.ac.za/hr_docs/constitutions/docs/BeninC(englishsummary)(rev).doc

[24] Original in Spanish. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr Translation of "in fragantí" not readily available.

[25] *"being caught in the act"* Latin.

[26] Original in Spanish. English version found online at http://www.v-brazil.com/government/laws/titleII.html

[27] Original in Spanish. English version found online at
http://www.chr.up.ac.za/hr_docs/constitutions/docs/Burkina%20FasoC%20(englishsummary)(rev).doc

[28] Art. 23 in original. There correct article number corresponding to the text indicates "article 43" not "23."

[29] Original in French. English version online at http://www.idlo.int/texts/leg5567.pdf

[30] Original in Spanish. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

| | |
|---|---|
| Egypt Const., art. 44 | "Homes shall have their sanctity and they may not be entered or inspected except by a causal judicial warrant as prescribed by the law." |
| El Salvador Const., art. 20: | "The home is inviolable and it will only be able to be entered by consent of the person who inhabits it, by judicial mandate, flagrant crime or imminent danger of its perpetration, or by serious risk of the people."[31] |
| Eritrea Const., art. 18(2): | "No person shall be subjected to unlawful search, including his home or other property; there shall be no unlawful entry of his premises and no unlawful seizure of his personal possessions; nor shall the privacy of his correspondence, communication or other property be violated. |
| Estonia Const., art. 33: | "The home is inviolable. No one may forcibly enter or search anyone's dwelling, property or place of work, except in such cases and in accordance with procedures determined by law for the protection of public order or health, or the rights and liberties of others, or in order to prevent a criminal act, to capture a criminal offender or to establish facts in a criminal investigation." |
| Ethiopia Const., art. 26.1: | "Everyone has the right to privacy. This right shall include the right not to be subjected to searches of his home, person or property, or the seizure of any property under his personal possession." |
| Germany Const. (Grundgesetz), art. 13.1: | "The home is inviolable." |
| Grenada Const., ch. 1.7: | "Except with his own consent, no person shall be subjected to the search of his person or his property or the entry by others on his premises." |
| Guatemala Const., art. 23: | "Inviolability of the house. The house is inviolable. Nobody will be able to penetrate in other people's dwelling without permission of that inhabits it, safe by written order of competent judge in which never specifies the reason for the diligence and before the six nor after the eighteen hours, Such diligence will be always made in the presence of the interested one, or of its agent chief executive."[32] |
| Guyana Const., art. 40.1(c): | "protection for the privacy of his home and other property and from deprivation of property without compensation." |
| Honduras Const., art. 99: | "The home is inviolable. No entrance or registry will be able to be verified without consent of the person who inhabits it or resolution of competent authority. However, it can be levelled off, in case of urgency, to prevent the commission or impunity of crimes or to avoid serious damages to the person or the property."[33] |
| Hong Kong Const., art. 29: | "The homes and other premises of Hong Kong residents shall be inviolable. Arbitrary or unlawful search of, or intrusion into, a resident's home or other premises shall be prohibited." |
| Ireland Const., art. 40.5: | "The dwelling of every citizen is inviolable and shall not be forcibly entered save in accordance with law." |
| Iran Const., art. 22: | "The dignity, life, property, rights, residence, and occupation of the individual are inviolate, except in cases sanctioned by law." |
| Italy Const., art. 14: | "(1) Personal domicile is inviolable. (2) No one's domicile may be inspected, searched, or seized save in cases and in the manner laid down by law conforming to the guarantee of personal liberty." |

---

[31] *Ib.*

[32] *Ib.*

[33] Original in Spanish. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

| Jamaica Const., art. 19.1: | "Except with his own consent, no person shall be subject to the search of his person or his property or the entry by others on his premises." |
|---|---|
| Jordan Const., art. 10: | "Dwelling houses shall be inviolable and shall not be entered except in the circumstances and in the manner prescribed by law." |
| Kuwait Const., art. 38: | "Places of residence shall be inviolable. They may not be entered without the permission of their occupants except in the circumstances and manner specified by law." |
| Latvia Const., art. 96: | "Everyone has the right to inviolability of their private life, home and correspondence." |
| Lebanon Const., art. 14: | "The citizen's place of residence is inviolable. No one may enter it except in the circumstances and manners prescribed by law." |
| Liberia Const., art. 16: | "No person shall be subjected to interference with his privacy of person, family, home or correspondence except by order of a court of competent jurisdiction." |
| Libya Const., art. 12: | "The home is inviolable and shall not be entered or searched except under the circumstances and conditions defined by the law."; art. 24.1: "A person's dwelling place shall be inviolable." |
| Luxembourg Const., art. 15: | "The home is inviolable. No domiciliary visit may be made except in cases and according to the procedure laid down by the law." |
| Macedonia Const., art. 26.1: | "The inviolability of the home is guaranteed." |
| Madagascar Const., art. 13.1: | "Everyone shall be assured of protection of his person, his residence, and his correspondence." |
| Mongolia Const., art. 16.13: | "Privacy of citizens, their families, correspondence, and homes are protected by law." |
| Nepal Const., art. 22: | "Except as provided by law, the privacy of the person, house, property, document, correspondence or information of anyone is inviolable." |
| Nicaragua Const., art. 26:[34] | "All persons have the right to: |
| | 1. privacy and the privacy of their family; |
| | 2. the inviolability of their home, correspondence, and communications; |
| | 3. respect for their honor and reputation. |
| | A private home may be searched only with a warrant from a competent judge or expressly authorized official to prevent a crime from being committed or to avoid damage to persons or goods, in accordance with the procedures established by law. The law shall determine the cases and the procedures for an examination of private documents, fiscal records and related documents, when such is indispensable for the investigation of matters before the Courts or for fiscal reasons. Illegally seized letters, documents and other private papers shall be null and void in legal proceedings or elsewhere." |
| Nigeria Const., art. 37: | "The privacy of citizens, their homes, correspondence, telephone conversations and telegraphic communications is hereby guaranteed and protected." |

---

[34] English version found online at http://www.leftjustified.com/leftjust/lib/sc/ht/wtp/nicaragu.html

14

| | |
|---|---|
| Oman Const., art. 27: | "Dwellings are inviolable and it is not permitted to enter them without the permission of the owner or legal occupant, except in the circumstances specified by the Law and in the manner stipulated therein." |
| Panama Const., art. 26: | "The home or the residence is inviolable."[35] |
| Paraguay Const., art. 33 & 34:[36] | "About the Right to Privacy |
| | (1) Personal and family privacy, as well as the respect of private life, are inviolable. Individual behavior that does not affect public order as established by law or the rights of third parties is exempted from the authority of public officials. |
| | (2) The protection of the privacy, dignity, and private image of each individual is hereby guaranteed. |
| | Article 34 About the Inviolability of Private Premises |
| | Every private premises is inviolable. Private premises can only be searched or closed by a court order in accordance with the law. By way of exception, it can be searched or closed without a court order in case of *flagrante delicto*[37] or to prevent the imminent perpetration of a crime or to avoid personal harm or property damage. |
| Peru Const., art. 2.9:[38] | "Every individual has the right: |
| | 9. [to] the inviolability of his home. No one may enter the home or conduct any investigation or search without authorization from the inhabitant or a court warrant except in the case of *flagrante delicto* [39] or very grave danger of the same. Exceptions for reasons of health or serious risk are governed by law." |
| Portugal Const., art. 34: | "The individual's home and the privacy of his correspondence and other means of private communication are inviolable....No one may enter the home of any person at night without his consent." |
| Qatar Const., art. 37: | "The sanctity of human privacy shall be inviolable, and therefore interference into privacy of a person, family affairs, home of residence, correspondence, or any other act of interference that may demean or defame a person may not be allowed save as limited by the provisions of the law stipulated therein." |
| Romania Const., art. 27.1: | "The domicile and the residence are inviolable. No one may enter or remain in the domicile or residence of a person without consent." |
| Russian Federation Const., art. 25: | "The home is inviolable. No one has the right to enter the home against the will of persons residing in it except in cases stipulated by the federal law or under an order of a court of law." |
| Rwanda Const., art. 22: | "The private lives of individuals shall not be infringed upon in any way....Domiciles shall be inviolable." |

---

[35] Original in Spanish. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

[36] English version found online at http://servat.unibe.ch/icl/pa00000_.html

[37] *"caught in the act"*

[38] English version available online at http://www.idlo.int/texts/leg6577.pdf

[39] *"being caught in the act."*

| | |
|---|---|
| Saint Kitts & Nevis Const., art. 9.1: | "Except with his own consent, a person shall not be subject to the search of his person or his property or the entry by others on his premises." |
| Saint Lucia Const.: art. 7.1 | (same as St. Kitts). |

Saint Vincent & The Grenadines Const., art. 7.1 (same as St. Kitts).

| | |
|---|---|
| Slovakia Const., art. 21.1: | "A person's home is inviolable. It must not be entered without the resident's consent." |
| Saudi Arabia Const., art. 37: | "The home is sacrosanct and shall not be entered without the permission of the owner or be searched except in cases specified by statutes." |
| South Korea Const., art. 16: | "All citizens are free from intrusion into their place of residence." |
| Spain Const., art. 18.2: | "The home is inviolable." |
| Suriname Const., art. 17.1: | "Everyone has a right to respect of his privacy, his family life, his home and his honor and good name." |
| Switzerland Const., 13.1: | "Every person has the right to respect for his or her private and family life, home, and secrecy of mail and telecommunication." |
| Syria Const., art. 31: | "Homes are inviolable." |
| Thailand Const., § 35 | "A person is protected for his or her peaceful habitation in and for possession of his or her dwelling place. The entry into a dwelling place without consent of its possessor or the search thereof shall not be made except by virtue of the law." |
| Trinidad & Tobago Const., art. 4(c): | "the right of the individual to respect for his private and family life." |
| Tunisia Const., art. 9: | "The inviolability of the home and the secrecy of correspondence are guaranteed, save in exceptional cases established by the law." |
| Turkey Const., art. 21.1: | "The domicile of an individual shall not be violated." |
| Uruguay Const., art. 11: | "The home is an asylum inviolable. At night nobody will be able to enter him without consent of its head, and by day, only of express order of competent Judge, in writing and in the cases determined by the law."[40] |
| Venezuela Const., art. 47: | "The domestic home and all deprived enclosure of person are inviolable."[41] |
| Vietnam Const., 73.1-2 | "The citizen is entitled to the inviolability of his domicile. No one is allowed to enter the domicile of another person without his consent, except in cases authorised by the law." |
| Zambia Const., art. 17.1: | "Except with his own consent, no person shall be subjected to the search of his person or his property or the entry by others on his premises." |
| Zimbabwe Const., art. 17.1: | "Except with his own consent or by way of parental discipline, no person shall be subjected to the search of his person or his property or the entry by others on his premises." |

---

[40] Original in Spanish. Translated by Altavista Babel Fish Translation online. http://babelfish.altavista.com/tr

[41] *Id.*

16

## Conclusion of Kopel, Gallant, and Eisen in
### The Human Right of Self-Defense

> I have used in proof of this law, the testimony of philosophers, historians, poets, and lastly even of orators. Not that they are indiscriminately to be relied on as impartial authority, since they often bend to the prejudices of their sect, the nature of their argument, or the interest of their cause, but where many minds of different ages and countries concur in affirming the same general sentiment, this general concurrence must be referred to some general cause; which in the questions we have undertaken to examine, can be no other than a right induction from the principles of natural justice, or some common consent. The former indicates the law of nature, the latter the law of nations...

So wrote Grotius in his introduction.[42] The human right of self-defense is affirmed by the concurrence of many minds of different ages—Grotius knew this, and as this Article has elaborated, the concurrence has continued in the nearly four centuries since Grotius. We have cited fewer orators and poets than did Grotius,[43] and we have enjoyed the benefit of many sources which did not exist at the time of Grotius, including the written constitutions all over the world, the Universal Declaration of Human Rights, and the vast structure of international law that was built on the foundation of Grotius. We have only rarely touched on the many heated arguments between the great scholars, or the tremendous differences in practices between leading systems of law, or how the modern world's constitutions and treaties are based on strikingly diverse views of civilization and justice. We have not addressed all the differences among our many sources because, regarding self-defense, "many minds of different ages and countries concur in affirming the same general sentiment."

To examine the evidence is to discover what the Special Rapporteur so artfully concealed: the overwhelming consensus among the sources of international law, from ancient times to the present, among diverse legal systems, religions, and nations: *self-defense is a fundamental human right*.[44]

*In this Article, we do not claim that the evidence produced thus far proves the existence of a universal international human right to possess and carry firearms in all circumstances*.[45] We do suggest that the evidence of an international human right to self-defense is clear. The existence of a right of personal defense undoubtedly must imply *some* right to defensive training, and to the possession of *some* type of defensive arms.

However, we have only attempted to suggest some possible lines of exploration for subsequent scholarly analysis of the derivative rights to defensive arms and defensive

---

[42] 1 GROTIUS, Prolog. § 41, quoted in Henry Wheaton, *Elements of International Law: With a Sketch of the History of the Science* 29 n. 13 (2002)(1836). While this Article has usually quoted from the 2005 edition of Grotius, we chose to use the alternative translation quoted in Wheaton because its English flows more naturally than does the 2005 text's version of the same quote.

[43] Indeed, the only orator we cited was Cicero (who was also a lawyer), and we have not cited any poets. So we will conclude the footnotes with an especially apt poet: "the sword Was given for this, that none need live a slave." Lucan, Pharsalia, book 4, lines 644-45 (Edward Ridley trans., composed between 59-65 A.D.)(epic poem of the Roman civil war), http://omacl.org/Pharsalia/book4.html.

[44] Emphasis is mine.

[45] Emphasis is mine, to which I disagree. See My Conclusion that follows.

training. *It does seem apparent that it would be a violation of human rights law for a government to forbid self-defense, to forbid defensive training, or to forbid the possession of reasonably necessary defensive arms. No government has the legitimate authority to forbid a person from exercising [their] human right to defend [themselves] against a violent attack, or to forbid [people] from taking the steps and acquiring the tools necessary to exercise that right.*[46]

## My Conclusion

I disagree with the conclusion asserted by Kopel, Gallant, and Eisen above that they **_do not claim that the evidence produced thus far proves the existence of a universal international human right to possess and carry firearms in all circumstances_**. I present the argument that the mere fact that people are human beings possessing a cognitive mind over all other creatures of this Earth living in a politicized civilization through moral, social, and legal norms have instituted the ideal that we, as a species in the animal kingdom, shall live a quality of life above that of the kill and be killed lifestyle of the animal kingdom. However, because we, as a human species, are still in possession of our animalistic instincts there is the criminal segment of human society that prey upon the rest of us and often puts us all at risk of kill or be killed situations *in extremis*. This philosophical view is supported by ample evidence of global crime statistics. There is plenty of evidence not presented by Kopel, Gallant, and Eisen to prove the human right of self-defense by owning, possessing, and bearing arms is a universal international human right. And it is this right that I claim in this Petition, No. 1142-06.

Although I am just an ordinary citizen of the United States and my opinion as a political nobody may have no respect from the polity of United States law or international human rights law or even in maritime law for the political and human rights of seaman I nevertheless do have vested constitutional rights with the United States and human rights with the United Nations where both the United States and the United Nations have violated those rights in their respective gun control agendas.

The United States was founded on the principal of a Common Defence as stipulated in the Preamble to the United States Constitution where the People would have a role in league with the States and the United States in combination with the Second Amendment, the Ninth Amendment and the Tenth Amendment of the Bill of Rights that an armed people would be pivotal to the Common Defence. The view that our Second Amendment right to keep and bear arms as an individual right as being part of the Common Defence as devolved, over the course of America's history, into an American on the deathbed of national suicide of some many causes that there is no single cause to blame. This state of national decline is best exposed by Pat Buchanan's new book, *DAY OF RECKONING: HOW HUBRIS, IDEOLOGY AND GREED ARE TEARING AMERICA APART.*[47] Pat Buchanan provides a list of characterizations on the current state of political affairs of the United States that threatens to destroy the United States as we traditional know it:[48]

- ♦ "America is coming apart, decomposing, and...the likelihood of her survival as one nation...is improbable -- and impossible if America continues on her current course," declares Pat Buchanan. "For we are on a path to national suicide."

- ♦ "America is in an existential crisis from which the nation may not survive."

- ♦ The U.S. Army is breaking and is too small to meet America's global commitments.

---

[46] Emphasis mine. See My Conclusion that follows.

[47] Patrick Joseph Buchanan (born November 2, 1938) is an U.S. politician, author, syndicated columnist and broadcaster. He ran in the 2000 presidential election on the Reform Party ticket. He also sought the Republican presidential nomination in 1992 and 1996. (Wikipedia).

[48] http://www.drudgereport.com/flash9pb.htm

- The dollar has sunk to historic lows and is being abandoned by foreign governments.

- U.S. manufacturing is being hollowed out.

- The greatest invasion in history, from the Third World, is swamping the ethno-cultural core of the country, leading to Balkanization and the loss of the Southwest to Mexico.

- The culture is collapsing and the nation is being deconstructed along the lines of race and class.

- A fiscal crisis looms as the unfunded mandates of Social Security and Medicare remain unaddressed.

- All these crises are hitting America at once -- a perfect storm of crises.

- Pax Americana, the era of U.S. global dominance, is over. A struggle for global hegemony has begun among the United States, China, a resurgent Russia and radical Islam

- Bush's invasion of Iraq was a product of hubris and of ideology, a secular religion of "democratism," to which Bush was converted in the days following 9/11

- Torn asunder by a culture war, America has now begun to break down along class, ethnic and racial lines.

- The greatest threat to U.S. sovereignty and independence is the scheme of a global elite to erase America's borders and merge the USA, Mexico and Canada into a North American Union.

- Free trade is shipping jobs, factories and technology to China and plunging America into permanent dependency and unpayable debt. One of every six U.S. manufacturing jobs vanished under Bush

- "Sovereign Wealth Funds," controlled by foreign regimes and stuffed with trillions of dollars from U.S. trade deficits, are buying up strategic corporate assets vital to America's security

- As U.S. wages are stagnant, corporate CEOs are raking in rising pay and benefits 400 to 500 times that of their workers

- The Third World invasion through Mexico is a graver threat to our survival as one nation than anything happening in Afghanistan or Iraq

- European-Americans, 89% of the nation when JFK took the oath, are now 66% and sinking. Before 2050, America is a Third World nation

- By 2060, America will add 167 million people and 105 million immigrants will be here, triple the 37 million today.

- Hispanics will be over 100 million in 2050 and concentrated in a Southwest most Mexicans believe belongs to them

One ingredient in this Ragu sauce of national suicide is found in our United States Code disparaging our Second Amendment rights. In 1948 the United States criminalized the _unorganized militia_ of the Second Amendment as _civilian military activity_ under 18 U.S.C. § 2386(B)(2)(b) exempt the _organized militia_ from the law for REGISTRATION OF CERTAIN ORGANIZATIONS, and the parallel U.S. Code of Federal Regulations, 28 C.F.R. § 10.1, _et al_. The criminalization of the powers reserved to the People under the Tenth Amendment and the People's Ninth Amendment right to exercise their Second Amendment rights to participate in the Common Defence as the _unorganized militia_ under their human right of self-determination is a violation of the Genocide Convention.

All currently existing gun control laws and any proposed gun control legislation by any nation must be strictly assessed as potentially or imminently infringing or violating the human right to life and the human right of self-defense, of personal safety and security for one's self and for the security of a free State (whether a State of the United States or of the United States as a nation) as incrementally moving a

nation toward circumstances that may someday pose a grave risk of genocide in violation of the Genocide Convention.

If the Genocide Convention is to have any practical and immediate effect for an individual citizen of any nation the right to own, possess and bear arms, whether openly as a sidearm or concealed (unless concealed carry is to be determined a violation of human rights when open carry is to be the norm) then the people of all nations, including seamen defending against pirates on the high sease, *the right to possess and carry firearms in all circumstances must be a universal international human right.*

The Commission must accept my Petition No. 1142-06 because the questions I presented herein and in my Petition are so closely related to Jessica Gonzales' Petition No. 1490-05 that the two Petitions are dependent upon each other because the one supports the other. If Jessica Gonzales had exercised her human right of armed self-defense in a more assertive manner her three little girls would most likely be alive today.

## LAST MINUTE NEWS

## OFFICIAL PRESS RELEASE
### Arkansas Attorney General Dustin McDaniel
Tuesday, Nov 27, 2007

# McDaniel to Support Gun Ownership Rights for Citizens at High Court

http://ag.arkansas.gov/newsroom/index.php?do:newsDetail=1&news_id=133

LITTLE ROCK — Today, Attorney General Dustin McDaniel announced his intent to support the Second Amendment as a "right to bear arms" for individuals, not just militia members, by joining a brief to be filed with the U.S. Supreme Court. Last week, the high court agreed to hear District of Columbia v. Heller, a lawsuit challenging gun laws enacted by the District of Colombia. The case is expected to be heard next spring.

The fundamental issue in Heller is whether the 2nd amendment confers a right to bear arms on individuals, as opposed to only state militias.

"I believe the Second Amendment confers a Constitutional right to bear arms on individuals, not just on militia members," McDaniel said. "It is a right that belongs to law-abiding Americans and it cannot be taken away by state, federal, or local laws."

Next year's ruling is considered extremely important, as it could settle for generations to come whether or not law abiding Americans will have a right to own a firearm.

Texas will file a brief with the Supreme Court arguing in favor of an individual's Second Amendment rights. Attorney General McDaniel announced today that Arkansas will join Texas on their brief.

"I spoke with Texas Attorney General Greg Abbott yesterday morning and assured him that he could count on the full support of the Arkansas Attorney General's Office in briefing this case," McDaniel said. "I will also aid in recruiting other Attorneys General to sign on in opposition of DC's gun control laws."

20

Respectfully subitted,

Don Hamrick